UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Asheville Division

| | | |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Sandra M. Peters complains as follows on behalf of herself and all others similarly situated, against Defendants Aetna Inc., Aetna Life Insurance Company, and OptumHealth Care Solutions, Inc.:

## INTRODUCTION

1.     This class action challenges a fraudulent scheme devised by Defendant Aetna Inc. and its subsidiaries ("Aetna") that misappropriates millions of dollars every year from Aetna insureds and employers who sponsor Aetna-administered self-insured health insurance plans. Aetna secretly forces these innocent parties to pay administrative fees owed by Aetna to various subcontractors that Aetna has retained to assist it in processing and administering health care claims. For years, Aetna has colluded with these subcontractors (the "Subcontractors"), including Defendant OptumHealth Care Solutions, Inc., to perpetrate this fraud.

2.     Aetna conceals its cost-shifting scheme by sending false Explanation of Benefits forms to insureds that misrepresent the administrative fees Aetna owes to the Subcontractors as

ordinary medical expenses billed by a medical provider. These misrepresentations serve as the cover that allows Aetna to illegally (i) obtain payment of the Subcontractors' administrative fees directly from insureds when the insureds' deductibles have not been reached; (ii) use insureds' health spending accounts to pay for these fees; (iii) inflate insureds' co-insurance obligations using administrative fees; (iv) artificially reduce the amount of available coverage for medical services when such coverage is subject to an annual cap; and (v) obtain payment of the administrative fees directly from employers when an insured's deductible has been exhausted or is inapplicable.

3.     By this class action, Plaintiff seeks relief for this scheme pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 through 1968, and the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## PARTIES

### *Plaintiff*

4.     Plaintiff Sandra M. Peters is insured by Aetna pursuant to a health insurance plan. Because Ms. Peters's plan is offered through her husband's former employer, Mars, Inc., it is governed by ERISA. Her plan, the Mars, Inc. Health Care Plan, is self-insured by Mars, Inc., meaning that Mars, Inc. finances the plan's benefit payments. Ms. Peters resides in Mill Spring, NC. She brings this action on her own behalf and on behalf of all similarly situated individuals and plans.

### *Defendants*

5.     Defendant Aetna Inc. is a Pennsylvania corporation with its principal business address at 151 Farmington Avenue, Hartford, CT 06156. Aetna Inc. is a worldwide health care benefits company. Aetna Inc., along with its wholly owned and controlled subsidiaries, including Defendant Aetna Life Insurance Company, offers, insures, underwrites, and administers health

benefits plans, including Plaintiff's health benefits plan, as detailed herein. Aetna Inc. and its subsidiaries are referred to as "Aetna" in this Complaint.

6.      Defendant Aetna Life Insurance Company ("ALIC") is a Connecticut corporation with its principal business address at 151 Farmington Avenue, Hartford, CT 06156. ALIC is a wholly-owned subsidiary of Aetna Inc. It is the lead operating entity for Aetna's branded life and health insurance organization.

7.      Defendant OptumHealth Care Solutions, Inc. ("Optum") is a Minnesota corporation with its principal office address at 6300 Olson Memorial Highway, Golden Valley, MN 55427. Optum provides claims administration and network management services to Aetna in connection with Aetna's administration of employee welfare benefit plans.

8.      Due to the manner in which they function, including the discretion they exercise in making coverage determinations with respect to ERISA plans, Defendants are functional ERISA fiduciaries and, as such, must comply with fiduciary standards.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1331 (federal question), and 29 U.S.C. § 1132(e)(1) (ERISA).

10.     Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *Background*

11.     Globally, Aetna has approximately 46 million customer relationships and $58 billion in annual revenues. According to Aetna's 2014 annual report, 95% of those revenues come from its Health Care segment, and it serves approximately 23.5 million insureds.

3

12.     According to Aetna's 2014 annual report, the plans that it offers can be either self-insured plans, which Aetna refers to as "administrative services contract" products, or insured plans, with claims funded out of premiums paid to Aetna by the plan sponsor (usually an employer) and/or the plan sponsor's employees. For the insured plans, Aetna says that it "assume[s] all or a majority of the risk for medical and dental care costs." Those who wish to be covered by insured plans (i.e., insureds), and/or plan sponsors on their behalf, pay premiums to Aetna that entitle them to benefits provided by the plan. Aetna also says that, with respect to its self-insured plans, "the plan sponsor assumes all or a majority of the risk for medical and dental care costs." Insureds of self-funded plans are often required to pay premiums to the plan, which entitles them to benefits provided by the plan.

13.     In either situation, Aetna serves as the claims administrator with responsibility for processing and adjudicating claims submitted by insureds and providing insureds with access to a network of providers who have agreed to accept discounted fees from Aetna-administered health insurance plans in exchange for providing covered services. Many of the plans sold by Aetna are governed by ERISA.

14.     In exchange for serving as the claims administrator for self-insured plans, Aetna receives an administrative fee from the plan sponsor pursuant to an agreement frequently known as an "administrative services agreement."

15.     There is no administrative services agreement in the context of an insured plan because Aetna is both the payor and the administrator. Instead, its administrative costs are built into the premiums that are charged to plan sponsors and/or insureds.

16.     According to Aetna's 2014 annual report, its medical products include Health Savings Accounts ("HSAs") and "Aetna HealthFund®, consumer-directed health plans that

4

combine traditional [Point of Service] or [Preferred Provider Organization] and/or dental coverage, subject to a deductible, with an accumulating benefit account (which may be funded by the plan sponsor and/or the member in the case of HSAs)."

17.     A HSA is a tax-exempt trust or custodial account established with a qualified HSA trustee to pay or reimburse certain medical expenses. Only individuals enrolled in a high-deductible health plan qualify for an HSA under IRS rules. The funds contributed to an HSA account are not subject to federal income tax at the time of deposit, and distributions from the HSA are not taxed if they are used for qualified medical expenses, as defined in Section 213(d) of the Internal Revenue Service Tax Code.

18.     Aetna reported that it held $1.3 billion in HSA funds at the end of 2014 "on behalf of members associated with high deductible health plans." A high deductible health plan is a plan with a lower premium and a higher deductible than a traditional health plan.

19.     According to Aetna's website, Aetna also offers Aetna HealthFund® Health Reimbursement Arrangements ("HRAs"). An HRA is an employer-funded medical reimbursement arrangement, pursuant to which the employer sets aside a specific amount of pre-tax dollars for employees to pay for health care expenses on an annual basis. The employee does not include distributions from the HRA in income, and does not pay tax on those distributions, only if they are used for qualified medical expenses, as defined in Section 213(d) of the Internal Revenue Service Tax Code.

20.     ERISA requires plan administrators like Aetna to provide reports to insureds on the results of how their claim are processed, including how much the treating provider billed for the medical services at issue; what portion of that bill was deemed to be an "allowed amount" under the plan (meaning that it is the amount that is "covered" under the plan); what portion of

the allowed amount will be paid by the plan and what portion is owed by the patient (due to a deductible or co-insurance obligation); and how much was actually paid to the provider on behalf of the patient. The purpose of these Explanation of Benefits forms ("EOBs") is to report what portion of the medical expenses are paid by the plan and what portion remains the responsibility of the insured.

### *Aetna's Cost-Shifting Scheme*

21.     Historically, Aetna handled all of the claims administration work required of a claims administrator by itself. It processed claims, adjudicated them, and entered into contracts with providers who agreed to participate in Aetna's network.

22.     In the last several years, however, it has delegated these responsibilities to a collection of Subcontractors for purposes of certain types of claims. For example, Aetna now hires Subcontractors to handle the administration of all chiropractic or physical therapist services. In order for a chiropractor or physical therapist to be considered an "in-network provider" for purpose of the plans that Aetna administers, Aetna requires them to enter into in-network contracts with the Subcontractors rather than with Aetna directly. Aetna has entered into such contracts with Optum and other Subcontractors, including American Specialty Health Group, Inc. ("ASH Group").

23.     The Aetna-Subcontractor contracts require Aetna to pay the Subcontractor a specified fee for each claim that it processes. These contracts further require Aetna to reimburse the Subcontractor for the payments it makes to in-network providers pursuant to a pre-determined rate schedule.

24.     When an Aetna insured has received medical services from a provider who is in one of the Subcontractor's networks, Aetna and the Subcontractor instruct the provider to submit the resulting claim for insurance benefits to the Subcontractor. In these claims, the providers

identify by CPT Code (a five-digit number used to identify each individual health care service) the specific services they provided to their patients, along with their usual and customary charge for that service. The American Medical Association, which has created and obtained a registered trademark for "CPT" ("Current Procedural Terminology"), describes CPT codes as "the most widely accepted medical nomenclature used to report medical procedures and services under public and private health insurance programs."

25.     The Subcontractor processes the claim and, if it is determined to be covered under the applicable plan, pays the provider pursuant to the terms of the fee schedule under the in-network contract. The Subcontractor is then reimbursed by Aetna in full for this amount.

26.     The Subcontractor is also entitled to an administrative fee from Aetna to cover its cost of processing the claim and administering the network on behalf of Aetna. However, in order to avoid (i) Aetna having to pay that administrative fee, (ii) having to increase the rate that Aetna charges to self-insured plan sponsors for providing administrative services, and (iii) having to increase premiums, Defendants covertly pass it along either to the insured or the plan as a "medical expense." They conceal these charges by having Aetna issue a misleading EOB to every insured on whose behalf a claim is submitted to a Subcontractor.

27.     Working with the Subcontractors, Aetna falsifies the EOBs that it sends to insureds. It misrepresents that the Subcontractor is the "provider" and then utilizes false CPT codes to represent that the administrative fees are being charged by a provider for medical services, when in fact they are charges for the Subcontractor's administrative fees. By this method, it adds the amount that Aetna owes to the Subcontractor to the amount of the provider's actual charge, and then treats this artificially inflated total in the EOB as the "allowed" and/or

"covered" amount payable by either the patient or the plan. In other EOBs, it simply inflates the amount charged for medical services, without resorting to the subterfuge described above.

28.     Most plans include a deductible, whereby the insured must pay a certain amount of out-of-pocket medical expenses before the plan is obligated to make any payments. Thus, the EOB may report that a set amount is a covered amount which is otherwise payable under the plan, but this amount is applied toward the deductible so that it is owed by the patient. In the case of a patient with an HRA or HSA, Aetna takes the funds directly from the patient's account to pay the amount that the EOB reports as being owed to the provider. If the deductible has previously been satisfied by the insured, then the EOB reports that the plan will pay the covered amount for the provider. Either way, Aetna's scheme forces the insured or plan to pay for more than covered medical expenses.

29.     Defendants' fraud is further demonstrated by comparing the Aetna EOBs to the Remittance Advice forms ("RAs") that the Subcontractors send to providers. These RAs accurately report the provider's usual and customary charge, the allowed amount based on the in-network fee schedule, and the amount that the Subcontractor was going to pay the provider. Thus, while the RAs accurately report what the provider actually charged as well as the actual amount paid to the provider based on the fee schedule, the EOBs report an inflated number as both the billed and allowed amount. The RAs do not, however, include or disclose the Subcontractor's administrative fees, or that fact that insureds and/or self-funded plans are being required to pay these fees.

30.     As a result of this scheme, when an insured has not exhausted her deductible, the patient is unknowingly financially liable for both the medical expenses owed to the provider *and* the administrative fee Aetna owes to its Subcontractor. This is despite the fact that nothing in

Aetna's plan documents imposes an obligation on insureds to pay out-of-pocket any of the administrative costs that Aetna owes to its Subcontractors, as opposed to actual medical expenses incurred from bills issued by health care providers. If the insured has already satisfied the deductible, then the plan pays, so that it, too, is improperly paying the administrative fee owed by Aetna to its Subcontractors, not just the medical expense. Aetna is supposed to recoup administrative fees through its administrative services agreement (for self-insured plans) or premiums (for insured plans), not by misrepresenting them as part of an insured's medical expenses for services from providers.

31.     By their uniform and fraudulent misrepresentations, Aetna and the Subcontractors are able to shift the cost for the Subcontractors' administrative fees from Aetna to Aetna's insureds and self-insured plans without their knowledge. Aetna depletes the insureds' HRA and HSA funds and the assets of self-insured plans to pay for these administrative fees, rather than for using them to pay for medical services. To the extent that the insureds are subject to deductibles or co-insurance requirements, they are forced to pay these administrative fees out of pocket. And when the insureds' plans include limits on the availability of coverage (for example, a $500 limit on chiropractic services), the charging of these administrative fees exhausts those limits more quickly, depriving the insureds of valuable medical coverage.

32.     This cost-shifting scheme also may allow Aetna to report inaccurate Medical Loss Ratios ("MLR"). An MLR represents the percentage of premium income that an insurer pays out in medical expenses on behalf of plan members, as compared to the portion spent toward administrative costs. Under the Patient Protection and Affordable Care Act ("PPACA"), Aetna is required to meet certain MLR requirements in order to avoid paying back rebates of excessive premiums. Through the actions described herein, Aetna may have been able to misrepresent

administrative fees it pays to its Subcontractors as medical expenses, thereby minimizing the potential for paying rebates under the PPACA.

### The Aetna-Optum Agreement

33.     Optum is one of Aetna's intermediaries. It is not a provider of medical services. It serves a purely administrative role in claims processing and network management.

34.     Aetna and Optum have a contractual arrangement under which Optum administers health services for Aetna. Pursuant to the Aetna-Optum agreement, Optum recruits, contracts with, and credentials chiropractors, who agree to accept a discounted rate of reimbursement for the services that they provide to patients insured by Aetna. Optum also receives, processes, and pays or denies benefits claims for the chiropractic services provided by its assembled network of chiropractors to insureds of Aetna.

35.     Each provider within Optum's network is required to enter into a contract with Optum (the "Optum Provider Agreement"). Pursuant to the Optum Provider Agreement, the chiropractors in Optum's network agree to provide chiropractic services to individuals enrolled in health plans, managed care organizations, and other health care service programs that have contracted with Optum, and to accept reduced rates, set forth in an appendix to the Optum Provider Agreement, as payment in full for those services.

36.     Optum works with Aetna to charge its administrative fees to insureds and plans who are treated by these providers, and Optum and Aetna misrepresent to insureds and plans that Optum's administrative fees are in fact expenses for covered medical services by the providers.

### Allegations Regarding Sandra Peters

37.     Ms. Peters received a Summary Plan Description ("SPD") for the Mars, Inc. Health Care Plan in which she participates. The SPD defines the "Claim Administrator" as Aetna. It states: "The Claim Administrator has the discretionary authority to determine whether

10

services and supplies are Medically Necessary and appropriately provided and may apply guidelines in making its determination. The Plan does not cover expenses that are not Medically Necessary and appropriately provided." Rather than performing these services itself, Aetna hires the Subcontractors to perform them, thus delegating its responsibilities as Claim Administrator.

38.     The SPD does not suggest that Aetna and the Subcontractors it hires can charge the insureds or the plans for Subcontractors' administrative fees as expenses for medical services. To the contrary, it states that the plan covers "a wide range of Medically Necessary health care services," which "must be provided by licensed practitioners." Administrative services by Optum or other Subcontractors do not fall within this definition. Similarly, charges for in-network treatments are defined in connection with expenses incurred for services from "participating providers," not Subcontractor administrative fees.

39.     In the "How Benefits Are Paid" section of the SPD, the SPD defines "Network Provider[s]" as "health care provider[s] or pharmac[ies]," and "Physicians" as "duly licensed member[s] of a medical profession." None of this applies to Subcontractors. The "Annual Coinsurance Maximum" under the Plan is defined as "the amount of Coinsurance you pay each year before the Plan pays 100% of the Negotiated Charge" for in-network services, and "Negotiated Charge" is defined as the "maximum charge a Network Provider has agreed to make." Similarly, the annual deductible is defined as "the part of your Covered Expenses you pay each calendar year before the Plan starts to pay benefits," and "Covered Expenses" are defined as "[m]edical, dental, vision or hearing services and supplies." Thus, the deductible and co-insurance requirements of the Mars, Inc. Health Care Plan are tied to actual medical expenses from Network Providers, which are not administrative fees charged by Subcontractors.

40. On July 5, 2013, Ms. Peters received medical services at Carolina Chiropractic Plus. The services provided were a chiropractic manipulation (CPT code 98941) and therapeutic exercise (CPT Code 97710). Carolina Chiropractic Plus submitted a claim to Optum for the services and reported that its ordinary charge for these services was $95.00.

41. Carolina Chiropractic Plus's provider agreement with Optum called for it to be paid $53.00 for the services it had submitted.

42. The EOB that Ms. Peters received from Aetna on or about August 1, 2013 for these services stated that the provider of services was "Chiro-OptumHealth Care Sol." It included not only the $95.00 charge, but also an additional $70.89 for an "unlisted modality," using CPT Code 97039. Thus, the EOB incorrectly stated that the provider had billed $165.89 for its services.

43. The EOB then stated that the $95.00 in services was "not payable," that the plan would pay $56.71 of the $70.89 "unlisted modality" charge (80%), and Ms. Peters would be responsible for paying another $14.18 under her 20% co-insurance responsibility.

44. The EOB was false and misleading. Carolina Chiropractic Plus was the provider, not Optum. CPT Code 97039 is used to describe unlisted modalities (*i.e.*, therapeutic approaches). As an official release from the Center for Medicare and Medicaid Services, titled "[Medicare Learning Network] Matters," stated, providers using CPT code 97039 should include a "detailed service description," "specify the type of modality utilized," and, "if the modality requires the constant attendance of the therapist, the time spent by the therapist one-on-one with the beneficiary must also be noted." Subcontractor fees are not a modality utilized by a provider and therefore a Subcontractor cannot legitimately issue a charge using a CPT Code. Moreover, contrary to the EOB, the provider did not receive $70.89 in total, because its contract with

Optum called for it only to be paid $53.00. And the $14.18 that Ms. Peters paid as her 20% co-insurance requirement was inflated by Optum's administrative fee charge, which was hidden in the "unlisted modality" charge.

45.     On July 9, 2014, Ms. Peters received medical services at Carolina Chiropractic Plus. The service provided was a chiropractic manipulation (CPT code 98940). Carolina Chiropractic Plus submitted a claim to Optum for the services and reported that its ordinary charge for this service was $40.00.

46.     Carolina Chiropractic Plus's provider agreement with Optum called for it to be paid $34.00 for the service it had submitted.

47.     The EOB that Ms. Peters received from Aetna on or about July 24, 2014 for these services stated that the provider of services was "Chiro-OptumHealth Care Sol." It included not only the $40.00 charge, but also an additional $70.89 for an "unlisted modality," using CPT Code 97039. Thus, the EOB incorrectly stated that the provider had billed $111.89 for its services.

48.     The EOB then stated that the $40.00 in services was "not payable," that the plan would pay $56.71 (80%) of the $70.89 "unlisted modality" charge, and Ms. Peters would be responsible for paying another $14.18 under her 20% co-insurance responsibility.

49.     The EOB was false and misleading. It stated that Optum was the provider, not Carolina Chiropractic Plus, and used CPT Code 97039 to charge for subcontractor fees, not medical services by a provider. The plan paid $56.71 to Optum when the provider's agreed charge was only $34.00. And Optum only paid $19.82 to Carolina Chiropractic Plus, so that the chiropractor's patient balance of $14.18 would match the $14.18 patient balance on Aetna's

EOB, further concealing the fraud. And Ms. Peters's 20% co-insurance requirement, as reflected in that patient balance, was inflated by Optum's administrative fee charge.

50.     Aetna and Optum repeated this fraudulent activity in connection with other chiropractic visits in 2013 and 2014 for which Ms. Peters' providers submitted claims to Aetna and Optum. For visits after Ms. Peters had fully paid her co-insurance requirement, her plan paid the entirety of the fraudulently inflated charges. For example, Ms. Peters received services at Carolina Chiropractic Plus on September 12, 2013. The EOB she received from Aetna on or about October 3, 2013 for those services reports that the plan paid $70.89 to the "provider," "Chiro-OptumHealth Care Sol," for them. However, according to a patient statement from the actual provider, Carolina Chiropractic Plus, it only received its contracted rate of $53.00 from Ms. Peters's insurance.

51.     Aetna and Optum also engaged in this scheme in connection with Ms. Peters's physical therapy visits. For example, on September 3, 2014, Ms. Peters received medical services at PRO Physical Therapy. The services performed were an e-stimulation (CPT code 97014), manual therapy (CPT code 97140), and two units of therapeutic exercises (CPT code 97710). PRO Physical Therapy submitted a claim to Optum for these services, and stated that its ordinary rate for them was $165.00.

52.     The EOB that Ms. Peters received from Aetna on or about September 25, 2014 for these services stated that the provider of services was "Optum Health Care Solutions." It included not only the $165.00 charges, but also an additional $87.72 for an "unlisted therapeutic procedure," using CPT Code 97139. Thus, the EOB incorrectly stated that the provider had billed $252.72 for its services.

14

53.     The EOB then stated that the $165.00 in services was "not payable," but that the plan would pay $70.18 of the "unlisted therapeutic procedure" charge (80%) and Ms. Peters would be responsible for another $17.54 under her 20% co-insurance responsibility.

54.     This also was false and misleading. PRO Physical Therapy was the provider, not Optum. CPT Code 97139 is used to describe unspecified physical therapies, not a Subcontractor's administrative fees. For example, the "[Medicare Learning Network] Matters" release states that "For CPT code 97139, the information supplied to the carrier must specify the procedure furnished and also meet the other requirements for therapeutic procedures, *i.e.*, the process of effecting change, through the application of clinical skills or services that attempt to improve function." Subcontractors' administrative fees obviously do not meet any requirements for therapeutic procedures and therefore a Subcontractor cannot legitimately issue a charge using this CPT Code.

55.     Meanwhile, on or about September 29, 2014, PRO Physical Therapy received an RA from Optum stating that Optum would pay $52.46 for the services provided to Ms. Peters on September 3, 2014, and that Ms. Peters would be responsible for $17.54 as co-insurance. The RA did not disclose that Defendants had actually added $87.72 to the provider's ordinary charges for the services, including their administrative fee, or that Defendants were charging Ms. Peters and her plan a total of $87.72.

56.     Aetna and Optum repeated this fraudulent activity in connection with other physical therapy visits for which Ms. Peters' providers submitted claims to Aetna and Optum.

57.     Ms. Peters notified the North Carolina Attorney General's Office of Consumer Protection and the North Carolina Department of Insurance of her concerns about Defendants' practices. In response, Aetna stated that it uses an "unlisted" CPT code to "reimburse Optum a

case rate for [its] services," and that it had "instructed Optum to bill with specific codes … to allow for the flat rate reimbursement." Aetna also admitted that the 20% co-insurance it had charged Ms. Peters was "more than 20 percent of the actual charge for the services."

### *The Aetna-ASH Group Agreement*

58.     Aetna also has a similar contractual relationship with ASH Group, in which ASH Group recruits, contracts with, and credentials chiropractors, who agree to accept a discounted rate of reimbursement for the services that they provide to patients insured by Aetna. Like Optum, ASH Group also receives, processes, and pays or denies benefits claims for the chiropractic services provided by its assembled network of chiropractors to insureds of Aetna. Each provider in ASH Group's network is required to enter into an agreement with it and accept reduced rates.

59.     ASH Group, like Optum, works with Aetna to charge its administrative fees to insureds who are treated by these providers and their plans, and Aetna and ASH Group misrepresent to insureds and plans that they are in fact expenses for covered medical services by the providers.

60.     Aetna has entered into a contract with another Subcontractor, Columbine Health Plan ("Columbine), which states that providers in the Columbine network will pay an administrative fee of $13.00 per date of service "as compensation for processing Provider's claims for payment." When this contract becomes effective, Aetna and Columbine will use providers to improperly and deceptively collect Columbine's administrative fees, without telling insureds or plans that they are incurring charges for Subcontractor "processing" fees, and not covered medical expenses.

## CLASS ALLEGATIONS

61.     Plaintiff Sandra Peters brings Counts I and II under RICO on her own behalf and on behalf of a class of similarly-situated individuals (the "RICO Class"), defined as:

> All Aetna insureds and self-funded plans who, from four years prior to the date of the filing of this action to its final termination (the "RICO Class Period"), paid administrative fees to one or more of the Subcontractors.

62.     In addition, Ms. Peters brings Count III for breach of fiduciary duty under ERISA on behalf of the Mars, Inc. Health Care Plan and on behalf of a class of similarly-situated plans (the "ERISA Plan Class"), defined as:

> All self-funded plans who, from six years prior to the date of the filing of this action to its final termination (the "ERISA Class Period"), retained Aetna to serve as their claims administrator and paid administrative fees to one or more of the Subcontractors.

63.     In addition, Ms. Peters brings Count IV for breach of fiduciary duty under ERISA on her own behalf and on behalf of a class of similarly-situated individuals (the "ERISA Insured Class"), defined as:

> All Aetna insureds who, from six years prior to the date of the filing of this action to its final termination (the "ERISA Class Period"), paid administrative fees to one or more of the Subcontractors.

64.     The members of the Classes defined above are so numerous that joinder of all members is impracticable. While the precise number of members in the Classes is known only to Aetna, Aetna and its Subcontractors are fiduciaries and administrators to numerous employee welfare benefit plans, many of which are governed by ERISA, and Aetna reports that it services 23.5 million medical members.

65.     There exist issues of fact and law common to all members of the Classes (with the ERISA issues only applicable to the ERISA Classes), including:

a.  whether Aetna and the Subcontractors participated in the conduct of a RICO enterprise;

b.  whether Aetna and the Subcontractors conducted the RICO enterprise through a pattern of racketeering activity;

c.  whether the EOBs sent to the Class and other communications from Aetna and the Subcontractors misrepresented Subcontractors' administrative fees as covered medical expenses;

d.  whether Aetna and the Subcontractors conspired to violate RICO;

e.  what legal duties ERISA imposes on Aetna and the Subcontractors when they charge insureds and plans for the claims administration and network management services that the Subcontractors provide to Aetna;

f.  whether Aetna and the Subcontractors' misrepresentation of the Subcontractors' administrative fees as covered medical expenses violates Aetna and the Subcontractors' duties under ERISA.

66.    Plaintiff's claims are typical of the claims of the other members of the Classes she would represent, and they will fairly and adequately represent the interests of the Classes.

67.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of class action litigation.

68.    The prosecution of separate actions by class members against Aetna would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.

69.    By, *inter alia*, misrepresenting the Subcontractors' administrative fees as covered medical expenses in violation of their fiduciary duties, Aetna and the Subcontractors have acted

on grounds generally applicable to the Classes, rendering declaratory relief appropriate respecting the Classes.

70.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This action presents no difficulties in management that would preclude maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### RICO – Violation of U.S.C. § 1962(c)

72.     Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1 through 71, above.

#### *Existence of a RICO Enterprise*

73.     Aetna and the Subcontractors are "persons" as defined in 18 U.S.C. § 1961(3), because they are entities capable of holding a legal or beneficial interest in property.

74.     Aetna and its Subcontractors, including Optum, have operated together in a coordinated manner in furtherance of a common purpose to collect administrative fees from Aetna insureds and plans by improperly characterizing them as payment for covered medical expenses. Therefore, they constitute an associated-in-fact "enterprise" as defined in 18 U.S.C. §

19

1961(4). Further, this enterprise is engaged in, and its activities affect, interstate or foreign commerce.

75.     In the alternative, Aetna has conducted the affairs of multiple bilateral association-in-fact RICO enterprises through a pattern of racketeering activity. The enterprises are the bilateral associations in fact of Aetna and each of the Subcontractors.

### *Conduct or Participation in the Enterprise's Affairs*

76.     Defendants conducted and participated in the affairs of the enterprise through a pattern of racketeering activity, as specified below.

### *Pattern of Racketeering Activity*

77.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud, Defendants, in violation of 18 U.S.C. § 1341, caused or conspired to cause matter and things to be delivered by the Postal Service or by private or commercial interstate carrier, and/or receive matter and things from the Postal Service or by private or commercial interstate carrier. These acts are done by each and every one of the Defendants intentionally and knowingly with the specific intent to advance their scheme, or with knowledge that use of the mails will follow in the ordinary course of business, or that such use can be foreseen, even if not actually intended.

78.     For the purpose of executing and/or attempting to execute the above described scheme to defraud, Defendants, in violation of 18 U.S.C. § 1343, transmit, cause to be transmitted and/or receive by means of wire communication in interstate and foreign commerce various writings, signs, and signals. These acts are done by Defendants intentionally and knowingly with specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications will follow in the ordinary course of business, or that such use can be foreseen, even if not actually intended.

79.    The matter and things that Defendants have sent or conspired to have sent via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, but are not limited to:

    a.    Aetna EOBs that uniformly misrepresented the administrative fees for Aetna's Subcontractors as payment for covered medical expenses;

    b.    Remittance Advice forms provided by Optum, ASH Group, and other Subcontractors to providers that concealed the fact that Aetna and the Subcontractors were charging additional money to Aetna's insureds and plans for administrative fees; and

    c.    Payments by insureds and plans for the administrative fees charged by way of this fraudulent scheme.

80.    Aetna and its Subcontractors' actions are evidence of a preexisting scheme to defraud. Aetna issued false EOBs that caused its insureds and plans to pay the administrative fees, and its Subcontractors concealed this information in their Compensation Summaries sent to providers. Aetna collects the fees from insureds and plans, and transmits them to the Subcontractors, who have full knowledge that the payments represent their administrative fees and not covered medical expenses. This shows that Aetna and the intermediaries knowingly designed their conduct to hide the fees from insureds and plans.

81.    Through the course of conduct described above, Aetna and the Subcontractors have committed wire fraud and mail fraud thousands or tens of thousands of times over the past four years and thus engaged in a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Reference to the aforementioned EOBs, compensation summaries, and payments

establishes the dates of the predicate acts of mail and wire fraud, the participants in each such predicate act, and the relevant facts surrounding each such predicate acts.

82.     Therefore, Defendants have violated 18 U.S.C. § 1962(c) in that they are associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and have conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

83.     The acts of racketeering amount to and pose a threat of continued criminal activity, because the acts have been and are an ongoing part of Defendants' regular way of doing business for several years. Acts substantially similar to the predicate acts have been and will be repeated over and over again. The pattern of racketeering activity has been directed towards thousands of persons, including Plaintiff, and will be directed towards thousands of other insureds, providers, and plans each year.

84.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and the other class members have been injured in their business or property, because the fraudulent scheme has caused them to pay for administrative fees that were improperly characterized as covered medical expenses.

85.     Accordingly, Plaintiff, on behalf of herself and all others similarly situated, seeks actual damages, treble damages, and costs of suit, including a reasonable attorneys' fee.

**COUNT II**
**RICO – Violation of 18 U.S.C. § 1962(d)**

86.     Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1 through 85, above.

87.     Defendants agreed to participate in the affairs of the enterprise described above by pursuing the criminal objective of misrepresenting Subcontractors' administrative fees as

22

covered medical expenses in order to obtain payment for those fees from Aetna's insureds and plans.

88.     Defendants adopted the goal of furthering or facilitating the criminal endeavor of enterprise minimally by agreeing to facilitate some of the acts leading to the substantive offenses, and directly by, as described above, engaging in numerous overt and predicate fraudulent racketeering acts in furtherance of each conspiracy.

89.     Therefore, Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

90.     Plaintiff and the other RICO Class members have been injured in their business or property by reason of Defendants' violations of 18 U.S.C. § 1962(d). Accordingly, Plaintiff, on behalf of herself and all others similarly situated, seeks treble damages and the cost of suit, including a reasonable attorneys' fee.

## COUNT III
## ERISA – 29 U.S.C. § 1132(a)(2)

91.     Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1 through 90, above, with the exception of the allegations specifically relating to RICO.

92.     As a result of Defendants' fiduciary status, ERISA imposes strict fiduciary responsibilities, obligations, and duties on them. These duties include the duty to administer ERISA plans solely for the benefit of the participants and beneficiaries of those plans, 29 U.S.C. § 1104(a)(1)(A), and with the care, skill, prudence, and diligence that a prudent man would exercise in the circumstances, 29 U.S.C. § 1104(a)(1)(B).

93.     As part of their fiduciary obligations, Defendants must issue accurate EOBs and other reports that properly characterize the billed and allowed charges, who the provider is, and

the proper amount owed by the insured and/or plan as part of the benefit determination process. They must conform their conduct to a fiduciary duty of loyalty; scrupulously avoid all self-interest, duplicity and deceit; and must fully disclose to, and inform insureds of, all material information, and may not make misrepresentations to insureds.

94. A fiduciary for a plan, like Defendants, is also liable for a breach of fiduciary responsibility by another fiduciary with respect to the same plan if the fiduciary knowingly participates in, or undertakes to conceal, an act or omission of that other fiduciary, knowing that the act or omission is a breach; fails to comply with the administration of its specific responsibilities and enables the other fiduciary to commit a breach; and has knowledge of a breach by the other fiduciary, unless he makes reasonable efforts to remedy the breach. 29 U.S.C. § 1105.

95. By, among other things, issuing EOBs that improperly characterize administrative fees as expenses for medical services, failing to disclose to insureds and plans the charges for administrative fees, and knowingly participating in, enabling, and failing to correct fiduciary breaches by their fellow Defendants, Defendants are systemically and uniformly breaching their ERISA duties, including their fiduciary duties, to Plaintiff's plan and the ERISA Plan Class.

96. Defendants' EOBs have concealed material information regarding the nature and purpose of the fees charged to the insureds and plans, to whom the fees are to be paid, for what services the fees are paid, whether the fees are reasonable for the services provided, what services are being purchased and whether they are necessary, and whether such payments involve conflicts of interest or prohibited transactions.

97. ERISA also prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ...

transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D), and from "dealing with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1). Defendants were and are subject to these prohibitions, which they have violated and are violating by deceptively using plan assets to pay administrative fees owed by Aetna to the Subcontractors.

98.     Pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2), Plaintiff and the ERISA Plan Class seek to correct Defendants' practices of issuing false EOBs, causing funds to transfer plan assets to parties in interest, and self-dealing in the assets of plans, to make good any losses to the self-funded plans that has resulted from each such breach, and to restore to such plans any profits of Defendants which have been made through use of assets of the plans by Defendants, and to subject Defendants to such other equitable or remedial relief as the court may deem appropriate, including but not limited to removal of Defendants as administrators of the ERISA Plan Class's benefits.

## COUNT IV
## ERISA – 29 U.S.C. § 1132(a)(1), (a)(3), and/or 29 U.S.C. § 1104

99.     Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1 through 98, above, with the exception of the allegations specifically relating to RICO.

100.     Plaintiff and the ERISA Insured Class may pursue breach of fiduciary duty claims against Aetna under 29 U.S.C. § 1132(a)(1), (a)(3) and/or 29 U.S.C. § 1104.

101.     As detailed herein, Defendants have violated their fiduciary duties to Plaintiff and the ERISA Insured Class by issuing false EOBs and using plan assets to pay administrative fees owed by Aetna to the Subcontractors. Plaintiff and the ERISA Insured Class are entitled to appropriate equitable relief to address these violations under ERISA, including but not limited to

an injunction to preclude Aetna from engaging in the improper conduct alleged herein, restoration of monetary losses to the plan, a surcharge for the improper gains obtained in breach of that duty, and removal of Aetna as administrator of the Class's benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in her favor against Aetna and requests that this Court:

A.     Certify this case as a class action; designate Plaintiff as class representative; and designate ZUCKERMAN SPAEDER LLP and THE VAN WINKLE LAW FIRM as class counsel;

B.     Enter judgment against Defendants and in favor of Plaintiff and the Classes;

C.     Adjudge and decree the acts alleged herein to be unlawful;

D.     Award the RICO Class damages in an amount to be determined at trial;

E.     Award the RICO Class threefold damages pursuant to 18 U.S.C. § 1964;

F.     Issue equitable and injunctive relief to remedy Defendants' RICO violations and prevent further violations of that statute;

G.     Issue equitable and injunctive relief under ERISA to remedy Defendants' past and ongoing violations of ERISA and breaches of fiduciary duty, including but not limited to enjoin further misconduct, requiring Defendants to issue accurate EOBs, restoring of monetary losses to self-insured plans and insureds, including interest, imposing a surcharge for the improper gains obtained in breach of Defendants' duties, and removal of Defendants as administrators of the plans;

H.     Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees, as provided by 18 U.S.C. § 1964 and 29 U.S.C. § 1132(g); and

I.     Award such other and further relief as is just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: June 12, 2015

Respectfully submitted,

/s/ *Larry McDevitt*
Larry McDevitt
N.C. State Bar No. 5032
David M. Wilkerson
N.C. State Bar No. 35742
Heather Whitaker Goldstein
N.C. State Bar No. 26194
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Telephone: (828) 258-2991
Facsimile: (828)257-2767
E-mail: lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com
hgoldstein@vwlawfirm.com

COUNSEL FOR PLAINTIFFS SANDRA M.
PETERS, on behalf of herself and all others
similarly situated

OF COUNSEL:

D. Brian Hufford (subject to *pro hac vice*
admission)
Jason Cowart (subject to *pro hac vice*
admission)
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
(212) 897-3434
(212) 704-4256 (fax)
dbhufford@zuckerman.com

Carl S. Kravitz (subject to *pro hac vice* admission)
Jason M. Knott (subject to *pro hac vice* admission)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(202) 778-1800
(202) 822-8106 (fax)
jknott@zuckerman.com

*Counsel  for Plaintiff Sandra M. Peters, on behalf of herself and all others similarly situated*