# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
Case No. 1:15-cv-00109-MR

|  |  |
|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND .............................................................4

    A.    Aetna, a Claims Administrator for Millions of Insureds, Outsources Its Administrative Duties to Subcontractors, Including Optum. ................................................................4

    B.    Aetna and the Subcontractors Secretly Shift the Subcontractors' Administrative Fees to Insureds. .............................6

    C.    Ms. Peters Receives Chiropractic Care and Physical Therapy, and Is Charged for Defendants' Administrative Fees. ..................8

ARGUMENT ................................................................................12

I.    MS. PETERS ALLEGES CONSTITUTIONAL STANDING. ...............12

    A.    Ms. Peters Alleges a Sufficient Injury in Fact. ....................13

    B.    Ms. Peters May Pursue Injunctive and Other Equitable Relief Under ERISA. ......................................................15

    C.    Aetna's Standing Argument As to Subcontractors Other than Optum Is Misdirected. ..............................................16

II.    MS. PETERS STATES VALID RICO CLAIMS. .................................16

    A.    Ms. Peters Alleges a Cause of Action Under 18 U.S.C. § 1962(c) Against Aetna and Optum. ......................................16

        1.    Ms. Peters Alleges a RICO Enterprise. ..........................17

        2.    Ms. Peters Alleges that Defendants Conducted or Participated in the Conduct of the Enterprise. ...................20

        3.    Ms. Peters Alleges a Pattern of Racketeering Activity. ................22

4. Ms. Peters Alleges that She Was Injured by Defendants' Racketeering Activity....................................................27

B. Ms. Peters Alleges a RICO Conspiracy Under 18 U.S.C. § 1962(d). .........................................................................28

III. MS. PETERS STATES VALID ERISA CLAIMS. ................................29

A. Ms. Peters Alleges Numerous Breaches of Fiduciary Duties. ............29

B. Plaintiff Is Not Required to Exhaust Administrative Appeals Before Bringing Her ERISA claims.....................................................32

C. Ms. Peters Alleges that Optum Is an ERISA Fiduciary. .....................38

CONCLUSION ....................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Adams v. Bain*,
　　697 F.2d 1213 (4th Cir. 1982) ....................................................12

*Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*,
　　No. 14-1832 WL 5313631 (3d Cir. Sept. 11, 2015)....................................36

*Anza v. Ideal Steel Supply Corp.*,
　　547 U.S. 451 (2006)......................................................................27

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009)......................................................................11

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007)......................................................................11

*Bible v. United Student Aid Funds, Inc.*,
　　799 F.3d 633 (7th Cir. 2015) ..........................................................21

*Bollig v. Christian Cmty. Homes & Servs., Inc.*,
　　No. 02-C-532-C, 2003 WL 23200362 (W.D. Wis. July 10, 2003) ...............14

*Boyle v. United States*,
　　556 U.S. 938 (2009)......................................................... 17, 18, 19

*Bridge v. Phoenix Bond & Indem. Co.*,
　　553 U.S. 639 (2008)......................................................................27

*Cent. States Se. & Sw. Areas Health & Welfare Fund
v. Merck-Medco Managed Care, L.L.C.*,
　　433 F.3d 181 (2d Cir. 2005) ..........................................................13

*Chambers v. King Buick GMC, LLC*,
　　43 F. Supp. 3d 575 (D. Md. 2014).................................................23

*Coleman v. Commonwealth Land Title Ins. Co.*,
　　No. 09-679, 2013 WL 4675713 (E.D. Pa. Aug. 30, 2013).............. 16, 19, 20

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ........................................................................12

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) ........................................................................15

*De'lonta v. Johnson*,
    708 F.3d 520 (4th Cir. 2013) ........................................................................11

*Deppe v. Tripp*,
    863 F.2d 1356 (7th Cir. 1988) ......................................................................28

*England v. Marriott Int'l, Inc.*,
    764 F. Supp. 2d 761 (D. Md. 2011) ..............................................................36

*ePlus Tech., Inc. v. Aboud*,
    313 F.3d 166 (4th Cir. 2002) .............................................................. 22, 26

*FDIC v. Kerr*,
    637 F. Supp. 828 (W.D.N.C. 1986) ..............................................................24

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000) ........................................................................13

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    No. 05 Civ. 7869(SAS), 2009 WL 3334867 (S.D.N.Y. Oct. 14, 2009)........19

*Fuller v. Liberty Life Assurance of Boston*,
    302 F. Supp. 2d 525 (W.D.N.C. 2004)..........................................................34

*Goodman v. Praxair, Inc.*,
    494 F.3d 458 (4th Cir. 2007) ........................................................................36

*Goren v. New Vision International*,
    156 F.3d 721 (7th Cir. 1998) ........................................................................21

*Griggs v. E.I. DuPont de Nemours & Co.*,
    237 F.3d 371 (4th Cir. 2001) .............................................................. 30, 31

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)............................................................................ 26, 27

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
530 U.S. 238 (2000)......................................................................................40

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ......................................................................23

*HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*,
101 F.3d 1005 (4th Cir. 1996) ....................................................................40

*Hemi Group, LLC v. City of New York*,
559 U.S. 1 (2010).........................................................................................28

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
751 F.3d 740 (6th Cir. 2014) ......................................................................32

*Houck v. Substitute Tr. Servs., Inc.*,
791 F.3d 473 (4th Cir. 2015) ......................................................................11

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
601 F. Supp. 2d 1201 (S.D. Cal. 2009) ......................................................19

*In re Schering–Plough Corp. ERISA Litig.*,
No. 03–1204(KSH), 2007 WL 2374989 (D.N.J. Aug. 15, 2007) ...............39

*Joseph F. Cunningham Pension Plan v. Mathieu*,
No. 97-2230, 1998 WL 403324 (4th Cir. Jul. 6, 1998)...............................40

*Kenseth v. Dean Health Plan, Inc.*,
722 F.3d 869 (7th Cir. 2013) ......................................................................31

*Korotynska v. Metropolitan Life Insurance Co.*,
474 F.3d 101 (4th Cir. 2006) ......................................................................36

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134 (1985).....................................................................................35

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) ......................................................................16

*McCravy v. Metro. Life Ins. Co.*,
690 F.3d 176 (4th Cir. 2012) ......................................................................35

vi

*Menasco, Inc. v. Wasserman*,
    886 F.2d 681 (4th Cir. 1989) ........................................................................27

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
    781 F.3d 182 (5th Cir. 2015) ........................................................................14

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015) ........................................................................36

*Owen v. Regence Bluecross Blueshield of Utah*,
    388 F. Supp. 2d 1318 (D. Utah 2005) ........................................................14

*Pender v. Bank of Am. Corp.*,
    788 F.3d 354 (4th Cir. 2015) ................................................................ 12, 15

*Phelps v. C.T. Enters., Inc.*,
    394 F.3d 213 (4th Cir. 2005) ........................................................................39

*Pisgah Labs., Inc. v. Mikart, Inc.*,
    No. 1:14-cv-00139-MR-DLH,
    2015 WL 996609 (W.D.N.C. Mar. 5, 2015) ................................................22

*Prof'l Orthopedic Assocs., PA v. Horizon Blue Cross Blue Shield of N.J.*,
    No. 14-4731 (SRC), 2015 WL 5455820 (D.N.J. Sept. 16, 2015) ................14

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)................................................................................ 20, 21

*Roman v. Guapos III, Inc.*,
    970 F. Supp. 2d 407 (D. Md. 2013) .............................................................16

*Salinas v. United States*,
    522 U.S. 52 (1997).........................................................................................17

*Schmuck v. United States*,
    489 U.S. 705 (1989).......................................................................................24

*Smith v. Sydnor*,
    184 F.3d 356 (4th Cir. 1999) .................................................... 33, 34, 35, 37

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ......................................................................14

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)......................................................................................12

*Stark v. Mars, Inc.*,
    790 F. Supp. 2d 658 (S.D. Ohio 2011).........................................................34

*Sun Savs. & Loan Ass'n v. Dierdorff*,
    825 F.2d 187 (9th Cir. 1987).........................................................................24

*SunTrust Bank v. Aetna Life Ins. Co.*,
    251 F. Supp. 2d 1282 (E.D. Va. 2003)................................................. 37, 38

*Tatum v. RJR Pension Inv. Comm.*,
    761 F.3d 346, 357 (4th Cir. 2014)................................................................39

*Trotter v. Kennedy Krieger Inst., Inc.*,
    No. 11-3422-JKB, 2012 WL 3638778 (D. Md. Aug. 22, 2012)............ 36, 38

*United Food & Commercial Workers Unions & Employers
Midwest Health Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013).........................................................................21

*United States v. Godwin*,
    765 F.3d 1306 (11th Cir.), cert. denied, 135 S. Ct. 491 (2014)....................22

*United States v. Mouzone*,
    687 F.3d 207 (4th Cir. 2012).........................................................................28

*United States v. Najjar*,
    300 F.3d 466 (4th Cir. 2002).........................................................................18

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009).....................................................................18

*United States v. Shifman*,
    124 F.3d 31 (1st Cir. 1997)............................................................................21

*University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*,
    996 F.2d 1534 (3d Cir. 1993) ........................................................................21

*Walters v. McMahen*,
    684 F.3d 435 (4th Cir. 2012).........................................................................28

*Wilson v. Kimberly-Clark Corp.*,
  254 Fed. App'x 280 (5th Cir. 2007) ...............................................37

*Wright v. North Carolina*,
  787 F.3d 256 (4th Cir. 2015) .......................................................11

**STATUTES**

18 U.S.C. § 1961(1) ...............................................................22

18 U.S.C. § 1961(4) ........................................................... 17, 18

18 U.S.C. § 1962(c) ........................................................... *passim*

18 U.S.C. § 1962(d) ...........................................................2, 28

18 U.S.C. § 1964(c) ...............................................................27

29 U.S.C. § 1002(21)(A)(i) & (iii)................................................38

29 U.S.C. § 1104(a)(1)(A) .......................................................29

29 U.S.C. § 1104(a)(1)(B) .......................................................30

29 U.S.C. § 1105 ...............................................................30

29 U.S.C. § 1106 ...............................................................30

29 U.S.C. § 1106(a)(1)(D) .......................................................31

29 U.S.C. § 1106(b)(1).......................................................... 31, 32

29 U.S.C. § 1109 ...............................................................35

29 U.S.C. § 1132(a)(1)(B) ................................................... 33, 35, 36

29 U.S.C. § 1132(a)(2).............................................................35

29 U.S.C. § 1132(a)(3)...................................................... 15, 35, 36, 40

29 U.S.C. § 1002(14) .............................................................31

**REGULATIONS**

29 C.F.R. § 2560.503-1(g) .......................................................37

29 C.F.R. § 2560.503-1(h) .......................................................................37

**RULES**

Fed. R. Civ. P. 9(b) ...............................................................................22

Fed. R. Civ. P. 12(b)(1).........................................................................12

Fed. R. Civ. P. 12(b)(6)................................................................... 11, 12

**OTHER AUTHORITIES**

Lee T. Polk, Statutory Provisions — Civil Remedies,
    1 ERISA Prac. & Litig. § 5:4 (West 2012)....................................35

# INTRODUCTION

Plaintiff Sandra Peters is a beneficiary in a health insurance plan issued by her husband's former employer, Mars, Inc. ("Mars"), and administered by Defendants Aetna, Inc. and Aetna Life Insurance Company (collectively, "Aetna"). The Aetna plan, which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), covers Ms. Peters for medically necessary services she receives from health care providers. In particular, the plan is required to pay Ms. Peters 80% of her medically necessary health care expenses, while she is responsible for 20%, until a specified deductible is satisfied. The plan is self-insured, so Mars uses its own assets to pay the medical expenses. The plan provides solely for the payment of medical expenses, and does not provide for the payment of Aetna's subcontractors' administrative costs.

Mars hired Aetna to administer the plan as an ERISA fiduciary, and contracted to pay Aetna's administrative fees. Aetna, in turn, subcontracted with certain companies to assist it in administering benefits plans (the "Subcontractors"), including Defendant Optum HealthCare Solutions, Inc. ("Optum"). Aetna agreed to pay the Subcontractors' and Optum's administrative fees out of its own pocket.

Instead of paying the fees, however, Aetna engaged in a scheme with its Subcontractors to collect them from insureds and plans by misrepresenting that

they were medical expenses. Defendants did so by, among other things, falsifying the Explanation of Benefits ("EOB") that ERISA requires Aetna to give to insureds, in which it reports on its processing of claims for benefits. The EOB is supposed to describe the benefits issued for each of the medical services billed by the provider, based on CPT codes (five-digit numbers developed by the American Medical Association and used to identify individual health care services). Aetna and the Subcontractors, however, added a fake CPT code that did not actually represent medical services, but rather the Subcontractors' administrative fees. As a result, the plan and Ms. Peters were misled into paying for the administrative fees.

Defendants therefore have violated their fiduciary obligations under ERISA by imposing undisclosed fees on the plan and the insureds, and have also violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d), by engaging in this fraudulent scheme. On behalf of herself and a putative class, Ms. Peters seeks to recover the excessive costs Defendants imposed and other appropriate equitable and injunctive relief.

Defendants argue in their motions to dismiss that Ms. Peters lacks constitutional standing and has failed to state RICO and ERISA claims. The motions should be denied. First, Ms. Peters has pleaded a sufficient injury to establish Article III standing. She alleges that she paid, out-of-pocket, a coinsurance requirement that was inflated by Optum's mischaracterized

administrative fee charge; that she was financially responsible for other inflated charges; and that Defendants' conduct caused these injuries. Aetna principally argues that Ms. Peters was not injured by the fraud because she could have spent more on out-of-network providers. Aetna Mem.[1] 8-9. But a defendant cannot commit fraud and then claim that no injury was suffered because the victim could have spent more elsewhere.

Second, Ms. Peters's complaint states the elements of a RICO claim. She alleges that Aetna conducted an association-in-fact RICO enterprise (or, in the alternative, enterprises) with Optum and its other Subcontractors, cooperating for the common purpose of collecting administrative fees from Aetna insureds and plans by improperly characterizing them as medical expenses. All of Defendants' challenges to various aspects of Ms. Peters's RICO claims fail. For example, Aetna contends that Ms. Peters did not identify any misrepresentations made to her. Aetna Mem. 9. This is demonstrably wrong. Ms. Peters has alleged that Aetna made numerous misleading statements about the administrative fee charges, including by adding fake CPT codes to the EOBs that Aetna attached to its own motion. Defendants are also wrong that Ms. Peters has not pleaded a viable RICO enterprise, pattern of racketeering acts, or injury. Ms. Peters plausibly alleges a

---

[1] "Aetna Mem." refers to Aetna's memorandum in support of its motion to dismiss (ECF No. 42). "Optum Mem." refers to Optum's memorandum (ECF No. 38).

3

wide-ranging fraud that was Defendants' regular course of doing business.

Third, Ms. Peters has pleaded claims that Defendants violated a number of their statutory ERISA duties and thus breached their fiduciary duties to Ms. Peters and her plan. Compl. ¶¶ 92-96. Defendants counter merely by ignoring or minimizing Ms. Peters's allegations about their conduct. They also assert that she failed to exhaust her administrative remedies, a claim that utterly fails, given that she has not pled a claim for benefits that must be exhausted. Indeed, Aetna itself says that no benefits were "denied." Aetna Mem. 36 n.10. Rather, Defendants breached their duties as claims administrators when they misrepresented administrative fees as medical expenses in order to pass them on to insureds and plans. ERISA allows Ms. Peters to bring claims based on this conduct, and it does not require her to first exhaust them in Aetna's internal review process.

## FACTUAL BACKGROUND[2]

### A. Aetna, a Claims Administrator for Millions of Insureds, Outsources Its Administrative Duties to Subcontractors, Including Optum.

Aetna is a health care benefits company that serves over 23 million insureds. Compl. ¶¶ 5, 11. It offers health benefits plans, including "self-insured plans"—in which the plan sponsor (usually an employer) funds medical costs—and "insured

---

[2] Plaintiff's factual allegations are taken as true for purposes of this motion. *See infra* 10-12.

plans"—in which claims are funded by premiums paid by the sponsor or individual insureds. *Id.* ¶ 12. For either type of plan, Aetna serves as the claims administrator responsible for processing claims and providing insureds with a network of providers who have agreed to accept discounted fees. *Id.* ¶ 13. When Aetna serves as claims administrator for a self-insured plan, it collects an administrative fee from the plan sponsor under an "administrative services agreement." *Id.* ¶ 14. For insured plans, there is no such agreement; Aetna collects its administrative costs as part of its premiums. *Id.* ¶ 15.

Under ERISA, administrators like Aetna are required to report to insureds on the processing of their claims for benefits. *Id.* ¶ 20. Administrators provide this reporting in EOBs, which report on the portion of a patient's medical expenses that the plan paid and the portion that remains the responsibility of the insured. *Id.* ¶ 20.

Aetna typically handled its claims administration work on its own. *Id.* ¶ 21. It processed claims, adjudicated them, and contracted with providers to join its network. *Id.* In recent years, however, it has delegated these responsibilities to Optum and other third-party Subcontractors. *Id.* ¶ 22. Aetna has hired Optum and other Subcontractors to administer all chiropractic or physical therapist services for its insureds. *Id.* For a chiropractor or physical therapist to be part of Aetna's network—as an "in-network provider"—Aetna requires that they enter into in-network contracts with the Subcontractors. *Id.* For example, each chiropractor in

Optum's network must enter into a provider agreement under which it agrees to provide services to insureds of Aetna plans at reduced rates. *Id.* ¶ 35. Optum does not itself provide medical services. *Id.* ¶ 33.

When a provider who is in-network with a Subcontractor like Optum renders service to an Aetna insured, Aetna and the Subcontractor instruct the provider to submit the resulting claim for insurance benefits to the Subcontractor. *Id.* ¶ 24. The providers identify the services they provided to their patients by CPT Code (a five-digit number used to identify individual health care services), along with describing their "usual and customary" charge for the service. *Id.* The Subcontractor processes the claim, determines whether or not the service is covered under the applicable plan, and then pays the provider as set forth in the in-network rate schedule. *Id.* ¶ 25. Aetna then reimburses the Subcontractor. *Id.*

### B. Aetna and the Subcontractors Secretly Shift the Subcontractors' Administrative Fees to Insureds.

Under the Subcontractors' agreements with Aetna, they are entitled to collect a fee from Aetna for their cost of processing claims and administering the provider networks. *Id.* ¶¶ 23, 26. But Defendants want to avoid forcing Aetna to pay those fees. *Id.* ¶ 26. If Aetna had to pay them, it would either reduce its profits or charge higher fees to the plan, which could reduce demand for its services. Therefore, instead of having Aetna pay the fees, Defendants covertly pass them along to insureds and plans as "medical expenses." *Id.* ¶ 26. They do this by

6

having Aetna issue misleading EOBs to insureds for claims submitted to Subcontractors. *Id.* The EOBs misrepresent that the Subcontractor is the "provider" and use false CPT codes to represent that the Subcontractor's administrative fees are for medical services. *Id.* ¶ 27. The EOBs add the amount that Aetna owes to the Subcontractor to the provider's actual charge, and then treat the artificially inflated total in the EOB as the "allowed" or "covered" medical expense amount payable by the insured or plan. *Id.*

The Subcontractors, meanwhile, send Remittance Advice ("RA") forms to providers that report the provider's usual charge, the allowed amount based on the in-network fee schedule, and the amount to be paid to the provider. *Id.* ¶ 29. However, the RA forms do not include or disclose the Subcontractor's administrative fees, or that Aetna and the Subcontractor are charging the insured an inflated amount. *Id.* By this method, Aetna and the Subcontractor shift the cost for the Subcontractor's fees to Aetna's insureds and self-insured plans, while concealing that they are doing so. *Id.* ¶ 31. The insureds unknowingly use their ERISA plan funds to pay for these fees, rather than using them for medical services. *Id.* To the extent that the insureds owe deductibles or coinsurance, they are forced to pay the fees out of pocket. *Id.* And when the insureds' plans limits coverage for the services, the fees deplete those coverage limits more quickly. *Id.*

**C.    Ms. Peters Receives Chiropractic Care and Physical Therapy, and Is Charged for Defendants' Administrative Fees.**

Plaintiff Sandra Peters is an insured under the Mars Health Care Plan. *Id.* ¶ 37. The Summary Plan Description ("SPD") for the Mars Plan defines Aetna as the Claim Administrator, a responsibility that Aetna has delegated to Optum. *Id.* The SPD also states that the Claim Administrator will determine whether services are medically necessary and appropriately provided, and that the plan does not cover services that are not medically necessary. *Id.* Nowhere does the SPD suggest that insureds or plans will be charged for Aetna's or its Subcontractors' administrative fees as expenses for medical services. *Id.* ¶¶ 38-39.

During 2013 and 2014, Ms. Peters received treatment on a number of occasions from providers in the Aetna-Optum network. *Id.* ¶¶ 40-57. For example, on July 5, 2013, Ms. Peters was treated at Carolina Chiropractic Plus. *Id.* ¶ 40. The services provided were a chiropractic manipulation (CPT code 98941) and therapeutic exercise (CPT code 97110). *Id.* She did *not* receive an "unlisted modality" (CPT code 97039) or any other services. *Id.* ¶ 42. Carolina Chiropractic Plus submitted a claim to Optum for the services it performed. *Id.* ¶ 40. It reported its ordinary charge for the services as $95.00, but under its provider agreement with Optum, it was only entitled to receive $53.00 for the services. *Id.* ¶¶ 40-41.

Aetna then sent an EOB to Ms. Peters that she received on or about August 1, 2013. *Id.* ¶ 42. The EOB stated that the "Provider" of services was "Chiro-

OptumHealth Care Sol." *Id.* This was misleading; Carolina Chiropractic Plus was the provider, and Optum was not. *Id.* The EOB listed the following services: "chiropractic manipulation" (CPT Code 98941), for which the "provider" billed $50.00, "therapeutic exercises" (CPT Code 97710), for which the provider billed $45.00, and "unlisted modality" (CPT Code 97039), for which the provider billed $70.89. *Id.* ¶¶ 40-42. Thus, the EOB misrepresented that the provider had billed $165.89 for its services, including the fee for the "unlisted modality" that was never performed by the actual provider. *Id.* The "unlisted modality" was actually a code that Aetna and Optum used to secretly inflate an insured's medical expenses to include Optum's administrative fee. *Id.* ¶ 44. But Subcontractor fees are not a modality performed by a medical provider, and therefore a Subcontractor cannot legitimately issue a charge using a CPT code. *Id.*

According to the EOB, the "chiropractic manipulation" and "therapeutic exercises" were deemed not payable, but the "unlisted modality" was payable. *Id.* ¶ 43. The EOB reported that Ms. Peters's plan would pay $56.71 of the $70.89 "unlisted modality" charge (80%), and Ms. Peters would have to pay, and did pay, another $14.18 under her 20% co-insurance responsibility. *Id.* ¶¶ 43-44. By including Optum's fees in the amount that the provider supposedly "billed," Defendants inflated the actual charge to Ms. Peters and her plan as follows:

9

| JULY 5, 2013 SERVICE BY CAROLINA CHIROPRACTIC PLUS | | | |
|---|---|---|---|
| | Without Administrative Fee | With Deceptively Charged Administrative Fee | Difference |
| **Plan Pays** | 80% of agreed rate = $42.40 $53.00 | 80% of $70.89 "unlisted modality" = $56.71 | $14.31 |
| **Ms. Peters Pays** | 20% of agreed rate = $10.60 $53.00 | 20% of $70.89 "unlisted modality" = $14.18 | $3.78 |

*Id.* ¶¶ 43-44. Defendants similarly inflated the charges to Ms. Peters and her plan on other occasions throughout 2013 to 2014, including for services she received on September 12, 2013, July 9, 2014, and September 3, 2014. *Id.* ¶¶ 45-56.

Ms. Peters eventually notified North Carolina officials of concerns about Defendants' billing practices. *Id.* ¶ 57. Aetna responded by admitting that it was using "unlisted" CPT codes to "reimburse Optum a case rate for [its] services." *Id.* It said that it had "instructed Optum to bill with specific codes . . . to allow for the flat rate reimbursement." *Id.* Thus, by Aetna's own admission, Optum and Aetna collaborated in the practice of using "unlisted modality" codes to deceptively include Optum's administrative fees when processing claims for medical services. Aetna also admitted that it charged Ms. Peters 20% co-insurance amounts that were "more than 20 percent of the actual charge for the services." *Id.*

## LEGAL STANDARD

Aetna and Optum each move to dismiss for failure to state a claim upon

which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), the court must "assess[] whether the complaint contains sufficient facts . . . to 'state a claim to relief that is plausible on its face.'" *Houck v. Substitute Tr. Servs.*, *Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court is required to "accept as true all the factual allegations contained in the complaint and construe them in the light most favorable to the plaintiff." *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013). Although a complaint must contain sufficient facts to state a plausible claim, "it nevertheless need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015).

The plausibility standard "requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Houck*, 791 F.3d at 484 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, "[t]o survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "If her explanation is plausible, her complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation." *Id.*

Aetna also argues that the Court should dismiss pursuant to Fed. R. Civ. P.

12(b)(1) for lack of constitutional standing.[3] Under this kind of motion, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Thus, the court must "assume all well-pled facts to be true and draw all reasonable inferences in favor of the plaintiff." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013).

## ARGUMENT

### I. MS. PETERS ALLEGES CONSTITUTIONAL STANDING.

Aetna's lead argument is that Ms. Peters lacks constitutional standing to pursue her claims. Aetna Mem. 7-14. For a plaintiff to plead standing, she must allege:

> (1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Pender v. Bank of Am. Corp.*, 788 F.3d 354, 365 (4th Cir. 2015) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008)). "In most kinds of litigation, there is scant need for courts to pause over the standing inquiry." *Friends of the Earth*, *Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154

---

[3] Both Aetna and Optum state that they are incorporating the other's arguments for dismissal by reference. Aetna Mem. 5 n.3; Optum Mem. 1 n.1.

(4th Cir. 2000).

### A. Ms. Peters Alleges a Sufficient Injury in Fact.

Aetna's arguments against standing fail at every turn. First, Aetna argues that Ms. Peters has not shown an injury in fact. Aetna Mem. 8-11. As Aetna must acknowledge, however, Ms. Peters has alleged that she paid at least one co-insurance requirement that secretly included Optum's administrative fee charges, and that she is financially responsible for other inflated co-insurance amounts. *See id.* at 9-10. These allegations are sufficient to plead an injury in fact for each of Ms. Peters's RICO and ERISA claims. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care*, *L.L.C.*, 433 F.3d 181, 202 (2d Cir. 2005) ("plan participants who paid percentage coinsurance would incur injury" from plan's alleged use of higher-priced drugs sold by parent company).

Aetna contends that Ms. Peters was not injured by the inflated payments because if she had received out-of-network services, she could have paid more. Aetna Mem. 8-9 (discussing provider's submission of bill using "ordinary charge"). But Aetna has no legal support for the proposition that an insured does not suffer a concrete injury when its fiduciary fraudulently increases the amount the insured and the plan must pay for an in-network service, if out-of-network service might have been more costly.

Aetna also argues that Ms. Peters lacks standing to assert a "claim" as to two

of the EOBs, for which she alleges "responsibility" for paying co-insurance, but not an actual payment. Aetna says that Ms. Peters must plead that she has made payment in order to rebut the supposedly "well-known" concept that some providers "waive or forgive a patient's coinsurance liability in order to curry favor with repeat customers." Aetna Mem. 10. This argument fails, as courts have recognized that an insured has standing when she alleges violations of an ERISA plan, without having to prove that the insured was balance billed by or paid the provider. *See*, *e.g.*, *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 192 (5th Cir. 2015) (citing *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona*, *Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014)); *Prof'l Orthopedic Assocs.*, *PA v. Horizon Blue Cross Blue Shield of N.J.*, No. 14-4731 (SRC), 2015 WL 5455820, at *2 (D.N.J. Sept. 16, 2015). Moreover, this argument is procedurally improper in any event, because Aetna is raising a facial challenge to Ms. Peters's standing. *See* Aetna Mem. 10. Ms. Peters has alleged that she is responsible for inflated coinsurance payments that she has not yet paid. Taken as true—as it must be at this juncture—this allegation shows a concrete injury.[4]

---

[4] Aetna's cases (Aetna Mem. 10)—which have been effectively rejected by both the Fifth and Ninth Circuits—are not to the contrary. Each involved a summary judgment ruling based on undisputed evidence that the patient owed nothing to the provider. *See Owen v. Regence Bluecross Blueshield of Utah*, 388 F. Supp. 2d 1318, 1318 (D. Utah 2005); *Bollig v. Christian Cmty. Homes & Servs., Inc.*, No. 02-C-532-C, 2003 WL 23200362, at *3 (W.D. Wis. July 10, 2003).

**B.     Ms. Peters May Pursue Injunctive and Other Equitable Relief Under ERISA.**

To seek injunctive and other equitable relief under ERISA, 29 U.S.C. § 1132(a)(3), Ms. Peters need only allege that Defendants breached their disclosure or other fiduciary obligations to her or her plan. *See Pender*, 788 F.3d at 366 (plaintiff had a "legally protected interest" sufficient to pursue an accounting for profits under 29 U.S.C. § 1132(a)(3), even with no financial loss).[5] Ms. Peters has so alleged. *See infra* 29-32.

In arguing that Ms. Peters must allege an "immediate threat of future harm" to obtain injunctive relief, Aetna Mem. 11, Aetna cites two cases, neither of which involved an ERISA claim. Thus, Aetna bases its motion on the wrong standard. In any event, Ms. Peters would satisfy Aetna's standard as well. She has plainly alleged that her injuries are continuing, because she is financially responsible for the inflated co-insurance payments. Compl. ¶¶ 48, 53. Moreover, if Ms. Peters seeks treatment in the future from an Optum network provider, she will be subjected to Defendants' improper practices. *Id.* ¶¶ 83, 98, 101. Thus, Ms. Peters has pleaded both an ongoing injury and an actual threat of injury. *See*, *e.g.*,

---

[5] Aetna cites *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013), for the proposition that Ms. Peters must allege "her own concrete injury" in order to seek relief on behalf of the plan under Count III. Aetna Mem. 8. What Aetna omits, however, is that this requirement does not apply to Count IV, in which Ms. Peters brings a 29 U.S.C. § 1132(a)(3) claim to enjoin violations of ERISA or "to obtain other appropriate equitable relief." *See, e.g.*, *Pender*, 788 F.3d at 366.

*McBurney v. Cuccinelli*, 616 F.3d 393, 403 (4th Cir. 2010) (plaintiff pleaded ongoing injury sufficient to support injunctive relief on claim alleging that Virginia FOIA law violated Constitution).

### C. Aetna's Standing Argument As to Subcontractors Other than Optum Is Misdirected.

Aetna contends that Ms. Peters "does not have standing to challenge" its relationships with Subcontractors other than Optum. But Ms. Peters is not suing those other Subcontractors. She is suing only Aetna and Optum, and has established standing as to them. That is all that is required, as Aetna's own cases acknowledge. *See*, *e.g.*, *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 416 (D. Md. 2013) (a plaintiff must "currently demonstrate standing against all defendants") (emphasis omitted). Whether Ms. Peters can serve as representative for a class that seeks relief against Aetna based on similar harms involving other Subcontractors is an issue for class certification. *See Coleman v. Commonwealth Land Title Ins. Co.*, No. 09-679, 2013 WL 4675713, at *9 n.5 (E.D. Pa. Aug. 30, 2013) (plaintiffs' ability to litigate claims on behalf of other individuals harmed by RICO scheme "w[ould] be decided when the parties litigate the class action status of this case").

## II. MS. PETERS STATES VALID RICO CLAIMS.

### A. Ms. Peters Alleges a Cause of Action Under 18 U.S.C. § 1962(c) Against Aetna and Optum.

In Count I, Ms. Peters alleges that Aetna and Optum violated 18 U.S.C. §

1962(c). The "elements predominant in a [§ 1962](c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997).

Defendants argue that Ms. Peters has failed to plead any of these elements, Aetna Mem. 20-27; Optum Mem. 8-16, as well as injury, Aetna Mem. 15-20; Optum Mem. 10 n.2. They are wrong.

### 1.    Ms. Peters Alleges a RICO Enterprise.

The term "enterprise" in RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "This enumeration of included enterprises is obviously broad, encompassing '*any* . . . group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). Under the liberal construction of RICO, an "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.* at 948.

Here, Ms. Peters alleges two different kinds of association-in-fact enterprises in the alternative. First, she alleges a single enterprise made up of Aetna and its Subcontractors, including Optum. She alleges specific facts about how Aetna coordinates with its Subcontractors, including Optum, American Specialty Health Group, Inc., and Columbine Health Plan, to carry out the common purpose of

17

collecting administrative fees under the guise that they are medical expenses. Compl. ¶ 1-2, 26-31, 36, 40-60.[6] Second, and in the alternative, she alleges that Aetna has formed multiple bilateral association-in-fact enterprises with each of its Subcontractors. *Id.* ¶ 75.[7]

Aetna argues that to allege a single enterprise including Aetna and the Subcontractors, Ms. Peters must allege that the Subcontractors directly collaborated *with each other*. Aetna Mem. 20-24. However, under *Boyle*, a plaintiff can successfully allege an enterprise when a defendant "occupied the center of the enterprise and used his position … to coordinate the activities of the … corporate defendants that made up the enterprise's outer edge." *Fuji Photo Film U.S.A.*, *Inc. v. McNulty*, No. 05 Civ. 7869(SAS), 2009 WL 3334867, at *3 (S.D.N.Y. Oct. 14, 2009). Aetna served that role here. *See id.* at *3; *see also Coleman*, 2013 WL

---

[6] Aetna ignores these allegations when it attempts to selectively paint Ms. Peters's enterprise allegations as "conclusory" by cherry-picking only the allegation in Paragraph 74. Aetna Mem. 20.

[7] Optum argues in a footnote that a "corporation cannot be part of an association-in-fact enterprise" because 18 U.S.C. § 1961(4) uses the term "group of individuals" to describe such an enterprise. Optum Mem. 12 n.3. The courts of appeals have unanimously rejected this argument, which is also inconsistent with *Boyle* and Fourth Circuit precedent. *See Boyle*, 556 U.S. at 944 n.2; *United States v. Najjar*, 300 F.3d 466, 485 (4th Cir. 2002) (affirming a RICO conviction of a corporation for participating in an association-in-fact enterprise); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009) (collecting cases and noting that no circuit judge has "dissented from the proposition that an association-in-fact enterprise may include corporations").

4675713, at *7 ("Commonwealth Land was the 'unifying rim' for the title agents by acting as a common leader and directing the illicit activities of the title agents."); *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1213 (S.D. Cal. 2009) (rejecting argument that "a 'hub and spoke' structure, [] does not fall within the definition of a RICO enterprise").

As to the alternative enterprise allegation (bilateral enterprises between Aetna and each of its Subcontractors), Aetna and Optum contend that Ms. Peters has only alleged a business relationship between them. Aetna Mem. 24-25; Optum Mem. 11-12. However, the Aetna-Optum relationship satisfied the three features described in *Boyle*: it had a purpose ("collect[ing] administrative fees from Aetna insureds and plans by improperly characterizing them as payment for covered medical expenses," Compl. ¶ 74); those associated with the enterprise worked together for the common purpose (*id.* ¶¶ 1, 24-31, 36, 40-57); and the relationship had longevity (conduct over the past four years, *id.* ¶¶ 40-57, 81). Thus, Aetna and Optum formed an association-in-fact enterprise.

Aetna also contends that Ms. Peters has not alleged bilateral enterprises between it and other Subcontractors. Aetna Mem. 26-27. However, her allegations about Aetna's collaboration with its other Subcontractors (Compl. ¶¶ 21-31, 58-60) are sufficient to plead plausible bilateral enterprises. *See Coleman*, 2013 WL 4675713, at *8 (bilateral associations between defendant and title agents

19

Case 1:15-cv-00109-MR   Document 46   Filed 10/14/15   Page 29 of 52

constituted enterprises). Moreover, Aetna is wrong that Ms. Peters must plead standing as to each of the bilateral enterprises. *See id.* at *9 ("[A]s long as Plaintiffs have established an injury from a predicate act they have RICO standing. … This standing permits them to plead multiple enterprises.").

### 2. Ms. Peters Alleges that Defendants Conducted or Participated in the Conduct of the Enterprise.

A defendant must "participate[] in the operation or management of the enterprise itself" to be subject to liability under section 1962(c). *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). Ms. Peters plausibly alleges that Aetna and Optum participated in the operation or management of their RICO enterprise by falsely billing for administrative fees using CPT codes for medical services and collecting payments from insureds and plans. Compl. ¶¶ 27, 44, 49, 54, 57, 80. By this conduct, Aetna and Optum each participated in the "operation and management" of the enterprise. Defendants' fraud was coordinated, and each had a role to play. Indeed, *by Aetna's own admission*, it asked Optum to submit fee charges for processing using improper CPT codes, and Optum did so. *Id.* ¶ 57. Optum supplied the input (the false CPT codes and increased charges) and Aetna supplied the output to insureds and plans (the false EOBs). Aetna then collected the money and transferred it to Optum. Each defendant was "plainly integral to carrying out" the enterprise's activities, and as such, each may be held liable under section 1962(c). *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir. 1997).

Aetna and Optum contend that they were simply engaged in a "business relationship" and "carr[ied] on business separately." Optum Mem. 11-12; *see also* Aetna Mem. 24-26. But this argument ignores Ms. Peters's plausible allegations that Aetna collaborated with Optum and its other Subcontractors to bill administrative fees to insureds and plans, such that they "work[ed] as a single enterprise." *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015).

In attempting to minimize their collaboration, Defendants rely on inapposite authority. For example, Aetna cites *Reves*, in which the plaintiffs only alleged that Ernst & Young, as outside accountant, provided services to an unlawful enterprise, not that it was *part* of the enterprise (as is the case with Defendants here). 507 U.S. at 185. Nor is this case like *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013), in which the plaintiff alleged only "parallel, uncoordinated fraud." *Id.* at 855.[8]

---

[8] Optum argues that at most it only performed services for the alleged enterprise, citing *Goren v. New Vision International*, 156 F.3d 721 (7th Cir. 1998), and *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993). Optum Mem. 13. But Optum is not like the defendants in those cases, who were outsiders of the alleged single-entity enterprises. Here, Ms. Peters alleges that Optum conducted or participated *in the enterprise itself* by "implementing or making decisions related to [the enterprise's] affairs." *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir.), *cert. denied*, 135 S. Ct. 491 (*cont'd on next page*)

### 3. Ms. Peters Alleges a Pattern of Racketeering Activity.

Ms. Peters has further alleged that the enterprise engaged in a pattern of racketeering activity. For such a pattern to exist, "two or more predicate acts of racketeering must have been committed within a ten year period." *ePlus Tech.*, *Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002). Mail and wire fraud are predicate acts of racketeering under RICO. 18 U.S.C. § 1961(1). In order to show mail or wire fraud, a party must show "(1) a scheme to defraud and (2) use of a mail or wire communication in furtherance of that scheme." *ePlus Tech*, 313 F.3d at 181. Ms. Peters has done so. *See* Compl. ¶¶ 1-2, 26-31, 36, 40-60, 77-82 (alleging scheme to defraud and mail and wire communications used to carry out that scheme).

Ms. Peters also pleads fraud with the requisite particularity. Under Fed. R. Civ. P. 9(b), "the circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Pisgah Labs.*, *Inc. v. Mikart*, *Inc.*, No. 1:14-cv-00139-MR-DLH, 2015 WL 996609, at *8 (W.D.N.C. Mar. 5, 2015) (citations omitted). However, Rule 9(b) "allows conclusory allegations of [the] defendant's knowledge as to the true facts and of [the] defendant's intent to deceive." *Harrison v. Westinghouse Savannah River*

_____

(2014). Specifically, Optum billed for its administrative fees using CPT codes, sent RA forms that hid the charges, and then collected the fees.

*Co.*, 176 F.3d 776, 784 (4th Cir. 1999).[9] Moreover, when evaluating a pleading in the context of RICO mail fraud, "despite the high standard demanded by the Rule 9(b) particularity requirement, . . . the court may also consider the interplay of the more liberal notice pleading standard of Rule 8, which simply requires 'a short and plain statement.'" *Chambers v. King Buick GMC*, *LLC,* 43 F. Supp. 3d 575, 595 (D. Md. 2014).

Ms. Peters's pleading is sufficient to give Defendants fair notice of the factual basis for the predicate acts of fraud. She specifically identifies EOBs that Aetna sent and RA forms that Optum transmitted. Compl. ¶¶ 40-56. She also alleges that Aetna's EOBs "uniformly misrepresented" administrative fees as medical expenses, and that Optum's mailings concealed the additional charges. *Id.* ¶ 79.

However, Aetna still contends that Ms. Peters has failed to plead fraud with particularity because she "fail[ed] to identify any specific 'false and misleading' statements in the[] EOBs" she received. Aetna Mem. 17. Not true. Ms. Peters

---

[9] Outside of securities cases brought after the passage of the Private Litigation Securities Reform Act, the Fourth Circuit has never imposed a requirement that a plaintiff must plead facts "giv[ing] rise to a *strong* inference of fraudulent intent," as Optum suggests is required here. Optum Mem. 13. Regardless, Ms. Peters's allegations permit the strong inference that Optum intended to deceive insureds and plans into paying for its administrative fees without their knowledge. *See* Compl. ¶¶ 24-27, 29, 49, 55, 57. This was to Optum's benefit because a party that does not know about a fee is not going to negotiate for a lower fee.

repeatedly, and in detail, explains why Defendants' EOBs and RA forms were misleading. The EOBs used false CPT codes, falsely claimed that Optum was the "provider" of medical services, and falsely reported the amounts billed by the actual provider—the chiropractor or physical therapist. *See*, *e.g.*, Compl. ¶¶ 42-44, 47-49, 52-54.[10] And the RA forms sent by Optum misrepresented Ms. Peters's co-insurance responsibility—because that responsibility had been inflated by the administrative fee charges. *Id.* ¶ 55 (discussing Sept. 29, 2014 RA form).[11] Thus, Ms. Peters has alleged predicate acts of mail and wire fraud with the requisite particularity.

Aetna invites the Court to consider whether the EOBs "belie Plaintiff's

---

[10] To the extent Defendants' EOBs were sent to insureds other than Ms. Peters, those EOBs are "peculiarly within the knowledge of [Defendants]," and so "less detail is required" to plead them with particularity. *FDIC v. Kerr*, 637 F. Supp. 828, 834 (W.D.N.C. 1986).

[11] Optum makes much of the fact that it did not mail the RA forms to Ms. Peters. Optum Mem. 9-10. But each mailing was still a RICO predicate act. *See Sun Savs. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir. 1987) (mailings to third parties "were in furtherance of [the] alleged fraudulent scheme" where their "effect was to prevent the development of any suspicion … and thus keep [the plaintiff] ignorant of [the defendant's] activities.").

Optum also contends that the forms were innocent and that it "communicated accurately with her providers." Optum Mem. 10 n.2. It is wrong: the forms contained misrepresentations and material omissions. Compl. ¶¶ 29, 55, 79(b). In any event, even an "innocent" mailing can "supply the mailing element" of a mail fraud offense, so long as it "is part of the execution of the scheme [to defraud] as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

unsupported assertions" of fraud. Aetna Mem. 17. It claims that the EOBs "do not make any representations about whether the flat rate paid to Optum" is for medical expenses. *Id.* (citing Aetna Mot., Ex. C). That is false. CPT codes by their very nature are solely designed to report claims for *medical services.* Thus, when Defendants used CPT codes to represent Optum's fee, they misrepresented the fee as a medical expense rather than explicitly disclosing the true nature of the charge to insureds and plans. For example:

- Exhibit C states that the "amount billed," as reflected on the EOB, is "[t]he amount your doctor or health care provider billed for services." ECF No. 41-3. Optum is neither a doctor nor a health care provider. Compl. ¶ 33.

- Exhibit C states that the provider of services was "Chiro-Optumhealth Care Sol"—which was not accurate, Compl. ¶ 50. The provider was Carolina Chiropractic Plus. *Id.*

- Exhibit C states that the so-called "provider" billed a total of $165.89 for Ms. Peters's visit on Sept. 12, 2013, including $70.89 for an unspecified "unlisted modality," code number 97039. ECF No. 41-3 at 2-3. The "unspecified modality" code and $70.89 amount, of course, was not billed by Ms. Peters's actual provider. That is where Optum hid its administrative fee charge. Compl. ¶ 57.

- Exhibit C refers to the CPT codes as "treatment code[s]" (ECF No. 41-3 at 3), which is in keeping with the purpose of CPT codes—to report medical procedures and services. Compl. ¶ 24.

In short, the EOB in Exhibit C—like the other EOBs submitted with Aetna's motion—further shows that Defendants misrepresented their administrative fees as medical expenses, and that Ms. Peters has pleaded fraud.

25

The predicate acts committed by Aetna and Optum are also part of a pattern: they "are *related*, and [] they amount to or pose a threat of *continued* criminal activity." *ePlus Tech*, 313 F.3d at 181 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Optum does not address these factors, but instead simply insists that "this is not a 'pattern' case." Optum Mem. 14. Citing a few inapposite cases, it contends that this is a "scheme confined to a single (purportedly) fraudulent goal"—defrauding Ms. Peters. *Id.* at 14-15. But Ms. Peters alleges to the contrary. She alleges that Defendants carried out similar conduct as to other insureds and plans thousands, or tens of thousands, of times over the past few years, that they will continue to do so, and that these acts are part of their "regular way of doing business." Compl. ¶¶ 80-83. Further, Ms. Peters alleges that Defendants repeatedly defrauded her over a two-year period in connection with multiple medical services she received from different providers (*id.* ¶¶ 40-56), that Aetna admitted that it told Optum to bill for its fees using medical codes (*id.* ¶ 57), and that Aetna has agreed with another Subcontractor to conceal its administrative fees (*id.* ¶ 60). These allegations establish that Defendants engaged in "related" predicate acts that "amount to or pose a threat of continued criminal activity." *See H.J. Inc.*, 492 U.S. at 239.[12] Common sense alone dictates that Aetna and Optum

---

[12] Unlike Optum's authorities, this case does not involve mere allegations of "ordinary commercial fraud between two parties." *See, e.g.*, *Menasco, Inc. v.* (*cont'd on next page*)

did not establish this scheme solely to victimize Ms. Peters.

### 4. Ms. Peters Alleges that She Was Injured by Defendants' Racketeering Activity.

Ms. Peters has alleged that she suffered an "injur[y] in [her] business or property." 18 U.S.C. § 1964(c); *see supra* 13-14. She has also alleged that she suffered this injury "by reason of" Defendants' scheme; *i.e.*, that the RICO pattern was a proximate cause of her injury. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (proximate cause is established where the injury was a "foreseeable and natural consequence of [the] scheme").

Ms. Peters's allegations establish a direct link between Defendants' RICO scheme and her injury. She alleges that Aetna's false EOBs caused her to bear financial responsibility for increased co-insurance requirements, and that she has already made a payment for inflated fees. Compl. ¶ 44, 49, 53-55. Optum's RA forms to providers helped conceal the scheme from Ms. Peters.[13] *Id.* ¶¶ 49, 55.

---

*Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (alleged pattern involved a single scheme to defraud plaintiffs out of their oil interests).

[13] Optum suggests that Ms. Peters "cannot link her claimed harm to anything Optum said or did." Optum Mem. 10. This ignores that Optum submitted its fees to Aetna for payment using false CPT codes, intentionally concealed the payments, (*cont'd on next page*)

Aetna overlooks most of these allegations when it contends that Ms. Peters has "failed to allege" causation. Aetna Mem. 19.[14]

### B. Ms. Peters Alleges a RICO Conspiracy Under 18 U.S.C. § 1962(d).

Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [18 U.S.C. § 1962(c)]." Liability under section 1962(d) "does not require that a defendant have a role in directing an enterprise." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Nor does it require that a defendant must commit or agree to commit the predicate acts of racketeering activity. *Id.* "Rather, simply agreeing to advance a RICO undertaking is sufficient." *Id.*

Defendants argue that Ms. Peters's conspiracy claim fails because she has

---

and collected them with knowledge that they were not made for covered medical services. Compl. ¶¶ 24-27, 29, 57, 80. It also ignores that "no requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from *all* of the predicate acts." *Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) (citation omitted).

[14] Defendants' authorities on causation are obviously distinguishable from this case, because there is an obvious and direct link here between Defendants' scheme and Ms. Peters's injuries. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 15 (2010) (plurality op.) (city did not adequately allege causation based on defendant's failure to file sale reports where its "theory of liability"—uncollected taxes from consumers—"rest[ed] on the independent actions of third and even fourth parties"); *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) (plaintiffs did not allege that defendants' false attestations when hiring undocumented immigrants "had a direct negative impact on the plaintiffs' wages, or on any other aspect of their compensation").

28

failed to allege substantive RICO violations. Aetna Mem. 28; Optum Mem. 16. They are wrong. *See supra* 17-28. Optum also contends that Ms. Peters has failed to "allege[] facts plausibly suggesting that [it] agreed to join a criminal conspiracy." Optum Mem. 16. Once again, however, Optum has overlooked Ms. Peters's allegations about its knowledge and its specific role in carrying out and covering up the fraud. Compl. ¶¶ 24-27, 29, 55, 57, 80, 87-90. These allegations, including the facts that Aetna told Optum to bill its administrative fees using medical service CPT codes and Optum purposefully did so, show that Optum agreed to cooperate with Aetna to advance the fraud scheme.

## III.  MS. PETERS STATES VALID ERISA CLAIMS.

### A.  Ms. Peters Alleges Numerous Breaches of Fiduciary Duties.

Ms. Peters alleges that Defendants were fiduciaries of her plan and that they breached a number of the statutory duties that they owed to her and the plan under ERISA. She contends that by issuing inaccurate EOBs that misrepresented charges for administrative fees as medical expenses, and instead taking those fees for themselves, Defendants failed to administer Aetna's ERISA plans solely for the benefit of the participants and beneficiaries of the plans, in violation of their duties under 29 U.S.C. § 1104(a)(1)(A). Compl. ¶¶ 92, 95-96. She also alleges that they failed to exercise the required care, skill, prudence, and diligence required by 29 U.S.C. § 1104(a)(1)(B). *Id.* She alleges that Defendants improperly used plan

assets to pay their administrative fees, in violation of the self-dealing prohibition in ERISA, 29 U.S.C. § 1106. *Id.* Finally, she alleges that each defendant was responsible for preventing or remedying the other defendant's breach under 29 U.S.C. § 1105, and failed to do so. *Id.* ¶ 94.

Aetna attacks Ms. Peters's claims on three grounds, all of which fail. First, it contends that Ms. Peters has not identified any "specific misrepresentations . . . in its EOBs, let alone any that she relied on to her detriment." Aetna Mem. 35. As it did with the RICO counts, however, Aetna simply ignores Ms. Peters's actual allegations. Ms. Peters alleges that the EOBs she received were false and misleading for a number of reasons. *See supra* 6-10, 23-25. As a result, Ms. Peters paid and was responsible for inflated co-insurance requirements. Compl. ¶¶ 49, 53. Similarly, her plan was overcharged as a result of the fraud. *Id.* ¶¶ 43-44, 48-50, 53-55. These allegations are more than sufficient to state a claim that Defendants breached their duty of loyalty by "making material misrepresentations to the beneficiary." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001). Aetna cannot wish these allegations away on a motion to dismiss.

Second, Aetna argues that it was not obligated to tell Ms. Peters that it was charging her for Optum's administrative fees under the guise that they were medical benefits. Aetna Mem. 35. Under ERISA, however, administrators do not just have a "duty to refrain from intentionally misleading a beneficiary"; they

"have a fiduciary obligation not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures," and can be required to "affirmatively provide information to the beneficiary." *Griggs*, 237 F.3d at 380 (citations omitted). Indeed, the duty to disclose material information is the "core of a fiduciary's responsibility." *Id.*; see also *Kenseth v. Dean Health Plan*, *Inc.*, 722 F.3d 869, 872 (7th Cir. 2013). In this case, Defendants created a material misimpression—that the amounts charged to Ms. Peters and her plan were for medical expenses, not for their own fees—and failed to correct it, as they could have done by explicitly disclosing that the charges included a substantial administrative fee for Optum.

Third, and finally, Aetna argues that Ms. Peters has not alleged self-dealing prohibited by 29 U.S.C. § 1106(a)(1)(D) or (b)(1). Aetna Mem. 39. Once again, however, it overlooks the underlying factual allegations. As to § 1106(a)(1)(D), Ms. Peters successfully alleges that Aetna and Optum participated in a prohibited "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." ERISA defines a "party in interest" as, *inter alia*, a "fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian)" and "[a] person providing services to such plan." 29 U.S.C. § 1002(14). Based on the allegations in the complaint, both Aetna and Optum plainly qualify under this definition. And the complaint alleges that Aetna and Optum used plan assets to pay Optum's fees, as a

transfer to Optum for each of their benefit, because otherwise Aetna would have owed the fees. Compl. ¶¶ 23, 31, 97. Similarly, Ms. Peters also successfully alleges that Defendants "deal[t] with [] assets of the plan in [their] own interest or for [their] own account," 29 U.S.C. § 1106(b)(1), because rather than having Aetna pay the administrative fees that it owed to Optum out of its own pocket, Defendants discharged that obligation by using plan assets to pay them. This is a straightforward allegation of a prohibited transaction—the use of plan assets to pay a fiduciary's financial obligations. *See Hi-Lex Controls*, *Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 742 (6th Cir. 2014) (affirming summary judgment for plaintiff where defendant "inflat[ed] hospital claims with hidden surcharges in order to retain additional administrative compensation").

Optum, meanwhile, argues merely that Ms. Peters has "not alleged facts suggesting that [it] violated the law" in performing the network management and claims processing work that Aetna delegated to it. Optum Mem. 19. However, Ms. Peters plausibly alleges that Optum violated its duties when it was performing its delegated work and then covered up those violations (Compl. ¶¶ 29, 55, 57); knowingly participated in, enabled, and failed to correct Aetna's fiduciary breaches (*id.* ¶ 95); and engaged in prohibited self-dealing (*id.* ¶ 97).

## B.   Plaintiff Is Not Required to Exhaust Administrative Appeals Before Bringing Her ERISA claims.

Although ERISA does not expressly include an exhaustion requirement,

courts have required plaintiffs to exhaust remedies before pursuing an ERISA action for denial of benefits under 29 U.S.C. § 1132(a)(1)(B). *See Smith v. Sydnor*, 184 F.3d 356, 361 (4th Cir. 1999). But Ms. Peters is not pursuing a claim for denied benefits in this action. In fact, as Aetna concedes, Defendants did not deny her benefits. *See* Aetna Mem. 36 n.10. Instead, they violated their fiduciary obligations by deceptively imposing administrative fees on her and her plan. A claim based on these violations does not require exhaustion in this Circuit. *See Smith*, 184 F.3d at 364-65.

Defendants try to skirt this problem by asserting that Ms. Peters's ERISA claims are merely repackaged claims for benefits by another name, such that administrative exhaustion is still required. Aetna Mem. 28-34; Optum Mem. 19-20. Not so.

*First*, although Defendants rely on *Smith*, that case in fact shows that Ms. Peters is not required to exhaust her ERISA claims. In *Smith*, the defendants argued that the plaintiff was required to exhaust administrative remedies before bringing her breach of fiduciary duty claims because her claims were merely a "[re]casting of a claim for benefits." *Id.* at 361. However, the *Smith* court found that the plaintiff's claims were not repackaged benefits claims, because he was not challenging a "denial of benefits or an action related to a denial of benefits, but rather the *conduct* of the [fiduciaries] that he claims has lowered the value of his

. . . Plan accounts." *Id.* at 363. Therefore, exhaustion was not required.[15]

Defendants do not even suggest that Ms. Peters's claims involve a "denial of benefits or an action related to a denial of benefits," as described in *Smith*. Rather, they contend that simply because their misrepresentations and breaches of duty were related to a claim for benefits, Ms. Peters should still be required to exhaust administrative appeals. Aetna Mem. 34; Optum Mem. 20 n.6. But Ms. Peters's ERISA claims are not like the claims that *Smith* described: she is not attempting to recast a denial of benefits as a breach of duty. Rather, like the plaintiff in *Smith*, Ms. Peters has alleged that Defendants engaged in conduct that violated their duties, separate and apart from any denial of benefits. The resolution of these claims will turn on ERISA, not simply upon the terms of her plan. The claims need not be exhausted. *See Smith*, 184 F.3d at 363.[16] Accepting Defendants' contrary standard would mean that every ERISA claim is a benefits claim, and that there are no fiduciary duty claims.

*Second*, Ms. Peters's claims under section 1132(a)(2) and section 1132(a)(3)

_____

[15] By contrast, in *Fuller v. Liberty Life Assurance of Boston*, 302 F. Supp. 2d 525 (W.D.N.C. 2004), cited by Aetna, the plaintiff's claim was "simply that Defendants misinterpreted or misapplied [her] Disability Plan when they initially denied [her] claim for benefits." *Id.* at 533.

[16] *See also Stark v. Mars, Inc.*, 790 F. Supp. 2d 658, 669 (S.D. Ohio 2011) (fiduciary duty claims based on "the alleged misrepresentations made to plaintiff, not [on] plaintiff's actual entitlement to benefits under the terms of the Plan" were "not simply repackaged benefits claims").

seek different relief than a claim under section 1132(a)(1)(B) to "recover benefits due . . . under the terms of [the] plan." Unlike a 1132(a)(1)(B) claim to recover benefits, a claim under section 1132(a)(2) seeks relief not for an individual who was denied benefits, but rather "in a representative capacity on behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985). Because section 1132(a)(2) relief is distinct from a section 1132(a)(1)(B) recovery of denied benefits, a section 1132(a)(2) claim need not be administratively exhausted. *See Smith*, 184 F.3d at 363 (plaintiff's claim for relief on behalf of the plan would not "solely benefit" him, "further supporting" the conclusion that he had "pleaded valid claims for breach of fiduciary duties).[17] Similarly, section 1132(a)(3) provides for "appropriate equitable relief" to individuals in response to breaches of fiduciary duty, including an injunction and other "make-whole relief such as equitable relief in the form of 'surcharge.'" *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 180 (4th Cir. 2012) (quoting Lee T. Polk, Statutory Provisions — Civil Remedies, 1 ERISA Prac. & Litig. § 5:4 (West 2012)). The availability of this relief likewise shows that Ms. Peters's section 1132(a)(3) claim should not be treated as a repackaged claim for the denial

---

[17] While recovery under 29 U.S.C. § 1132(a)(2) will benefit Ms. Peters's plan, that does not preclude Ms. Peters from bringing a claim under that section, as Optum seems to argue (Optum Mem. 21). *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 ("§ [1132](a)(2) authorizes a beneficiary to bring an action against a fiduciary who has violated [29 U.S.C. § 1109]").

of benefits. *See N.Y. State Psychiatric Ass'n*, *Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 134-135 (2d Cir. 2015) (plaintiff was allowed to pursue section 1132(a)(1)(B) and section 1132(a)(3) claims simultaneously because different relief might be available).[18]

*Third*, exhaustion of remedies is an affirmative defense, not a prima facie element of an ERISA claim. *See*, *e.g.*, *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*, No. 14-1832, 2015 WL 5313631, at *2-3 (3d Cir. Sept. 11, 2015); *Trotter v. Kennedy Krieger Inst.*, *Inc.*, No. 11-3422-JKB, 2012 WL 3638778, at *4 (D. Md. Aug. 22, 2012). Thus, Ms. Peters was not required to plead exhaustion, even if it is required for her claims. *See Goodman v. Praxair*, *Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (stating that a Rule 12(b)(6) motion generally cannot reach the merits of affirmative defenses); *Trotter*, 2012 WL 3638778, at *4 ("failure to exhaust is an affirmative defense that must be pled and proved by the defendant"). And there is nothing in Ms. Peters's complaint that suggests a failure to exhaust.[19]

---

[18] *Korotynska v. Metropolitan Life Insurance Co.*, 474 F.3d 101 (4th Cir. 2006), does not support dismissal of the section 1132(a)(3) claim, as Optum contends (Optum Mem. 21). In that case, by the plaintiff's *own admission*, she was seeking *only* to recover denied benefits pursuant to section 1132(a)(3). *Id.* at 105; *see also England v. Marriott Int'l, Inc.*, 764 F. Supp. 2d 761, 780 (D. Md. 2011) (allowing plaintiffs to simultaneously bring claims under 29 U.S.C. § 1132(a)(1)(B) and (a)(3) and distinguishing *Korontynska*).

[19] Although Defendants argue that Plaintiff has not exhausted her administrative appeals, they identify no facts in the complaint to support the (*cont'd on next page*)

*Fourth*, based on the allegations that Ms. Peters does include about the EOBs she received, Ms. Peters did not have "meaningful access to administrative review procedures," and Aetna's exhaustion argument fails for this reason as well. *SunTrust Bank v. Aetna Life Ins. Co.*, 251 F. Supp. 2d 1282, 1289 (E.D. Va. 2003). ERISA regulations require plans to give notice of an "adverse benefit determination" and afford claimants a right to an internal appeal of that determination. *See* 29 C.F.R. § 2560.503-1(g); 29 C.F.R. § 2560.503-1(h). Defendants do not identify any such notice that they gave to Ms. Peters. Indeed, Aetna argues that although "ERISA regulations generally require that the EOB explain the reason for a denial . . . none of Plaintiff's services at issue in the Complaint were denied." Aetna Mem. 36 n.10. If Aetna's actions did not qualify as an "adverse benefit determination," then there was no mandatory appeal—and no exhaustion requirement. *See Smith*, 184 F.3d at 364-65.

Moreover, when a defendant does not give proper notice of an adverse benefit determination, the plaintiff does not have meaningful access to an appeal

argument. Instead, they simply say that Ms. Peters "does not allege" exhaustion, and "apparently seeks to avoid exhaustion altogether" by framing her claims as breach of fiduciary duty claims. Aetna Mem. 29-30; *see also* Optum Mem. 19 ("Peters fails to plead exhaustion of administrative remedies"). However, these grounds do not support a 12(b)(6) motion, because Ms. Peters was under no obligation to plead exhaustion. *See Wilson v. Kimberly-Clark Corp.,* 254 Fed. App'x 280, 286 (5th Cir. 2007) ("the court's requirement that plaintiffs plead exhaustion of remedies under the plan was an improper ground for dismissal here"). Defendants' exhaustion arguments fail on this ground alone.

even if there is otherwise a mechanism for pursuing one. *SunTrust Bank*, 251 F. Supp. 2d at 1289. Here, Defendants concealed their actions by having Aetna issue false EOBs that categorized their administrative fee charges as medical expenses. A plaintiff who has been lied to by a fiduciary in this way does not have meaningful access to an administrative appeal.

*Fifth*, and finally, Ms. Peters has alleged that she complained to the North Carolina authorities and that Aetna responded by defending its conduct. Compl. ¶ 57. This, along with Aetna's assertion that no services were denied, shows that an attempt to pursue administrative remedies would have been futile. *See Trotter*, 2012 WL 3638778, at *5.

## C. Ms. Peters Alleges that Optum Is an ERISA Fiduciary.

A person is an ERISA fiduciary "with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) & (iii). ERISA "does not limit fiduciary status to the fiduciaries named in a plan document"; a party may be a "functional fiduciary" depending on the activities it actually performs. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 357 n.6 (4th Cir. 2014). Because "[f]iduciary status is a fact sensitive inquiry," at the motion to dismiss stage, "courts generally do not dismiss claims

. . . where the complaint sufficiently pleads defendants' ERISA fiduciary status."

*In re Schering–Plough Corp. ERISA Litig.*, No. 03–1204(KSH), 2007 WL 2374989, at *7 (D.N.J. Aug. 15, 2007).

Ms. Peters's complaint easily meets that standard. She alleges that Aetna is designated as the "Claim Administrator" by the Mars Plan, with "discretionary authority" to determine whether medical services and supplies are necessary and appropriate. Compl. ¶ 37. She alleges that Aetna has delegated these responsibilities to Optum and its other subcontractors. *Id.* She alleges that Optum "receives, processes, and pays or denies benefits claims" for services provided by its in-network chiropractors to Aetna insureds. *Id.* ¶ 34. And she alleges that both Aetna and Optum exercise discretion in making coverage determinations with respect to ERISA plans, and as such, are "functional ERISA fiduciaries." *Id.* ¶ 8. These allegations are more than sufficient to state a plausible claim that Optum is an ERISA fiduciary. *See Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 221 (4th Cir. 2005) (reversing grant of summary judgment because defendants who "voluntarily assumed the responsibility of a fiduciary [] bec[a]me subject to the obligations of a fiduciary under ERISA").

Optum argues that it is not an ERISA fiduciary, cherry-picking one allegation from Ms. Peters's complaint in which Ms. Peters emphasizes that Optum is a claims administrator, not a medical services provider. Optum Mem. 17

(quoting Compl. ¶ 33). Based solely on this allegation about its "administrative role," it contends that "[d]iscretion is the *sine qua non* of ERISA fiduciary status" and that it performed only ministerial tasks. *Id.* However, it ignores all of Ms. Peters's other allegations about the discretion that Aetna delegated to Optum and that Optum actually exercises when it processes claims. These allegations must be taken as true, and they are fatal to Optum's argument.[20] In any event, Ms. Peters is not required to allege that Optum is a fiduciary in order to bring her section 1132(a)(3) claim based on its participation in ERISA violations. *See Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241 (2000) (plaintiff could bring section 1132(a)(3) claim against "nonfiduciary 'party in interest' to a prohibited transaction).

## CONCLUSION

Defendants' motions to dismiss should be denied.

---

[20] Optum's authorities merely stand for the proposition that an entity must exercise discretion to be a fiduciary. *See Joseph F. Cunningham Pension Plan v. Mathieu*, No. 97-2230, 1998 WL 403324, at *1, *3 (4th Cir. Jul. 6, 1998) (granting summary judgment because defendant's activities were not discretionary); *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1009 (4th Cir. 1996) (granting summary judgment because claims processor had no discretionary authority).

Dated: October 14, 2015

Carl S. Kravitz (*pro hac vice*)
Jason M. Knott (*pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(202) 778-1800
(202) 822-8106 (fax)
jknott@zuckerman.com

Respectfully submitted,

/s/ Larry McDevitt
Larry McDevitt
David M. Wilkerson
Heather Whitaker Goldstein
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
lmcdevitt@vwlawfirm.com

D. Brian Hufford (*pro hac vice*)
Jason S. Cowart (*pro hac vice*)
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
(212) 897-3434
(212) 704-4256 (fax)
dbhufford@zuckerman.com

*Attorneys for Plaintiff Sandra M. Peters,*
*on behalf of herself and all others*
*similarly situated*

41

# CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2015, I served the foregoing Plaintiff's Consolidated Opposition to Defendants' Motion to Dismiss on all counsel of record using the CM/ECF system.

E. Thomison Holman
NC Bar No. 19380
Matthew S. Roberson
NC Bar No. 32901
ADAMS HENDON CARSON CROW
& SAENGER, P.A.
72 Patton Avenue
Asheville, NC 28801
tholman@adamsfirm.com
mroberson@adamsfirm.com
Tel: (828) 252-7381
Fax: (828) 252-5018

Geoffrey M. Sigler
Jason Neal
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
GSigler@gibsondunn.com
JENeal@gibsondunn.com
Tel: (202) 955-8500
Fax: (202) 530-9635

Richard J. Doren
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
RDoren@gibsondunn.com
Tel: (213) 229-7000
Fax: (213) 229-6038

*Attorneys for Defendants Aetna Inc. and Aetna Life Insurance Company*

Mark T. Calloway
Michael R. Hoernlein
Brian D. Boone
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
mark.calloway@alston.com
michael.hoernlein@alston.com
brian.boone@alston.com

*Attorneys for Defendant OptumHealth Care Solutions, Inc.*

/s/ Larry McDevitt
Larry McDevitt

42