**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:15-cv-00109-MR**


| | | |
|---|---|---|
| **SANDRA M. PETERS, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| | ) ) | |
| **AETNA, INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |
| _____ | ) | |


**THIS MATTER** is before the Court on OptumHealth Care Solutions, Inc.'s Motion to Dismiss the Complaint [Doc. 37] and the Motion of Defendants Aetna, Inc. and Aetna Life Insurance Company to Dismiss Plaintiff's Complaint [Doc. 39].

## I.    PROCEDURAL BACKGROUND

On June 12, 2015, the Plaintiff Sandra M. Peters filed this putative class action against the Defendants Aetna, Inc., Aetna Life Insurance Company (collectively, "Aetna"), and OptumHealth Care Solutions, Inc.

("Optum"), asserting claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO") and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). [Doc. 1]. In her Complaint, the Plaintiff alleges that Aetna engaged in a fraudulent scheme with Optum and other subcontractors, which were employed to process and administer health care claims, whereby insureds were caused to pay the subcontractors' administrative fees because the Defendants misrepresented such fees as medical expenses. The Plaintiff alleges that these misrepresentations allowed Aetna to illegally (i) obtain payment of the subcontractors' administrative fees directly from insureds when the insureds' deductibles have not been reached; (ii) use insureds' health spending accounts to pay for these fees; (iii) inflate insureds' co-insurance obligations using administrative fees; (iv) artificially reduce the amount of available coverage for medical services when such coverage is subject to an annual cap; and (v) obtain payment of the administrative fees directly from employers when an insured's deductible has been exhausted or is inapplicable. [Id.].

The Plaintiff asserts two claims based on RICO violations. In Count I of the Complaint, the Plaintiff alleges that Aetna and its subcontractors, including Optum, violated 18 U.S.C. § 1962(c) by engaging in acts of mail

and wire fraud in furtherance of a common purpose to collect administrative fees from Aetna insureds and plans by improperly characterizing them as payment for covered medical expenses, and as such, constitute an associated-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4). Alternatively, the Plaintiff alleges that Aetna has conducted multiple bilateral association-in-fact RICO enterprises with each of its subcontractors. In Count II of the Complaint, the Plaintiff alleges that the Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). The Plaintiff also asserts two claims under ERISA, alleging that the Defendants breached their fiduciary duties as plan administrators, in violation of 29 U.S.C. § 1132(a)(2) (Count III) and 29 U.S.C. § 1132(a)(1), (a)(3), and/or 29 U.S.C. § 1104 (Count IV).

Aetna and Optum now seek the dismissal of this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Plaintiff lacks standing to assert her claims and that her Complaint otherwise fails to state claims upon which relief can be granted. [Docs. 37, 39]. The Plaintiff has filed a consolidated opposition to the Defendants' motions [Doc. 46], to which the Defendants have replied [Docs. 48, 49].

Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(1) Standard

Because standing is an element of subject matter jurisdiction, a motion to dismiss for lack of standing is properly analyzed under Federal Rule of Civil Procedure 12(b)(1).  See Pitt County v. Hotels.com, L.P., 553 F.3d 308, 311 (4th Cir. 2009).  The Plaintiff bears the burden of proving that subject matter jurisdiction exists.  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir. 2009).  The Court should grant a motion to dismiss for lack of subject matter jurisdiction only "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  In making this determination, the Court should "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  Id.

### B.    Rule 12(b)(6) Standard

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

(2007)). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012).

Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

## III. FACTUAL BACKGROUND

Taking the well-pleaded factual allegations of the Complaint as true, the following is a summary of the relevant facts.[1]

The Plaintiff is insured by Aetna pursuant to a health insurance plan ("the Mars Health Care Plan") offered through her husband's former employer, Mars, Inc. [Doc. 1 at ¶ 4]. The Plaintiff's plan is self-insured by Mars, Inc., which means that Mars, Inc. finances the plan's benefit payments. [Id.].

Aetna offers, insures, underwrites, and administers health benefits plans, including the Plaintiff's health benefits plan. [Id. at ¶ 5]. Optum provides claims administration and network management services to Aetna in connection with Aetna's administration of employee welfare benefit plans. [Id.].

Aetna offers both self-insured plans, which Aetna refers to as "administrative services contract" products, and insured plans. For the insured plans, Aetna assumes all or a majority of the risk for medical and dental care costs, and the insureds and/or plan sponsors on their behalf pay

---

[1] In reciting the relevant factual allegations, the Court has disregarded all "bare legal conclusions" asserted in the Amended Complaint, see Aziz, 658 F.3d at 391, as well as "[t]he mere recital of elements of a cause of action," see Walters, 684 F.3d at 439.

premiums to Aetna that entitle them to benefits provided by the plan. With respect to self-insured plans offered by Aetna, the plan sponsor assumes all or a majority of the risk for medical and dental care costs, and the insureds are required to pay premiums to the plan, which in turn entitles them to benefits provided by the plan. [Id. at ¶ 12]. In either situation, Aetna serves as the claims administrator, processing and adjudicating claims submitted by insureds and providing insureds with access to a network of providers who have agreed to accept discounted fees from Aetna-administered health insurance plans in exchange for providing covered services. [Id. at ¶ 13].

In exchange for serving as the claims administrator for self-insured plans, Aetna receives an administrative fee from the plan sponsor pursuant to an agreement known as an "administrative services agreement." [Id. at ¶ 14]. There is no administrative services agreement in the context of an insured plan because Aetna is both the payor and the administrator. Instead, its administrative costs are built into the premiums that are charged to plan sponsors and/or insureds. [Id. at ¶ 15].

As the plan administrator, Aetna provides its insureds with Explanation of Benefits forms ("EOBs") stating how their claims are processed, including how much the treating provider billed for the medical services at issue; what portion of that bill was deemed to be an "allowed amount" under the plan

(meaning the amount that is "covered" under the plan); what portion of the allowed amount will be paid by the plan and what portion is owed by the patient (due to a deductible or co-insurance obligation); and how much was actually paid to the provider on behalf of the patient. The purpose of these forms is to report what portion of the medical expenses are paid by the plan, what portion remains the responsibility of the insured, and what portion need not be paid. [Id. at ¶ 20].

Aetna contracts with subcontractors to handle its claims administration work. [Id. at ¶ 22]. For example, Aetna hired Optum and other subcontractors to handle the administration of all chiropractic or physical therapy services. Chiropractors and physical therapists enter into contracts with the subcontractors in order to be considered "in-network providers" for purpose of the plans that Aetna administers. [Id.]. Aetna then pays the subcontractor a specified fee for each claim that it processes and reimburses the subcontractor for the payments it makes to in-network providers pursuant to a pre-determined rate schedule. [Id. at ¶ 23].

When an Aetna insured receives medical services from a provider who is in one of the subcontractor's networks, Aetna and the subcontractor instruct the provider to submit the resulting claim for insurance benefits to the subcontractor. In these claims, the providers identify by CPT Code (a

five-digit number used to identify each individual health care service) the specific procedures and services they provided to their patients, along with their usual and customary charge for that procedure or service. [Id. at ¶ 24]. The subcontractor processes the claim and, if it is determined to be covered under the applicable plan, pays the provider pursuant to the terms of the fee schedule under the in-network contract. The subcontractor is then reimbursed by Aetna in full for this amount. [Id. at ¶ 25].

The subcontractor is also entitled to an administrative fee from Aetna to cover its cost of processing the claim and administering the network on behalf of Aetna. However, in some instances Aetna issues EOBs to the insureds showing this administrative fee to be a "medical expense." Aetna does this in order to avoid (i) having to pay that administrative fee itself, (ii) having to increase the rate that it charges to self-insured plan sponsors for providing administrative services, and (iii) having to increase premiums. [Id. at ¶ 26]. These EOBs also represent that the subcontractor is the "provider" and then utilize false CPT codes to represent that the administrative fees are being charged by a provider for medical services, when in fact they are charges for the subcontractor's administrative fees. [Id. at ¶ 27]. This scheme enables Aetna and the subcontractors to shift the cost for the

subcontractors' administrative fees from Aetna to Aetna's insureds and self-insured plans without disclosing that it is doing so.

Defendant Optum is one of Aetna's subcontractors. [Id. at ¶ 33]. Aetna and Optum have a contractual arrangement under which Optum administers health services for Aetna. Pursuant to the Aetna-Optum agreement, Optum recruits, contracts with, and credentials chiropractors, who agree to accept a discounted rate of reimbursement for the services that they provide to patients insured by Aetna. Optum also receives, processes, and pays or denies claims for the chiropractic services provided by its assembled network of chiropractors to insureds of Aetna. [Id. at ¶ 34].[2]

Each provider within Optum's network is required to enter into a contract with Optum (the "Optum Provider Agreement"). Pursuant to the Optum Provider Agreement, the chiropractors in Optum's network agree to provide chiropractic services to individuals enrolled in health plans, managed care organizations, and other health care service programs that have contracted with Optum, and to accept reduced rates, set forth in an appendix

---

[2] The Complaint alleges that Aetna has a similar contractual relationship with ASH Group and Columbine, in which ASH Group and Columbine recruit, contract with, and credential chiropractors, who agree to accept a discounted rate of reimbursement for the services that they provide to patients insured by Aetna. [Id. at ¶¶ 58-60]. There is no allegation in the Complaint, that the Plaintiff was charged any fees by ASH Group or Columbine.

to the Optum Provider Agreement, as payment in full for those services. [Id. at ¶ 35]. Optum and Aetna work together to charge Optum's administrative fees to insureds and plans but misrepresent to those insureds and plans that Optum's administrative fees are in fact charges for covered medical services that had been provided by the chiropractors. [Id. at ¶ 36].

The Complaint identifies four instances when Aetna made such false and misleading statements to the Plaintiff regarding the amount charged for medical expenses in Explanation of Benefits forms (EOBs).[3]

### 1.    The August 1, 2013 EOB

On July 5, 2013, the Plaintiff received medical services at Carolina Chiropractic Plus. The services provided were a chiropractic manipulation (CPT code 98941) and therapeutic exercise (CPT Code 97710). Carolina Chiropractic Plus submitted a claim to Optum for the services and reported that its ordinary charge for these services was $95.00. [Id. at ¶ 40]. Carolina Chiropractic Plus's provider agreement with Optum called for it to be paid

---

[3] The Plaintiff's Complaint refers to and relies on four EOBs from Aetna regarding services she received from Optum-contracted providers as well as the Summary Plan Description ("SPD") for her plan. Although these documents were not attached to her Complaint, the Defendants have submitted these documents in support of their Motions to Dismiss. As these documents are "integral" to the Complaint, and the Plaintiff does not appear to challenge their authenticity, the Court may consider these documents without converting the motions to dismiss to motions for summary judgment. See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).

$53.00 for the services it had submitted. [Id. at ¶ 41]. The EOB that the Plaintiff received from Aetna on or about August 1, 2013 for these services stated that the provider of services was "Chiro-OptumHealth Care Sol." It included not only the $95.00 charge, but also an additional $70.89 for an "unlisted modality," using CPT Code 97039, thus indicating that the provider had billed $165.89 for its services. [Id. at ¶ 42]. The EOB also stated that the $95.00 in services was "not payable," that the plan would pay $56.71 of the $70.89 "unlisted modality" charge (80%), and that the Plaintiff would be responsible for paying the remaining $14.18 under her 20% co-insurance responsibility. [Id. at ¶ 43].

The CPT Code 97039 for "unlisted modality," however, was used to mask the fact that it included Optum's administrative fee by showing it as an actual medical procedure performed by the medical provider. The provider did not receive all of the $70.89, because its contract with Optum called for it only to be paid $53.00. [Id. at ¶ 44]. The other $17.89 comprises Optum's fees, but was thus paid by the plan and the Plaintiff, rather than by Aetna which had contracted for Optum's administrative services.

## 2. The October 3, 2013 EOB

For visits after the Plaintiff had fully paid her co-insurance requirement, her plan paid all of the charges that were overstated in this manner. For

example, the Plaintiff received services at Carolina Chiropractic Plus on September 12, 2013. The EOB she received from Aetna on or about October 3, 2013 for those services reports that the plan paid $70.89 to "Chiro-OptumHealth Care Sol" as the provider for these services. However, according to a patient statement from the actual provider, Carolina Chiropractic Plus, it only received its contracted rate of $53.00 from the Plaintiff's insurance. [Id. at ¶ 50].

### 3. July 24, 2014 EOB

On July 9, 2014, the Plaintiff received medical services at Carolina Chiropractic Plus. The service provided was a chiropractic manipulation (CPT code 98940). Carolina Chiropractic Plus submitted a claim to Optum for the services and reported that its ordinary charge for this service was $40.00. [Id. at ¶ 45]. Carolina Chiropractic Plus's provider agreement with Optum called for it to be paid $34.00 for the service it had submitted. [Id. at ¶ 46]. The EOB that the Plaintiff received from Aetna on or about July 24, 2014 for these services stated that the provider of services was "Chiro-OptumHealth Care Sol." It included not only the $40.00 charge, but also an additional $70.89 for an "unlisted modality," again using CPT Code 97039, thereby indicating that the provider had billed $111.89 for its services. [Id. at ¶ 46]. The EOB further stated that the $40.00 in services was "not payable,"

that the plan would pay $56.71 (80%) of the $70.89 "unlisted modality" charge, and that the Plaintiff would be responsible for paying the remaining $14.18 under her 20% co-insurance responsibility. [Id. at ¶ 48].

Again, the EOB stated that Optum was the provider, not Carolina Chiropractic Plus, and used CPT Code 97039 to charge for subcontractor administrative fees which were not for medical services provided by the chiropractor. The plan paid $56.71 to Optum when the provider's agreed charge was only $34.00. Optum in turn only paid $19.82 to Carolina Chiropractic Plus, so that the chiropractor's patient balance of $14.18 would match the $14.18 patient balance on Aetna's EOB. [Id. at ¶ 49].

### 4.      The September 25, 2014 EOB

On September 3, 2014, the Plaintiff received medical services at PRO Physical Therapy. The services performed were an e-stimulation (CPT code 97014), manual therapy (CPT code 97140), and two units of therapeutic exercises (CPT code 97710).  PRO Physical Therapy submitted a claim to Optum for these services, and stated that its ordinary rate for them was $165.00. [Id. at ¶ 51].  The EOB that the Plaintiff received from Aetna on or about September 25, 2014 for these services stated that the provider of services was "Optum Health Care Solutions."  It included not only the $165.00 charge, but also an additional $87.72 for an "unlisted therapeutic

procedure," this time using CPT Code 97139. Thus, the EOB incorrectly stated that the provider had billed $252.72 for its services. [Id. at ¶52]. The EOB further stated that the $165.00 in services was "not payable," but that the plan would pay $70.18 of the "unlisted therapeutic procedure" charge (80%) and that the Plaintiff would be responsible for paying $17.54 under her 20% co-insurance responsibility. [Id. at ¶ 53].

## IV. DISCUSSION

### A. Standing

The Defendants first challenge the Plaintiff's Complaint on the basis of Article III standing. Specifically, they contend that: (1) the Plaintiff lacks standing to bring any of her claims because she has failed to allege any concrete injury arising from the relationship between Aetna and Optum; (2) the Plaintiff lacks standing to seek injunctive relief because she has failed to alleged any facts to show an immediate threat of future harm; and (3) the Plaintiff lacks standing to challenge Aetna's agreements with subcontractors other than Optum.[4]

---

[4] Aetna raised and briefed the issue of standing in its Motion to Dismiss, and Optum incorporated Aetna's arguments by reference in its Motion to Dismiss. [See Doc. 38 at 8 n.1].

Article III of the United States Constitution limits federal courts' jurisdiction to actual "cases" or "controversies."  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000).  As the Supreme Court has explained, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The doctrine of standing is intended "to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate . . . ."  Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 319 (4th Cir. 2002).  In order to satisfy Article III's standing requirement, a plaintiff must demonstrate that: (1) plaintiff suffered an injury in fact; (2) that the injury suffered is "fairly traceable" to the challenged actions of the defendant; and (3) that it is likely, rather than just speculative, that the plaintiff's alleged injury will be redressed by a favorable decision by the Court.  Defenders of Wildlife, 504 U.S. at 560-61.

### 1.    Injury in Fact

The Defendants first argue that the Plaintiff fails to allege any injury in fact as a result of the Defendants' actions.  To establish injury in fact, a plaintiff must demonstrate that she has "suffer[ed] an invasion of a legally protected interest which is concrete and particularized, as well as actual or

imminent." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204

F.3d 149, 154 (4th Cir. 2000).

Here, the Plaintiff has alleged that she has paid at least one coinsurance requirement that included Optum's administrative fee charges, and she has alleged that she is financially responsible for other inflated co-insurance amounts. These allegations are sufficient to plead an injury in fact for each of the Plaintiff's RICO and ERISA claims. See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 202 (2d Cir. 2005) ("plan participants who paid percentage coinsurance would incur injury" from plan's alleged use of higher-priced drugs sold by parent company).[5]

The Defendants also argue that the Plaintiff lacks standing to assert a claim as to two of the EOBs, as she alleges only "responsibility" for paying co-insurance but not an actual payment. Specifically, the Defendants contend that this allegation is insufficient to establish injury, as it is "well-known" that some providers "waive or forgive a patient's coinsurance liability in order to curry favor with repeat customers." [Doc. 42 at 22]. This argument

---

[5] The Defendants also contend that the Plaintiff was not injured by the inflated payments because if she had received out-of-network services, she could have paid more. [Doc. 42 at 20-21 (discussing provider's submission of bill using "ordinary charge")]. The Defendants, however, cite no legal support for this speculative proposition.

fails, however, for two reasons. First, whether a "well-known" practice of some providers is applicable to the Plaintiff's claim is speculation without any basis. Second, courts have recognized that an insured has standing when she alleges violations of an ERISA plan without having to prove that the insured paid the provider or was balance billed by the provider. See, e.g., North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare, 781 F.3d 182, 192 (5th Cir. 2015) (citing Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc., 770 F.3d 1282, 1291 (9th Cir. 2014)); Professional Orthopedic Assocs., PA v. Horizon Blue Cross Blue Shield of N.J., No. 14-4731 (SRC), 2015 WL 5455820, at *2 (D.N.J. Sept. 16, 2015).

In sum, taking the well-pleaded factual allegations of the Complaint as true, the Plaintiff has pleaded a concrete injury sufficient to establish standing to assert the claims in this case.

## 2.  Standing to Seek Injunctive Relief

The Plaintiff's Complaint also seeks injunctive and other equitable relief to remedy the Defendants' alleged "past and ongoing" violations of RICO and ERISA.   [Doc. 1 at 26].  The Defendants argue that the Plaintiff does not allege any facts to support an immediate threat of future harm, as is necessary to seek any injunctive relief.  As the Plaintiff has established an injury in fact, the Court concludes that the Plaintiff has established standing

18

sufficient to seek relief, whether legal or equitable in nature, for such injuries. Determining the appropriate remedy for such remedies is premature at this time. Accordingly, the Defendants' motions to dismiss the Plaintiff's claim for injunctive and other equitable relief is denied.

### 3. Standing To Challenge Aetna's Arrangements with Other Subcontractors

The Defendants additionally argue that the Plaintiff lacks standing to challenge Aetna's separate relationships with two other "subcontractors" who are not defendants in this case: American Specialty Health Group, Inc. ("ASH") and Columbine Health Plan ("Columbine").

The Plaintiff claims injury as a result of Aetna's relationship with Optum. She has alleged no injury arising from Aetna's relationships with any other subcontractors. The Plaintiff cannot avoid the requirements of standing and assert claims or seek discovery about subcontractors that had no impact on her own claims merely by bringing this case as a putative class action. See Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996) (quoting Blum v. Yaretsky, 457 U.S. 991, 999 (1982)) ("a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject"). As the putative class representative, the

Plaintiff "must allege and show that [she] personally [has] been injured, not that injury has been suffered by other, unidentified members of the class to which [she claims to] belong." <u>Pashby v. Delia</u>, 709 F.3d 307, 316 (4th Cir. 2013) (quoting <u>Blum</u>, 457 U.S. at 1001 n.13). Thus, to the extent that the Plaintiff attempts to assert any claims regarding Aetna's actions with respect to any subcontractors other than Optum, the Plaintiff lacks standing to assert such claims.

### B.   RICO Claims

In Count I of the Complaint, the Plaintiff asserts a claim under 18 U.S.C. §1962(c), which makes it illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To state a claim under this provision, a plaintiff must allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. <u>See</u> <u>United States v. Mouzone</u>, 687 F.3d 207, 217 (4th Cir. 2012).

RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." <u>Gamboa v. Velez</u>, 457 F.3d 703, 705 (7th

Cir. 2006). RICO provides "drastic" penalties, including treble damages, which are "designed to provide society with a powerful response to the dangers of organized crime." <u>US Airline Pilots Ass'n v. AWAPPA, LLC</u>, 615 F.3d 312, 317 (4th Cir. 2010). While recognizing that RICO must be construed liberally so as to effectuate its remedial purposes, the Fourth Circuit has cautioned that courts must take care "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted." <u>Id.</u> (quoting <u>Menasco, Inc. v. Wasserman</u>, 886 F.2d 681, 683 (4th Cir. 1989)).

In the present case, the Plaintiff's RICO claims fail because the Plaintiff has failed to allege any facts that plausibly suggest that the Defendants carried on a criminal "enterprise" that had a structure independent of their routine and completely legitimate business dealings. The Plaintiff's *only* assertions in support of her allegation that the Defendants engaged in a RICO "enterprise" are in Paragraphs 74 and 75 of the Complaint, which state as follows:

74.    Aetna and its Subcontractors, including Optum, have operated together in a coordinated manner in furtherance of a common purpose to collect administrative fees from Aetna insureds and plans by improperly characterizing them as payment for covered medical expenses.    Therefore, they constitute an associated-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4).    Further, this enterprise is engaged in, and its activities affect, interstate or foreign commerce.

75.    In the alternative, Aetna has conducted the affairs of multiple bilateral association-in-fact RICO enterprises through a pattern of racketeering activity. The enterprises are the bilateral associations in fact of Aetna and each of the Subcontractors.

[Doc. 1 at ¶¶ 74, 75].

Under RICO, an association-in-fact enterprise "must have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009).  The Plaintiff's conclusory allegations in Paragraph 74 regarding Aetna's relationships with its various subcontractors fail to establish a multilateral association-in-fact enterprise, as the Plaintiff wholly fails to allege any relationships between Aetna's various subcontractors.   In fact, the Complaint is completely devoid of any factual allegations plausibly suggesting that Aetna and its subcontractors "functioned as a unit,"

22

Continental Petroleum Corp. v. Corporation Funding Partners, LLC, No. 11-cv-7801 (PAE), 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012), or "act[ed] together for a common purpose or course of conduct," Rao v. BP Prods. N. Am., Inc., 589 F.3d 389, 400 (7th Cir. 2009). The Plaintiff's allegations "do not plausibly imply anything more than parallel conduct by the [subcontractors]," in entering into separate contracts with Aetna, and thus "they cannot support the inference that the [subcontractors] 'associated together for a common purpose of engaging in a course of conduct.'" Ins. Brokerage, 618 F.3d at 374 (quoting Boyle, 556 U.S. at 946). At best, the Plaintiff's allegations establish that the subcontractors "enter[ed] into separate agreements with a common defendant," but that they had "no connection with one another, other than the common defendant's involvement in each transaction." Id. at 327 (quoting Dickson, 309 F.3d at 203). Courts repeatedly have rejected similar attempts to plead a broad, ill-defined multilateral RICO enterprise consisting of various entities that merely contract with the same company. See, e.g., In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 374-75 (3d Cir. 2010); Vuyyuru v. Jadhav, No. 3:10-cv-173, 2011 WL 1483725, at *17 (E.D. Va. Apr. 19, 2011), aff'd, 501 F. App'x 294 (4th Cir. 2012) (quoting Ins. Brokerage, 618 F.3d at 369); Valcom, Inc. v. Vellardita, No. 2:13-cv-3025-WHW-CLW, 2014 WL 1628431, at *6 (D.N.J.

Apr. 23, 2014) (citing <u>Ins. Brokerage</u> and concluding that "[a] rimless wheel is not an enterprise"); <u>Target Corp. v. LCH Pavement Consultants, LLC</u>, No. CIV. 12-1912 (JNE/JJK), 2013 WL 2470148, at *4-6 (D. Minn. June 7, 2013) (recognizing that "the Third Circuit and several district courts have reasoned that a rimless hub-and-spokes organization does not qualify as an association-in-fact enterprise" and collecting cases and secondary sources); <u>see also</u> <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 203-04 (4th Cir. 2002) (rejecting allegations of a "rimless wheel" structure as insufficient in an antitrust conspiracy case). Accordingly, the Court concludes that the Plaintiff's RICO claim based on an alleged multilateral RICO enterprise should be dismissed.

The Plaintiff's alternative theory -- that Aetna conducted a series of bilateral association-in-fact RICO enterprises with Optum and the other subcontractors -- also fails. The Plaintiff's allegations in this regard fail to assert anything more than an ordinary commercial relationship between Aetna and Optum through which Aetna is pursuing its own, independent goal of controlling costs for its plan sponsors and members through negotiated rates. <u>See, e.g.</u>, <u>United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.</u>, 719 F.3d 849, 854 (7th Cir. 2013) (rejecting RICO enterprise based on agreement and related

communications between two companies regarding a drug-switching program, because there was no reason to believe that "these communications or actions were undertaken on behalf of the *enterprise* as opposed to" the companies "in their individual capacities, to advance their individual self-interests"). Aside from the Plaintiff's conclusory assertion that Aetna and Optum "operated together in a coordinated manner in furtherance of a common purpose" [see, e.g., Doc. 1 at ¶ 74], the Plaintiff fails to allege any facts demonstrating such "coordination" between Aetna and Optum to establish a RICO enterprise. See Boyle, 556 U.S. at 947 n.4.

A contractual arrangement through which a claims administrator contracts with a network of providers at a negotiated flat rate hardly suggests the existence of a RICO enterprise. Aetna's purpose in its contractual relationship with Optum is to have insurance claims administered. Optum's purpose is to provide claims administration services for a fee. The fact that a small part of their arrangement deflects responsibility for the fee to an improper party does not transform their otherwise legitimate contractual arrangement into a criminal enterprise. The interactions between Aetna and Optum "show[ ] only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes" of the allegedly wrongful activity. United Food, 719 F.3d at 855. Without an

indication that "the cooperation in this case exceeded that inherent in every commercial transaction," the Complaint provides no basis "for inferring that [the Defendants were] conducting the enterprise's affairs" and not their own, independent interests.  Id. at 856.[6]

For all of these reasons, the substantive RICO claim set forth in Count I of the Complaint must be dismissed.  Because the Plaintiff's substantive RICO claim fails, the conspiracy count (Count II) fails as well.  See Walters, 684 F.3d at 445; GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001).

### C.    ERISA Claims

In her Complaint, the Plaintiff alleges that the Defendants were both fiduciaries of her plan and that they breached a number of the statutory duties that they owed to her and the plan under ERISA. Specifically, she contends that by issuing EOBs that misrepresented charges for administrative fees as medical expenses, and then keeping those fees, the Defendants failed to administer Aetna's ERISA plans solely for the benefit of

---

[6] As part of the Plaintiff's alternative RICO theory, she claims not just a bilateral RICO enterprise between Aetna and Optum, but also "multiple bilateral" enterprises between Aetna and the other subcontractors. The Plaintiff, however, pleads no facts to support the existence of any "bilateral" RICO enterprises with these other subcontractors. [See Doc. 1 at ¶ 75].  Thus, even if the Plaintiff had standing to challenge Aetna's relationships with these other subcontractors (which the Court has concluded she does not), the Plaintiff fails to plausibly allege any bilateral RICO enterprises involving any of these other entities.

the participants and beneficiaries of the plans, in violation of their duties under 29 U.S.C. § 1104(a)(1)(A). [Doc. 1 at ¶¶ 92, 95-96]. She also alleges that they failed to exercise the required care, skill, prudence, and diligence required by 29 U.S.C. § 1104(a)(1)(B). [Id.]. She alleges that the Defendants improperly used plan assets to pay their administrative fees, in violation of the self-dealing prohibition in ERISA, 29 U.S.C. § 1106. [Id.]. Finally, she alleges that each Defendant was responsible for preventing or remedying the other Defendant's breach under 29 U.S.C. § 1105, and failed to do so. [Id. at ¶ 94].

Optum contends that the ERISA claims against it should be dismissed because Optum is not a "fiduciary" within the meaning of ERISA. [Doc. 38 at 24]. A person is an ERISA fiduciary "with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) & (iii). ERISA "does not limit fiduciary status to the fiduciaries named in a plan document"; a party may be a "functional fiduciary" depending on the activities it actually performs. Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 357 n.6 (4th Cir. 2014), cert. denied, 135 S.Ct. 2887 (2015).

Because "[f]iduciary status is a fact sensitive inquiry," at the motion to dismiss stage, "courts generally do not dismiss claims . . . where the complaint sufficiently pleads defendants' ERISA fiduciary status." In re Schering–Plough Corp. ERISA Litig., No. 03-1204 (KSH), 2007 WL 2374989, at *7 (D.N.J. Aug. 15, 2007). Here, the Plaintiff has sufficiently alleged facts to plausibly claim that Optum is a fiduciary. The Plaintiff alleges in the Complaint alleges that Aetna is designated as the "Claim Administrator" by the Mars Plan, with "discretionary authority" to determine whether medical services and supplies are necessary and appropriate. [Doc. 1 at ¶ 37]. The Plaintiff further alleges that Aetna has delegated these responsibilities to Optum in that Optum "receives, processes, and pays or denies benefits claims" for services provided by its in-network chiropractors to Aetna insureds. [Id. at ¶ 34]. The Plaintiff also alleges that both Aetna and Optum exercise discretion in making coverage determinations with respect to ERISA plans, and as such, are "functional ERISA fiduciaries." [Id. at ¶ 8]. These allegations are more than sufficient to state a plausible claim that Optum is an ERISA fiduciary. See Phelps v. C.T. Enters., Inc., 394 F.3d 213, 221 (4th Cir. 2005) (reversing grant of summary judgment because

defendants who "voluntarily assumed the responsibility of a fiduciary [ ] bec[a]me subject to the obligations of a fiduciary under ERISA").[7]

Aetna attacks the substance of the Plaintiff's ERISA claims on three grounds. First, it contends that the Plaintiff's ERISA claims fail because the Plaintiff has not identified any "specific misrepresentations . . . in its EOBs, let alone any that she relied on to her detriment." [Doc. 42 at 47]. Contrary to Aetna's argument, however, the Plaintiff clearly alleges that the EOBs that the Plaintiff received were false and misleading in a number of ways and that as a result of these misleading statements, the Plaintiff paid and/or was responsible for inflated co-insurance requirements. [Doc. 1 at ¶¶ 48, 53]. Similarly, the Plaintiff alleges that her plan was overcharged as a result of the fraud. [Id. at ¶¶ 43-44, 48-50, 53-55]. These allegations are more than sufficient to state a claim that the Defendants breached their duty of loyalty by "making material misrepresentations to the beneficiary." See Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380 (4th Cir. 2001).

---

[7] In any event, the Plaintiff is not required to allege that Optum is a fiduciary in order to bring her § 1132(a)(3) claim based on its participation in ERISA violations. See Harris Trust and Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 245 (2000) (plaintiff could bring section 1132(a)(3) claim against "nonfiduciary party in interest" to a prohibited transaction).

Second, Aetna argues that no breach of fiduciary duty occurred because it was not obligated to tell the Plaintiff that it was charging her for Optum's administrative fees under the guise that they were medical benefits. [Doc. 42 at 47]. Under ERISA, however, administrators not only have a "duty to refrain from intentionally misleading a beneficiary"; they "have a fiduciary obligation not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures," and can be required to "affirmatively provide information to the beneficiary." Griggs, 237 F.3d at 380 (citations omitted). Indeed, the duty to disclose material information is the "core of a fiduciary's responsibility." Id. (citation omitted). In the present case, the Plaintiff has sufficiently alleged that the EOBs created a material misimpression -- that the amounts charged to the Plaintiff and her plan were for medical expenses, not for administrative fees -- and that Aetna failed to correct this misimpression.

Third, Aetna argues that the Plaintiff has not alleged any self-dealing prohibited by 29 U.S.C. § 1106(a)(1)(D) or (b)(1). [Doc. 42 at 51]. Contrary to Aetna's argument, however, the Complaint clearly alleges that both Aetna and Optum participated in a prohibited "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). ERISA defines a "party in interest" as, *inter alia*, a "fiduciary (including, but

not limited to, any administrator, officer, trustee, or custodian)" and "[a] person providing services to such plan." 29 U.S.C. §§ 1002(14)(A) and (B). Based on the allegations in the Complaint, both Aetna and Optum plainly qualify under this definition.

The Plaintiff further alleges that by using plan assets to pay Optum's fees, Aetna avoided its responsibility to pay those fees from its *own* assets. [Doc. 1 at ¶¶ 23, 31, 97]. As such, both Optum and Aetna benefitted from the use of plan assets in this manner. Similarly, the Plaintiff alleges that the Defendants "deal[t] with [ ] assets of the plan in [their] own interest or for [their] own account," 29 U.S.C. § 1106(b)(1), because Aetna used plan assets to pay the administrative fees that it owed to Optum. [Id. at ¶ 97]. The Plaintiff clearly alleges prohibited transactions by the Defendants, and her claims are therefore not subject to dismissal on this basis.

Both Defendants argue that the Plaintiff's ERISA claims are subject to dismissal because the Plaintiff failed to exhaust her administrative remedies before filing the Complaint. Although ERISA does not expressly include an exhaustion requirement, courts have required plaintiffs to exhaust remedies before pursuing an ERISA action for denial of benefits under 29 U.S.C. § 1132(a)(1)(B). See Smith v. Sydnor, 184 F.3d 356, 361 (4th Cir. 1999). The Plaintiff, however, is not pursuing a claim for denied benefits in this action.

The Plaintiff is alleging a breach of fiduciary obligations, a claim which does not require the exhaustion of administrative remedies.  See Smith, 184 F.3d at 364-65.

The Defendants argue that the Plaintiff's breach of fiduciary duty claims are merely repackaged claims for benefits by another name, such that administrative exhaustion is still required.  [Doc. 42 at 28-34; Doc. 38 at 19-20].  The Plaintiff, however, is not challenging a "denial of benefits or an action related to a denial of benefits, but rather the *conduct* of the [fiduciaries] that [she] claims has lowered the value of [her] . . . Plan accounts."  Smith, 184 F.3d at 363; see also Stark v. Mars, Inc., 790 F. Supp. 2d 658, 669 (S.D. Ohio 2011) (holding that fiduciary duty claims based on "the alleged misrepresentations made to plaintiff, not [on] plaintiff's actual entitlement to benefits under the terms of the Plan" were "not simply repackaged benefits claims").  The Plaintiff has alleged that the Defendants engaged in conduct that violated their duties, separate and apart from any denial of benefits.  The Plaintiff does not allege that the Defendants denied benefits.  The Plaintiff alleges that the Defendants *granted* benefits, but then also charged an improper administrative fee back to the Plaintiff and/or her plan.   The resolution of these claims will turn on ERISA, not simply upon the terms of her plan. Accordingly, these claims need not have been exhausted.  Id.

In any event, exhaustion of remedies is an affirmative defense, not a prima facie element of an ERISA claim.  See, e.g., Am. Chiropractic Ass'n v. Am. Specialty Health Inc., No. 14-1832, 2015 WL 5313631, at *2-3 (3d Cir. Sept. 11, 2015).  As such, the Plaintiff was not required to plead exhaustion in order to survive the Defendants' motions to dismiss.  See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (stating that a Rule 12(b)(6) motion generally cannot reach the merits of affirmative defenses unless "*all* facts necessary to the affirmative defense clearly appear on the face of the complaint") (citation and internal quotation marks omitted; emphasis added).

Finally, Optum argues that the Plaintiff's fiduciary claims fail because § 1132(a)(2) authorizes recovery only for injuries to the plan, not for injuries to individual participants or beneficiaries.  [Doc. 38 at 28].  While recovery under 29 U.S.C. § 1132(a)(2) may benefit the Plaintiff's plan, that does not preclude the Plaintiff from bringing a claim under that section.  See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140 (1985) (noting that § 1132(a)(2) "authorizes a beneficiary to bring an action against a fiduciary who has violated [29 U.S.C. § 1109]"); LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 256 (2008) (holding that although § 1132(a)(2) does not provide a remedy for individual injuries, the statute "authorize[s]

recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account").

For all of these reasons, the Defendants' motions to dismiss the Plaintiff's ERISA claims are denied.

# O R D E R

**IT IS, THEREFORE, ORDERED** that OptumHealth Care Solutions, Inc.'s Motion to Dismiss the Complaint [Doc. 37] and the Motion of Defendants Aetna, Inc. and Aetna Life Insurance Company to Dismiss Plaintiff's Complaint [Doc. 39] are hereby **GRANTED IN PART** and Counts I and II of the Complaint are **DISMISSED WITH PREJUDICE**. In all other respects, the Defendants' Motions [Docs. 37, 39] are **DENIED**.

**IT IS SO ORDERED.**

Signed: August 31, 2016

Martin Reidinger
United States District Judge