# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:15-cv-00109-MR

| | | |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **O R D E R** |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion to Compel Aetna and Optum to Produce Documents Improperly Redacted or Withheld as Privileged [Doc. 89].

## I.     BACKGROUND

This a putative class action brought by the Plaintiff Sandra M. Peters against the Defendants Aetna, Inc., Aetna Life Insurance Company (collectively, "Aetna"), and OptumHealth Care Solutions, Inc. ("Optum"),

asserting claims pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA"). [Doc. 1].[1]

The Plaintiff is a former[2] member of an ERISA plan ("the Mars Plan" or "the Plan") self-funded by her husband's former employer, Mars, Inc. ("Mars"), for its employees and retirees. Mars, through its benefits committee, is the "Plan Administrator" for the Plan. [Aetna Ex. 6: Summary Plan Description at 57]. Through a Master Service Agreement, the Mars Plan hired Aetna to perform certain enumerated administrative services for the plan, including a specific delegation to act as the Plan's "Claim Fiduciary" with respect to adjudicating benefits claims and the first two levels of appeals under the Plan. In that regard, Mars delegated "discretionary authority [to Aetna] to determine entitlement to benefits . . . including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the Plan." [Aetna Ex. 2: Master Service Agreement at 00002790]. In another section titled "Fiduciary Duty," the Master Service Agreement provides that Mars "retains complete authority

---

[1] The Plaintiff also asserted claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"). The Plaintiff's RICO claims, however, have been dismissed. [See Doc. 54].

[2] The Plaintiff had primary medical coverage under the Mars Plan from approximately 1980 to February 1, 2015. Currently, she has coverage through Medicare. [Optum Ex. 2 at 5].

and responsibility for the Plan, its operation, and the benefits provided thereunder," and that Aetna is "empowered to act on behalf of [Mars] in connection with the Plan only to the extent expressly stated . . . ." [Id. at 00002772].

Beginning in 2012, Aetna entered into a series of provider contracts with Optum, by which Aetna agreed to pay Optum flat "per visit" rates for physical therapy, occupational therapy, and chiropractic services in particular markets. In exchange, Optum agreed to provide Aetna and its customers with access to Optum's network of treating providers, along with clinical oversight (also referred to as "patient management"), claims processing, and other administrative services related to this network. [Aetna Ex. 7: Aetna 30(b)(6) Dep. at 19; Aetna Exs. 12-15]. Optum would also pay its contracted providers for the services they performed. Because of this structure, there would often be a difference between the per visit rate paid by Aetna to Optum and the rate paid by Optum to its downstream treating provider, which would be paid to Optum as an "administrative fee."[3]

---

[3] In some instances, the amount paid by Optum to its downstream provider exceeded the amount Aetna paid to Optum. When that occurred, Optum absorbed that loss as a part of its overall operating arrangement with Aetna. [Optum Ex. 8: Eichten Dep. at 124-25].

In her Complaint, the Plaintiff alleges that Aetna and Optum fraudulently misrepresented such administrative fees as medical expenses. The Plaintiff alleges that these misrepresentations allowed Aetna to illegally (i) obtain payment of Optum's administrative fees directly from insureds when the insureds' deductibles have not been reached; (ii) use insureds' health spending accounts to pay for these fees; (iii) inflate insureds' co-insurance obligations using administrative fees; (iv) artificially reduce the amount of available coverage for medical services when such coverage is subject to an annual cap; and (v) obtain payment of the administrative fees directly from employers when an insured's deductible has been exhausted or is inapplicable. [Doc. 1]. The Plaintiff alleges that in so doing, the Defendants breached their fiduciary duties as plan administrators, in violation of 29 U.S.C. § 1132(a)(2) (Count III) and 29 U.S.C. § 1132(a)(1), (a)(3), and/or 29 U.S.C. § 1104 (Count IV). [Id.].

In November 2016, the Plaintiff served discovery requests on Defendants, seeking the production of certain documents. In response, the Defendants served their initial privilege logs asserting the attorney-client privilege. After meeting and conferring, the Defendants agreed to serve revised privilege logs, and the Plaintiff agreed to provide a list of categories of documents that were of particular interest to the Plaintiff under the

fiduciary exception to the attorney-client privilege. The Plaintiff's categories included legal advice related to the following topics:

1. Whether Optum was providing services that were covered under the terms of Aetna's plans;

2. Whether Defendants were permitted to use Optum's rates when assessing member and plan responsibility;

3. Whether it was proper for Defendants to represent Optum as a "provider" to plans and members;

4. Defendants' use of CPT[4] codes for services not performed by actual providers ("dummy codes") when administering claims for benefits;

5. Communications with plans and members about the Optum arrangement or related plan changes;

6. Defendants' medical loss reporting obligations;

7. The use of plan assets to compensate Optum (such as the provision in the Provider Agreements requiring Aetna to make direct payment to Optum from plans); and

8. Whether Optum's services were medically necessary under Aetna plans.

Aetna advised that it was not aware of any legal advice aside from advice falling into categories 5 and 6 (communications with plans and

---

[4] Current Procedural Terminology, or "CPT Codes" are standardized codes used to bill medical outpatient and office procedures. See generally https://www.ama-assn.org/practice-management/cpt-current-procedural-terminology?-process-how-code-becomes-code= (last visited July 26, 2018).

members about the Optum arrangement or related plan changes and the Defendants' medical loss reporting obligations), and Optum advised that it was only aware of the existence of legal advice falling into category 4 (Defendants' use of CPT codes for services not performed by actual providers when administering claims for benefits). The Defendants, however, refused to stipulate that they received no legal advice regarding the other categories.

The Defendants served revised privilege logs on December 8 and 11, 2017, and Optum served a supplemental log on December 22, 2017. At the Defendants' request, the Plaintiff sought to further narrow the dispute by highlighting documents that the Plaintiff believed were either subject to the fiduciary exception to the attorney-client privilege or were likely to be subject to that exception. The parties met and conferred again but were unable to resolve the dispute.

The Plaintiff now moves to compel the Defendants to produce certain documents that the Defendants have redacted or withheld as privileged. The Plaintiff contends that such documents must be produced because they are subject to the fiduciary exception to the attorney-client privilege. The Plaintiff further contends that Aetna is also improperly asserting work product privilege with respect to certain notes taken by Aetna employee Shiron

Hagens ("Hagens' Notes") regarding her communications with Optum employees concerning the Plaintiff's ERISA plan.  Accordingly, Plaintiff asks the Court to: (1) compel Aetna and Optum to produce the withheld documents that fall within the fiduciary exception; (2) conduct an *in camera* review of certain withheld documents that appear likely to be subject to the fiduciary exception; and (3) compel Aetna to produce Hagens' Notes.  [Docs. 89, 90 (sealed), 91 (redacted)].  The Defendants filed Responses in opposition [Docs. 100 (redacted), 101 (sealed), 102 (redacted), 103 (sealed)], and the Plaintiff filed Replies to each Response [Docs. 112 (sealed), 113 (sealed), 114 (redacted), 115 (redacted)].  The Court held a hearing on the Plaintiff's motion on June 19, 2018.

## II.    STANDARD OF REVIEW

Rule 26 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of

> discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Under Rule 37 of the Federal Rules of Civil Procedure, "a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). The decision to grant or deny a motion to compel is generally an issue within the broad discretion of the trial court. See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929 (4th Cir. 1995). However, the application of the attorney-client privilege presents a mixed question of law and fact for the Court. See In re Grand Jury Proceedings, 33 F.3d 342, 353 (4th Cir. 1994).

## III.    DISCUSSION

### A.    The Attorney-Client Privilege and the Fiduciary Exception

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "The privilege is intended to encourage full and frank communication between attorneys and their clients." United States v. Mett, 178 F.3d 1058, 1062 (9th Cir. 1999).

Because the attorney privilege "impedes the full and free discovery of the truth," the privilege must be "narrowly construed." Hawkins v. Stables, 148 F.3d 379, 383 (4th Cir. 1998) (citations and internal quotation marks

8

omitted). Thus, the Fourth Circuit has explained that the attorney-client privilege applies only when the following factors are met:

> (1) the asserted holder of the privilege is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982) (citation omitted). The privilege does not protect all aspects of an attorney-client relationship; rather, it "protects only confidential communications occurring between the lawyer and his client." Hawkins, 148 F.3d at 383-84. The party claiming the protection bears the burden of demonstrating the applicability of the attorney-client privilege. In re Grand Jury Proceedings, 33 F.3d at 353.

The Fourth Circuit has recognized an exception to the attorney-client privilege when the client procuring the legal advice is acting as a fiduciary for

9

another. As the Court explained in <u>Solis v. Food Employers Labor Relations</u> <u>Association</u>, the fiduciary exception is "[r]ooted in the common law of trusts" and "is based on the rationale that the benefit of any legal advice obtained by a trustee regarding matters of trust administration runs to the beneficiaries." 644 F.3d 221, 226 (4th Cir. 2011). "Consequently, trustees cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege." <u>Id.</u> at 226-27 (citation and internal quotation marks omitted). Noting that the exception has been applied to fiduciary relationships outside the context of traditional trusts, the <u>Solis</u> Court observed that courts typically rely on one of two related rationales for the application of the exception:

> [S]ome courts have concluded that the ERISA fiduciary's duty to act in the exclusive interest of beneficiaries supersedes the fiduciary's right to assert attorney-client privilege. Other courts, however, have reasoned that the ERISA fiduciary, as a representative of the beneficiaries, is not the real client in obtaining advice regarding plan administration and thus never enjoyed the privilege in the first place. **Under either rationale, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries.**

<u>Id.</u> at 227 (internal citations and quotation marks omitted; emphasis added).

10

The ERISA fiduciary exception, however, is not without its limits. "The exception will not apply, for example, to a fiduciary's communications with an attorney regarding her personal defense in an action for breach of fiduciary duty." Id. at 228; see also Mett, 178 F.3d at 1064 ("where a plan fiduciary retains counsel in order defend herself against the plan beneficiaries . . . the attorney-client privilege remains intact"). Likewise, "communications between ERISA fiduciaries and plan attorneys regarding non-fiduciary matters, such as adopting, amending, or terminating an ERISA plan, are not subject to the fiduciary exception." Solis, 644 F.3d at 228. Ultimately, determining whether communications relate to fiduciary matters such that the fiduciary exception applies "is a matter of context and content." Tatum v. R.J. Reynolds Tobacco Co., 247 F.R.D. 488, 495 (M.D.N.C. 2008).

While the Solis Court did not explicitly state who bears the burden of proving the applicability of the fiduciary exception,[5] the Fourth Circuit has held with respect to other exceptions to the attorney-client privilege that the party seeking to overcome the attorney-client privilege bears the burden of

---

[5] While not stating so explicitly, the Fourth Circuit appeared to acknowledge in Solis that the party asserting the fiduciary exception has the burden of proving that the exception applies. See Solis, 644 F.3d at 228 (rejecting argument that good cause must be shown in order "to overcome a privilege").

establishing that an exception applies.  <u>See, e.g.</u>, <u>Grand Jury Proceedings</u>, 33 F.3d at 352 (discussing crime-fraud exception to attorney-client privilege); <u>accord</u> <u>Mett</u>, 178 F.3d at 1064 (discussing fiduciary exception to attorney-client privilege).[6]

The attorney-client privilege is a significant cornerstone of our justice system.  It fosters open and frank consultation with learned counsel regarding legal matters.  <u>See</u> <u>Upjohn</u>, 449 U.S. at 389.  Accordingly, once a party has established that the attorney-client privilege is applicable to its communications with counsel, there is a presumption that the material is, and should remain, privileged.  Any exceptions to that privilege are narrowly construed.  "[W]here attorney-client privilege is concerned, hard cases should be resolved in favor of the privilege, not in favor of disclosure."  <u>Mett</u>, 178 F.3d at 1065.  "An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."  <u>Upjohn</u>, 449 U.S. at 393.

---

[6] The Plaintiff argues that, in light of their purported roles as fiduciaries, the Defendants bear the burden of demonstrating that the fiduciary exception does not apply to the challenged documents.  It makes no sense, however, to require a party – in this case, the Defendants – to bear the burden of demonstrating that the attorney-client privilege applies and *then* require the same party to prove a negative, that is, that an exception to that privilege does *not* apply.  This latter burden rightly falls on the shoulders of the Plaintiff.

**B.  The Disputed Documents**

The Plaintiff moves the Court to compel the Defendants to produce a number of documents identified in their privilege logs as protected under the attorney-client privilege.  Significantly, the Plaintiff does not challenge the applicability of the attorney-client privilege to any of these documents; rather, the Plaintiff argues that these documents should be produced to her under the fiduciary exception to the attorney-client privilege.

**1.  Optum Disputed Documents**

The Plaintiff argues that Optum should produce the following categories of documents identified in its privilege log:

- Optum's Claims and Payment Process. These log entries include legal advice about "claims-payment flow"; "claims processing and payment workflow"; "Aetna claims flow"; "per-visit pricing"; "payment process"; "Aetna claims process"; "claims-payment process"; "claims process"; "service model presentation"; "Aetna appeals process"; and "billing practices meeting". [See, e.g., Pl. Ex. 2: Optum Supp. Priv. Log Nos. 5, 208].

- Optum's Administrative Fees and CPT Codes. These log entries include legal advice about "administrative fees"; "administrative fees for Aetna claims"; "CPT codes"; "coding question"; "EOBs … and … administrative fees"; "DOI process/CPT coding"; and "administrative fees, CPT code, and coinsurance". [See, e.g., Pl. Ex. 2: Optum Supp. Priv. Log Nos. 20, 45, 46, 195].

- Optum's Compensation Structure. These log entries include legal advice about "compensation schedule"; "fee

13

schedule"; "services-and-compensation schedule"; "services-and-compensation provisions"; and "services-and-compensation addendum." [See, e.g., Pl. Ex. 2: Optum Supp. Priv. Log Nos. 49, 65, 88].

For the reasons that follow, the Court concludes that the Plaintiff has failed to establish that Optum was functioning as a fiduciary in relation to any of the issues addressed in these documents.

In determining the existence of a fiduciary duty, "the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) *when taking the action subject to the complaint*." Pegram v. Herdrich, 530 U.S. 211, 226 (2000) (emphasis added). ERISA defines a "fiduciary" as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Here, only Aetna has a contractual relationship with Mars and the Mars Plan. The contracts between Mars and Aetna specify that Mars is the "Plan Administrator" for the Mars Plan and "retains complete authority and responsibility for the Plan, its operation, and the benefits provided." [Optum Ex. 6 at 2]. These contracts further designate Aetna as the "Claim Fiduciary" with the "discretionary authority to determine entitlement to benefits under the applicable Plan documents." [Id. at 20, 46].

Optum has no contractual relationship with the Mars Plan. Rather, Optum contracts directly with Aetna to create and maintain provider networks for chiropractic and physical-therapy services. The Aetna-Optum relationship at issue comprises various contracts, including two Provider Agreements, two Delegated Credentialing Agreements, two Contract Oversight Claims Management Agreements, and two Delegated Patient Management agreements. Aetna negotiated those contracts with Optum for its system-wide business, not for the benefit of any particular Aetna plan. [See Optum Ex. 4: Optum 30(b)(6) Dep. at 47]. None of the Aetna-Optum contracts delegates to Optum discretionary authority to make benefits determinations for Aetna plans or gives Optum control over any plan's assets.

Optum plays a limited ministerial role in Aetna's claims process. When an Aetna plan member visits an Optum-contracted chiropractor or physical

therapist, that downstream network provider performs a service for the Aetna plan member and submits a claim to Optum. If a claim is untimely or missing required information, Optum processes what is called an "administrative denial." [Optum Ex. 8: Eichten Dep. at 66; Optum Ex. 4: Optum 30(b)(6) Dep. at 73-74]. This denial does not involve any discretion on the part of Optum; rather, it is a mechanical process governed by Aetna's claims-submission rules.

If the claim is timely and includes the required information, then Optum forwards the claim to Aetna. Aetna then determines whether to cover the claim and (if covered) how much to pay and sends its determination back to Optum. If Aetna decides that the claim is covered under the Aetna member's plan, then Aetna determines the member's financial responsibility (if any) and communicates its decision to Optum. Optum then pays the treating provider the contracted rate between Optum and that provider minus the amount that Aetna calculated as the member's financial responsibility. [Optum Ex. 8: Eichten Dep. at 111; Optum Ex. 4: Optum 30(b)(6) Dep. at 62, 117]. Depending on the services and plan at issue, Aetna may pay Optum more or less than what Optum pays the downstream providers. [Optum Ex. 8: Eichten Dep. at 124-25].

Here, the actions that are the subject of the Plaintiff's Complaint are the benefits determinations that *Aetna* makes under the Mars Plan and the EOBs that Aetna sends to plan participants for approved claims. According to the Plaintiff, *Aetna* should have calculated her financial responsibility based on the rates that Optum separately negotiated with its contracted network providers and not on the rates that Aetna separately negotiated with Optum.  [See e.g., Optum Ex. 1: Peters Dep. at 52, 248].

With respect to this issue, the Mars Plan makes clear that Aetna, not Optum, has the authority to determine a plan member's financial responsibility.  Because it is clear that Optum did not manage or administer this aspect of the Plan, the Court must conclude that Optum was not acting in a fiduciary capacity with respect to the actions complained of by the Plaintiff.

The Plaintiff nevertheless claims that Optum is a fiduciary because: (1) Aetna granted Optum the authority to grant or deny benefit claims; (2) the contract between Aetna and Optum allowed Optum to control its own compensation for its services; and (3) Optum had control over the amount of administrative charges it would collect, which charges were taken out of plan assets.

Contrary to the Plaintiff's argument, however, the record before this Court shows that Aetna retains all discretionary authority to pay or deny benefits claims. Aetna sends the EOBs for benefits claims processed under the Aetna-Optum contracts, and Aetna possesses the unilateral right to change the claims-processing rules that Optum must follow. Optum, on the other hand, serves a "purely administrative role" in this process — managing a network of its own contracted providers and processing claims under Aetna's rules to send to Aetna so that Aetna can determine coverage. See McKeehan v. Cigna Life Ins. Co., 344 F.3d 789, 792 (8th Cir. 2003) (distinguishing between a third party hired to perform "ministerial claims processing functions" and "a plan administrator wielding discretionary authority"); 29 C.F.R. § 2509.75-8 D-2 ("[A] person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.").

Optum has no authority to decide whether a particular claim is covered under a particular Aetna plan and cannot pay itself, much less pay itself out of a particular plan's assets. Rather, Optum "review[s], bill[s], and pay[s]" claims to providers who render services in accordance with Aetna's rules. [Optum Ex. 11: PT/OT Contract Oversight Claims Mgmt. Agmt., at 3, § 1.6; id. at 4, § 2.1]. Optum does not make benefits determinations; Aetna does and decides all appeals from its members. [Id. at 7, § 2.5]. Optum simply has no discretion with respect to the granting or denying of benefit claims. See Baxter v. C.A. Muer Corp., 941 F.2d 451, 455-56 (6th Cir. 1991) (holding that claims processor who only had authority to pay out benefits according to the terms of the established plan was not an ERISA fiduciary). No discretion equates to no fiduciary status.[7]

The Plaintiff also argues that Optum is a fiduciary because it "control[s] its own compensation for its services." [Doc. 90 at 21]. Contrary to the Plaintiff's argument, however, Optum does not unilaterally set its own

---

[7] At the hearing on the motion to compel, the Plaintiff's counsel argued that Optum is a fiduciary even if it has no discretion because it "exercises . . . authority or control respecting management or disposition of [plan] assets," citing 29 U.S.C. § 1002(21)(A). The Plaintiff cites to no court that has interpreted this provision in such a manner. Indeed, the Plaintiff's interpretation of this language turns basic fiduciary concepts on their head. A fiduciary is obligated to act in the best interests of its beneficiaries. If the fiduciary has no discretion in the discharge of its duties, the fiduciary has no ability to alter its conduct in order to further the beneficiaries' interests.

compensation. Optum's compensation was a product of arm's length negotiations. [See Doc. 91-1: Hagens Decl. at ¶ 5; Optum Ex. 4: Optum 30(b)(6) Dep. at 59]. "[W]hen a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms." Santomenno v. John Hancock Life Ins. Co., 768 F.3d 284, 293 (3d Cir. 2014). If Aetna decides to cover a particular claim, the contracts specify how much Aetna will pay Optum. That amount does not change unless the parties renegotiate their contract. [Optum Ex. 7: PT/OT Prov. Agmt. at 44-233]. Further, Optum negotiated at arm's length with its network providers regarding what those providers would accept as payment for services. In those circumstances, the service provider "owe[s] no fiduciary duty" to the plan. See In re Express Scripts/Anthem ERISA Litig., No. 16 Civ. 3399, 2018 WL 339946, at *15 (S.D.N.Y. Jan. 5, 2018) ("[T]hat ESI earns its compensation by charging an insurance provider more than it paid to the retail pharmacy . . . does not transform it into a fiduciary."), appeal filed, Feb. 5, 2018; In re UnitedHealth Grp. PBM Litig., No. 16-cv-3352, 2017 WL 6512222, at *10 (D. Minn. Dec. 19, 2017) ("negotiating and setting discounted rates . . . [are] not [] fiduciary function[s]").

The Plaintiff also argues that Optum is an ERISA fiduciary because it controls plan assets by deciding how much to charge Aetna for administrative services.  As discussed above, however, Optum (as a third-party service provider) and Aetna (as claims administrator) "negotiate[d] at arm's length over the terms of their agreement," so "discretionary control over plan management lies not with [Optum] but with [Aetna], who decides whether to agree to the service provider's terms."  Santomenno, 768 F.3d at 293.  Because Aetna "exercise[s] final authority in deciding whether to accept or reject" the terms of the contracts with Optum, Optum "owe[s] no fiduciary duty" to any specific Aetna plan.  Id.  In any event, a third-party vendor does not control plan assets simply by charging for its services.  See, e.g., Malone v. Teachers Ins. & Annuity Ass'n of Am., No. 15-cv-8308, 2017 WL 913699, at *4 (S.D.N.Y. Mar. 7, 2017) ("[T]hat the fees used to pay for the recordkeeping services are collected *from* Plan assets does not give the collector of those fees authority *over* Plan assets.") (emphasis in original).

In sum, the Plaintiff has failed to demonstrate that Optum was functioning as a fiduciary with respect to any aspect of the Mars Plan. Accordingly, the Court concludes that the fiduciary exception does not apply, and Optum is not required to produce any documents that it has claimed are subject to the attorney-client privilege.

### 2. Aetna Disputed Documents

The Plaintiff argues that Aetna should produce a number of documents identified in its privilege log.  The Plaintiff argues that these documents are not privileged pursuant to the fiduciary exception to the attorney-client privilege.  While Aetna does not dispute that it served in a limited fiduciary role in the administration of the Plaintiff's Plan, it argues that the documents at issue relate to legal advice obtained with respect to its non-fiduciary functions.

In arguing in favor of disclosure, the Plaintiff asserts that essentially everything that Aetna does as a plan administrator is "related to plan administration" and thus is subject to disclosure under the fiduciary exception, unless it is a communication specifically related to the defense of this legal action.  The authorities the Plaintiff cites in support of this proposition, however, do not support such an expansive rule.  As stated by the Court in Solis, the application of the fiduciary exception with respect to any particular communication is a question of "context and content."  Solis, 644 F.3d at 231 (citing Mett, 178 F.3d at 1064; Tatum, 247 F.R.D. at 495).  The Solis Court also acknowledged, however, that the fiduciary exception is "not without limits" and therefore will not apply to communications between an ERISA fiduciary and its counsel "regarding non-fiduciary matters."  Solis,

644 F.3d at 228. Accordingly, to determine whether these otherwise privileged documents are subject to the fiduciary exception, the Court must first determine whether these documents relate to issues of "plan administration" as opposed to other non-fiduciary functions of Aetna as the claims administrator.

The Plaintiff first seeks Aetna's privileged communications regarding "Aetna's Decision to Hire Optum/Contract Negotiations with Optum." [Doc. 90 at 13]. Aetna's privilege log identifies these documents as including "legal advice of counsel regarding response to Optum Statement of Work"; legal advice "regarding contract negotiations with Optum"; and legal advice "regarding Optum provider contracts." [See, e.g., Pl. Ex. 1: Aetna Initial Privilege Log at PRIV-015, PRIV-052, PRIV-081]. All of these communications, however, concern Aetna's negotiations with Optum to establish and maintain a provider network that benefited a broad range of health-care consumers and were not directly associated with the Plaintiff's Plan or *any* other particular benefit plan. In this regard, Aetna sought counsel regarding a prospective business arrangement and association. Courts have held that these type of network contracting negotiations are not fiduciary functions. See, e.g., DeLuca v. Blue Cross Blue Shield of Mich., 628 F.3d 743, 747 (6th Cir. 2010). Aetna, not the Plaintiff, was the "real

23

client" when Aetna's network personnel sought legal advice while negotiating and implementing this system-wide contractual relationship.

The Plaintiff argues that Aetna nevertheless acted as a fiduciary because "appointing an ERISA fiduciary is itself a fiduciary act." [Doc. 90 at 25-26]. However, there is nothing in the record to show that Aetna ever appointed Optum as a fiduciary. As noted above, the only claims processing function performed by Optum exclusively involved the "review, billing, and payment of health care claims to" treating providers who contracted with Optum. [Aetna Ex. 14: Contract Oversight Claims Mgmt. Agmt. at 2 § 1.6]. At all times, Aetna retained decision-making authority over coverage determinations and decided all appeals from its members. [Id. at 7 § 2.5; Aetna Ex. 15: Delegated Patient Mgmt. Agmt. at 6 § 2.4; id. at 22 § 3; see also Aetna Ex. 11: Optum 30(b)(6) Dep. at 53 (Aetna "make[s] all final decisions"); Aetna Ex. 7: Aetna 30(b)(6) Dep. at 109 (stating that Optum does not make claims determinations; "Aetna adjudicates the claims")]. Optum's discrete claims processing and clinical oversight functions, which relate to the administration of its own network of treating clinicians, do not transform Optum into a fiduciary to any of the plan participants. See, e.g., HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross, 101 F.3d 1005, 1009 (4th Cir. 1996) ("Given [the administrator's] limited role in processing claims under the Plan

and reading a computer screen to determine who is and who is not covered, it is clear that [the administrator] is not a fiduciary under the Plan"); <u>Baxter</u>, 941 F.2d at 455-56 (holding that claims processor who only had authority to pay out benefits according to the terms of the established plan was not an ERISA fiduciary).

The Plaintiff also moves to compel production of Aetna's privileged communications about "Draft Communications about Optum Relationship." [Doc. 90 at 13]. The documents at issue involve drafts of Aetna's "field communications" to its internal account teams: "communications to and for use by Aetna accounts teams regarding [the] Optum relationship," including any "attached draft field communication[s] and draft plan sponsor letter[s]." [<u>See, e.g.</u>, Pl. Ex. 1: Aetna Initial Privilege Log at PRIV-025]. Aetna issued these field communications to its account teams (the teams that interact with plan sponsors for particular "accounts") to announce Aetna's roll-out of the Optum relationship in particular markets (or, in later years, changes to the relationship). [Aetna Ex. 7: Aetna 30(b)(6) Dep. at 130, 131]. The purpose was to educate Aetna's account teams so that they could understand the Optum relationship and communicate with plan sponsors about it as needed. [<u>Id.</u> at 130]. Aetna's network personnel sought legal advice on these field

communications because they related to Aetna's contracts with Optum, as well as other contractual and legal requirements.[8]

Aetna's draft field communications do not fall within any fiduciary function under the Plaintiff's plan or any other plan. These communications do not relate to any particular benefits claim, and there is no evidence that the Plaintiff or any other ERISA plan beneficiary ever saw the field communications. The cases that the Plaintiff cites involving direct communications to ERISA plan *beneficiaries* are inapposite. See, e.g., Durand v. Hanover Ins. Grp., Inc., 244 F. Supp. 3d 594, 624 (W.D. Ky. 2016) (communication "to Plan beneficiaries"); Tatum, 247 F.R.D. at 496-97 (same). Moreover, Aetna's field communications were not part of any fiduciary function owed to the Plaintiff's plan or any particular ERISA plan; they were system-wide communications to Aetna's account teams, including teams responsible for non-ERISA plans completely irrelevant to this case. The Plaintiff has failed to demonstrate that these documents come within the

---

[8] It should be noted that Aetna has produced the final field communications. [See Aetna Ex. 16]. The Plaintiff, however, seeks to discover the attorney advice and input regarding the drafting of these communications. In Solis, the Court specifically identified communications between an ERISA fiduciary and the plan's attorneys regarding actions in amending a plan as "non-fiduciary matters" and thus not discoverable. See Solis, 644 F.3d at 228. Likewise, legal advice received by Aetna regarding how to communicate to the Plans regarding the modification or amendments to the manner of processing claims would be a "non-fiduciary matter."

purview of the fiduciary exception. Accordingly, the Court concludes that these draft communications are not subject to disclosure under the fiduciary exception.

The Plaintiff seeks privileged communications about Aetna's medical loss ratio (or "MLR") reporting to government agencies. [See, e.g., Pl. Ex. 1: Aetna Initial Privilege Log at PRIV-164]. Under the Affordable Care Act, "health insurance issuer[s] offering group or individual health coverage" must submit data reflecting the proportion of premium revenues spent on clinical services and quality improvement as opposed to all other non-claims costs. 42 U.S.C. § 300gg-18(a). Insurers must annually submit aggregated MLR reports (not broken down by plan) to the Secretary of Health and Human Services. See 45 C.F.R. § 158.120.

The Plaintiff has failed to show how the reporting of this data falls within Aetna's fiduciary functions to her or her Plan. Indeed, because the Plaintiff's plan is self-funded, these MLR requirements are not even applicable to the Mars Plan. [Aetna Ex. 17: CMS, CCIIO Technical Guidance (CCIIO 2012-2): Questions and Answers Regarding the Medical Loss Ratio Regulation, Answer #23]. Accordingly, the Court concludes that Aetna should not be required to produce these documents under the fiduciary exception to the attorney-client privilege.

## C.    *In Camera* Review

The Plaintiff contends that the Defendants have either redacted or withheld documents as to which it appears highly likely that the fiduciary exception will apply, although the Plaintiff contends that the Defendants' descriptions of these documents are too vague for the Plaintiff to tell whether they do in fact contain legal advice regarding the performance of any fiduciary obligation.  For these categories, the Plaintiff asks that the Court compel Defendants to produce a sample of these documents for an *in camera* review.  For Aetna, these entries include documents containing legal advice relating to:

(1)    "complaint to North Carolina Department of Justice";

(2)    "Optum relationship" and "Optum contractual relationship";

(3)    "Optum claims handling";

(4)    "relationships with Optum-contracted providers" and "provider relationships";

(5)    "North Carolina Department of Insurance inquiry";

(6)    "lawsuit, with attached filed complaint"; and

(7)    "vendor relationships."

[See Doc. 90 at 14]. For Optum, these documents include legal advice relating to:

(1) "draft provider agreements" and "provider agreement";

(2) "provider complaints";

(3) "Aetna contract" and "contract language" and "Aetna contractual arrangement" and "legal review of contract" and "Aetna MA Base Agreement" and "Aetna addendum" and "contract negotiation" and "various Aetna contract issues";

(4) "Aetna's and Optum's relationship";

(5) "proposed geographic expansion" and "classification (risk vs. ASO) of contractual geographic expansion" and "[s]preadsheet about transferring risk";

(6) "legal advice about litigation" and "legal work on unrelated litigation" and "Aetna contracts and litigation status";

(7) "Aetna SE … Gross vs Net Accounting";

(8) "Aetna Maryland issues";

(9) "historic legal advice … about administrative fees";

(10) "right to appeal";

(11) "chiropractic services agreement" and "physical health services agreements";

(12) "southeast physical health deals";

(13) "contractual risks in Aetna … markets"; and

(14) "spreadsheet displaying Aetna Action Log."

[Id. at 14-15].

The Court may engage in an *in camera* review of documents that are claimed to be privileged in order to determine whether an exception to such privilege applies. United States v. Zolin, 491 U.S. 554, 572 (1989) (permitting *in camera* review to determine whether crime-fraud exception applies). Before the Court may engage in such a review, the movant must present "a factual basis adequate to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the . . . exception applies." Id. (internal citation omitted). Once that threshold showing is made, the determination of whether to engage in an *in camera* review is a matter of the Court's discretion. Id.; In re Grand Jury Proceedings, 33 F.3d at 350.

Here, the Plaintiff has failed to demonstrate a factual basis sufficient to support a good faith belief that *in camera* inspection may reveal evidence that the information in the materials is not privileged under the fiduciary exception to the attorney-client privilege. First, the Defendants' privilege logs show that these privileged communications relate to non-fiduciary functions;

30

for the reasons discussed above, these communications remain privileged. Moreover, the Defendants' privilege logs reveal that several of these communications relate to legal advice given once Aetna's relationship with the Plan's participants became adversarial. For example, Aetna has entries on its privilege log related to "legal advice relating to . . . 'complaint to North Carolina Department of Justice'; . . . [and] 'North Carolina Department of Insurance inquiry.'" [Pl. Ex. 1: Aetna Initial Privilege Log]. These documents, which date from December 2014, involve Aetna's responses to state regulators regarding Plaintiff's complaints about alleged "up-charging fraud." [See, e.g., Aetna's Ex. 18, July 23, 2014 Letter]. These communications do not appear to involve Aetna's fiduciary function but rather concern advice sought to protect Aetna from liability. See Mett, 178 F.3d at 1066 ("while the fiduciary exception does apply to advice on matters of plan administration, the attorney-client privilege reasserts itself as to any advice that a fiduciary obtains in an effort to protect herself from civil or criminal liability"). In short, the Plaintiff has failed to establish a factual basis sufficient to support a good faith belief that *in camera* inspection may reveal evidence that the information in these documents relate to plan administration. Accordingly, the Court in the exercise of its discretion declines to conduct an *in camera* review of these additional documents.

### D.    Hagens' Notes

Finally, the Plaintiff moves to compel the production of handwritten notes taken by Shiron Hagens, an Aetna employee.   Aetna withheld production of these notes on the grounds that they were prepared at the direction of counsel in connection with Aetna's ongoing defense of this litigation and thus constitute protected work product.  The Plaintiff counters that the fiduciary exception applies equally to the work product privilege, and these notes fall within that exception.  Further, even if the notes are protected work product, the Plaintiff argues that she has a substantial need for their disclosure because, due to the timing of Aetna's disclosure of the existence of these notes, the Plaintiff was unable to question Ms. Hagens about the underlying communications.

In order to invoke the work product privilege, a party must show that the work product in question was prepared by, or at the direction of, an attorney in anticipation of litigation.  E.I. Dupont de Nemours and Co. v. Kolon Indus., Inc., 269 F.R.D. 600, 604 (E.D. Va. 2010). Fact work product, such as the notes at issue here, is discoverable only "upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship."  In re Grand Jury Proceedings, 33 F.3d at 348.

The notes that the Plaintiff seeks were prepared by Shiron Hagens, a Senior Network Manager at Aetna who worked on the Optum relationship. Ms. Hagens explains in her Declaration that she prepared these notes in 2017 at the direction of two Aetna in-house attorneys in connection with Aetna's defense of this case. [Aetna Ex. 19: Hagens Decl.]. On March 30, 2017, the two Aetna attorneys (Stephen Fisher and William Kramer) advised and directed Jennifer Cross (Ms. Hagens' supervisor) to have a discussion with Optum about questions raised by the Plaintiff's plan sponsor in connection with this litigation. [Id. at ¶ 3]. Ms. Cross conveyed that direction to Ms. Hagens, who had a discussion with Optum and took notes so that she could report back to Ms. Cross and Aetna's legal counsel. [Id.]. Ms. Hagens and Ms. Cross reported back to the same two Aetna attorneys on April 11, 2017, at which point Ms. Cross and Ms. Hagens were advised and directed by counsel to have another discussion with Optum, which occurred on April 12, 2017. [Id. at ¶ 7, 8]. Ms. Hagens again took notes so that she could report back to counsel. [Id. at ¶ 8]. Ms. Hagens understood that she was acting at the direction of Aetna's in-house attorneys in connection with Aetna's defense of this litigation. [Id. at ¶ 4]. She has kept the notes confidential. [Id. at ¶ 9].

Hagens' notes fall squarely within the work product doctrine. They were prepared at the direction of counsel in the midst of ongoing litigation with the Plaintiff.[9] And even assuming that the fiduciary exception applies to work product, it is clear that Aetna's relationship with the Plan was adversarial at the time these notes were taken. As such, the fiduciary exception is simply not applicable. Further, the Plaintiff has not demonstrated any substantial need for these notes, as the Plaintiff's counsel has already been able to question two Optum employees regarding any non-privileged facts that could be learned from their discussions with Hagens, and has discovered the notes of those Optum employees. For all of these reasons, the Plaintiff's motion to compel Hagens' Notes is denied.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion to Compel Aetna and Optum to Produce Documents Improperly Redacted or Withheld as Privileged [Doc. 89] is **DENIED**.

---

[9] The notes of the Optum participants in the meeting were not prepared at counsel's direction and thus have been produced.

**IT IS SO ORDERED.**

Signed: July 27, 2018

Martin Reidinger
United States District Judge