# EXHIBIT 1 (REDACTED - MOTION TO SEAL PENDING)

```
 1              UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                    ASHEVILLE DIVISION
 3    - - - - - - - - - - - -x
         SANDRA M. PETERS,    :
 4       on behalf of         :
         herself and all      :
 5       others similarly     :
         situated,            :
 6                            :  Case No.
            Plaintiff,        :
 7                            :  1:15-cv-00109-MR
            v.                :
 8                            :
         AETNA, INC.; AETNA   :
 9       LIFE INSURANCE       :
         COMPANY; and         :
10       OPTUMHEALTH CARE     :
         SOLUTIONS, INC.,     :
11                            :
            Defendants.       :
12    - - - - - - - - - - - -x
                            Wednesday, May 30, 2018
13                              Washington, D.C.
14
15    Videotaped Deposition of:
16              CONSTANTIJN PANIS, Ph.D.,
17    called for oral examination by counsel for the
18    Defendants, pursuant to notice, at the law offices
19    of Gibson, Dunn & Crutcher, LLP, 1050 Connecticut
20    Avenue, Northwest, Washington, D.C. 20036-5306,
21    before Christina S. Hotsko, RPR, CRR, of Veritext
22    Legal Solutions, a Notary Public in and for the
23    District of Columbia, beginning at 7:10 a.m., when
24    were present on behalf of the respective parties:
25
```

Case 1:15-cv-00109-MR Document 160-1 Filed 09/07/18 Page 2 of 73

1      A.   Yes.

2      Q.   The top of the page on page 1, there's a

3   section entitled Scope of Work.

4           Do you see that?

5      A.   Yes.

6      Q.   Does this section reflect the assignment

7   you were given by plaintiff's counsel?

8      A.   Yeah.  Although it's a little vague,

9   right?  It says to provide an opinion on certain

10  aspects related to potential class certification.

11     Q.   I agree it's a little vague.  I'm going

12  to ask you about that.

13     A.   Yes.

14     Q.   So let's -- let's start just by asking,

15  is that an accurate reflection of what your

16  assignment was from plaintiff's counsel?

17     A.   It's accurate.  Yes.

18     Q.   What were the certain aspects that you

19  were asked to provide an opinion on?

20     A.   I believe they are spelled out in more

21  detail later on in the report.  Let's go to

22  page 9.  Specifically, I was asked to look at

23  the -- the gains that the -- revenues that Optum

24  derived from the alleged arrangement.

25           On page 10, I was asked to -- or

1  actually it's a little earlier.  I was also asked

2  to establish the number of plan members and plans

3  that were involved.  I forget exactly where that

4  is located.

5        And then starting at the bottom of page

6  10, I was asked to analyze claims for which the

7  responsibility of the plan and the member

8  combined were equal to the Aetna-allowed amount

9  and exceeded the provider-allowed amount.

10      Q.  Any other aspects that you were asked to

11  provide an opinion on by plaintiff's counsel?

12      A.  Not that I recall.  Though there might

13  be some other ones, small ones.

14      Q.  And did you reach any opinions on those

15  aspects --

16      A.  I did.

17      Q.  -- that you just described?

18      A.  I did.

19      Q.  And can you direct me in the report to

20  your opinions?

21      A.  Perhaps the easiest thing to do is to go

22  to page 14, the summary.  Paragraph 54 lists the

23  number of plans and the number of members who

24  were overcharged as a result of the alleged

25  agreement.

1       Paragraph 55 shows the gains that Optum

2  derived from this agreement.

3       Paragraph 56, it indicates the amounts

4  by which plans and members were overcharged.

5     Q.  So those three paragraphs summarize your

6  opinions in this case?

7     A.  Yeah.  Of course the whole report is

8  relevant, but these are the salient features that

9  I would like to communicate.

10     Q.  Is it your view that these statements in

11  paragraphs 54 to 56 are expert opinions?

12     A.  Yes.

13     Q.  And what expertise are you relying on to

14  make the statements in paragraphs 54 to 56?

15     A.  It's an understanding of the way in

16  which medical payments -- medical services are

17  paid for by plans, by members, through

18  co-payments, deductibles, and co-insurance.  So

19  it's a knowledge of medical claims and then

20  there's knowledge about data processing that is

21  required to add up the numbers.

22     Q.  And other than adding up the numbers,

23  what other opinions are reflected here in

24  paragraphs 54 to 56?

25     A.  I believe they speak for themselves.

1      Q.  Are you providing an opinion in this
2  case on whether a class should be certified?
3      A.  I'm not, no.
4      Q.  Were you asked to consider whether a
5  class should be certified by plaintiff's counsel?
6      A.  No.
7      Q.  Do you have an understanding of why not?
8          MR. KNOTT:  Object to the form.
9          THE WITNESS:  No.  I've not thought
10  about it.
11  BY MR. SIGLER:
12     Q.  Could you turn, please, to paragraph 10
13  of your report.
14     A.  Yes.
15     Q.  Paragraph 10 refers to the fact that you
16  routinely analyze healthcare claims.
17         Do you see that?
18     A.  Yes.
19     Q.  Now, earlier today you were describing
20  some of your involvement in other litigation
21  matters such as False Claims Act cases.
22         Are there any matters you've been
23  involved in that you view as particularly
24  relevant to your work in this case?
25         MR. KNOTT:  Object to the form.

1  did you get your understanding reflected here in

2  paragraph 11?

3      A.  In part from Mr. Knott, plaintiff's

4  counsel, and in part from reviewing the various

5  materials that I listed at the end of my report.

6      Q.  And the second and third sentence of

7  paragraph 11 refer to allegations in the case,

8  correct?

9      A.  Correct.

10     Q.  And in the second sentence when you

11 refer to the plaintiff's allegations, where did

12 you get that understanding?

13     A.  That could have been from the complaint.

14 It probably was from the complaint and from

15 discussions with counsel.

16     Q.  And when you refer to plaintiff's

17 allegation that participants' beneficiaries plans

18 were overcharged for benefit claims as a result

19 of charges by Optum, are you offering an opinion

20 in this case on whether that allegation is

21 correct?

22     A.  No, I'm not.

23     Q.  So for purposes of your report, you have

24 accepted that allegation as true; is that

25 correct?

1      A.  Let me maybe -- let me see here.  I

2  calculate overcharges.  So I've reviewed the data

3  and I concluded that, indeed, plan participants

4  and beneficiaries and plans were overcharged.

5          So I guess I accept that allegation.  I

6  mean, I confirm the allegation.  Let's put it

7  that way.

8      Q.  Are you -- but are you providing an

9  opinion that the amounts you calculated were

10  overcharges that resulted from charges by Optum?

11      A.  Yes.

12      Q.  And are you providing an opinion that

13  those overcharges were improper?

14      A.  No.  That would be a legal issue.

15      Q.  In the third sentence of paragraph 11,

16  you say that, "Optum's services are allegedly

17  concealed as medical services, which were billed

18  to health benefit plans and paid in part by

19  members of those plans or the plans themselves."

20          Is that a summary of the plaintiff's

21  allegations?

22      A.  It is among the allegations.

23      Q.  And are you offering an opinion on

24  whether this allegation is correct?

25      A.  I've noticed in the data that certain

1      A.  Yes.

2      Q.  Paragraph 15 contains your understanding

3    of the plan member class that plaintiff seeks to

4    have certified, correct?

5      A.  Yes.

6      Q.  And again, you're not offering an

7    opinion that this class should be certified,

8    correct?

9      A.  No.  I'm not offering any legal

10   opinions.

11     Q.  But you're not offering any opinion that

12   the class should be certified, correct?

13     A.  Correct.

14     Q.  Now, the second sentence of this

15   paragraph says, "Members may have been

16   overcharged to the extent that they were

17   responsible for Optum charges included in medical

18   claims," correct?

19     A.  Correct.

20     Q.  And are you offering an opinion that

21   members actually were overcharged or that they

22   may have been overcharged?

23     A.  Not every member was overcharged.  Some

24   members did not have any out-of-pocket expenses,

25   for example, so they would not have been

1    recover damages in the case?

2          MR. KNOTT:  Object to the form.

3          THE WITNESS:  Again, I'm not offering an

4    opinion on damages even.  I'm offering an opinion

5    about overcharges.  And whether that was improper

6    is a legal issue.  So the damages would be a

7    legal issue.

8          But it is my opinion that if a member

9    was not overcharged, that I would not identify

10   this person as a putative class member.

11         And I mentioned earlier some plan

12   members did not have any out-of-pocket expenses,

13   so they would not have been overcharged.  But

14   some members paid deductibles.  And in almost all

15   cases where deductibles were paid, there was no

16   overcharge either.  So there was no out-of-pocket

17   expense, but not an overcharge.

18   BY MR. SIGLER:

19      Q.  But you agree that if a member did not

20   have any out-of-pocket expenses, that member has

21   not been overcharged, correct?

22      A.  Correct.

23      Q.  And if a member paid a deductible, you

24   agree the member has not been overcharged?

25      A.  On that particular claim.  Correct.

1      Q.  And let me go back to something you said
2    earlier.  You said that you're not providing an
3    opinion in this case on damages?
4          MR. KNOTT:  Object to the form.
5          THE WITNESS:  Correct.
6  BY MR. SIGLER:
7      Q.  As an economist, do you understand what
8    damages are?
9      A.  I do.  But I believe that you're
10   challenging whether the overcharges were proper,
11   and I'm not getting into proper or improper
12   discussions.
13         So the actual damages, you know, I'm
14   relying on counsel to tell me whether overcharges
15   equal damages or whether the damages are some
16   different amount.  I'm not getting into the legal
17   aspects of that.
18     Q.  So when you provide calculations in your
19   report of overcharges, you're not providing an
20   opinion on whether those calculations reflect
21   proper or improper overcharges?
22     A.  Correct.
23     Q.  You're just providing an opinion and
24   calculation on the difference between one set of
25   numbers and another set of numbers, not providing

1  an opinion on which set of numbers is correct; is
2  that fair?
3          MR. KNOTT:  Object to the form.
4          THE WITNESS:  That's fair.
5  BY MR. SIGLER:
6      Q.  Now, have you ever provided an expert
7  opinion on damages in any other case?
8      A.  Yes.
9      Q.  And in that other case, you were able to
10  opine on what constitutes damages without
11  worrying about whether it's a legal issue?
12          MR. KNOTT:  Object to the form.
13          THE WITNESS:  Because counsel would tell
14  me what types of amounts would be part of the
15  damages.
16  BY MR. SIGLER:
17      Q.  As an economist, what does the
18  word "damages" mean?
19          MR. KNOTT:  Object to the form.
20          THE WITNESS:  It's not an economic term.
21  So as an economist, my opinion -- my
22  understanding of damages is similar to the
23  layman's understanding.
24  BY MR. SIGLER:
25      Q.  Okay.  Well, as a layman understanding,

1   what does "damages" mean?

2          MR. KNOTT:  Object to the form.

3          You can answer.

4          THE WITNESS:  It is monetary amounts

5   that were lost due to a certain behavior, an

6   improper behavior.

7   BY MR. SIGLER:

8      Q.  And is it your understanding that the

9   overcharges alleged by plaintiff in this case

10  meet that definition?

11     A.  Well, again, that's a legal issue, you

12  know, whether these overcharges were proper or

13  not.  And I'm not opining on that.  I'm just

14  calculating what the overcharges were or, as you

15  categor -- as you phrased it, calculating the

16  difference between two numbers.

17     Q.  And why is it necessary to a calculation

18  of damages to know whether the conduct at issue

19  was proper or not?

20         MR. KNOTT:  Object to the form.

21         THE WITNESS:  Again, that sounds like a

22  legal issue.  But if -- if the judge or jury

23  decides that the arrangement was perfectly legal,

24  then I believe there would be no damages.  There

25  would have been overcharges the way I calculated

1      Q.  And did you consider the discussions

2    with counsel in reaching a view on whether the

3    amended complaint impacts your report in this

4    case?

5      A.  Can you repeat that?

6           MR. SIGLER:  Could you read it back?

7           (The reporter read the record as

8           requested.)

9           THE WITNESS:  Nothing surfaced that

10   would lead me to believe that I would need to

11   amend my report.

12   BY MR. SIGLER:

13      Q.  Is it possible that you would want to

14   amend your report or offer a new report if the

15   amended complaint were accepted?

16           MR. KNOTT:  Object to the form.

17           THE WITNESS:  It's possible.  Again, I

18   have not reviewed the amended complaint in

19   detail.  I haven't seen anything that would

20   prompt me to revise my report, but it's possible.

21   BY MR. SIGLER:

22      Q.  Let's go back to the report,

23   paragraph 16.

24      A.  Yes.

25      Q.  Does paragraph 16 reflect your

1    understanding of what health benefit plan class

2    plaintiff seeks to have certified?

3        A.  Yes.

4        Q.  And you're not providing an opinion on

5    whether this class, this proposed class, should

6    be certified, correct?

7        A.  Correct.

8        Q.  Now, on the second sentence you make the

9    statement "Plans may have been overcharged to the

10   extent they were responsible for Optum charges

11   included in medical claims."

12          Do you see that?

13       A.  Yes.

14       Q.  And are you offering an opinion on

15   whether plans actually were overcharged or

16   whether they may have been overcharged?

17       A.  It's possible that some plans did not

18   make any payments, and they would not have been

19   overcharged.

20       Q.  And so is it your opinion that plans may

21   have been overcharged depending on their

22   particular claims experience?

23          MR. KNOTT:  Object to the form.

24          THE WITNESS:  Yes.

25

1  BY MR. SIGLER:

2      Q.  And how would you find out whether any

3  particular plan was overcharged?

16      Q.  Have you, in connection with your report

17  or your work subsequent to the report, determined

18  whether any particular health plan was

19  overcharged using your analysis?

20      A.  No, I have not.

21      Q.  Have you determined whether any

22  particular plan member was overcharged based on

23  your analysis?

24      A.  Yes.

25      Q.  And what work have you done in that

1  would point to as a reference for how you're

2  using it in this case?

3       A.  No.  I defined it for the purposes of

4  this case.

5       Q.  And do you define it somewhere in your

6  report what overcharge means?

7       A.  I'm not sure where it first appears,

8  where it's defined.  It's certainly implicitly

9  defined in paragraph 30, right, where I calculate

10  one thing, calculate another thing, and call the

11  difference an overcharge.

12       Q.  Using the terminology we were using

13  earlier in reference to this illustrative

14  example, is the overcharge the difference of a

15  member or plan responsibility calculated using

16  the Aetna per-visit rate versus using the Optum

17  downstream rate?

18       A.  Correct.

19       Q.  And is it plaintiff's contention in this

20  case that the Optum downstream rate should have

21  been used to calculate member and plan

22  responsibility?

23       A.  I believe that that's the plaintiff's

24  contention.  Yes.

25       Q.  And are you -- you're not providing an

1   opinion that the Optum downstream rate was

2   required to be used to calculate member and plan

3   responsibility, correct?

4        A.   Correct.

5        Q.   Under your use of the term "overcharge,"

6   if a member or plan was overcharged, was that

7   member or plan injured?

8             MR. KNOTT:  Object to the form.

9             THE WITNESS:  Again, that's -- that's --

10  that gets to damages, that gets to a legal issue,

11  as to whether the overcharge was proper.  And I'm

12  not making a statement whether it's proper or

13  improper.

14            If the judge or jury decides that the

15  overcharge was improper, then that would

16  translate into an injury.

17  BY MR. SIGLER:

18       Q.   And as you used the term "overcharge,"

19  would the amount of an overcharge -- if a judge

20  or jury finds that the plaintiff's theory is

21  valid, would the amount of that overcharge equal

22  damages?

23            MR. KNOTT:  Object to the form.

24            THE WITNESS:  For this particular claim,

25  that would be the damage.  At least perhaps part

1    A.  Not in detail, but I've seen it.  Yes.

2    Q.  Did you see the hours and hours of

3  questions about her transaction records between

4  her and her treating provider in that transcript?

5         MR. KNOTT:  Object to the form.

6         THE WITNESS:  I have not seen that, no.

7         If it helps, I would imagine it's messy.

8  BY MR. SIGLER:

9    Q.  Right.  So -- and in fact, I believe

10  that may be the word that she used to describe

11  it.

12    A.  Okay.

13    Q.  So -- but that type of a messy analysis

14  would be necessary to figure out what a

15  particular member paid, still owes, doesn't still

16  owe on amounts with her -- with his or her

17  treating provider, correct?

18         MR. KNOTT:  Object to the form.

19         THE WITNESS:  It would also be possible

20  to establish the unpaid amount from provider

21  records, which tend to be much less messy.

22  BY MR. SIGLER:

23    Q.  How much experience do you have

24  reviewing provider billing records?

25    A.  A lot.

1      Q.  And in your view, they're not messy?

2          MR. KNOTT:  Object to the form.

3          THE WITNESS:  They're -- they're not as

4   clean as Medicare records, for example, but

5   they're plenty clean to analyze.

6   BY MR. SIGLER:

7      Q.  You haven't reviewed any of the provider

8   records at issue in this case, correct?

9      A.  You know, I -- I -- not specifically for

10  this case, but I did have a case once of a --

11  where I was assisting counsel for a physical

12  therapist in North Carolina.  So I've seen

13  physical therapy billing records.

14     Q.  What case was that?

15     A.  It's -- I don't think it's listed

16  because it didn't lead to a report --

17     Q.  Okay.

18     A.  -- or no filing case.

19     Q.  And do you have any idea whether that

20  provider was involved with Optum or the issues in

21  this case?

22     A.  No.  This was about Medicare records.

23     Q.  Now, Dr. Panis, you testified that you

24  believe plaintiff's contention in this case is

25  that member and plan responsibility should be

1   calculated based on the Optum downstream rates,
2   correct?
3           MR. KNOTT:  Object to the form.
4           THE WITNESS:  Correct.
5   BY MR. SIGLER:
6       Q.  What's the basis for that contention, to
7   your knowledge?
8       A.  The complaint, I think -- or the basis
9   of the contention?  It would be my understanding
10  that -- based on -- I'm not sure what the basis
11  would be.
12      Q.  Have you -- strike that.
13          Let's go to paragraph 36.
14      A.  Yes.
15      Q.  So there's a section on -- on this page
16  beginning at paragraph 35, continuing through
17  paragraph 38, discussing Optum's gain --
18      A.  Correct.
19      Q.  -- correct?
20      A.  Yes.
21      Q.  And in paragraph 6 -- excuse me, in
22  paragraph 36, you provide the -- a calculation of
23  gain on the example we were just discussing,
24  correct?
25      A.  Correct.

1    Q.  Now, what does the term "gain" mean as

2  you're using it here?

3    A.  Again, there could be all kinds of

4  definitions.  In this case, it is the difference

5  between what Optum received from Aetna on behalf

6  of the plan and the payment that Optum made to

7  the provider.

8    Q.  And apart from the calculation that you

9  just described, does the term "gain" have meaning

10  to you as an economist?

11    A.  I'm sure.  It's a -- it's the difference

12  between a -- an income and a cost.

13    Q.  And is it your understanding that the

14  plaintiff in this case is seeking to recover gain

15  in some way?

16    A.  I'm not sure exactly what the

17  plaintiff's seeking to recover in this context.

18    Q.  And you were asked to calculate Optum's

19  gain as reflected here in your report, correct?

20    A.  I was, yes.

21

22

23

24

25

1    Q.  In general, is the gain to Optum

2  equivalent to the alleged overcharge in your

3  report?

4    A.  In general, yes.

5    Q.  And are there situations in which it is

6  not?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 1:15-cv-00109-MR   Document 160-1   Filed 09/07/18   Page 24 of 73

1  slightly different.

2      Q.  Does it matter for purposes of

3  calculating the gain to Optum what the amounts

4  paid to Optum were used for by Optum?

5          MR. KNOTT:  Object to the form.

6          THE WITNESS:  For my purposes, no.

7  BY MR. SIGLER:

8      Q.  And have you seen the

9  term "administrative fee" used in this case?

10     A.  Sure.

11     Q.  You don't use that term in your report,

12 correct?

13     A.  Correct.

14     Q.  Why is that?

15

16

17

18

19

20

21

22     Q.  And I'm just -- I want to get back to

23 the question I asked.

24         Is there a reason -- well, strike that.

25         Is it relevant to your analysis whether

1 some portion of the Optum amount is an

2 administrative fee or not?

3          MR. KNOTT:  Object to the form.

4          THE WITNESS:  No.  Given the fairly

5 precise and narrow definition of what I was asked

6 to calculate, no, there is no role for

7 administrative fees or any other expense.

8 BY MR. SIGLER:

9     Q.  Okay.  So it doesn't matter, for

10 purposes of your opinions and your calculations,

11 whether the amounts paid to Optum were

12 administrative or for something else?

13          MR. KNOTT:  Object to the form.

14          THE WITNESS:  Correct.

15 BY MR. SIGLER:

16     Q.  Does the term "administrative fee" have

17 a defined meaning to economists?

18          MR. KNOTT:  Object to the form.

19          THE WITNESS:  It's not an economic term.

20 You know, it's a fee used for the administration

21 in this case of claims.

22 BY MR. SIGLER:

23     Q.  But outside of this case, does it have a

24 defined meaning?

25     A.  Not necessarily, no.

1    Q.   And you're not providing an opinion on

2    this case on whether something is administrative

3    or something else, correct?

4    A.   Correct.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    Q.   Okay.  Now, you acknowledged a few

20    minutes ago that some of the amounts paid to

21    Optum would have been used for Optum's costs and

22    expenses, correct?

23    A.   Sure.

24         MR. KNOTT:  Object to the form.

25         THE WITNESS:  Yes.

1   BY MR. SIGLER:

2       Q.  So Optum -- not all of the amounts paid

3   to Optum would have gone to Optum's bottom line,

4   correct?

5           MR. KNOTT:  Object to the form.

6           THE WITNESS:  Correct.  And Optum

7   provided services that were useful.

8   BY MR. SIGLER:

9       Q.  And as an economist, do you believe that

10  it's an appropriate damages model to recoup from

11  Optum all of the amounts that Optum paid,

12  including those amounts that it spent providing

13  those services?

14          MR. KNOTT:  Object to the form.

15          THE WITNESS:  It's not an economic

16  issue.  It's a legal issue.

17  BY MR. SIGLER:

18      Q.  So you're not providing an opinion as an

19  economist on whether that's an appropriate model

20  that you've calculated here?

21          MR. KNOTT:  Object to the form.

22          THE WITNESS:  Correct.

23  BY MR. SIGLER:

24      Q.  Were you instructed by plaintiff's

25  counsel how to calculate the Optum gain model

1  that you have reflected here in your report?

2     A.  Yes.

3     Q.  And is the same true with respect to the

4  overcharge model, you were instructed by

5  plaintiff's counsel how to do that?

6     A.  Yes.

7     Q.  And you carried out those calculations

8  on both models based on the instructions from

9  plaintiff's counsel, correct?

10     A.  Correct.

11     Q.  If you were analyzing a disgorgement of

12  profits model, you would do it differently than

13  you have done these calculations here; is that

14  correct?

15       MR. KNOTT:  Object to the form.  Vague.

16       THE WITNESS:  It would all depend on

17  which profits are disgorged.  It comes down to

18  definitions.

19  BY MR. SIGLER:

20     Q.  Well, would you agree that the gain to

21  Optum that you're discussing in your report is

22  not Optum's profit --

23       MR. KNOTT:  Object --

24  BY MR. SIGLER:

25     Q.  -- for its services?

1          MR. KNOTT:  Object to the form.  It's

2     vague.

3          THE WITNESS:  I agree with it.

4     BY MR. SIGLER:

5        Q.  A profit to Optum would be some lower

6     amount after taking out the cost and expenses of

7     providing those services, correct?

8          MR. KNOTT:  Object to the form.  It's

9     vague.

10          THE WITNESS:  I have no insight into

11     Optum's costs, but I would imagine that they're

12     positive and that there is -- that the bottom

13     line profit is less than the gain as defined

14     here.

15     BY MR. SIGLER:

16        Q.  In paragraph 38 of your report you make

17     the statement "Insofar related to claims that

18     were covered by self-insured plans, this amount

19     can also be viewed as gain to Aetna, which was

20     able to avoid using its own funds to pay these

21     amounts."

22          Do you see that?

23        A.  Yes.

24

25

Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 30 of 73

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
```

15      Q.   For purposes of a gain to Optum, are

16  plaintiffs seeking to recover the amounts paid by

17  Aetna on insured plans?

18          MR. KNOTT:  Object to the form.

19          THE WITNESS:  I don't know.

20  BY MR. SIGLER:

```
21
22
23
24
25
```

1

2

3

4

5

6

7

8    Q.  Going back to paragraph 38 in the

9    discussion of Aetna, what does it mean to say

10   that Aetna may have been able to avoid using its

11   own funds to pay these amounts?

12       A.  So the idea is that a self-insured plan

13   as in contracts with Aetna, an ASO contract, to

14   administer claims.  Including in the

15   administration of claims would be claims to

16   physical therapists and chiropractors.  And so

17   Aetna, in principle, needs to -- is responsible

18   for administering these claims.

19           It's contracted with Optum to administer

20   those claims, and it made payments to -- or on

21   behalf of plans, it made payments to Optum, but

22   those are payments that, at least for the

23   administration of the claims, Aetna would have

24   needed to make itself.

25       Q.  So does this go back to the discussion

1    we were having earlier about what administrative

2    services contracts provide?

3         A.   What it covers.   Sure.

4         Q.   And again, you haven't looked at any of

5    those contracts to determine what they actually

6    cover, correct?

7         A.   Correct.

8         Q.   So if any particular contract covered

9    only Aetna's administrative costs and not costs

10   associated with Optum, you would agree that this

11   statement does not apply, correct?

12              MR. KNOTT:   Object to the form.

13              THE WITNESS:   It would depend on the

14   language of the contract.

15   BY MR. SIGLER:

16        Q.   Do you have an opinion on whether Aetna

17   was required to provide the types of services

18   that Optum was performing under any of Aetna's

19   administrative services contracts?

20        A.   Well, we've discussed this, right?   In

21   principle, an ASO contract provides for claims

22   administration services.   And in principle, that

23   includes all claims under a certain plan.

24              Now you're saying that perhaps some

25   claim administration services may have been

1    excluded, that's possible, theoretically.  I

2    haven't seen it.  I haven't accounted for it.

3        Q.  Right.  And you haven't seen one way or

4    the other what these contracts provide, correct?

5        A.  Correct.

6        Q.  Do you know whether the services

7    provided by Optum are services that Aetna was

8    providing before it entered into the Optum

9    relationship?

10        A.  I don't know that.

11        Q.  If Aetna was not already providing these

12    services and the Optum services were increased or

13    enhanced services not provided by Aetna, does

14    that impact your view on this issue?

15            MR. KNOTT:  Object to the form.

16            THE WITNESS:  I guess it would depend on

17    the language of the contract.

18            MR. SIGLER:  Good time to take a break.

19            VIDEO TECHNICIAN:  Off the record at

20    9:52.

21            (A recess was taken.)

22            VIDEO TECHNICIAN:  Media unit 3.  Back

23    on the record at 10:08.

24    BY MR. SIGLER:

25        Q.  Dr. Panis, in reviewing the claims data

1    haven't seen any documents.  I haven't picked up
2    on any language in documents where that would be
3    discussed.
4    BY MR. SIGLER:
5        Q.  Do you know whether the goal, from
6    Aetna's perspective, was to achieve savings
7    through lower rates for services and/or
8    management of those services to reduce the number
9    of services or visits in those markets?
10           MR. KNOTT:  Object to the form.
11           THE WITNESS:  I don't know that.
12    BY MR. SIGLER:
13        Q.  If there were documents or information
14    about those goals of the relationship or whether
15    those goals were successful, would those be
16    relevant to your analysis of the Aetna-Optum
17    relationship?
18           MR. KNOTT:  Object to the form.
19           THE WITNESS:  No.  My -- my charge was
20    to calculate the things that I calculated.  And
21    any advantages to Optum or Aetna of the contracts
22    would be irrelevant to the types of overcharges
23    that I calculated.
24    BY MR. SIGLER:
25        Q.  If the Aetna-Optum relationship lowered

1    the cost of physical therapy and chiropractic

2    services in these markets, would that be

3    beneficial to health plans and plan members?

4            MR. KNOTT:  Object to the form.

5            THE WITNESS:  It may well be.  Sure.

6    BY MR. SIGLER:

7        Q.  How would it be?

8        A.  Well, eventually the cost of providing

9    medical care could have been lowered.

10        Q.  And lower cost of chiropractic and

11   physical therapy services would result in lower

12   payments by self-funded plans and members for

13   those services, correct?

14           MR. KNOTT:  Object to the form.

15           THE WITNESS:  Sure.

16   BY MR. SIGLER:

17        Q.  If there were benefits flowing to plan

18   sponsors and plan members from the Aetna-Optum

19   relationship through this lower costs, who should

20   pay for those benefits, in your view?

21           MR. KNOTT:  Object to the form.

22           THE WITNESS:  Well, so benefits, then

23   presumably it's because the cost of providing

24   services would be lowered.  And so the providers

25   apparently would take lower reimbursement rates.

Case 1:15-cv-00109-MR  Document 160-1  Filed 09/07/18  Page 36 of 73

1    along was appropriate or inappropriate, correct?

2         A.   No.   That's a legal issue.

3         Q.   And you're not providing an opinion on

4    expectations of anyone, right, about that?

5         A.   Correct.

6         Q.   Dr. Panis, let's go to paragraph 39.

7    Paragraph 39 starts with "I have been instructed

8    by plaintiff's counsel to identify," and goes on

9    to describe a population of claims, correct?

10        A.   Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:15-cv-00109-MR   Document 160-1   Filed 09/07/18   Page 38 of 73



Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 39 of 73



Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 40 of 73

         Is that your understanding of claims

involving deductibles that Optum's charges were

not collected?

    A.  Yes.  For the most part.  I believe

Case 1:15-cv-00109-MR  Document 180-1  Filed 09/07/18  Page 41 of 73

1    there's an exception for has accounts, health

2    savings accounts.

3        Q.  And you get to that later in your

4    report, correct?

5        A.  I do.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Q.  So approximately when did you exclude

24    these claims?

25        A.  I'm not sure exactly.  Maybe a month

1    before the report was due, something like that.

2        Q.  How -- how should deductible claims have

3    been processed in plaintiff's view?

4            MR. KNOTT:  Object to the form.  Calls

5    for a legal conclusion.

6            THE WITNESS:  I don't think that the

7    plaintiff has any issue with the deductible

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 44 of 73



Case 1:15-cv-00109-MR Document 160-1 Filed 09/07/18 Page 45 of 73



Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 46 of 73



Case 1:15-cv-00109-MR ~ Document 160-1 ~ Filed 09/07/18 ~ Page 47 of 73

1  BY MR. SIGLER:

13  BY MR. SIGLER:

14      Q.  What's your understanding of plaintiff's

15  contention on how deductible claims should have

16  been processed?

17          MR. KNOTT:  Object to the form.

18  BY MR. SIGLER:

19      Q.  Should deductibles have been credited at

20  the Optum downstream rate or at the Aetna

21  per-visit rate?

22          MR. KNOTT:  Object to the form.

23          THE WITNESS:  I don't know what the

24  contention is.  But I would imagine it's -- it

25  should have been credited as the provider-allowed

1  amount, at the actual payment -- at the actual

2  deductible payment.

3  BY MR. SIGLER:

4      Q.  And just to -- so we're using the same

5  terms here, you mean you believe it's Aetna's --

6  excuse me, strike that.

7          You believe it's plaintiff's position

8  that the deductible should have been credited at

9  the Optum downstream rate; is that correct?

10          MR. KNOTT:  Object to the form.

11          THE WITNESS:  I don't know what

12  plaintiff is -- plaintiff's contention is, but

13  that would make sense to me.

14  BY MR. SIGLER:

15      Q.  And if that were the case, those members

16  that we were just discussing who benefited would

17  come out behind under plaintiff's theory,

18  correct?

19          MR. KNOTT:  Object to the form.

20          THE WITNESS:  Correct.

21  BY MR. SIGLER:

22      Q.  Did plaintiff's counsel explain why they

23  wanted you to carve out the deductible claims

24  from your analysis?

25          MR. KNOTT:  Object to the form.  That

1  calls for work product.  I instruct you not to

2  answer the question.

3         MR. SIGLER:  Are you directing him not

4  to answer?

5         MR. KNOTT:  Yes.

6  BY MR. SIGLER:

7

8

9

10

11

12

13

14

15

16

17

18

19     Q.  Well, do you have an understanding that

20  you were asked to carve those claims out because,

21  as we were just discussing, class members

22  benefited from the way those claims were handled?

23         MR. KNOTT:  Object to the form.

24         THE WITNESS:  That's not my

25  understanding.

Case 1:15-cv-00109-MR  Document 160-1  Filed 09/07/18  Page 50 of 73

1  BY MR. SIGLER:

2      Q.  Did you have discussions with

3  plaintiff's counsel about carving those claims

4  out, the deductible claims?

5          MR. KNOTT:  Objection.  I instruct you

6  not to answer that question as it calls for work

7  product.

8          MR. SIGLER:  And Jason, it's a yes or no

9  question about whether he discussed that topic

10  with you.  My understanding is that your view is

11  that questions like that do not call for work

12  product.

13          Are you directing him not to answer?

14          MR. KNOTT:  I am because I've heard from

15  you repeatedly that even asking for the topic

16  is -- intrudes on the privilege.  So I will act

17  consistently with your position for the time

18  being.

19  BY MR. SIGLER:

20      Q.  Dr. Panis, are you -- is it your

21  testimony that you were directed by plaintiff's

22  counsel to carve out these deductible claims and

23  that you can't explain why you were asked to do

24  that because plaintiff's counsel is directing you

25  not to answer?

1    A.  No.  My understanding is there was no

2    overcharge; and therefore, I was asked to exclude

3    them.

4    Q.  And did you have other discussions with

5    plaintiff's counsel about excluding those claims

6    that you can't speak to because you're being

7    directed not to answer?

8    A.  No.

9    Q.  So why were you asked to carve those

10   claims out?  What is the purpose of carving those

11   claims out?

12   A.  Well, that would -- I would have to

13   speculate what Mr. Knott is thinking.  But again,

14   there was no overcharge.  I could include them; I

15   could exclude them.  It would make no difference

16   for my total overcharges.

17   Q.  If you included those claims, wouldn't

18   you have to account for the benefit to class

19   members that flowed from those claims?

20       MR. KNOTT:  Object to the form.  Calls

21   for a legal conclusion.

22       THE WITNESS:  And as I explained, it is

23   not clear whether a benefit actually accrued to

24   the member.  It would only accrue if the -- if

25   the member eventually met the deductible and not

1    the max out-of-pocket amount.

2    BY MR. SIGLER:

3        Q.  But the only reason it's not clear is

4    because you haven't done that analysis, right?

5            MR. KNOTT:  Object to the form.

6            THE WITNESS:  Sure.

7    BY MR. SIGLER:

8        Q.  And you haven't done that analysis

9    because you were directed to carve those claims

10   out, correct?

11           MR. KNOTT:  Object to the form.

12           THE WITNESS:  But also because I would

13   not be able to do it based on the data that I

14   have.

15   BY MR. SIGLER:

16       Q.  What data would you need to figure out

17   the impact of these deductible claims on class

18   members?

19       A.  I would need to know or -- you know,

20   there may be several ways of doing it.  We talked

21   about this a few minutes ago.

22           One way to do it is to have the entire

23   claim population, not just the physical therapy

24   and chiropractic claims, but also hospital visits

25   or anything else, that would help me determine

1  whether a member met the deductible and not the

2  max out-of-pocket amount.

3      Q.  Can you think of any other way?

4      A.  As I also said earlier, Aetna could just

5  give me a summary of whether the member

6  eventually met the deductible and the maximum

7  out-of-pocket amount.

8      Q.  Okay.  Paragraph 40 also refers to

9  another category that I'm going to restate using

10  the same terminology we've been using today,

11  which is one where the Optum downstream rate is

12  higher than the Aetna per-visit rate, correct?

13      A.  Correct.

14      Q.  How common is that situation?

15      A.  There were 9.7 percent of claims in that

16  category.

17      Q.  And when you say 9.7 percent of claims,

18  you're referring to the entire claim as opposed

19  to a particular claim line?

20      A.  Oh, yes.

21      Q.  And did you also carve these claims out

22  at the direction of counsel?

23      A.  Yes.

24      Q.  Do you have an understanding of why you

25  were directed to carve these claims out?

1      A.   There could be some discussion over

2    whether an undercharge should be deducted from a

3    damage amount, but that is a legal issue and I am

4    not here to determine which claims or offsets

5    should be part of the damages.

6      Q.   As an economist, you agree that those

7    claims where the Optum downstream rate was higher

8    than the Aetna per-visit rate could be viewed as

9    undercharged claims?

10          MR. KNOTT:   Object to the form.

11          THE WITNESS:   They could be

12    undercharged.   Yes.

13   BY MR. SIGLER:

14     Q.   And if those claims were included in the

15    analysis, there would be some members who

16    benefited from the way the Aetna-Optum

17    relationship was structured on those claims,

18    correct?

19          MR. KNOTT:   Object to the form.

20          THE WITNESS:   Possibly.

21   BY MR. SIGLER:

22     Q.   Some members and some plans, correct?

23     A.   Possibly.   Yes.

24     Q.   Can you think of any way that they would

25    not have benefited from the Optum downstream

1  rate --

2      A.  I'm sorry, I thought you met on net as

3  in the only claims that someone had were all

4  undercharges.

5          No.  I believe many members would

6  have -- would face aggregate overcharges that

7  would be reduced as a result of these types of

8  claims with undercharges.

9      Q.  And on those specific undercharge

10  claims, those members and plan sponsors would

11  have benefited from the way the Aetna-Optum

12  relationship was structured, correct?

13          MR. KNOTT:  Object to the form.

14          THE WITNESS:  Yes.

15  BY MR. SIGLER:

16      Q.  And they would be worse off under

17  plaintiff's theory by which the Optum downstream

18  rate would be used to calculate their

19  responsibilities, correct?

20          MR. KNOTT:  Object to the form.

21          THE WITNESS:  Yes.

22  BY MR. SIGLER:

23      Q.  Did Aetna or Optum gain anything on

24  these claims where the Optum downstream rate is

25  higher than the Aetna per-visit rate?

1     A.  No.  I believe that Optum, in fact, lost
2  money on those claims.
3     Q.  And as an economist, would it make sense
4  to consider that loss to Optum in figuring out
5  a -- to offset that loss to Optum against the
6  gain that you calculated based on other claims?
7          MR. KNOTT:  Object to the form.  Calls
8  for a legal conclusion.
9          THE WITNESS:  That's exactly -- it is a
10  legal issue.  As an economist, yes, I would
11  subtract.  I would offset some of those
12  overcharges.  But whether that's a -- whether
13  that's a -- legally acceptable, I don't know
14  that.
15  BY MR. SIGLER:
16     Q.  And you didn't offset them because
17  plaintiff's counsel directed you not to; is that
18  correct?
19     A.  Correct.
20     Q.  When did you take the step to exclude
21  these claims that we're talking about where the
22  Optum downstream rate is higher than the Aetna
23  per-visit rate?
24     A.  It was part of the same step where I was
25  instructed to focus only on claims where the

1   downstream rate is lower than the per-visit rate.

2       Q.   And you said that was around a month

3   before your report?

4       A.   That's -- it's a very rough guess.

5       Q.   But you also said earlier that you did

6   an earlier calculation of overcharges that

7   included deductible claims, correct?

8       A.   Yes.

9       Q.   Did you do an earlier calculation that

10  included these claims involving a higher Optum

11  downstream rate?

12      A.   Yes.

13      Q.   And in that earlier calculation, did

14  those claims partially offset the alleged

15  overcharges on the other claims?

16          MR. KNOTT:  Object to the form.

17          THE WITNESS:  Yes.

18  BY MR. SIGLER:

19      Q.   And were there some members who only had

20  claims involving higher Optum's downstream rates?

21      A.   I don't know.

22      Q.   Did you provide a calculation to

23  plaintiff's counsel that included those claims

24  involving higher Optum downstream rates?

25          MR. KNOTT:  Object to the form.  I would

```
1    instruct you not to answer that because I think
2    asking for preliminary calculations runs afoul of
3    work product.
4    BY MR. SIGLER:
5         Q.  Did you consider those earlier
6    calculations in connection with your work in this
7    case?
8         A.  Well, not for the final report.  It was
9    part of the exploratory analyses.
10        Q.  But you considered those calculations,
11   correct?
12        A.  Yes.
13        Q.  Do you still have them?
14        A.  I think so.
15        Q.  Did you run those calculations before
16   you started drafting your report?
17        A.  Yes.
18        Q.  So they weren't part of your draft
19   report, correct?
20        A.  No.
21            MR. KNOTT:  Object to the form.
22   BY MR. SIGLER:
23
24
25
```

1 ███████████████████████████████████

2 ███████████████████████████████████

3 ███████████████████████████████████

4 ███████████████████████████████████

5      Q.  And what did it show in terms of there

6   being some claims where members were coming out

7   ahead and some claims where members were coming

8   out behind under plaintiff's theory?  Were there

9   some members coming out ahead and some coming out

10  behind in that earlier analysis?

11          MR. KNOTT:  Object to the form.

12          THE WITNESS:  My calculations have been

13  at the claim level.  And you're asking for

14  aggregations of members, I did not do that.

15  BY MR. SIGLER:

16      Q.  Do you have an understanding of why you

17  were asked to not use the calculation that you

18  did originally and instead substitute this

19  calculation based on a smaller claims population

20  excluding hundreds of thousands of claims?

21          MR. KNOTT:  Object to the form.

22          THE WITNESS:  I presume it relates to

23  legal theories that plaintiff is developing.

24  BY MR. SIGLER:

25      Q.  Did they explain those legal theories to

1   you?

2        A.   No.

3        Q.   But the exclusion of these claims and

4   the new analysis was not based on your analysis

5   as an economist that it made sense to do it that

6   way, correct?

7        A.   Correct.

8             MR. KNOTT:   Object to the form.

9   BY MR. SIGLER:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SIGLER:

2        Q.  Dr. Panis, if you turn to the last page

3    of your report, page 14.

4        A.  Yes.

5        Q.  This is the summary section that you

6    directed me to earlier when I asked where your

7    opinions were in your report.

8            Now, the three paragraphs in this

9    section discuss the overcharge and gain

10   calculations that we were just discussing before

11   the break, correct?

12       A.  Correct.

13       Q.  And those overcharge and gain

14   calculations are based on a population of claims

15   that was limited based on direction from counsel,

16   correct?

17       A.  Correct.

18       Q.  And the calculations themselves were

19   also based on directions from counsel, correct?

20           MR. KNOTT:  Object to the form.

21           THE WITNESS:  I was asked to calculate

22   overcharges as defined by counsel.  Sure.

23   BY MR. SIGLER:

24       Q.  And other than those overcharge and gain

25   calculations, are there any other opinions here

1    in this section, or is that an accurate summary

2    of your opinions in the case?

3          MR. KNOTT:  Object to the form.

4          THE WITNESS:  I believe it's an accurate

5    summary.

6    BY MR. SIGLER:

7        Q.  Now, by excluding 30 percent of the

8    claims, you are excluding from your analysis some

9    plans and members who may have benefited from the

10   Aetna-Optum relationship, correct?

11         MR. KNOTT:  Object to the form.  It's

12   vague.

13         THE WITNESS:  Some plans and members who

14   may have been undercharged, yes.

15   BY MR. SIGLER:

16       Q.  And those same plans and members may be

17   worse off under the plaintiff's theory by which

18   Optum downstream rates should have been used,

19   correct?

20         MR. KNOTT:  Object to form.

21         THE WITNESS:  On net, perhaps some would

22   have been worse off.  It's an easy calculation

23   that I have not yet performed.

24   BY MR. SIGLER:

25       Q.  And then for some plans and members that

1　are still in your analysis as part of the

2　population that you analyzed, you have excluded

3　some of those class members' claims, correct?

4　　A.　Correct.

5　　Q.　So for those class members who may have

6　been in for some claims and out for others, you

7　would not have, in your analysis, a complete

8　picture of that class member's claims experience,

9　correct?

10　　　　MR. KNOTT:　Object to the form.

11　　　　THE WITNESS:　Correct.

12　BY MR. SIGLER:

13　　Q.　And so you would not also, in your

14　analysis, have a complete picture of the impact

15　of the Aetna-Optum relationship on those plan

16　members and plan sponsors, correct?

17　　　　MR. KNOTT:　Object to the form.　It's

18　vague.

19　　　　THE WITNESS:　I believe it's correct.

20　BY MR. SIGLER:

21　　Q.　Now, is it possible for some of those

22　plans and plan sponsors who are in your analysis

23　but only for some claims that if you looked at a

24　complete picture, that those plan members and

25　plan sponsors, some of them would have come out

1  ahead based on the Aetna-Optum relationship?

2          MR. KNOTT:  Object to the form.

3          THE WITNESS:  It's possible that some

4  would have come out ahead.  Sure.

5  BY MR. SIGLER:

6      Q.  But you haven't -- your analysis

7  wouldn't tell us which ones, correct?

8      A.  That is correct.

9          MR. KNOTT:  Object to the form.

10          THE WITNESS:  And, indeed, my analysis

11  is entirely based on claims, not on the claim

12  experience of a person.

13  BY MR. SIGLER:

14      Q.  Your analysis is a claims analysis in

15  the aggregate, as opposed to an analysis of the

16  specific impact on a particular plan or plan

17  member, correct?

18          MR. KNOTT:  Object to the form.

19          THE WITNESS:  Yeah.  Again, it's very

20  easy to disaggregate by members.  It's a little

21  bit more involved to disintegrate by plan.  But I

22  have not done it yet.

23  BY MR. SIGLER:

24      Q.  But to look at the impact of the

25  Aetna-Optum relationship on a member, you would

1  have to look at that member's complete claims

2  experience and the evolution of claims over the

3  course of the year to figure out the impact of

4  deductibles and other aspects of that member's

5  claims experience, correct?

6        MR. KNOTT:  Object to the form.  Vague.

7        THE WITNESS:  As an economist, I believe

8  you're correct.  Legally, I don't know whether

9  such offsets as you're implying are appropriate.

10  BY MR. SIGLER:

11     Q.  Are you providing any opinions about

12  whether the Aetna-Optum relationship was in the

13  interest of any plan member or plan?

14     A.  I am not, no.

15     Q.  And as an economist, you agree that

16  determining whether the Aetna-Optum relationship

17  was in the interest of any particular member or

18  plan, you would need to look at a variety of

19  factors specific to that member or plan?

20        MR. KNOTT:  Object to the form.

21        THE WITNESS:  It would not require a

22  member-by-member individualized analysis, if

23  that's what you're asking.  It would require a

24  formulaic approach that includes a bit more than

25  I've included for this purpose.

1  BY MR. SIGLER:

2      Q.  To determine the -- whether the

3  Aetna-Optum relationship was in the interest of a

4  particular plan member or plan, would you be

5  interested in knowing whether the relationship

6  caused that member's payments to go up or down on

7  the services that they received?

8          MR. KNOTT:  Object to the form.

9          THE WITNESS:  Yes.

10 BY MR. SIGLER:

11     Q.  And that's not something you've looked

12 at in connection with this case, correct?

13     A.  Correct.

14         MR. SIGLER:  This is already marked.

15 BY MR. SIGLER:

16     Q.  Dr. Panis, you've been handed a document

17 that was pre-marked Exhibit 144 from a previous

18 deposition.

19         Can you take a look at this document and

20 tell me whether you recognize it?

21     A.  I believe I've seen it before.  I don't

22 think it contains anything that -- on which I

23 relied for my report.

24     Q.  If you turn to the very back of the

25 document, the last two pages --

1  case a situation where there is a per-member

2  per-month rate paid to Optum, but that rate is

3  billed back to self-funded plans?

4          MR. KNOTT:  Object to the form.

5          THE WITNESS:  I presume it would depend

6  on the language in the ASO contract between Aetna

7  and the self-insured plan.  I presume that it's

8  possible, although it would surprise me.

9  BY MR. SIGLER:

10     Q.  Is that a but-for world that you

11 considered in connection with this case?

12     A.  No.

13     Q.  Is a potential but-for world in this

14 case one where members and plan sponsors' shares

15 of allowed amounts are calculated using the Optum

16 downstream rate?

17         MR. KNOTT:  Object to the form.

18         THE WITNESS:  Could you repeat it?

19         (The reporter read the record as

20         requested.)

21         THE WITNESS:  I believe that's the

22 but-for world that I've been assuming.

23 BY MR. SIGLER:

24     Q.  And in your review of the data produced

25 in this case, you understand that Aetna does not

1      A.   This is possible.   I haven't
2   investigated it, but it's very easy to pass on an
3   extra field.
4      Q.   And very easy.   Based on what experience
5   are you relying when you say "very easy"?
6      A.   My experience with IT systems that can
7   pass on an extra field.
8      Q.   And you're not familiar with Aetna's
9   systems or Optum's systems, correct?
10     A.   Correct.
11     Q.   And do you know whether Optum would be
12  willing to give Aetna its contracted downstream
13  rates with treating providers?
14     A.   I don't know that.
15     Q.   Before this case, Dr. Panis, had you run
16  into the use of per diem or per-visit rates in
17  the healthcare industry?
18     A.   I think the Medicare perspective payor
19  system is similar to a per-visit rate, per
20  hospital stay rate.   Yes.
21     Q.   And is that a reimbursement methodology
22  that has been commonly used in the healthcare
23  industry for hospitals?
24     A.   Since 1993, I think.   Yes.
25     Q.   And when it's used for hospitals, when

Case 1:15-cv-00109-MR ~ Document 180-1 ~ Filed 09/07/18 ~ Page 69 of 73

1  hospitals are compensated based on a flat rate

2  for a particular visit or scope of services,

3  those rates are supposed to cover all of the

4  hospital's costs associated with those services,

5  correct?

6      MR. KNOTT:  Object to the form.

7      THE WITNESS:  Yeah.  Correct.  Except,

8  again, in extraordinarily costly cases where

9  there may be an additional outlier payment.

10  BY MR. SIGLER:

11     Q.  And for the hospital, the costs

12  associated with that hospital's services would

13  include not just the professional services but

14  also the management of those services, the

15  supervision, and other costs associated with

16  running the hospital, correct?

17     MR. KNOTT:  Object to the form.

18     THE WITNESS:  Correct.

19  BY MR. SIGLER:

20     Q.  And in the case of those per-visit rates

21  being paid to hospitals, there's nothing improper

22  about hospitals, in your view, being compensated

23  for those costs, correct?

24     A.  No, there's nothing improper.  And

25  similarly, if the hospital subcontracts certain

1    services, the cost of those services would need

2    to be covered by the per-visit rate.

3         Q.   And the costs associated with running a

4    hospital, such as keeping it clean, keeping the

5    lights on, making sure there's a management

6    structure in place, all of those costs are built

7    into the hospital's per-visit rates, correct?

8              MR. KNOTT:  Object to the form.

9              THE WITNESS:  Right.

10   BY MR. SIGLER:

11        Q.   In your work relating to skilled nursing

12   facilities, are they also compensated based on a

13   per-visit rate?

14        A.   There are variations, depending on the

15   needs of the patients.

16        Q.   And what are the most -- what's the most

17   common way that skilled nursing facilities are

18   compensated?

19        A.   There's so-called re -- RUGs, R-U-G,

20   resource utilization groups, where an assessment

21   is made of the needs of a patient.

22              So, for example, certain patients can

23   feed themselves, certain cannot.  And the

24   compensation is a fixed amount, depending on the

25   abilities and the needs of the patients.

1        Q.   And --
2        A.   Fixed amount per day.  Not per stay, but
3    per day.
4        Q.   So it's a per diem, correct?
5        A.   Yes, yes.
6        Q.   And in the case of per diem rates paid
7    to skilled nursing facilities, are those per diem
8    rates constructed in a way to compensate the
9    skilled nursing facilities for all of their costs
10   associated with that date of service?
11       A.   Yes.
12       Q.   And that would include not just the
13   professional services of the nurses but also the
14   management of those services, the cost of keeping
15   the lights on and running the facility, correct?
16       A.   Correct.
17            MR. KNOTT:  Object to the form.
18   BY MR. SIGLER:
19       Q.   And in your view, there's nothing
20   improper about that compensation structure,
21   correct?
22       A.   It sounds like a legal issue --
23            MR. KNOTT:  Object to the form.
24            THE WITNESS:  -- but I don't believe
25   there's anything improper, no.

```
 1    BY MR. SIGLER:
 2        Q.  It's common -- it's been common in the
 3    healthcare industry for years, correct?
 4        A.  Yes.
 5            MR. SIGLER:  Let's take a break.
 6            VIDEO TECHNICIAN:  Off the record at
 7    12:27.
 8            (A recess was taken.)
 9            VIDEO TECHNICIAN:  Media unit 5.  Back
10    on the record at 1:12.
11    BY MR. SIGLER:
12        Q.  Dr. Panis, we talked earlier today about
13    the fact that Aetna has contracts with
14    administrative services -- excuse me,
15    administrative services contracts with
16    self-funded plan sponsors, right?
17        A.  Yes.
18        Q.  And we talked about the fact that you
19    haven't reviewed those contracts.
20            Have you reviewed any other documents
21    reflecting communications between Aetna and
22    self-funded plan sponsors concerning anything
23    having to do with the Optum relationship?
24            MR. KNOTT:  Object to the form.
25            THE WITNESS:  I have not.
```