# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### Civil Case No. 1:15-cv-00109-MR

SANDRA M. PETERS, on behalf of
herself and all others similarly situated,

Plaintiff,

v.

AETNA INC., AETNA LIFE
INSURANCE COMPANY, and
OPTUMHEALTH CARE
SOLUTIONS, INC.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**DEFENDANTS' BRIEF IN
OPPOSITION TO
PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................6

      A.    Aetna contracted with Optum to save money for Aetna plans and members.....................................................................6

      B.    Aetna and Optum negotiated and implemented their relationship to achieve the sought-after savings for plans and members. ..........................................................................8

STANDARD OF REVIEW .................................................................11

ARGUMENT ......................................................................................13

    I.    THERE IS NO COMMON PROOF THAT AETNA BREACHED FIDUCIARY DUTIES TO MORE THAN A THOUSAND DIFFERENT PLANS.................................................13

      A.    Contracts and communications vary from plan to plan...........14

      B.    Peters's misrepresentation-based allegations also require individualized inquiries.............................................................20

      C.    The prohibited-transaction theory also requires individualized inquiry. ..............................................................22

    II.    THERE IS NO COMMON PROOF OF INJURY.............................23

      A.    Peters imagines a but-for world that could never exist............24

      B.    Even in Peters's flawed but-for world, there is no common proof of injury. ...........................................................26

    III.    PETERS IS NOT A TYPICAL OR ADEQUATE CLASS REPRESENTATIVE FOR EITHER CLASS.....................................30

      A.    Peters is not typical or adequate because she does not share the proposed classes' interests.........................................30

      B.    Peters cannot sue on behalf of other self-insured plans............31

IV.   PETERS CANNOT SIDESTEP INDIVIDUALIZED ISSUES
      BY APPEALING TO EQUITY.........................................................34

      A.    The "equitable" monetary remedies that Peters seeks are
            inherently individualized. ........................................................34

      B.    Peters cannot show through classwide evidence that the
            proposed classes are entitled to monetary relief from
            Optum under ERISA § 502(a)(3)...............................................36

V.    EACH OF PETERS'S CLASS-CERTIFICATION THEORIES
      FAILS FOR ADDITIONAL REASONS...........................................38

CONCLUSION ..........................................................................................40

Case 1:15-cv-00109-MR   Document 162   Filed 09/07/18   Page 3 of 52

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aetna UCR Litig.*,
   No. 07-cv-03541, Dkt. 1157 (D.N.J. June 30, 2018)..........................................15

*Berry v. Wells Fargo & Co.*,
   No. 3:17-cv-00304, 2017 WL 7411165 (D.S.C. July 31, 2017) ......................32

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ...............................................................................29

*Bond v. Marriott Int'l, Inc.*,
   296 F.R.D. 403 (D. Md. 2014) ......................................................................38, 39

*Branch v. Gov't Emps. Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) .........................................................................24

*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) ..............................................................................5

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ...................................................15, 20, 23, 29, 30

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)...........................................................................................12

*Carr v. Int'l Game Tech.*,
   No. 3:09-cv-00584, 2012 WL 909437 (D. Nev. Mar. 16, 2012)......................21

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ...............................................................................40

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   433 F.3d 181 (2d Cir. 2005) ..............................................................................34

*Chorosevic v. MetLife Choices*,
   No. 4:05-cv-2394, 2007 WL 2159475 (E.D. Mo. July 26, 2007) .....................15

# TABLE OF AUTHORITIES
(continued)

*CIGNA Corp. v. Amara*,
563 U.S. 421 (2011).................................................................21, 23, 34, 36

*Clark v. Duke University*,
No. 1:16-cv-1044, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) ...................31

*Colon v. Pencek*,
No. 3:07-cv-00473, 2008 WL 4093694 (W.D.N.C. Aug. 28, 2008).................36

*Comcast v. Behrend*,
569 U.S. 27 (2013)................................................................................5, 34

*Conkright v. Frommert*,
559 U.S. 506 (2010)................................................................................16

*Cox v. Blue Cross Blue Shield of Mich.*,
166 F. Supp. 3d 891 (E.D. Mich. 2015) ..............................................35

*David v. Alphin*,
817 F. Supp. 2d 764 (W.D.N.C. 2011) .............................................23

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ...........................................................30

*DeLuca v. Blue Cross Blue Shield of Mich.*,
628 F.3d 743 (6th Cir. 2010) ...........................................................14

*Di Biase v. SPX Corp.*,
No. 3:14-cv-00656, 2017 WL 4366994 (W.D.N.C. Oct. 2, 2017)....................31

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ......................................................16, 17

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) ...........................................................30

*Dzinglski v. Weirton Steel Corp.*,
875 F.2d 1075 (4th Cir. 1989) .........................................................14

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ..............................................................11, 14, 39

*Fallick v. Nationwide Mutual Insurance Co.*,
162 F.3d 410 (6th Cir. 1998) ...............................................................32

*Franco v. Conn. Gen. Life Ins. Co.*,
289 F.R.D. 121 (D.N.J. 2013)................................................................25

*Franco v. Conn. Gen. Life Ins. Co.*,
299 F.R.D. 417 (D.N.J. 2014), *aff'd*, 647 F. App'x 76 (3d Cir.
2016) ........................................................................................15

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ...............................................................39

*George v. Duke Energy Ret. Cash Balance Plan*,
259 F.R.D. 225 (D.S.C. 2009) .............................................................21

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002).........................................................................35

*Gunnells v. Healthplan Services, Inc.*,
348 F.3d 417 (4th Cir. 2003) ..............................................................11, 40

*Hansberry v. Lee*,
311 U.S. 32 (1940)..........................................................................23

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000).........................................................................36

*Helton v. AT & T Inc.*,
709 F.3d 343 (4th Cir. 2013) ...............................................................18

*Henry v. Champlain Enter., Inc.*,
445 F.3d 610 (2d Cir. 2006) ...............................................................28

Case 1:15-cv-00109-MR   Document 162   Filed 09/07/18   Page 6 of 52

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Hudson v. Delta Air Lines, Inc.*,
  90 F.3d 451 (11th Cir. 1996) ............................................................21

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) .......................................................12, 13

*King v. Capital One Bank (USA), N.A.*,
  No. 3:11-cv-00068, 2012 WL 5570624 (W.D.Va. Nov. 15, 2012) ..................33

*Leber v. Citigroup, Inc.*,
  No. 07-cv-9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) .........................37

*Leister v. Dovetail, Inc.*,
  546 F.3d 875 (7th Cir. 2008) ............................................................24

*Lindsey v. Normet*,
  405 U.S. 56 (1972).........................................................................6

*Lipstein v. UnitedHealth Grp.*,
  296 F.R.D. 279 (D.N.J. 2013).............................................................15

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985).......................................................................33

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993).......................................................................36

*Montanile v. Bd. of Tr. of Nat'l Elevator Indus. Health Ben. Plan*,
  136 S. Ct. 651 (2016).....................................................................35

*Naparala v. Pella Corp.*,
  No. 14-cv-03465, 2016 WL 3125473 (D.S.C. June 3, 2016)...........................40

*Noah U. v. Tribune Co. Med. Plan*,
  138 F. Supp. 3d 1134 (C.D. Cal. 2015) ............................................18

*In re Panacryl Sutures Prods. Liab. Cases*,
  263 F.R.D. 312 (E.D.N.C. 2009) ......................................................40

Case 1:15-cv-00109-MR   Document 162   Filed 09/07/18   Page 7 of 52

*Parker v. Asbestos Processing, LLC,*
    No. 11-cv-01800, 2015 WL 127930 (D.S.C. Jan. 8, 2015) ................................40

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ..............................................................................14, 19

*Pender v. Bank of Am. Corp.,*
    788 F.3d 354 (4th Cir. 2015) ................................................................35

*Pender v. Bank of Am. Corp.,*
    No. 17-1485, 2018 WL 2714683 (4th Cir. June 5, 2018)
    (unpublished) ................................................................................35

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.,*
    654 F.3d 618 (6th Cir. 2011) ................................................................19

*Plasterers' Local Union No. 96 Pension Plan v. Pepper,*
    663 F.3d 210 (4th Cir. 2011) ................................................................13

*Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan for Key Execs.,*
    182 F. Supp. 3d 573 (E.D. Va. 2016) ................................................30

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
    725 F.3d 244 (D.C. Cir. 2013) ................................................................3

*Rozo v. Principal Life Ins. Co.,*
    No. 14-cv-00463, 2017 WL 2292834 (S.D. Iowa May 12, 2017) ....................38

*Sandwich Chef of Tex. v. Reliance Nat'l Indem. Ins. Co.,*
    319 F.3d 205 (5th Cir. 2003) ................................................................13

*In re Schering Plough Co. ERISA Litig.,*
    589 F.3d 585 (3d Cir. 2009) ................................................................38

*Sedlack v. Braswell Servs. Grp., Inc.,*
    134 F.3d 219 (4th Cir. 1998) ................................................................14

Case 1:15-cv-00109-MR   Document 162   Filed 09/07/18   Page 8 of 52

Page(s)

*Sellers v. Anthem Life Ins. Co.*,
No. 16-2428, 2018 WL 2727895 (D.D.C. June 6, 2018) ...................................22

*Sims v. BB&T Corp.*,
No. 1:15-cv-732, 2018 WL 3128996 (M.D.N.C. June 26, 2018) ......................24

*Spano v. Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) .......................................................................31, 38

*Spaz Beverage Co. Defined Ben. Pension Plan v. Douglas*,
No. 11-cv-02059, 2011 WL 3359749 (E.D. Pa. Aug. 4, 2011).........................33

*Sweda v. Univ. of Penn.*,
No. 2:16-cv-04329, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ...................22

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) .............................................................................34

*In re Titanium Dioxide Antitrust Litig.*,
962 F. Supp. 2d 840 (D. Md. 2013).....................................................................33

*Tootle v. ARINC, Inc.*,
222 F.R.D. 88 (D. Md. 2004) .............................................................................21

*Vanvels v. Betten*,
No. 1:06-cv-710, 2007 WL 329048 (W.D. Mich. Jan. 31, 2007) .....................33

*Varity Corp. v. Howe*,
516 U.S. 489 (1996)............................................................................................35

*In re Wachovia Corp. ERISA Litig.*,
No. 3:09-cv-262, 2010 WL 3081359 (W.D.N.C. Aug. 6, 2010).......................37

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................................................... 2, 3, 6, 11, 12, 13, 23, 39

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
No. MDL 09-2074, 2014 WL 6888549 (C.D. Cal. Sept. 3, 2014)....................15

Case 1:15-cv-00109-MR   Document 162   Filed 09/07/18   Page 9 of 52

# TABLE OF AUTHORITIES

(continued)

<u>Page(s)</u>

*Wiseman v. First Citizens Bank & Tr. Co.*,
  215 F.R.D. 507 (W.D.N.C. 2003)........................................................21

*Zimmerman v. Bell*,
  800 F.2d 386 (4th Cir. 1986) ...........................................................39

**Statutes**

28 U.S.C. § 2072(b) ...........................................................................6

29 U.S.C. § 1002(14) .......................................................................22

29 U.S.C. § 1106 .............................................................................22

29 U.S.C. § 1132(a)(1)(B) ...............................................................15

# INTRODUCTION

Aetna contracted with Optum to lower physical-therapy and chiropractic costs for Aetna plan sponsors and members. The evidence shows that the relationship has been a success: The Aetna-Optum contracts produced millions of dollars in savings for Aetna plan sponsors and members.

Yet Peters—a *former* member of *one* of those plans—nevertheless seeks damages (under the guise of "equitable" relief) and declaratory relief on behalf of more than a thousand self-insured plans and thousands of plan members who had claims processed under the Aetna-Optum contracts.[1] She contends that this Court can determine whether Aetna acted against those plans' and members' interests—breaching fiduciary duties to them all—simply by analyzing the Aetna-Optum contracts and a few deposition excerpts and exhibits. But Peters does not address the elements of her ERISA claims, much less show that those elements are susceptible to common proof. Nor does she argue that the Aetna-Optum contracts injured all self-insured plans and their members. And she ignores the evidence showing that the Aetna-Optum contracts saved money for the plans and plan members that she seeks to represent.

Peters also sidesteps the evidence showing—on an individualized, plan-by-plan basis—that Aetna complied with the plan terms and governing contracts. Peters does not and cannot show through classwide evidence that Aetna breached any

---

[1] Self-insured plans are those (like Peters's plan) in which the plan sponsor (usually a large employer) designs the plan and is financially responsible for paying benefits for its employees and their dependents. Many self-insured plans hire Aetna to perform administrative services.

fiduciary duty or contract, that non-fiduciary Optum assisted Aetna in any breach, or that alleged breaches harmed all self-insured plans and their members. On the contrary, the record is full of evidence—varying from plan to plan and claim to claim—refuting those allegations. Peters ignores that evidence, but Aetna and Optum will not. And this Court cannot. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Instead of grappling with those issues, Peters slings mud, apparently hoping to divert attention away from Rule 23's requirements. Peters's accusations are false, but in any event, the question at class certification is not whether her accusations are true or false. It is whether she can show that the elements of the putative class members' claims are susceptible to classwide proof. Peters must do so through evidence that withstands "rigorous analysis." *Dukes*, 564 U.S. at 350. For many reasons, she cannot do so:

*First*, the proposed classes do not satisfy Rule 23(a)'s commonality requirement, which requires Peters to prove that the class members "have suffered the same injury." 564 U.S. at 350. "That does not mean merely that they have all [allegedly] suffered a violation of the same provision of law." *Id.* Rather, "[t]heir claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate *common answers* apt to drive the resolution of the litigation." *Id.* (emphasis added).

2

There is no common question that would generate common answers for either proposed class. The elements of Peters's claims (which she avoids discussing) involve individualized issues that defy class treatment. Proving that Aetna breached any fiduciary duty owed to a particular plan (of which there are well over a thousand) would require examining the underlying contracts and evidence for that plan. The resulting plan-specific questions—including whether the plan or contract authorizes the Aetna-Optum relationship—would generate thousands of individualized inquiries on the issues that will "drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. And besides that, the proposed class members would run into this Court's earlier ruling that Aetna was not performing a fiduciary function when entering into and implementing the Aetna-Optum relationship and that Optum was not performing a fiduciary function for any plan at any time. Dkt. 141 at 21, 23–24.

*Second*, Peters cannot demonstrate through classwide evidence that all proposed class members suffered injury—an essential element of ERISA claims (and an Article III standing requirement). Even as Peters ignores the evidence of savings and other benefits flowing from the Aetna-Optum contracts, she cannot ignore her own proposed expert's analysis showing that thousands of benefits claims (approximately *30 percent*) resulted in no injury as Peters defines it. Beyond that, Aetna and Optum's expert demonstrated through a claim-by-claim analysis that Peters—who claims that she was "overcharged" on most of the 53 approved benefits claims in question—was not injured at all and in fact would be worse off under her own theory. That kind of individualized analysis prevents class certification. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir.

3

2013) ("[W]e do expect the common evidence to show all class members suffered some injury.").

*Third*, the proposed classes do not satisfy Rule 23(a)'s typicality and adequacy requirements because Peters does not share the same interests as the proposed classes. Because Peters suffered no concrete injury, she lacks Article III standing. But even if Peters could pursue a liability theory against her economic interests, this Court should not permit her to drag along thousands of others who would be worse off under her theory. Those problems are magnified for the "Plan Claim Class"— Peters's attempt to sue derivatively on behalf of more than a thousand self-insured plans that would have paid millions more for services without the savings generated under the Aetna-Optum contracts. She has no connection to those plans and does not share their interests. Many entered into contracts with Aetna authorizing the Aetna-Optum relationship, and many continue to benefit from the savings that it generates.

*Fourth*, Peters does not specify what "equitable" relief the proposed class members seek or explain how they would prove their entitlement to it—another warning sign. Even if the proposed classes could establish liability through common evidence, individualized questions about whether particular payments were "inequitable" or "ill-gotten" would engulf the proposed classes.

*Fifth*, the proposed classes do not satisfy Rule 23(b)(1). Even if the relief that Peters seeks qualifies as "equitable," it is still individualized monetary relief. And Peters purports to sue on behalf of more than a thousand different plans, undermining the rationale sometimes used for applying 23(b)(1) in a single-plan ERISA case.

4

*Sixth*, the proposed classes fail Rule 23(b)(3)'s predominance and superiority requirements because individualized inquiries would overwhelm any "class" proceeding. As demanding as Rule 23(a)'s commonality requirement is (*see generally Dukes*), "Rule 23(b)(3)'s predominance criterion is even more demanding." *Comcast v. Behrend*, 569 U.S. 27, 34 (2013). To satisfy Rule 23(b)(3), Peters must do more than identify a common litigation-driving question that will generate a common answer. She must also show that other issues won't splinter the proposed classes into thousands of individualized inquiries. She cannot do so for either proposed class.

*Seventh*, because the proposed classes are overrun with individualized issues of liability, causation, and injury, there is no issue certification to be had under Rule 23(c)(4). None of Peters's "issues" is provable through common evidence.

\* \* \*

On top of all those problems, Peters has not offered a workable plan for a class trial. For good reason: A "class" trial here is a fiction. Peters is here on the hope that this Court will ignore thousands of individual issues (and the impossibility of a one-for-all trial) to certify the proposed classes. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (decertifying class that was "exceedingly unlikely to be tried").

But this Court cannot ignore those individual issues. They are critical to resolving the elements of and defenses to the proposed class members' claims. *Each* putative class member must prove the elements of each claim. And "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its . . .

defenses to individual claims." *Dukes*, 564 U.S. at 367. Aetna and Optum each have a due-process right to an "opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (internal quotation marks omitted). That right is not diminished because this is a class action. *See* Rules Enabling Act (28 U.S.C. § 2072(b)) (the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right"). There is no way to resolve the thousands of individualized issues and defenses through a class trial.

## BACKGROUND

The parties spent well over a year in discovery, and yet Peters barely cites to the evidentiary record. As a result, she presents a narrow (and skewed) view of the Aetna-Optum relationship—one that ignores the evidence of cost savings for the Aetna plans and members whom she seeks to represent.

### A. Aetna contracted with Optum to save money for Aetna plans and members.

Aetna contracted with Optum to generate savings for Aetna plans and members. Ex. 1, 208:1-5 (Aetna's goal was "to achieve medical cost savings for our members and plan sponsors"); Ex. 2, 31:1-4 ("save money for our employers and the members"); Ex. 3, 45:23-46:2 ("It is … always about the reduction of unit cost or utilization and driving the medical cost savings."); Ex. 4, 102:3-4 ("[w]e wanted to help realize savings for the plan sponsors and for the members"); Ex. 5, 54:24-25 ("the opportunity to have increased savings for our members and plan sponsors"); Ex. 15, 207:2-3 ("I know for a fact our value of the program we provided to Aetna was very strong."); Ex. 16, 71:21-72:12 (discussing program savings); Ex. 17, 47:12-

6

17 ("Aetna's original goal and consistent goal was to save money for the therapy program. . . ."). The documents back that up. *See*, *e.g.*, Ex. 6, -00015341-43 (analysis of "savings projection[s]" showing that "this was a good deal" and would produce "savings for the entire region"); Ex. 7, -00032588 (Optum presentation about "savings delivered").

Savings were the focus from the beginning. In 2011, Aetna issued a "request for proposal" to several companies (including Optum) with networks of physical therapists. Ex. 1, 22:2-5. Aetna's goal was "to lower medical costs for employers and members" in several states in the Southeast. Ex. 4, 30:17-18. After "carefully evaluat[ing]" the "pros and cons" of the various responses, Aetna concluded that "Optum had a very solid network" and could offer favorable rates resulting in "medical cost savings for [Aetna's] members and plan sponsors." Ex. 1, 44:4-22. In fact, Aetna concluded that Optum could save plans and members *millions* of dollars. *See* Ex. 8, ¶¶ 59-64 (discussing Exs. 10, 13).

That analysis showed two types of savings. First, the program would generate "unit cost savings"—essentially lower rates—because the Aetna-Optum contract rate was on average lower than the pre-Optum rates that Aetna's plans and members were paying. ███████████████████████████████████████ ███████████████████████████████████████ ██████████████ Second, the program would generate "treatment cost savings due to control of unnecessary visits/utilization." Ex. 14, -00015291; Ex. 1, 45:2-5.

Because most of Aetna's commercial business is self-insured, the lion's share of the program savings flowed to self-insured plans and their members. Aetna also

paid the same rates and received the same savings for the plans that it insures in those markets, so it also benefited from the cost savings (but to a lesser extent than self-insured plans because there are fewer members in Aetna-insured plans). *See* Ex. 8, ¶¶ 64-66.

### B. Aetna and Optum negotiated and implemented their relationship to achieve the sought-after savings for plans and members.

Negotiating and implementing the Aetna-Optum contracts required many months of work—both before and after they went live.[2] In 2012, after arm's-length negotiations (Dkt. 141 at 20), Aetna and Optum entered into agreements relating to Optum's physical-therapy network. Just over a year later, they did the same for Optum's chiropractor network. ██████████████████████████████ ████████████████████████████████ Those efforts yielded millions of dollars in savings for Aetna plans and members. *E.g.*, Ex. 1, 48:13–20; Ex. 7; Ex. 8, ¶¶ 59–64; Ex. 15, 207:2–3; Ex. 17, 47:12–17.

Peters second-guesses one aspect of the Aetna-Optum relationship: Aetna's agreement to pay Optum a flat per-visit rate. She argues that Aetna adopted a "policy" of "forcing" plan members to pay Optum's "administrative fees," but she identifies no "policy"—just the Aetna-Optum contracts. Peters also relies on a handful of emails offhandedly describing the fee structure as "burying" Optum's administrative fee in the claims process. But witnesses have explained that those

---

[2] Peters falsely asserts that Aetna "decided that the written terms of its plans were irrelevant." Br. 5. The evidence shows that Aetna analyzed the Aetna-Optum contracts and concluded that it did not need to change plan terms to implement the contracts. *See* Ex. 25; Ex. 1, 42:2–43:24.

emails do not reflect a nefarious purpose or intent to deceive. *E.g.*, Ex. 4, 188:2-12 (denying use of "bury" and explaining that the per-visit-rate's purpose was cost savings); Ex. 15, 201:4-16, 205:5-11 (no recollection of people using "bury"); Ex. 17, 195:19-196:1 (Optum understood that "bury the admin fee" simply meant "[t]hat Aetna requested we build our administrative fee into the claims process").

Aetna chose the per-visit rate structure for three reasons. First, it drives savings: Optum offered a per-visit rate that was lower on average than Aetna's pre-Optum fee-for-service rates. Second, the per-visit structure is "common in the industry." Ex. 8, ¶ 33; *see also* Ex. 18, -00002809 (referring to Aetna's use of per-visit rates). As Dr. Kessler (Defendants' expert and a Stanford healthcare economist) explains, per-visit rates are a common alternative to fee-for-service rates; rather than paying providers based on the "volume of services," using per-visit rates "create[s] incentives to [p]roviders to deliver higher-quality care at lower cost." Ex. 8, ¶ 24.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

The claims process works as follows: An Aetna plan member visits an Optum-contracted chiropractor or physical therapist. That downstream provider performs a service for the Aetna plan member and submits a claim to Optum. If the claim is timely and includes the required information,[3] then Optum forwards the claim to

---

[3] Optum did not see—or need to see—the plans because Aetna made all coverage determinations. Ex. 17, 191:14–16; Dkt. 141 (Order) at 17.

Aetna, using a CPT code specified in the Aetna-Optum contracts.[4] Aetna determines whether to cover the claim and (if covered) how much to pay based on the Aetna-Optum contract rate and then sends its determination back to Optum. If Aetna decides that the claim is covered under the Aetna member's plan, then Aetna calculates the member's financial responsibility (if any) and communicates its decision to Optum. Optum then pays the treating provider the Optum downstream rate (the contracted rate between Optum and that provider) minus the amount that Aetna calculated as the member's financial responsibility. Ex. 15, 111:14–17; *id.* at 124:13-125:2; Ex. 17, 62:10–15, 117:8–19. For the Aetna plan and member, financial responsibility is capped at the Aetna-Optum per-visit rate, no matter how many services the downstream provider bills.

On the whole, the Aetna-Optum relationship generated significant savings, but as with many flat-rate arrangements, results vary across the range of benefits claims. Each claim is different—involving different plan language, benefit design, member obligations (co-insurance, co-pay, or deductible), downstream providers, and so on. *See* Ex. 1, 135:2–9. Aetna does not know Optum's downstream rates. █

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

---

[4] There are also good reasons to use the CPT codes that some call "dummy codes." As witnesses have testified (and documents confirm), those codes facilitate the efficient processing and payment of claims. *See*, *e.g.*, Ex. 2, 120:11–18. For Aetna to process and pay claims using the per-visit rate, Optum needed to include the contractually specified CPT code. Ex. 1, 62:14-63:11.



Accordingly, determining the relationship's impact on any particular plan or member requires individualized analysis—of those scenarios and others.

\* \* \*

Peters tries to paint a sinister picture of the Aetna-Optum relationship, but the record shows that the goal was savings for Aetna plans and members. The relationship delivered on that goal.

## STANDARD OF REVIEW

Class "certification is proper only if the 'trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Dukes*, 564 U.S. at 350–51 (citation omitted). Peters tries to blunt that standard by citing *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417 (4th Cir. 2003), a pre-*Dukes* case that suggested that "federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application….'" Br. 10. Whatever *Gunnell*'s merits in 2003, *Dukes* is now the law. *See*, *e.g.*, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (class certification was "manifestly improper" because district court did not undertake the "rigorous analysis" that *Dukes* requires).

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Dukes*, 564 U.S. at 348

11

(quoting *Califano v. Yamasaki*, 442 U.S. 682 (1979)). Peters must justify a departure from the usual rule. *Id.* at 350. And she must do so with evidence: "Rule 23 does not set forth a mere pleading standard." *Id.* "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* "[A]ctual, not presumed, conformance with Rule 23(a) remains indispensable." *Id.* (internal quotation marks omitted).[5]

As part of its rigorous analysis, the Court must analyze the merits when they overlap with Rule 23's requirements: "Frequently th[e] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 564 U.S. at 350–51; *see also id.* ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (emphasis added, internal quotation marks omitted)). That makes sense because the end goal of certification is a class-wide *trial*. A one-for-all trial requires one-for-all evidence, so this Court "must formulate some prediction as to how specific issues will play out to determine

---

[5] The evidence must be both admissible and persuasive. *See, e.g., Dukes*, 564 U.S. at 354 ("[E]ven if properly considered, [plaintiffs' expert's] testimony does nothing to advance [plaintiffs'] case."); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds that testimony should not be excluded. . . . Like any evidence, admissible expert testimony may persuade its audience, or it may not.").

whether common or individual issues predominate." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (internal quotation marks omitted).

## ARGUMENT

Based on a handful of pre-*Dukes* cases, Peters argues that Rule 23(a)'s commonality requirement "is not demanding" (Br. 12) and proceeds accordingly—rattling off generic "contentions" supposedly common to the proposed classes. Br. 13-14. But that is precisely the error that the Supreme Court rejected in *Dukes*. 564 U.S. at 350. Peters never mentions the elements of her ERISA claims—let alone explains how she would prove them through common evidence at a classwide trial. *See*, *e.g.*, *Sandwich Chef of Tex. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 220 (5th Cir. 2003) (to "make a meaningful determination of the certification issues," court must "understand the claims, defenses, relevant facts, and applicable substantive law").

Peters's contentions aside, the *evidence* shows that the proposed classes do not satisfy Rule 23's requirements because the elements of Peters's claims—including breach, causation, and injury (*see Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 219 (4th Cir. 2011))—require individualized inquiries.

## I. THERE IS NO COMMON PROOF THAT AETNA BREACHED FIDUCIARY DUTIES TO MORE THAN A THOUSAND DIFFERENT PLANS.

Peters claims that Aetna breached fiduciary duties to *all* the self-insured plans in question and that Optum (as a non-fiduciary) somehow aided Aetna's breaches.

Br. 1. As support, Peters points to the Aetna-Optum contracts and evidence about how they were implemented. *Id*. at 1–2, 3–9. But that class theory fails out of the gate because this Court already ruled that Aetna was not serving a fiduciary role when it contracted with Optum "to establish and maintain a provider network that benefited a broad range of health-care consumers and were not directly associated with the Plaintiff's Plan or *any* other particular benefit plan" or when Aetna "implement[ed] this system-wide contractual relationship." Dkt. 141 at 23.[6] The Court also ruled that Optum did not serve a fiduciary role at any point for any plan. *Id.* at 24-25. Peters cannot evade those rulings by repackaging rejected arguments as common "contentions." *See EQT Prod.*, 764 F.3d at 361 (reversing class certification premised on flawed common issue).

In any case, there is no way to determine whether Aetna breached fiduciary duties without examining Aetna's contracts and course of dealing with each individual plan. Multiply that individualized inquiry by the 1,600 self-insured plans in the proposed class, and Peters's "common" question turns into thousands of mini-trials.

### A. Contracts and communications vary from plan to plan.

Peters glosses over Aetna's thousands of different contracts and communications with self-insured plans, but that evidence is central to Peters's claims: "To adhere to the plan is not a breach of fiduciary duty." *Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir. 1989); *see also Sedlack v. Braswell Servs.*

---

[6] *See also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747 (6th Cir. 2010).

*Grp., Inc.*, 134 F.3d 219, 225 (4th Cir. 1998) (same); 29 U.S.C. § 1132(a)(1)(B) (ERISA plaintiff must show entitlement to benefits "under the terms of" the plan). Here, the relevant contracts and communications vary from plan to plan, precluding class certification. *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (rejecting class certification because the relevant contracts varied and raised "a wholly distinct set of interpretive issues"); *In re Aetna UCR Litig.*, No. 07-cv-03541, Dkt. 1157(D.N.J. June 30, 2018) (denying class certification in ERISA case because of variations in Aetna's self-insured plans).[7]

Peters tries to neutralize that variability by claiming that Aetna "admitted" in a handout to the Department of Labor that its plans prohibited the Aetna-Optum contracts. Br. 2, 5. That is not true: The handout does not say what Peters suggests, and she ignores Aetna's testimony refuting her assertion. Ex. 1, 202:17-209:21. Determining whether a particular plan permitted the Aetna-Optum relationship requires analyzing evidence specific to that plan.

Take Peters's plan. Aetna adhered to its terms by using its "Negotiated Charge" (the Aetna-Optum contract rate) with its "Network Provider" (Optum). Ex. 1, 150:9–151:2; 154:5–22; Ex. 22. Peters disagrees with that interpretation. Under

---

[7] Peters's cases (Br. 14–15) are distinguishable either because they involve only a single plan (with a single contract) or because they involve a class theory that does not implicate plan contracts or communications. In cases involving multiple varying plans, numerous courts have denied class certification. *See also Chorosevic v. MetLife Choices*, No. 4:05-CV-2394, 2007 WL 2159475, at *8 (E.D. Mo. July 26, 2007); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, No. MDL 09-2074, 2014 WL 6888549, at *4, *6-12 (C.D. Cal. Sept. 3, 2014); *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 289 (D.N.J. 2013); *Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 425 (D.N.J. 2014), *aff'd*, 647 F. App'x 76 (3d Cir. 2016).

her liability theory, Aetna must treat Optum's downstream rate with the chiropractor who treated her as the "Negotiated Rate."[8] But that disagreement is just that: a disagreement. It does not show that Aetna's interpretation was "arbitrary and capricious" under the deferential standard that would apply (*Conkright v. Frommert*, 559 U.S. 506, 512 (2010)) or that Aetna breached a fiduciary duty to the Mars plan. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007).

And for Rule 23's purposes, resolving those issues under Peters's plan does not resolve them under the many other plans that Peters purports to include in the class. Each self-insured plan is unique, reflecting its sponsor's design. For example, another putative class member's plan includes different terms that are irreconcilable with Peters's argument under her own plan. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[8] Peters also argues that administrative fees are not medically necessary and thus were not covered under her plan. That argument conflicts with the plan terms as well as her own testimony that *her plan* should cover her chiropractor's administrative costs. Ex. 26, 184:20–185:6; *id.* at 91:21–92:3. It also conflicts with Dr. Panis's testimony that "per diem" rates are common in the industry, proper, and include the service provider's administrative costs and profits. Ex. 27, 220:15–224:4.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

Other plans in the record—from the several dozen that Peters's counsel randomly selected out of the 1,600 different plans in the proposed "Plan Claim Class"—include provisions that are both different from those in the two examples discussed above *and* irreconcilable with Peters's argument. Ex. 80, -00074487 (Preferred Care Provider "that has contracted with Aetna"); Ex. 81, -00077683 (Network Provider "that has contracted with Aetna"); Ex. 57, -00070455 (similar). And still other plan provisions—barring particular claims by particular plan members—support defenses that would require additional plan-specific and claim-specific inquiries.[9]

And variations in plan terms are just the beginning. If there are competing interpretations of plan provisions, resolving those disputes would turn on additional plan-specific evidence. *See DiFelice*, 497 F.3d at 418 (in fiduciary-breach case,

---

[9] *See, e.g.,* Ex. 42, -00075693 (requiring exhaustion of appeals before any lawsuit, imposing a 90-day contractual limitations period after final appeal decision, and requiring "[a]ny lawsuit related to your claim or this Plan" to be brought "in Federal District Court in Richmond, Virginia, which will be the exclusive forum for such suits."); Ex. 76, -00069525–26 (member must "complete all appeal processes of the Plan before being able to . . . bring an action in litigation"); Ex. 50, -00074719 ("Bringing an appeal within applicable timelines is a prerequisite to filing a lawsuit in court regarding your claim.").

examining the "totality of the circumstances"); *Helton v. AT&T Inc.*, 709 F.3d 343, 353 (4th Cir. 2013) ("we have long recognized that certain types of extrinsic evidence often are necessary for a court to assess whether an administrator abused its discretion in denying a plan member's request for benefits").

Aetna's administrative services contract with Mars, for instance, refutes Peters's position. *See Noah U. v. Tribune Co. Med. Plan*, 138 F. Supp. 3d 1134, 1146 (C.D. Cal. 2015) (discussing administrative services contracts "as a means of interpreting the written language of the Plan Documents"). ████████████████

████████████████████████████████████████████

Ex. 18, -00002809, which at that point had included Optum since 2012. Aetna did not agree (nor did Mars ask Aetna) to change any of its network contracts or reimbursement methodologies or to serve a fiduciary role when negotiating or implementing network contracts. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Aetna complied with the contract by providing Peters "access" to its "network" and by using the "per diem" rates through the "Aetna contract" with Optum. Optum's downstream rates, meanwhile, were not in any "Aetna contract."

Administrative services contracts also vary from plan to plan,[10] adding yet another layer of individualized inquiry. *See Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 631 (6th Cir. 2011) (denying Rule 23(b)(3) class because different administrative services agreements established different functions and responsibilities). Beyond that, determining whether Aetna "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint" (*Pegram*, 530 U.S. at 226) would also require looking at those individualized contracts.

Aetna's communications with plan sponsors also vary and show that many plans knew about the Aetna-Optum relationship—bolstering the conclusion that those plans authorized the relationship. In each of the past several years, Aetna sent letters to self-insured plans describing how the Aetna-Optum relationship works— including describing the services and claims handling and explaining that the network vendor's (Optum's) contracted rate "includes an administrative fee for any delegated services by the vendor." Ex. 9, (Ex. C, -00067620 (2015 disclosure letter)); *see also id.* (Ex. B, -00067759 (2016 letter)) and (Ex. A, -00077049 (2017 letter)). Aetna's account teams also had other plan-specific communications— ranging from emails to calls to meetings—with plan sponsors about the Aetna-Optum relationship. *See* Ex. 1, 125:14–126:22; Ex. 78, ¶ 10 (multiple discussions with Peters's plan sponsor). Those communications vary because Aetna's various

---

[10] *See, e.g.*, Ex. 41, -00075500-01; Ex. 68, -00076999; Ex. 48, -00074799-800; Ex. 39, -00078359.

account teams "own" and "manage" each plan-sponsor relationship differently. Ex. 1, 131:11–133:4.[11]

As that evidence shows, Aetna's contracts and communications with many different plans *support* the Aetna-Optum contracts, which used a common industry fee structure to deliver savings to plans and members. Peters cannot show that Aetna acted contrary to plans' or members' interests across the board and certainly cannot do so using common evidence. *See Broussard*, 155 F.3d at 340.

### B. Peters's misrepresentation-based allegations also require individualized inquiries.

When Peters responded to the motions to dismiss three years ago, she relied principally on ERISA cases alleging misrepresentations. As the case has evolved, Peters's misrepresentation-based theories have faded to the background. Today, she alleges only that the EOBs that Aetna sent to plan members were misleading (Br. 1, 7-8, 14), but those allegations are not susceptible to classwide proof.

First, Peters fails to identify any specific classwide misrepresentation. At her deposition, Peters agreed that her EOBs accurately reflected Aetna's benefits calculations under the Aetna-Optum contracts and that Optum's Remittance Advices to her providers were correct; she simply disagrees with Aetna's calculations. *See* Ex. 26, 182:2–21; 228:13–231:17. But if Aetna's calculations were appropriate—an

---

[11] Peters asserts, based on a supposed "script" that Aetna produced in discovery (Br. 5), that Aetna did not tell plan sponsors about Optum's "fees." But Peters neglects to mention that this Court already ruled that the system-wide "field communication" in question did not implicate a "fiduciary function." Dkt. 141 at 26. On top of that, Peters does not identify a single plan with which Aetna used the "script" and ignores Aetna's disclosures about Optum's fees to her own plan and others.

issue requiring a plan-by-plan inquiry (*see* Section I.A)—then her challenge to the EOBs fails as well. The EOBs also vary: For instance, only some listed the so-called "dummy" codes that Peters challenges. *Id.* at 155:23–157:8; *see, e.g.,* Ex. 28.

Second, even if Peters could identify a particular classwide misrepresentation, she cannot establish detrimental reliance (a required element) on a classwide basis. *See Tootle v. ARINC, Inc.*, 222 F.R.D. 88, 97 (D. Md. 2004) (denying class certification in ERISA fiduciary-breach case because of individualized reliance issues). Peters identifies no evidence that anyone—let alone all or substantially all putative class members—detrimentally relied on any alleged misrepresentations. Peters admitted at her deposition that she did not rely on EOBs to make any payments; rather, she paid the amounts that her physical therapist or chiropractor told her to pay based on their separate in-office communications and invoices. Ex. 26, 261:22–262:25; 172:11–19; 136:21–137:7; 100:25–101:9. And plan members could get additional information about the Aetna-Optum relationship (for instance, by calling a number on the EOBs). *See, e.g.¸ id.* at 198:24–199:20; 190:16–191:11, 208:6–209:6; Exs. 30-32. Those individualized reliance issues preclude certification of a misrepresentation theory. *See, e.g.*, *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996); *Tootle*, 222 F.R.D. at 97; *Wiseman v. First Citizens Bank & Tr. Co.*, 215 F.R.D. 507, 510 (W.D.N.C. 2003); *George v. Duke Energy Ret. Cash Balance Plan*, 259 F.R.D. 225, 240 (D.S.C. 2009).[12]

---

[12] *CIGNA Corp. v. Amara* is not to the contrary. "The [*Amara*] Court did not analyze whether detrimental reliance is an element of a claim for misrepresentation in violation of fiduciary duties . . . under ERISA." *Carr v. Int'l Game Tech.*, No. 3:09-cv-00584, 2012 WL 909437, at *4 (D. Nev. Mar. 16, 2012).

### C. The prohibited-transaction theory also requires individualized inquiry.

Peters also seeks certification of her theory that Aetna "engaged in prohibited transactions under 29 U.S.C. § 1106 by using plan assets to pay Optum's administrative fees." Br. 10. That is as far as Peters goes in developing that theory. But in case Peters has more to say in her reply, the theory gets her no closer to class certification.

Aetna's payments to Optum could not qualify as prohibited transactions because they represent Optum's "bargained-for consideration as a service provider." *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 37 (D.D.C. 2018); *Sweda v. Univ. of Penn.*, No. 2:16-cv-04329, 2017 WL 4179752, at *11 (E.D. Pa. Sept. 21, 2017) ("If [plaintiff's] argument were true, then any time plan administrators contracted with another party to provide services to plan participants in exchange for money . . ., it would qualify as a prohibited transaction."). At any rate, ERISA does not prohibit payments that a plan authorizes. *Sellers*, 316 F. Supp. 3d at 33–38. Deciding whether a particular plan authorized the Aetna-Optum relationship would require evidence unique to that plan. *See* Section I.A.[13]

---

[13] Aetna's payments to Optum also do not qualify as prohibited transactions because Optum is not a "party in interest" under 29 U.S.C. § 1106. ERISA defines "party in interest" to include various entities—"fiduciaries," for example—but Optum doesn't fit any of the listed categories. *See* 29 U.S.C. § 1002(14). Peters might argue that Optum qualifies as a "person providing services to such plan" (*id.*), but as this Court already concluded, "Optum has no contractual relationship with the Mars Plan" (Dkt. 141 at 15) or any other Aetna plan. Optum provides services to Aetna, not to Aetna's self-insured plans.

## II.  THERE IS NO COMMON PROOF OF INJURY.

Peters never attempts to show that there is common proof of injury to all (or nearly all) members of the proposed classes. But that is an element of her ERISA claims. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011) (ERISA plaintiff seeking monetary relief must "show[] actual harm—proved . . . by a preponderance of the evidence"); *David v. Alphin*, 817 F. Supp. 2d 764, 781 (W.D.N.C. 2011) ("[P]articipants suing under ERISA have the burden of showing that they personally suffered some actual or threatened injury" from the "the allegedly unlawful conduct"). Peters avoids the topic because there is no classwide proof of injury. On the contrary, the evidence shows that the Aetna-Optum contracts saved plans and members millions of dollars—an undeniable benefit to the putative class members. Indeed, many proposed class members would be *worse* off if Peters had her way—proof that this case is not suitable for class certification. *See, e.g.*, *Hansberry v. Lee*, 311 U.S. 32, 45 (1940) (class representative "whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent does not afford that protection to absent parties which due process requires"); *Broussard*, 155 F.3d at 338 ("basic due process requires that named plaintiffs possess undivided loyalties to absent class members").

That problem is neither "illusory" nor "irrelevant," as Peters suggests. Br. 17. A proposed class challenging conduct that benefited (or at least did not injure) absent class members fails under any Rule 23 provision. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350 (internal quotation marks omitted). And "[t]he possibility

23

that some class members did not suffer injuries [also] causes individual injury issues to predominate" under Rule 23(b)(3). *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 551–52 (E.D. Va. 2018).

Peters tries to mask those defects by arguing that Aetna "forced" the putative class members "to bear responsibility for the Optum fees." Br. 1, 2, 9, 12, 13. But Aetna did not "force" members to pay Optum's rates any more than it forces members to pay the rates that Aetna negotiated with countless other providers and related entities. Paying negotiated rates for services (particularly when those services result in substantial net savings) is not economic injury.

### A.    Peters imagines a but-for world that could never exist.

To determine whether alleged misconduct caused an ERISA plaintiff economic harm, a court must consider the position that the plaintiff would have been in but for the alleged misconduct. *See Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008) (Posner, J.) (in ERISA case, determining loss by comparing benefits received to benefits that would have been due but for the alleged misconduct); *Sims v. BB&T Corp.*, No. 1:15-cv-732, 2018 WL 3128996, at *5 (M.D.N.C. June 26, 2018) ("While the ERISA statute does not define 'losses,' courts have generally applied the law of trusts to find that a loss occurs when there is a difference between the current value of the Plan as compared to what the Plan would have been worth had the breach not occurred."). Peters imagines a but-for world in which Aetna plans and members benefit from Optum's services without paying for them. Br. 13, 18. That but-for world makes no economic sense.

For starters, there is no evidence that Optum would have provided its services for free in any alternate world, just as there is no evidence that Aetna would have absorbed the cost of service fees that benefited self-insured plans and members. Ex. 8, ¶¶ 49-50. As Dr. Kessler explained, it is perhaps economically plausible that Aetna would have charged plans and members for the cost of Optum's services in another way (for example, through a per-member-per-month fee if Aetna's systems could accommodate it) or eliminated the Aetna-Optum relationship altogether. *Id.* ¶ 50. But it makes no sense to posit a but-for world in which Aetna plans and members benefit from Optum's networks for free. *See* Ex. 23, ¶ 4 (Aetna senior director explaining that Aetna "would not have entered into or retained" the Optum relationship if Peters's proposal were the only option).

To lend an aura of validity to her imagined but-for world, Peters offers an "expert" report from Dr. Panis. Br. 8. But Dr. Panis's report fails Rule 702's requirements and in any case does not withstand Rule 23's "rigorous analysis." He offers only arithmetic. Dr. Panis testified that Peters's counsel instructed him to run calculations on a particular subset of handpicked claims and that he is not opining on whether those calculations reflect a proper economic analysis of injury or damages or even contemplate a realistic but-for world. Ex. 27, 108:23-109:11 (acknowledging that he was "not sure what the basis would be" for calculating member and plan responsibility based on the Optum downstream rates); 116:24-117:10 (conceding that Peters's counsel instructed him "how to calculate the Optum gain model" and his "overcharge model"). Gerrymandered class definitions and calculations do not satisfy Rule 23. *See Franco v. Conn. Gen. Life Ins. Co.*, 289

F.R.D. 121, 138–39 (D.N.J. 2013) (rejecting implausible liability theory and denying class certification).

Peters has alternatively suggested that the proper but-for world is one in which the Aetna-Optum contracts remain in place but Aetna's alleged misrepresentations about them do not. But that only complicates the analysis: Showing harm in that but-for world would require each putative class member to prove that (a) Aetna misled them (an allegation that defies proof by common evidence (*see* Section I.A-B)) and (b) had they known the "truth," the member or plan would have somehow opted out of the Aetna-Optum relationship *and* still paid less for healthcare services—an unsupported (and unsupportable) assumption. Ex. 8, ¶ 46. If a plan would have agreed to the Aetna-Optum relationship knowing its details (as the evidence shows is likely for many plans), then there could be no injury because the plan and its members would have faced the same financial responsibility regardless of any alleged misrepresentations. *Id.*

## B. Even in Peters's flawed but-for world, there is no common proof of injury.

For all the reasons discussed above, Peters's proposed but-for world could never exist. But even taking Peters's theory on its own terms, individualized issues still predominate in the proposed classes because there is no way to determine whether a particular class member suffered harm without analyzing that member's plan, communications with Aetna, and claims history. Only then could the Court determine whether a particular class member would have been better off, worse off, or the same in Peters's but-for world.

Dr. Panis agrees. At his deposition, he explained that, "[a]s an economist," he would have to "look at [a] member's complete claims experience and the evolution of claims over the course of [a] year" to determine the impact of any "overcharge" on that member. Ex. 27, 174:24–175:9.[14] Indeed, whether a plan or plan member suffered "harm" (as Peters defines it) depends on many individualized factors, including a plan's design and its effects on a member's claims history.

Dr. Kessler illustrated the need for that sort of individualized inquiry using real-world data from putative class members. Ex. 8, ¶¶ 67-128. He demonstrated that in Peters's proposed but-for world (where Aetna calculates members' financial responsibility based on Optum downstream rates), many proposed class members would be worse off or unaffected, which means that they are uninjured in the real world. Dr. Kessler also explained that there is no way to identify uninjured class members short of an individualized inquiry. Dr. Panis looked at only a subset of claims (at counsel's instruction), so he did not consider how Peters's liability theory would affect any particular plan or plan member (taking into account their claims history and plan design). If Dr. Panis had done so, he would have observed a variety of ways in which absent class members would be worse off in Peters's but-for world.

For instance, the evidence shows that Optum's downstream rate is often higher (on thousands of claims) than the Aetna-Optum contract rate. In those cases, a plan member would be worse off if Aetna calculated financial responsibility based on the higher Optum downstream rate. Ex. 8, ¶ 35. Peters tries to define away that

---

[14] Dr. Panis emphasized at his deposition that he is *not* offering an opinion on whether the proposed classes can or should be certified. Ex. 27, 47:1–3; 64:11–13.

problem, engineering her class definitions to include only benefits claims for which the Optum downstream rate was lower than the Optum-Aetna rate. Br. 18. But there is no economic or legal basis for carving up the proposed classes like that: If Peters were correct that *all* plans required Aetna to calculate member responsibility based on the Optum downstream rate, then Aetna should use that rate for *every* benefits claim—including for those that Peters tries to excise from the proposed classes.

In any case, Peters's manipulation of her class definitions serves only to invite (not prevent) an individualized claim-by-claim inquiry because a plan member could have some charges with an Optum downstream rate lower than the Aetna-Optum rate and some charges with a downstream rate higher than the Aetna-Optum rate. Dr. Kessler illustrated that scenario with real-world data for a putative class member who had three claims with an Optum downstream rate higher than the actual Aetna-Optum rate and one claim with an Optum downstream rate lower than the Aetna-Optum rate. That member would be better off in the real world than in Peters's proposed but-for world. *See* Ex. 8, ¶¶ 69-74. Yet Peters seeks monetary "relief" on that uninjured class member's behalf. *See Henry v. Champlain Enter., Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) ("The aim of ERISA is to make the plaintiffs whole, but not to give them a windfall.") (Sotomayor, J.) (internal quotation marks omitted).

A plan's design can also affect how a member would fare in Peters's but-for world. A plan member whose benefits claims exceeded their annual out-of-pocket maximum in a particular year could not have been injured by the Aetna-Optum contracts because that member would have paid the same amount for medical care

that year regardless of whether Aetna calculated financial responsibility based on the Aetna-Optum rate or the Optum downstream rate.

That is not just theory: Peters herself suffered no "injury" in 2013. Using the Optum downstream rates that year wouldn't have made any difference; given her plan design and claims history, she would have owed the same "maximum" amount anyway in 2013. Ex. 8, ¶¶ 107-112. Dr. Kessler also demonstrated that plan deductibles, coinsurance, and copayments affect whether a class member suffered harm as Peters defines it. *Id.* at ¶¶ 75-104. For instance, Peters experienced a net benefit in 2014 because of the interplay between the deductible, coinsurance, and out-of-pocket maximum for her plan. *Id.* at ¶¶ 113-127. Indeed, Dr. Kessler demonstrated that by substituting the Optum downstream rates for the Aetna-Optum rates on all of Peters's approved benefits claims, she would be worse off by $114.71. *Id.* at ¶ 127.

As Dr. Kessler explains, it is only through a claim-by-claim and member-by-member inquiry—comparing actual payments against hypothetical payments under the Optum downstream rates and accounting for the impact of any rate changes on a member's deductible, copayments, coinsurance, and out-of-pocket maximum—that you can determine whether a particular class member suffered "injury." Peters's ERISA claims defy class treatment. *See Broussard*, 155 F.3d at 342–43; *see also Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005) (affirming denial of class certification because "not every member of the proposed classes can prove with common evidence that they suffered impact").

## III. PETERS IS NOT A TYPICAL OR ADEQUATE CLASS REPRESENTATIVE FOR EITHER CLASS.

The proposed classes also fail Rule 23(a)'s typicality and adequacy requirements, which "goes to the heart of a representative part[y's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). "[W]hen the variation in claims strikes at the heart of the respective causes of actions," the Fourth Circuit has "readily denied class certification." *Id.* at 466-47.

### A. Peters is not typical or adequate because she does not share the proposed classes' interests.

Without evidence that she suffered concrete injury (*see* Section II), Peters lacks standing. *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (named plaintiff must establish Article III standing). But even if Peters had standing, that would not give her the right to represent thousands of class members who benefited from the Aetna-Optum contracts (or at least suffered no injury) and in many cases would be worse off if she won.

If there is "a conflict of interest between different groups" of class members "with respect to the appropriate relief . . . [t]he Supreme Court and [the Fourth Circuit] have long interpreted the adequate representation requirement of Rule 23(a)(4) to preclude class certification." *Broussard*, 155 F.3d at 337; *see also Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan for Key Execs.*, 182 F. Supp. 3d 573, 584 (E.D. Va. 2016) (proposed class failed adequacy requirement because the relief sought could have harmed certain class members). ERISA claims are no different: "It is not enough to say that the named plaintiffs want relief for the plan as

30

a whole, if the class is defined so broadly that some members will actually be harmed by that relief." *Spano v. Boeing Co.*, 633 F.3d 574, 586–87 (7th Cir. 2011).

Unlike in *Clark v. Duke University*, No. 1:16-cv-1044, 2018 WL 1801946, at *8 (M.D.N.C. Apr. 13, 2018) (cited at Br. 18), the conflict here is not "hypothetical." It is real and can be measured in dollars and cents using actual claims. Aetna and Optum have identified class members whose financial responsibility was lower under the Aetna-Optum contracts than it would have been in Peters's but-for world. Recalculating benefits would not help them and in fact could make them worse off. As important, *Clark* involved a single plan, not more than a thousand. Figuring out how each member and plan would fare in Peters's but-for world requires individualized inquiry. *Di Biase v. SPX Corp.*, No. 3:14-cv-00656, 2017 WL 4366994, at *4 (W.D.N.C. Oct. 2, 2017) ("If class members do not share the same interests, then it is illogical to presume that a class representative would be able to represent all of the varying and perhaps contrary interests with equal gusto.").

### B. Peters cannot sue on behalf of other self-insured plans.

Peters's failure to satisfy Rule 23(a)'s typicality and adequacy requirements is most pronounced for the proposed "Plan Claim Class." Peters—a former participant in a single plan—seeks this Court's permission to sue on behalf of more than 1,600 *other* self-insured ERISA plans. Br. 9. She does so by asserting a derivative claim under ERISA § 502(a)(2) "on behalf of" her former plan and then broadening her class definition to include many other plans.

But that does not work. Peters "has not alleged that [s]he was a participant or beneficiary" of those other plans, so she "has not suffered a personal injury in

connection with the [other plans]," making her "ineligible to file suit." *Berry v. Wells Fargo & Co.*, No. 3:17-cv-00304, 2017 WL 7411165, at *5 (D.S.C. July 31, 2017). The plaintiff in *Berry*, like Peters here, cited *Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410, 424 (6th Cir. 1998), but the *Berry* court "decline[d]" to follow *Fallick* and instead "follow[ed] the precedent of [the Fourth] Circuit and the Supreme Court" in concluding that the plaintiff lacked standing to sue on behalf of other plans. *Berry*, 2017 WL 7411165, at *6. "[T]he Fourth Circuit has not adopted the reasoning in *Fallick* and the case appears to run afoul of the standing requirements articulated by the Supreme Court." *Id.*

Even if a former ERISA plan member could sue on behalf of plans other than her own, Peters cannot do so here because she does not represent those other plans' interests. Many of them knew about the Aetna-Optum relationship. And many benefited from it. Peters has no idea what those plans' interests are. Ex. 26 263:21-25. Indeed, Peters (a former plan member) is interested only in maximizing her monetary recovery on *past* claims. But self-insured plans have a broader interest in keeping costs low, not to mention a fiduciary obligation to their members. They must at least *consider* the benefits flowing from the Aetna-Optum relationship—including the services, network, and cost savings. Peters ignores those benefits—benefits that plans would lose if Peters prevails.

Peters's conflict with the proposed self-insured-plan class is also evident in her class definitions (which exclude many participants) and her "overcharge" model (which excludes many more claims). Those engineering efforts show that she does

32

not share the interests of any plan "as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985).

Finally, Peters's proposed "Plan Claim Class" also fails because many of those claims are subject to arbitration. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████[15] Identifying, interpreting, and applying those provisions would necessarily require a plan-by-plan inquiry.[16] "[W]here certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[] the commonality and typicality of the class." *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013); *see also King v. Capital One Bank (USA), N.A.*, No. 3:11-cv-00068, 2012 WL 5570624, at *14 (W.D.Va. Nov. 15, 2012).

---

[15] *See Vanvels v. Betten*, No. 1:06-cv-710, 2007 WL 329048, at *4 (W.D. Mich. Jan. 31, 2007) ("If the plan has agreed to arbitrate its disputes with a fiduciary . . . a participant or beneficiary suing on behalf of the plan must do so subject to the arbitration agreement"); *Spaz Beverage Co. Defined Ben. Pension Plan v. Douglas*, No. 11-cv-02059, 2011 WL 3359749, at *4 (E.D. Pa. Aug. 4, 2011) (same).

[16] ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ Others contain forum-selection clauses. *See, e.g.*, Ex. 55, -00071096.

## IV. PETERS CANNOT SIDESTEP INDIVIDUALIZED ISSUES BY APPEALING TO EQUITY.

Peters says that "she seeks equitable relief for Defendants' misconduct" but never explains what she seeks (and from whom). Br. 10. Rule 23 demands a tighter fit between Peters's liability theory and requested relief. *Behrend*, 569 U.S. at 35. In any case, whatever Peters calls the equitable relief that she seeks—"surcharge," "restitution," or "disgorgement"—the individualized *liability* issues remain. If anything, Peters's prayer for equitable monetary relief injects additional layers of complexity and member-specific inquiry.

### A. The "equitable" monetary remedies that Peters seeks are inherently individualized.

Whatever the "equitable" monetary relief sought, it would require individualized inquiry:

*Surcharge.* In *Amara*, the Supreme Court explained that "just as a court of equity would not surcharge a trustee for nonexistent harm . . ., a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm . . . by a preponderance of the evidence." 563 U.S. at 442. The plaintiff must "show harm and causation" (*id.*), which would require individualized inquiries.

*Restitution/Disgorgement/Accounting.* Equitable restitution "under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by 'demonstrat[ing] individual loss.'" *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 200 (2d Cir. 2005). It also requires the plaintiff to trace specifically identifiable funds that arguably belong to the plaintiff. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 332 (4th

Cir. 2006) (proposed class failed to show that alleged "premium overcharges [were] traceable"); *Montanile v. Bd. of Tr. of Nat'l Elevator Indus. Health Ben. Plan*, 136 S. Ct. 651, 658 (2016) (same reasoning); *Cox v. Blue Cross Blue Shield of Mich.*, 166 F. Supp. 3d 891, 895 (E.D. Mich. 2015) (dismissing ERISA complaint seeking "restitution and disgorgement of [alleged] hidden fees": "Because Plaintiffs have failed to sufficiently allege a specifically identifiable fund in [the administrator's] possession, they have not set forth sufficient allegations to establish statutory standing for equitable restitution.").[17] Peters has not done so for herself, and the proposed classes could not possibly do so through common evidence.

That is not all. "[C]ourts and commentators have cautioned against awarding a plaintiff equitable relief, and disgorged profits in particular, to the extent doing so would amount to a windfall or penalize a defendant." *Pender v. Bank of Am. Corp.*, No. 17-1485, 2018 WL 2714683, at *9 (4th Cir. June 5, 2018) (unpublished). Yet that is what Peters invites in seeking "equitable" remedies for proposed classes full of uninjured people. In any case, determining whether Aetna or Optum unfairly profited from a particular plaintiff's payment would require individualized inquiry into that plaintiff's benefits claims.

Finally, to seek any form of equitable relief, each proposed class member would need to show that they have no adequate remedy at law. *Varity Corp. v. Howe*,

---

[17]  "There is a limited exception [to the tracing requirement] for an accounting for profits." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 n.2 (2002). But even then, any profits to be accounted must have "in equity and good conscience belonged to *the plaintiff.*" *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 364 (4th Cir. 2015) (emphasis added) (citation omitted).

516 U.S. 489, 511-12 (1996). Peters previously disavowed any § 502(a)(1)(B) claim (Dkt. 46 at 32-33), but she now attempts to disavow her disavowal. Br. 9. Regardless, if any putative class members have an adequate remedy at law, they cannot seek equitable relief. Sorting that out would require individualized inquiries.

### B.     Peters cannot show through classwide evidence that the proposed classes are entitled to monetary relief from Optum under ERISA § 502(a)(3).

Peters seeks relief against Optum only under ERISA § 502(a)(3). Br. 10 ("Second, she seeks a declaration that Optum is liable under 29 U.S.C. § 1132(a)(3) for its role in aiding Aetna's fiduciary violations."); *id.* at n.9 ("Optum can be held liable under [ERISA § 502(a)(3)] even if it is not a fiduciary.") (citing *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245 (2000)). Peters limits her claims in that way for good reason: Because "Optum was not acting in a fiduciary capacity with respect to the actions complained of by [Peters]" (Dkt. 141 at 17), it cannot face liability under ERISA § 502(a)(2), which applies only to plan fiduciaries, or under ERISA § 502(a)(1)(B), which applies only to the plan itself, a plan administrator, or a plan fiduciary. *Colon v. Pencek*, No. 3:07-cv-00473, 2008 WL 4093694, at *6 (W.D.N.C. Aug. 28, 2008). That leaves only Peters's request for "other appropriate equitable relief" under § 502(a)(3).

Peters suggests in a footnote that "other appropriate equitable relief" may include "accounting, restitution, and surcharge." Br. 10 n.10. But the Supreme Court has held that ERISA § 502(a)(3) does not authorize a surcharge remedy against a nonfiduciary. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *Amara*, 563 U.S.

at 442 ("The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.")

Even considering restitution, the § 502(a)(3) claims against Optum would end up awash in a sea of individualized inquiries. To get restitution under *Harris Trust*, a class member would need to prove that, among other things, Aetna breached a fiduciary duty to that class member's plan *and* Optum knowingly participated in the breach. *See In re Wachovia Corp. ERISA Litig.,* No. 3:09-cv-262, 2010 WL 3081359, at *17 (W.D.N.C. Aug. 6, 2010) (Reidinger, J.). To establish Optum's knowing participation, each class member would need to show that, for the plan in question, Optum "(1) knew of [Aetna's] status as a fiduciary and (2) knew that [Aetna's] conduct contravened a fiduciary duty." *Leber v. Citigroup, Inc.*, No. 07-cv-9329, 2010 WL 935442, at *14 (S.D.N.Y. Mar. 16, 2010). Optum never saw the Aetna plans. Ex. 17, 191:11-24. Regardless, Peters cannot demonstrate through common evidence that Optum knew that Aetna breached fiduciary duties to more than a thousand different plans. *See* Section I; Ex. 15, 141:21-22 (Optum employee testifying that "I think we were doing everything as we should have."). And determining whether Optum should return property belonging in "good conscience" to a particular plaintiff would require individualized inquiries.[18]

---

[18]

## V.  EACH OF PETERS'S CLASS-CERTIFICATION THEORIES FAILS FOR ADDITIONAL REASONS.

Because Peters's ERISA claims are by nature individualized, her proposed classes fail not only Rule 23(a)'s requirements but also those in Rule 23(b)(1), (b)(3), and (c)(4).

Peters asks this Court to certify a mandatory class under Rule 23(b)(1), with no opt-outs, all to upend the Aetna-Optum contracts that have yielded millions of dollars in benefits for the very plans and members whom she seeks to represent. But "[c]ertification under Rule 23(b)(1) is usually inappropriate where 'the alleged conduct harmed some participants and helped others.'" *Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403, 410 (D. Md. 2014) (quoting *Spano v. Boeing Co.*, 633 F.3d 574, 588 (7th Cir. 2011)). That is true here. The proposed classes include "some class members [who] suffered no injury and some [who] could be harmed by the requested relief." *Id.*

Peters contends that claims like hers are "paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class" (Br. 20) (quoting *In re Schering Plough Co. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009)), but she fails to mention that *Schering Plough* and nearly every other case that she cites involved a *single* plan—not the 1,600-plus involved here. The courts in those cases certified classes because the challenged conduct "was governed by a uniform Contract including standardized terms that were applied to all plan participants." *Rozo v. Principal Life Ins. Co.*, No. 14-cv-00463, 2017 WL 2292834, at *5 (S.D. Iowa May 12, 2017) (cited at Br. 20 n.15); *see also Schering Plough*, 589 F.3d at 604 (class claims were not

affected by "individual relationships with the defendants"). Here, the claims turn on many different plans with varying terms and involving unique communications with Aetna.

Along the same lines, certification under Rule 23(b)(1) is inappropriate because Peters seeks individualized monetary relief, not one-for-all classwide relief. *Dukes*, 564 U.S. at 362 ("Individualized monetary claims belong in Rule 23(b)(3)."); *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir. 1986) (district court properly denied certification under 23(b)(1)(A) and (B) because the class primarily sought monetary compensation and there was no limited fund).

The proposed classes also fail Rule 23(b)(3). They cannot meet the predominance or superiority requirements because resolving the absent class members' claims would require individualized inquiries into (at the very least) each class member's applicable plan language and complete claims experience. "Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014) ("[T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement."). That the proposed classes include "some members [who] were not adversely affected" also forecloses a Rule 23(b)(3) damages class. *Bond*, 296 F.R.D. at 411.

Peters also includes a passing proposal for certification of issue classes under Rule 23(c)(4). Br. 25. She relies on the Fourth Circuit's remark that courts should take "full advantage" of that option, but she fails to mention that the option exists

only where "the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met" for a particular claim. *Gunnells*, 348 F.3d at 441. When (as here) countless individualized determinations are required, "Rule 23(c)(4) may not be used to manufacture predominance for the purposes of Rule 23(b)(3)." *In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 325 (E.D.N.C. 2009); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)(4)").

Even if Peters could identify some threshold common issues, certification would "nevertheless be inappropriate" because any minor efficiency gains would be "insubstantial when measured against the remaining issues." *Naparala v. Pella Corp.*, No. 14-cv-03465, 2016 WL 3125473, at *15 (D.S.C. June 3, 2016). None of the issues driving the litigation can be isolated for classwide resolution, so certifying "certain simple and relatively straightforward common threshold issues"—whatever they may be—"would be to allow the tail to wag the dog." *Parker v. Asbestos Processing, LLC*, No. 11-cv-01800, 2015 WL 127930, at *15 (D.S.C. Jan. 8, 2015).

## CONCLUSION

This case could never end with a "class" trial. The Court should deny Peters's motion for class certification.

Submitted on September 7, 2018.

/s/ E. Thomison Holman

E. Thomison Holman
  NC Bar No. 19380
HOLMAN LAW, PLLC
56 College Street, Suite 302
Asheville, NC 28801
tom@holmanlawwnc.com
Tel: (828) 252-7381
Fax: (828) 252-5018

Geoffrey M. Sigler (*pro hac vice*)
Jason Kleinwaks (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
GSigler@gibsondunn.com
JKleinwaks@gibsondunn.com
Tel: (202) 955-8500
Fax: (202) 530-9635

Richard J. Doren (*pro hac vice*)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
RDoren@gibsondunn.com
Tel: (213) 229-7000
Fax: (213) 229-6038

*Counsel for Aetna Inc. and Aetna Life
Insurance Company*

/s/ Brian D. Boone

Mark T. Calloway
  NC Bar No. 10822
Michael R. Hoernlein
  NC Bar No. 40419
Brian D. Boone
  NC Bar No. 38910
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
mark.calloway@alston.com
michael.hoernlein@alston.com
brian.boone@alston.com

*Counsel for OptumHealth Care
Solutions, Inc.*

41

## **CERTIFICATE OF SERVICE**

I certify that on September 7, 2018, I filed and served a copy of Defendants' Brief in Opposition to Plaintiff's Motion for Class Certification using the CM/ECF system, which will give notice to counsel of record.

*/s/ E. Thomison Holman*

E. Thomison Holman
 NC Bar No. 19380
HOLMAN LAW, PLLC
56 College Street, Suite 302
Asheville, NC 28801
tom@holmanlawwnc.com
Tel: (828) 252-7381
Fax: (828) 252-5018

*Counsel for Defendants Aetna Inc. and Aetna Life Insurance Company*

42