# EXHIBIT 2

```
1            UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                   ASHEVILLE DIVISION
    ----------------------------
3   SANDRA M. PETERS, on behalf  :
    of herself and all others    :
4   similarly situated,          :
                                 :
5        Plaintiff,              :
                                 : Case No.
6   vs.                          : 1:15-cv-00109-MR
                                 :
7   AETNA, INC., AETNA LIFE      :
    INSURANCE COMPANY, and       : CONFIDENTIAL
8   OPTUM HEALTH CARE SOLUTIONS, : ATTORNEYS' EYES ONLY
    INC.,                        :
9                                :
         Defendants.             :
10  ----------------------------
11                                   Washington, D.C.
12                                   Monday, June 25, 2018
13  Videotaped Deposition of:
14                DR. DANIEL P. KESSLER
15  called for oral examination by counsel for
16  Plaintiff, pursuant to notice, at Gibson, Dunn &
17  Crutcher, LLP, 1050 Connecticut Avenue, Northwest,
18  Washington, D.C., before Felicia A. Newland, CSR, of
19  Veritext Legal Solutions, a Notary Public in and for
20  the District of Columbia, beginning at 9:00 a.m.,
21  when were present on behalf of the respective
22  parties:
```

1          Q     And so your opinion is that for a

2     member who would have reached the out-of-pocket

3     maximum regardless of the overcharges, there is no

4     injury, right?

5          A     No, that's not necessarily my

6     opinion.  No, that's not my opinion.

7          Q     Why not?

8          A     Well, because I'd have to break that

9     down a little bit.  So, first of all, I don't -- I

10    mean, I don't think of things in terms of

11    overcharges, but if there were a participant who

12    had something that Dr. Panis describes as an

13    overcharge, that participant may recover the

14    Dr. Panis, quote, unquote, overcharge if they reach

15    their out-of-pocket maximum, but -- but may not,

16    depending on how far over their out-of-pocket

17    maximum they go and the magnitude of their

18    so-called overcharge.

19         Q     So if the participant would have gone

20    over the out-of-pocket maximum regardless of

21    whether they were overcharged for particular

22    claims, then your opinion is that participant

1      wouldn't have economic injury, right?

2              A      No.  I don't think that's my opinion.

3      I mean, it would depend on the specifics of the --

4      of the participant's circumstance.  You would have

5      to evaluate it person by person.

6                      In this particular case, Ms. Peters

7      did experience zero economic impact for the reasons

8      that I discuss in my report.

9              Q      Well, let's try a hypothetical.

10     Okay?

11             A      Okay.

12             Q      Let's say you have a participant with

13     $1,000 out-of-pocket maximum --

14             A      Yes.

15             Q      -- and the provider charges her for a

16     fraudulent claim, $100 for a service that was never

17     performed --

18             A      Okay.

19             Q      -- and in that year the participant

20     incurs claims up to $2,500, right, so regardless of

21     whether there was a fraudulent claim or not, the

22     participant would have hit the out-of-pocket

1    maximum.

2              Is it your opinion that that

3    participant would suffer no economic injury from

4    the fraudulent claim?

5         A    So the participant would be way over

6    her out-of-pocket maximum.  I mean, yeah, that

7    participant then would not suffer direct economic

8    injury because she would have laid out the same

9    amount either way.

10        Q    Is it your opinion that that number

11   would not have a remedy for the fraudulent claim?

12             MS. LOADHOLT:  Objection to form.

13             MR. SIGLER:  Objection to form and

14   foundation.

15             THE WITNESS:  No.  I mean, I don't --

16   I don't know about that.  I mean, that's -- that

17   sounds like a -- I mean, a legal conclusion as to

18   whether a participant had a remedy.  What I'm

19   saying is that in that hypothetical, there would

20   not be an economic injury to the participant.

21             Now, of course, the plan would have

22   had an economic injury by virtue of having to

1    have paid for a claim that in the hypothetical

2    was fraudulent.

3    BY MR. KNOTT:

4          Q     And so in your view, the -- the

5    member having paid the $100 to a provider for

6    something that was a fraudulent charge is not an

7    economic injury?

8                    MS. LOADHOLT:  Objection to form.

9                    MR. SIGLER:  Objection to form.  Lack

10   of foundation.

11                   THE WITNESS:  No, I wouldn't say

12   that.  I mean, in this example, the -- the question

13   is, you know, would the member have had an economic

14   injury in a but-for world -- would the -- would the

15   participant have been worse off had there been no

16   fraudulent activity versus having had there been

17   fraudulent activity and if either way the

18   participant would have met and far exceeded her

19   out-of-pocket maximum, then she would not have an

20   economic injury, but the plan certainly would.

21   BY MR. KNOTT:

22         Q      If you isolated the fraudulent

1       charge, would the member have an economic injury?

2                       MR. SIGLER:  Same objections.

3                       MS. LOADHOLT:  Same.

4                       THE WITNESS:  Yes.  If -- if you

5       weren't considering the member in terms of her

6       entire claims history, but just for that particular

7       claim, then she would have an economic injury,

8       because on that particular claim she shouldn't have

9       paid the fraudulent amount.  I mean, that's a

10      different question than I understood that was at

11      issue in this case.

12      BY MR. KNOTT:

13              Q     Paragraph 126, in the third sentence,

14      you say, "Ms. Peters benefited from the credits to

15      her deductible in 2014 created by the agreements."

16      Is that right?

17              A     As compared to Dr. Panis' but-for

18      world, yes.

19              Q     How did the agreements create the

20      credits to her deductible?

21              A     Well, the agreements created the

22      credits to her deductible in excess of her actual

 1    participant responsibility by virtue of her

 2    deductible responsibility being based on the lesser

 3    of the Optum downstream rates and the participant

 4    responsibility based on the Aetna bundled payment

 5    rates, while at the same time basing her deductible

 6    credits on the bundle payment rates.

 7              And so in the absence of the

 8    agreements, she would not have received the -- she

 9    would not have obtained the Aetna downstream rates

10    on which her actual participant deductible

11    responsibility was based, nor would she have had

12    credits to her deductible equal to the Aetna

13    bundled payment rates because neither of those

14    would exist.

15         Q    I want to direct you back to the

16    exhibit that was the provider agreement.  I think

17    it's 220.

18         A    Yes.

19         Q    If you look at page 631, there's a

20    Section 4.3.1.  Do you see that?

21         A    Yes.

22         Q    ████████████████████████████████

1    ███████████   ████████████████████████

2    ███████████████████████████████████

3    ██████████████████████   ██████████████

4    ███████████████████████████████████

5    ██████████████████████████████████

6    █████████

7                   Did I read that correctly?

8         A     Yes.

9         Q     And you understand that the network

10    there is Optum, right?

11        A     Yes.

12        Q     So my question is:  Where in this

13    agreement did you see that Optum would refrain from

14    collecting the entire deductible?

15                   MS. LOADHOLT:  Objection to form.

16                   MR. SIGLER:  Objection to form and

17    foundation.

18                   THE WITNESS:  I'm not sure I

19    understand.  Do you mean -- can you -- what do you

20    mean by "entire deductible"?  I don't understand

21    that.

22

1      BY MR. KNOTT:

2              Q      Aetna calculated the deductible based

3      on the Aetna bundled payment rate, right?

4              A      Yes.  For purposes of accumulating

5      the participant towards the participant's

6      deductible, yes.

7              Q      But not for purposes of what the

8      participant owed, right?

9              A      Yes.  The participant responsibility

10     was the lesser of the Optum downstream rate and the

11     Aetna bundled payment.

12             Q      And my question is:  Did you see that

13     somewhere in this agreement that that was the rule?

14                     MS. LOADHOLT:  Objection to form.

15                     MR. SIGLER:  Objection to form and

16     foundation.

17                     THE WITNESS:  I -- I don't remember

18     where I learned that.  I -- this agreement is, I

19     mean, hundreds of pages, I could, I suppose, look

20     through it.  I don't remember if it was in here or

21     not.

22