**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

| | |
|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC.,<br><br>Defendants. | Case No. 1:15-cv-00109-MR |

## OPTUMHEALTH CARE SOLUTIONS, INC.'S MEMORANDUM SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .................................................. 3

    A.    The Aetna-Optum contracts save Aetna plans and their members money ............................................................................................. 4

    B.    Aetna pays Optum a negotiated rate set by contract, and Optum in turn pays its network provider a negotiated rate set by a different contract. ................................................................................ 5

    C.    Aetna's payments to Optum under the contracts at issue are not segregated from other payments that Optum receives. ............................ 7

    D.    The Aetna-Optum relationship complies with the Mars Plan. ................. 8

STANDARD OF REVIEW ......................................................................... 10

ARGUMENT ............................................................................................... 11

I.     PETERS SUFFERED NO INJURY ................................................... 12

II.    NONFIDUCIARY OPTUM CANNOT BE LIABLE UNDER § 502(A)(3) BECAUSE AETNA DID NOT CAUSE THE MARS PLAN TO ENGAGE IN A PROHIBITED TRANSACTION AND DID NOT BREACH ANY FIDUCIARY DUTY ............................................. 13

    A.    Aetna did not violate ERISA § 406(a)(1)(D). ............................................ 13

          1.    Optum is not a "party in interest" under § 406(a). ....................... 14

          2.    Peters's out-of-pocket payments to providers were not plan assets. ........................................................................................... 15

          3.    The compensation that Aetna paid Optum on the benefits claims that Peters challenges was reasonable. ............................... 16

    B.    Optum can't be liable for Aetna's alleged violation of § 406(b)(1). ........ 17

    C.    Aetna did not breach any fiduciary duty to Peters or the Mars Plan. ...................................................................................................... 17

III.    OPTUM DID NOT KNOWINGLY PARTICIPATE IN ANY
ALLEGED PROHIBITED TRANSACTION OR FIDUCIARY
BREACH BY AETNA. ........................................................................................ 20

IV.    THE MONETARY RELIEF THAT PETERS SEEKS FROM
OPTUM (A NONFIDUCIARY) IS UNAVAILABLE UNDER ERISA
§ 502(A)(3). .................................................................................................... 21

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................ 11

*Bouchat v. Balt. Ravens Football Club,*
    346 F.3d 514 (4th Cir. 2003) ....................................................... 11

*Central States, SE & SW Areas Health & Welfare Fund v. Am. Int'l Grp., Inc.,*
    840 F.3d 448 (7th Cir. 2016) ....................................................... 24

*CIGNA Corp. v. Amara,*
    563 U.S. 421 (2011) ..........................................................3, 22, 23

*Colon v. Pencek,*
    No. 3:07-cv-00473, 2008 WL 4093694 (W.D.N.C. Aug. 28, 2008).......................... 21

*Conkright v. Frommert,*
    559 U.S. 506 (2010) ....................................................................... 20

*Cox v. Blue Cross Blue Shield of Michigan,*
    166 F. Supp. 3d 891 (E.D. Mich. 2015) .................................... 24

*Danza v. Fid. Mgmt. Trust Co.,*
    533 F. App'x 120 (3d Cir. 2013) .........................................15, 17

*Deluca v. Blue Cross Blue Shield of Mich.,*
    No. 06-12552, 2007 U.S. Dist. LEXIS 37448 (E.D. Mich. May 23, 2007)...............................................................................................15–16

*DiFelice v. U.S. Airways, Inc.,*
    497 F.3d 410 (4th Cir. 2007) ....................................................... 20

*Dreher v. Experian Info. Sols., Inc.,*
    856 F.3d 337 (4th Cir. 2017) ...................................................2, 13

Case 1:15-cv-00109-MR   Document 189   Filed 02/01/19   Page 4 of 36

*Dzinglski v. Weirton Steel Corp.*,
  875 F.2d 1075 (4th Cir. 1989) ...................................................................... 18

*Firestone v. Bruch*,
  489 U.S. 101 (1989) ...................................................................... 20

*Gabriel v. Alaska Elec. Pension Fund*,
  773 F.3d 945 (9th Cir. 2014) ...................................................................... 23

*Gordon v. CIGNA Corp.*,
  890 F.3d 463 (4th Cir. 2018) ...................................................................... 18

*Great-West Life & Annuity Insurance Company v. Knudson*,
  122 S. Ct. 708 (2002) ...................................................................... 23, 24

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ...................................................................... *passim*

*In re UnitedHealth Group PBM Litig.*,
  No. 16-cv-3352, 2017 U.S. Dist. LEXIS 208328 (D. Minn. Dec. 19,
  2017) ...................................................................... 15

*In re Wachovia Corp. ERISA Litig.*,
  No. 3:09cv262, 2010 WL 3081359 (W.D.N.C. Aug. 6, 2010) .................................. 13

*Leber v. Citigroup, Inc.*,
  No. 07-cv-9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) .................................. 20

*LeBlanc v. Cahill*,
  153 F.3d 134 (4th Cir. 1998) ...................................................................... 17

*Malone v. Teachers Ins. & Annuity Assoc.*,
  No. CV-12-cv-187, 2017 WL 913699 (S.D.N.Y. Mar. 7, 2017) ................................. 23

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ...................................................................... 1, 3, 22

*Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*,
  136 S. Ct. 651 (2016) ...................................................................... 24

*Richardson v. Perales*,
  402 U.S. 401 (1979) ...................................................................... 11

iv

*Scott v. Aon Hewitt Fin. Advisors, LLC*,
 No. 17C679, 2018 U.S. Dist. LEXIS 44606 (N.D. Ill. Mar. 19, 2018) ................... 16

*Sedlack v. Braswell Servs. Grp., Inc.*,
 134 F.3d 219 (4th Cir. 1998) ...............................................................................18–19

*Sellers v. Anthem Life Ins. Co.*,
 316 F. Supp. 3d 25, 34 (D.D.C. 2018)............................................................14, 15, 24

*Sereboff v. Mid-Atlantic Med. Serv.*,
 547 U.S. 356 (2006) ............................................................................................... 24

*Surgicore, Inc. v. Midwest Operating Eng'rs Health & Welfare Fund*,
 No. 01C9138, 2002 U.S. Dist. LEXIS 24152 (N.D. Ill. Dec. 13, 2002) ................. 15

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
 445 F.3d 311 (4th Cir. 2006) ............................................................................23, 24

*Tussey v. ABB, Inc.*,
 746 F.3d 327 (8th Cir. 2014) ................................................................................. 20

*UFCW Local 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P.*,
 No. 05-2435 (JEI), 2005 U.S. Dist. LEXIS 25759 (D.N.J. Oct. 28,
 2005)....................................................................................................................... 14

*United States v. Cartwright*,
 411 U.S. 552 (1973) ............................................................................................... 16

*United States v. Steele*,
 897 F.3d 610 (4th Cir. 2018)................................................................................... 16

*Waller v. Blue Cross*,
 32 F.3d 1337 (9th Cir. 1994) ................................................................................. 15

## Statutes, Rules, and Other Authorities

29 U.S.C. § 1002. ....................................................................................................... 14

29 U.S.C. § 1106 (ERISA § 406)...................................................................................*passim*

29 U.S.C. § 1108 (ERISA § 408)........................................................................... 2, 16

29 U.S.C. § 1132 (ERISA § 502) ........................................................................*passim*

81 Fed. Reg. 21002 (Apr. 5, 2016) ................................................................ 16

*Fair Market Value*, Black's Law Dictionary (10th ed. 2014) .......................... 16

Federal Rule of Civil Procedure 56 ............................................................... 10

Restatement (Third) of Trusts § 95 (2012) .................................................... 22

Restatement (Third) on Restitution & Unjust Enrichment § 51(4) (2012) ................. 23

Case 1:15-cv-00109-MR   Document 189   Filed 02/01/19   Page 7 of 36

# TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | Transcript excerpts from the deposition of Sandra M. Peters |
| 2 | Transcript excerpts from the Aetna 30(b)(6) deposition |
| 3 | Transcript excerpts from the deposition of Cyndy Kilpinen |
| 4 | Exhibit 213 to the deposition of Dr. Daniel P. Kessler |
| 5 | Exhibit 1 to the deposition of Dawn Waggoner |
| 6 | Transcript excerpts from the deposition of Shiron A. Hagens |
| 7 | Document AETNA-PETERS-00015341 |
| 8 | Transcript excerpts from the deposition of Theresa Eichten |
| 9 | Transcript excerpts from the deposition of Jennifer Cross Hennigan |
| 10 | Transcript excerpts from the deposition of Dawn Waggoner |
| 11 | Transcript excerpts from the Optum 30(b)(6) deposition |
| 12 | Excerpt from Exhibit 58 to Hagens deposition |
| 13 | Exhibit 9 to the deposition of Dawn Waggoner; *see also* Exhibit 126 to the Aetna 30(b)(6) deposition |
| 14 | Exhibit 45 to the Eichten deposition |
| 15 | Transcript excerpts from the deposition of David Elton |
| 16 | Theresa Eichten's September 7, 2018 Declaration |
| 17 | Exhibit 127 to the Aetna 30(b)(6) deposition |
| 18 | Summary Table based on Exhibit 16 (Eichten Declaration) and Exhibit 207 to the Panis deposition |

| | |
|---|---|
| 19 | Exhibit 133 to the Aetna 30(b)(6) deposition |
| 20 | Transcript excerpts from the deposition of Dr. Constantijn Panis |
| 21 | April 15, 2012 Provider Agreement, Exhibit 4 to the Waggoner deposition |
| 22 | June 1, 2013 Provider Agreement, Exhibit 6 to the Waggoner deposition |
| 23 | July 1, 2016 Amendment No. 4, Exhibit 63 to the Gallagher deposition |

## INTRODUCTION

Peters's case against Optum has unraveled. First, this Court dismissed with prejudice her RICO claims (Counts I and II). Dkt. 54 at 34; *see also* Dkt. 142 (denying Peters's motion to resurrect her RICO claims). Then discovery undermined her ERISA claims (Counts III and IV): When the Court denied Peters access to Optum's privileged communications under ERISA's so-called fiduciary exception, it held that "Optum was not acting in a fiduciary capacity with respect to the actions complained of by [Peters]." Dkt. 141 at 17; *id.* at 21 ("[Peters] has failed to demonstrate that Optum was functioning as a fiduciary with respect to any aspect of the Mars Plan.").

In light of that ruling—which entitles Optum to summary judgment on Counts III and IV—Peters has dropped her fiduciary claims against Optum: She does not seek certification of a class pursuing fiduciary liability against Optum.[1] Dkt. 146 at 13. That leaves only Peters's unpleaded claim that Optum is liable under ERISA § 502(a)(3) as a nonfiduciary party in interest who participated in supposed prohibited transactions (ERISA § 406). *See, e.g.,* Dkt. 146 at 10 n.9 ("Optum can be liable under [§ 502(a)(3)] even if it is not a fiduciary.") (citing *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 245 (2000)); Dkt. 179 at 15 (Peters "alleges that Optum is liable for participating in the prohibited transactions because it 'knew or should have known' that it was the

---

[1] The Mars Plan has not sued Aetna or Optum. Because Optum is not a fiduciary vis-à-vis the Mars Plan, Peters cannot sue Optum on the Plan's behalf under ERISA § 502(a)(2). *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253 (1993).

recipient of ill-gotten assets."). For the reasons set out in Defendants' opposition to class certification, that leftover claim is not susceptible to classwide proof. *See* Dkt. 172. And it should not proceed against Optum at all. This Court should grant summary judgment to Optum for at least eight reasons:

*First*, Peters suffered no injury, so she lacks Article III standing and has no ERISA claim. *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *Harris Trust*, 530 U.S. at 245. When you analyze Peters's out-of-pocket payments on a claim-by-claim basis under the terms of her health plan, it is undisputed that she benefited from the Aetna-Optum relationship. *See* Dkt. 172 at 21–28.

*Second*, Optum is not a "party in interest" vis-à-vis the Mars Plan. Optum has no relationship with the Mars Plan. Dkt. 141 at 15.

*Third*, Peters's out-of-pocket payments to her network providers were not plan assets, so § 406(a)—which requires a transaction involving plan assets—does not apply.

*Fourth*, Optum's compensation from Aetna was "reasonable" (§ 408(b)(2)).

*Fifth*, Optum cannot be liable for any alleged self-dealing by Aetna under § 406(b)(1) because that provision applies only to a fiduciary's unilateral conduct.

*Sixth*, this Court already ruled that Aetna was not serving a fiduciary role when it contracted with Optum "to establish and maintain a provider network that benefited a broad range of health-care consumers and [was] not directly associated with the Plaintiff's Plan or *any* other particular benefit plan" or when Aetna "implement[ed] this system-wide contractual relationship." Dkt. 141 at 23. And even if Aetna served a

2

fiduciary function for some aspect of Peters's claims, Aetna adhered to Peters's plan and acted reasonably when it calculated her financial responsibility. Dkt. 172 at 14–17.

*Seventh*, even if Peters could show that Aetna caused the Mars Plan to engage in a prohibited transaction or otherwise breached a fiduciary duty—she cannot—Optum did not knowingly participate in any breach: (1) Aetna was not serving a fiduciary function when it contracted with Optum (Dkt. 141 at 23), (2) Optum never saw the Mars Plan, (3) Optum believed (correctly so) that the Aetna-Optum contracts were saving Aetna plans and members money, and (4) Optum could not have knowingly participated in benefits determinations committed to Aetna's discretion. Court's Order, Dkt. 141 at 17 ("[T]he actions that are the subject of [Peters's] Complaint are the benefits determinations that *Aetna* makes under the Mars Plan and the EOBs that Aetna sends to plan participants for approved claims.") (emphasis in original).

*Finally*, the monetary relief that Peters seeks from Optum is not equitable and thus not available under § 502(a)(3). Whatever labels Peters uses—"surcharge," "restitution," "disgorgement," "accounting"—she admits that she seeks make-whole monetary relief from Optum (Dkt. 146 at 10), which is not available under § 502(a)(3) or from a nonfiduciary. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011).

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:

3

**A. The Aetna-Optum contracts save Aetna plans and their members money.**

In 2011, Aetna issued a "request for proposal" to several companies (including Optum) with networks of physical therapists. Ex. 2, 22:2–5; *see also* Ex. 3, 30:17–18. After "carefully evaluat[ing]" the "pros and cons" of the various responses, Aetna concluded that "Optum had a very solid network" and could generate millions of dollars in "medical cost savings for [Aetna's] members and plan sponsors." Ex. 2, 44:4–22; *see also* Ex. 4, ¶¶ 59–64.

The parties' analyses showed two types of savings. First, the program would generate "unit cost savings"—lower rates—because the Aetna-Optum contract rate was on average lower than the pre-Optum rates that Aetna's plans and members were paying. Ex. 4, ¶ 61. Second, the program would generate ███████████ ███████████████████████████ Ex. 5, -00015291; Ex. 2, 45:2–5. The lion's share of those savings flow to self-insured plans and their members; comparatively few members are enrolled in Aetna-insured plans. Ex. 4, ¶¶ 64–66.

In 2012, after arm's-length negotiations, Aetna and Optum entered into agreements relating to Optum's physical-therapy network. Dkt. 141 at 3; Ex. 21. Just over a year later, they did the same for Optum's chiropractor network. Dkt. 141 at 3; Ex. 22. And in 2016, they renegotiated the chiropractic contract to lower rates even more. Ex. 6, 76:20–78:8; Ex. 23. The result was millions of dollars in savings for Aetna plans and members. *E.g.*, Ex. 2, 47:12–16, 48:13–20; Ex. 7; Ex. 4, ¶¶ 59–64; Ex. 8,

207:1–3. That was the goal all along. Ex. 2, 208:1–5 (Aetna's goal was "to achieve medical cost savings for our members and plan sponsors"); Ex. 6, 31:1–4; Ex. 9, 45:23–46:2 ███████████████████████████████████████████ ██████████████████; Ex. 3, 102:3–4; Ex. 10, 54:24–25; Ex. 8, 207:2–3 ("I know for a fact our value of the program we provided to Aetna was very strong."); Ex. 11, 47:12–17; Ex. 7, -00015341–43 ████████████████████████████████; Ex. 12, -00032588.

### B. Aetna pays Optum a negotiated rate set by contract, and Optum in turn pays its network provider a negotiated rate set by a different contract.

Under its contracts with the various downstream providers in its network, Optum pays each provider a specified amount (which varies by provider) for services to plan members. Ex. 8, 124:25–125:2. Under the Aetna-Optum contracts, Aetna pays Optum a flat per-visit amount that includes an administrative fee. Ex. 2, 71:24–72:11; Exs. 21, 22, 23; Dkt. 141 at 3. ██████████████████████████████ ████████████████████████████████████████████ Ex. 6, 120:11–18; Ex. 11, 29:2–9.

The claims process works as follows: An Aetna plan member visits an Optum-contracted chiropractor or physical therapist. That downstream provider submits a claim to Optum for the service performed. Ex. 11, 117:8–13. If the claim is timely and includes the required information (*id.* at 73:24–74:5), Optum forwards the claim to Aetna (*id.* at 117:14–16), using a CPT code (sometimes referred to as a "dummy" code)

5

specified in the Aetna-Optum contracts. *Id.* at 75:9–12, 117:14–16; *see also* Ex. 13, -00003057 (added code is "just a code we use in regards to contracting"); Dkt. 141 at 15–16. As witnesses have testified (and documents confirm), those codes facilitate the efficient processing and payment of claims. *See, e.g.,* Ex. 6, 120:11–18; Ex. 11, 65:2–12. Although some emails and notes offhandedly referred to the Aetna-Optum fee structure as "burying" Optum's administrative fee in the claims process (*see, e.g.,* Ex. 14, -000024287), witnesses explained (and documents confirm) that "bury" meant only "[t]hat Aetna requested [Optum] build [its] administrative fee into the claims process." Ex. 11, 195:19−196:3; *see also* Ex. 3, 188:2−12 (Optum understood "bury" to mean "include"); Ex. 8, 201:4−16, 205:5−11.

With each benefits claim, Aetna determines whether to cover the claim. If the claim is covered, Aetna calculates the payment and the member's responsibility based on the Aetna-Optum contract rate (not the Optum downstream rate, which Aetna does not know), and then sends its determination back to Optum. Dkt. 141 at 16; Ex. 8, 111:5–17, 117:17–19. Optum then pays the downstream provider the contracted rate between Optum and that network provider minus the amount that Aetna calculated as the member's financial responsibility under the member's individual plan terms. *Id.* at 124:13–125:2; Ex. 11, 62:10–15, 117:8–19.

Although the Aetna-Optum contracts generated millions of dollars in savings for Aetna plans and their members, some plans and members had questions about the relationship. *See, e.g.,* Ex. 15, 31:25–32:23. Reacting to those questions, some Optum

6

employees considered whether there was a better way for Aetna to explain the program to avoid confusion. *See, e.g., id.*, 57:5–12. But as Peters testified, she knew before filing this lawsuit that the North Carolina Department of Insurance had analyzed the Aetna-Optum relationship and deemed it "legal." Ex. 1, 213:18–214:13.

### C. Aetna's payments to Optum under the contracts at issue are not segregated from other payments that Optum receives.

Under the Aetna-Optum relationship, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

7



**D.** **The Aetna-Optum relationship complies with the Mars Plan.**

Until February 2015, Peters received health benefits through a plan that Mars (her husband's former employer) established and funded.[2] Compl. ¶ 4; Dkt. 103 at 4. For years, Aetna has been the claims administrator for the Mars Plan. Ex. 2, 113:10–19.

Optum has no relationship with Mars and never saw the Mars Plan. Dkt. 141 at 15; Ex. 11, 191:11–16. But discovery in this case has revealed that Mars and Aetna agreed that ████████████████████████████████████████████████

_____

[2] Since February 2015, Peters's primary medical coverage has been through Medicare. Ex. 1, 37:23–38:4. Peters also had supplemental Medicare coverage through Aetna (until December 2015), through Blue Cross and Blue Shield of North Carolina (2016), and through Cigna (2017 and 2018). *Id.* at 37:25–39:21.



Optum's downstream rates, meanwhile, were not in any "Aetna contract." *See* Ex. 2, 125:14–126:22; Ex. 16, ¶ 5.

Between 2013 and 2015, Peters visited chiropractors and physical therapists in Optum's network. Ex. 1, 74:24–75:1, 77:21–78:7. Under the Mars Plan, Peters bore full financial responsibility for her claims until she met her $250 deductible, after which she was responsible for 20 percent co-insurance payments on each claim until she met her $1,650 out-of-pocket maximum. *Id.* at 56:15–57:12. After that, she had no financial responsibility for her benefits claims. *Id.* Optum never received a payment from Peters or the Mars Plan. Ex. 16 ¶ 9. Peters made out-of-pocket payments to her chiropractors and physical therapists, not to Optum. *See, e.g.,* Ex. 1, 142:1–150:19; Ex. 11, 127:8–128:2.

Until Peters met her annual deductible, she paid only the rate between Optum and its downstream provider, but Aetna credited her as if she had paid the Aetna-Optum contract rate. Ex. 1, 68:13–71:19. In 2014, Peters did better in reality than she would have under her liability theory. That year, she was responsible for ████ of

9

her chiropractic and physical-therapy claims. Ex. 4, ¶ 123. If Aetna had calculated Peters's financial responsibility and deductible credits based on the downstream provider rates instead of the Aetna-Optum contract rates, she would have paid ███—$114.71 more than she did in reality. *Id.* ¶¶ 113–125.

In 2013 and 2015, Peters would have fared the same under her liability theory as she did in the real world. In 2013, Peters was responsible for ███ of her chiropractic and physical therapy claims. Ex. 4, ¶ 108. If Aetna had applied the downstream provider rates to *all* of Peters's chiropractic and physical therapy claims to calculate her patient responsibility and credited toward her deductible and out-of-pocket maximum only the downstream rates, she still would have been responsible for ███ because she would have reached her out-of-pocket maximum in any event. *Id.* ¶¶ 108–112. In 2015, Peters had only one benefits claim involving an Optum downstream provider, and she was responsible for the entire downstream rate because she had not met her deductible for that year. *Id.* ¶ 127. Even by her theory, she suffered no injury on that claim.

Considering all the benefits claims in question, Peters alleges that she paid $129.78 more than she should have. But applying the downstream rates consistently to all claims—and not just to certain self-selected claims—would result in Peters's paying $114.71 more than she did in reality. Ex. 4.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, this Court must "grant summary judgment if the moving party shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." "By its very terms, [Rule 56] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Once the moving party meets its burden, the nonmoving party must offer evidence of a genuine issue for trial. *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 522 (4th Cir. 2003). And it must be more than a "mere scintilla of proof." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## **ARGUMENT**

In her reply supporting class certification, Peters announced her latest liability theory: She claims "that Aetna violated ERISA by causing the plans to engage in transactions constituting a 'transfer' of 'assets of the plan' to a 'party in interest,' 29 U.S.C. § 1106(a)(1)(D), and by dealing with the assets of the plans 'in [its] own interest or for [its] own account,' 29 U.S.C. § 1106(b)(1)." Dkt. 179 at 15. She also alleges "that Optum is liable for participating in the prohibited transactions because it 'knew or should have known' that it was the recipient of ill-gotten assets." *Id.*

Viewing the evidence in the light most favorable to Peters, she cannot recover from Optum under § 502(a)(3). The Aetna-Optum relationship caused Peters no injury. And Aetna did not cause the Mars Plan to engage in any prohibited transaction and did not breach a fiduciary duty to Peters or the Mars Plan. Even if Aetna did, Optum did not knowingly participate in Aetna's supposed violation. And the monetary relief that Peters

11

(obliquely) seeks from Optum is not available under ERISA § 502(a)(3) because it is not equitable relief and in any event is not available from a nonfiduciary.

## I. PETERS SUFFERED NO INJURY.

Exhibit 18 lists the ■ benefits claims at issue in the litigation. Peters admits that she suffered no harm on ■ of the ■ benefits claims. For the other ■ benefits claims, Peters claims that she paid $129.78 more than she should have. But she calculates that number by applying the downstream provider rates to a self-selected subset of ■ claims. Applying the downstream rates to all ■ claims—and not just to certain claims—shows that Peters would have paid $114.71 *more* than she did in reality. Ex. 4, App'x H.

The following table shows how Peters's financial responsibility for her chiropractic and physical therapy claims each year would have differed if Aetna had calculated Peters's financial responsibility and deductible credits based on the downstream provider rates instead of on the Aetna-Optum contract rates:



In 2013, Peters would have reached her out-of-pocket maximum in any event, so her responsibility would not have been different. In 2014, Peters would have paid more under her theory because she would not have met her deductible as soon as she did in reality. In 2015, Peters had only one benefits claim involving an Optum

downstream provider, and she was responsible for the entire downstream provider rate because she had not met her deductible for that year. Ex. 4, ¶ 127.

The claim-by-claim analysis shows that Peters would be *worse off* by $114.71 if Aetna calculated her benefits by her rules (as opposed to her Plan's rules).[3] She suffered no financial harm, so she lacks the concrete injury that Article III and ERISA require. *See Dreher*, 856 F.3d at 340; *Harris Trust*, 530 U.S. at 251.

## II. NONFIDUCIARY OPTUM CANNOT BE LIABLE UNDER § 502(A)(3) BECAUSE AETNA DID NOT CAUSE THE MARS PLAN TO ENGAGE IN A PROHIBITED TRANSACTION AND DID NOT BREACH ANY FIDUCIARY DUTY.

Optum (a nonfiduciary) cannot face liability under § 502(a)(3) unless a fiduciary violated ERISA. *See Harris Trust*, 530 U.S. at 251; *In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2010 WL 3081359, at *57 (W.D.N.C. Aug. 6, 2010). Peters alleges that Aetna violated ERISA by causing the Plan to engage in transactions constituting a "transfer" of "assets of the plan" to a "party in interest" (a violation of § 406(a)(1)(D)) and by dealing with the assets of the Plan "in [its] own interest or for [its] own account" (a violation of § 406(b)(1)). Dkt. 179 at 15. The undisputed facts show the opposite.

### A. Aetna did not violate ERISA § 406(a)(1)(D).

Section 406(a)(1)(D) prohibits a plan fiduciary from causing the plan to engage in a transaction if it "knows or should know that such transaction constitutes a direct

---

[3] Multiply that claim-by-claim analysis by thousands of putative class members, and it becomes clear that the proposed classes could never satisfy Rule 23. Dkt. 172.

or indirect . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Congress enacted ERISA § 406(a) to bar "certain transactions deemed 'likely to injure the *pension plan*.'" *Harris Trust*, 530 U.S. at 241–42 (emphasis added).

Section 406(a)(1)(D) does not apply for three reasons: (1) Optum is not a "party in interest"; (2) Peters's out-of-pocket payments to downstream providers were not plan assets; and (3) Optum's compensation was reasonable.

### 1.    Optum is not a "party in interest" under § 406(a).

Section 406(a)(1)(D) applies only to certain transactions between a plan and a "party in interest." ERISA defines "party in interest" to include various entities. 29 U.S.C. § 1002(14). Optum is not one of them.

Peters might claim that Optum qualifies as a "person providing services to [the Mars Plan]." 29 U.S.C. § 1002(14)(B). It doesn't. To qualify as a "person providing services" to a plan, a party must "have a relationship with the pension plan that preexists, or is independent of, the relationship created by the allegedly prohibited transaction." *UFCW Local 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P.*, No. 05-2435 (JEI), 2005 U.S. Dist. LEXIS 25759, at *9 (D.N.J. Oct. 28, 2005); *see also Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018) ("[T]he statute only prohibits such service relationships with persons who are 'parties in interest' by virtue of *some other relationship*.") (emphasis added). Optum does not have a relationship with the Mars Plan—contractual or otherwise. Dkt. 141 at 15; *see also* Ex. 1, 241:11–13.

Beyond that, Optum does not qualify as a party in interest because it did not render services "directly to the plan itself." *Surgicore, Inc. v. Midwest Operating Eng'rs Health & Welfare Fund*, No. 01C9138, 2002 U.S. Dist. LEXIS 24152, at *9 (N.D. Ill. Dec. 13, 2002); *see also Danza v. Fid. Mgmt. Trust Co.*, 533 F. App'x 120, 126 (3d Cir. 2013) (negotiation did "not fall into the category of transactions that Section 406(a) was meant to prevent" because there was "no allegation that A&P had a prior relationship with Fidelity" and no evidence that the transaction was other than at arm's length); *Waller v. Blue Cross*, 32 F.3d 1337, 1346 (9th Cir. 1994) (Section 406(a) "insure[s] arm's-length transactions by fiduciaries of funds subject to ERISA"); *Sellers*, 316 F. Supp. 3d at 36. Optum provides services to Aetna, not to the Mars Plan. Dkt. 141 at 15. And Optum's fees were "a product of arm's length negotiations" with Aetna. *Id.* at 20.

### 2. Peters's out-of-pocket payments to providers were not plan assets.

Even if Optum were a party in interest (it is not), § 406(a)(1)(D) still would not apply because Peters's claim does not involve a transfer to, or use of, any "assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Peters claims that she paid inflated co-insurance amounts, but her payments to downstream providers were not plan assets. "[B]ecause plans generally have no right to the recoupment of copayments and coinsurance paid to providers, such payments do not, absent an arrangement to the contrary, constitute *plan* assets . . . ." *In re UnitedHealth Group PBM Litig.*, No. 16-cv-3352 (JNE/BRT), 2017 U.S. Dist. LEXIS 208328, at *44–45 (D. Minn. Dec. 19, 2017); *see also Deluca v. Blue Cross*

*Blue Shield of Mich.*, No. 06-12552, 2007 U.S. Dist. LEXIS 37448, at *9 (E.D. Mich. May 23, 2007) ("Increased contributions, co-payments, and deductibles paid by participants and beneficiaries are not 'losses to the plan' . . . . [And they] also are not profits 'of [the plan] fiduciary' or profits 'made through use of assets of the plan.'").

### 3. The compensation that Aetna paid Optum on the benefits claims that Peters challenges was reasonable.

Even if Optum were a party in interest vis-à-vis the Mars Plan—again, it is not—ERISA § 408(b)(2) exempts from § 406's prohibitions "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2).

"Reasonable compensation" is based on a "fair market standard." *Scott v. Aon Hewitt Fin. Advisors, LLC*, No. 17C679, 2018 U.S. Dist. LEXIS 44606, at *34 (N.D. Ill. Mar. 19, 2018) (quoting Best Interest Contract Exemption, 81 Fed. Reg. 21002 (Apr. 5, 2016)). And "fair market value is '[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction.'" *United States v. Steele*, 897 F.3d 606, 610 (4th Cir. 2018) (quoting *Fair Market Value*, Black's Law Dictionary (10th ed. 2014)); *see also United States v. Cartwright*, 411 U.S. 546, 552 (1973) (same definition). As the Court has found, Aetna and Optum negotiated at arm's length (*e.g.*, Dkt. 141 at 20–21; Dkt. 172 at 37 n.14), and the evidence shows that Optum's compensation was reasonable. *See, e.g.*, Ex. 4, ¶¶ 38, 48, 49, 50, 57. For the ▮ benefits

claims on which Peters claims a financial loss, Optum's net fee varied greatly—from a few dollars to a few cents to a loss. Ex. 18; Dkt. 141 at 3 n.3. Optum's relatively small profit—a total of ███ on the █ claims for which Peters claims a financial loss (*see id.*)—was reasonable; it was not "ill-gotten" in any sense.

**B.      Optum can't be liable for Aetna's alleged violation of § 406(b)(1).**

Optum cannot face liability under ERISA § 502(a)(3) for supposedly knowingly participating in Aetna's alleged violations of ERISA § 406(b)(1). Section 406(b)(1) addresses unilateral fiduciary conduct: It prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b); *see also LeBlanc v. Cahill*, 153 F.3d 134, 138 (4th Cir. 1998) (allowing for the possibility of nonfiduciary liability under §§ 406(b)(2) and (b)(3) because they "explicitly involve two parties"). Because § 406(b)(1) applies only to a fiduciary's unilateral conduct, Peters cannot use § 406(b)(1) as a vehicle for getting relief from Optum under § 502(a)(3). *See Danza*, 533 F. App'x at 126 ("A service provider cannot be held liable [under 406(b)] for merely accepting previously bargained-for fixed compensation that was not prohibited at the time of the bargain.").

**C.      Aetna did not breach any fiduciary duty to Peters or the Mars Plan.**

In her class-certification reply, Peters argued that Aetna violated §§ 406(a)(1)(D) and 406(b)(1) and that Optum knowingly participated in those violations. *See* Dkt. 179 at 15. But Peters might pivot to rely on some alleged fiduciary breach by Aetna to support

her claim against Optum.[4] *See* Dkt. 146 at 10 (seeking "a declaration that Optum is liable under 29 U.S.C. § 1132(a)(3) for its role in aiding Aetna's fiduciary violations"). Aetna did not breach any fiduciary duty to Peters or the Mars Plan.

For starters, and as this Court has already recognized, Aetna did not serve a fiduciary function in establishing and maintaining the Aetna-Optum relationship, so Peters's claim fails at the threshold. Aetna contracted with Optum to lower physical-therapy and chiropractic costs for Aetna plan sponsors and members, and the relationship has done just that—to the tune of millions of dollars in savings for Aetna plan sponsors and members. *E.g.*, Ex. 2, 47:12–16, 48:13–20; Ex. 7;  Ex. 4, ¶¶ 59–64; Ex. 8, 207:1–3.

In any case, Aetna complied with the Mars Plan. ███████████████ ████████████████████████████████████████████ Ex. 17, -00002809. There was no agreement that Aetna would change any of its network contracts (which already included the Aetna-Optum contracts) or that Aetna would serve a fiduciary role when negotiating or implementing its network contracts.

Beyond that, Aetna's calculations of Peters's financial responsibility complied with the Mars Plan. *See Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir. 1989) ("To adhere to the plan is not a breach of fiduciary duty."); *Sedlack v. Braswell Servs. Grp., Inc.*,

---

[4] The Fourth Circuit "has never formally recognized" a cause of action against nonfiduciaries under ERISA § 502(a)(3) for "knowingly participating in a breach of trust by a fiduciary." *Gordon v. CIGNA Corp.*, 890 F.3d 463, 476 (4th Cir. 2018).

134 F.3d 219, 225 (4th Cir. 1998) (same). 

██████████████ Optum's downstream rates were not in any "Aetna contract."

Peters disagrees: She argues that Aetna must interpret Optum's downstream rate with the chiropractor who treated her as the "Negotiated Charge."[5] But Aetna's determination that Optum is the "Network Provider" for purposes of calculating the "Negotiated Charge" is consistent with the Mars Plan's definitions of those terms. Ex. 19, -00003013. And Peters's argument that her treating chiropractor, with whom Aetna has no contract, is a "Network Provider" conflicts with the Aetna-Mars contract, ██████ ██████████████████████████████████████████████████ ██████ Ex. 17, -00002809. Peters has failed to show that Aetna's interpretation was arbitrary and capricious—███████████████████████████████

---

[5] Peters's argument that administrative fees are not medically necessary and thus not covered by her plan conflicts with the plan terms and with her own claim that her plan should cover her chiropractor's administrative costs. Ex. 1, 184:20–185:6, 91:21–92:3.

██████████████████████████████ *See id.* at -00002790; *Firestone v. Bruch*, 489 U.S. 101, 111 (1989); *Conkright v. Frommert*, 559 U.S. 506, 512 (2010); *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014) (joining numerous circuits in applying *Firestone* deference to fiduciary claims). Nor does Peters's disagreement with Aetna's interpretation show that Aetna breached a fiduciary duty. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 419–21 (4th Cir. 2007).

## III. OPTUM DID NOT KNOWINGLY PARTICIPATE IN ANY ALLEGED PROHIBITED TRANSACTION OR FIDUCIARY BREACH BY AETNA.

Even if Peters could show that Aetna caused the plan to engage in a prohibited transaction or breached a fiduciary duty (it didn't), Optum did not knowingly participate in any violation. To establish Optum's knowing participation, Peters must show that, for the Mars Plan, Optum "(1) knew of [Aetna's] status as a fiduciary and (2) knew that [Aetna's] conduct contravened a fiduciary duty." *Leber v. Citigroup, Inc.*, No. 07-cv-9329, 2010 WL 935442, at *14 (S.D.N.Y. Mar. 16, 2010); *see also Harris Trust*, 530 U.S. at 251 (holding that liability under ERISA § 502(a)(3) extends beyond the "principal wrongdoer" only to "a transferee of ill-gotten" assets who had "actual or constructive knowledge of the circumstances that rendered the transaction unlawful"). Peters can show neither—for several reasons.

First, as this Court has already found, Aetna was not serving a fiduciary function when it contracted with Optum. Dkt. 141 at 23.

Second, Optum never saw the Mars Plan documents (Ex. 11, 191:11–24), so

Optum did not know (a) whether Aetna was serving a fiduciary role when it took the actions that Peters challenges, (b) whether the Plan permitted or prohibited any given payment arrangement, or (c) whether any particular claim determination violated plan terms. *See Harris Trust*, 530 U.S. at 251.

Third, Optum could not have knowingly participated in Aetna's functions under the Mars Plan. Aetna (not Optum) determined Peters's benefits and calculated her financial responsibility. *See* Dkt. 141 at 17, 18, 19 ("Optum has no authority to decide whether a particular claim is covered under a particular Aetna plan and cannot pay itself, much less pay itself out of particular plan assets."); *see also* Ex. 2, 109:12–17, 170:12–14.

Fourth, Optum always believed (correctly so) that the Aetna-Optum contracts saved Aetna plans and members money. *E.g.*, Ex. 2, 48:13–20; Ex. 10, 54:17–25; Ex. 4, ¶¶ 59–64; Ex. 8, 207:2–3; Ex. 11, 47:12–17.

## IV. THE MONETARY RELIEF THAT PETERS SEEKS FROM OPTUM IS UNAVAILABLE UNDER ERISA § 502(A)(3).

Peters seeks relief against Optum only under ERISA § 502(a)(3). Dkt. 146 at 10; *id.* at 10 n.9. She limits her claim in that way for good reason: Because "Optum was not acting in a fiduciary capacity with respect to the actions complained of by [Peters]" (Dkt. 141 at 17), it cannot be liable under § 502(a)(2) (which applies only to plan fiduciaries) or under § 502(a)(1)(B) (which applies only to the plan itself or to a plan administrator). *Colon v. Pencek*, No. 3:07-cv-00473, 2008 WL 4093694, at *6 (W.D.N.C. Aug. 28, 2008).

Section 502(a)(3) authorizes a plan "participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Peters does not seek injunctive relief (Dkt. 146 at 9–10), which leaves only her request for "other appropriate equitable relief." Dkt. 1 at 25, 26.

Peters has never explained precisely what "equitable" relief she seeks from Optum. At various points, Peters has mentioned "surcharge" (Dkt. 1, Prayer for Relief; Dkt. 146 at 10), "restitution" (Dkt. 146 at 10), "disgorgement of profits" (Dkt. 179 at 19–21), and an "accounting" (Dkt. 146 at 10). None of those remedies is available from Optum (a nonfiduciary) under § 502(a)(3).

**Surcharge**. The Supreme Court held in *Mertens* that § 502(a)(3) does not authorize a surcharge remedy against a nonfiduciary. 508 U.S. 248. The *Mertens* Court rejected the plaintiffs' argument that they sought appropriate equitable relief, explaining that "although they often dance around the word, what [plaintiffs] in fact seek is nothing other than compensatory *damages*—monetary relief for all losses their plan suffered as a result of the alleged [misconduct]." *Id.* at 255 (emphasis in original).

At equity, the surcharge remedy "extended to a breach of trust committed by a *fiduciary* encompassing any violation of a duty imposed upon that fiduciary." *Amara*, 563 U.S. at 442 (emphasis added); *see also* Restatement (Third) of Trusts § 95 (2012) ("If a *breach of trust* causes a loss . . . , the beneficiaries are entitled to restitution and may have

the *trustee* surcharged" to compensate them for the breach.) (emphasis added). "Thus, insofar as an award of make-whole relief is concerned," the *Amara* Court explained, the difference between a plan trustee/fiduciary and a nonfiduciary is "critical." *Id.* Critical indeed: Surcharge is never available against a nonfiduciary. *See also Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 957–58 (9th Cir. 2014); *Malone v. Teachers Ins. & Annuity Assoc.*, No. CV-12-cv-187, 2017 WL 913699, at *6 (S.D.N.Y. Mar. 7, 2017) ("Because defendant is not a fiduciary of the Plans with respect to the recordkeeping services it provides, the Plans may not recover compensatory damages under a surcharge theory.").

**_Restitution/disgorgement/accounting_**. Peters is not entitled to restitution under § 502(a)(3) because the monetary relief that she seeks from Optum is legal, not equitable.[6] "Restitution can be a legal or an equitable remedy." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 332 (4th Cir. 2006) (citing *Great-West Life & Annuity Insurance Company v. Knudson*, 122 S. Ct. 708 (2002)). "It is a legal remedy where the plaintiff cannot 'assert title or right to possession of particular property, but [he] might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him.'" *Thorn*, 445 F.3d at 332 (quoting *Great-West*, 534 U.S. at 212–18). It is an equitable remedy "where money or property identified as belonging in good

---

[6] Disgorgement and accounting of profits are forms of restitution. *See* Restatement (Third) on Restitution and Unjust Enrichment § 51(4); *id.* cmt. A.

conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 332 (quoting *Great-West*, 534 U.S. at 213). In *Thorn*, the Fourth Circuit rejected the notion that the proposed class's "restitution request [was] an equitable remedy" because the plaintiffs did not submit evidence that the defendant's "race-based premium overcharges are traceable." *Id.* at 332; *see also Sereboff v. Mid-Atlantic Med. Serv.,* 547 U.S. 356, 362-63 (2006) (remedies sought were equitable because the plan "sought specifically identifiable funds" and "not recovery from the [defendants'] assets generally"); *Cox v. Blue Cross Blue Shield of Michigan*, 166 F. Supp. 3d 891, 896 (E.D. Mich. 2015) (plaintiffs failed to sufficiently allege a "specifically identifiable fund").

So too here: Peters cannot *trace* any payment to Optum because she never *made* any payment to Optum. Peters paid co-insurance, co-payment, and deductible amounts to Optum's *downstream* providers, not to Optum. Ex. 1, 142:1–150:19. Optum never received a payment from Peters or her plan. *See* Ex. 16 ¶ 9. When the Supreme Court has concluded that relief was equitable, the defendant held the money "in segregated accounts or funds," and the plaintiff sought "an equitable lien against the specifically identified account or fund." *Central States, SE & SW Areas Health & Welfare Fund v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 452–53 (7th Cir. 2016); *see also Great-West*, 534 U.S. at 216 (equitable restitution "limit[ed] . . . to the return of identifiable funds (or property) belonging to the plaintiff and held by the defendant"); *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 658–59 (2016) (same reasoning); *Sellers*, 316 F. Supp. 3d at 41 (equitable recovery "extends only to funds in defendant's

possession and traceable to the unlawfully obtained assets"). Optum does not have a segregated account or fund holding payments from Aetna for the Aetna-Optum relationship and in any event never received a payment from Peters or her plan.

Even if amounts representing the difference between Aetna's payments to Optum and Optum's payments to downstream providers could somehow form the basis for equitable restitution—they cannot—it would be inequitable to force Optum to return its reasonable compensation. Most of what Peters calls "Optum's gain" covered Optum's costs. Ex. 16, Ex. A; Ex. 20, 116:2–118:14.

## CONCLUSION

Peters has no claim against Optum. The Court should grant summary judgment to Optum and should dismiss Peters's Complaint against Optum.

Respectfully submitted February 1, 2019.

/s/ *Brian D. Boone*
Brian D. Boone (NC Bar No. 38910)
Michael R. Hoernlein (NC Bar No. 40419)
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
brian.boone@alston.com
michael.hoernlein@alston.com

*Counsel for OptumHealth Care Solutions, Inc.*

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S RULES

I certify that this Brief complies with Local Rule 7.1 and this Court's Pretrial Order and Case Management Plan: It uses Microsoft Word double-spacing and one-inch margins, is in Garamond 14-point font (including the footnotes), and does not exceed 25 pages.

February 1, 2019

/s/ *Brian D. Boone*
Brian D. Boone (NC Bar No. 38910)
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
brian.boone@alston.com

*Counsel for OptumHealth Care Solutions, Inc.*

## CERTIFICATE OF SERVICE

I certify that on February 1, 2019, I filed and served a copy of this Brief on all counsel of record using the CM/ECF system.

/s/ *Brian D. Boone*
Brian D. Boone (NC Bar No. 38910)
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
brian.boone@alston.com

*Counsel for OptumHealth Care Solutions, Inc.*