08:59

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION


SANDRA M. PETERS, on behalf of
herself and all others
similarly situated,

        Plaintiff,

v.                              Case No. 1:15-cv-00109-MR

AETNA INC., AETNA LIFE
INSURANCE COMPANY, and
OPTUMHEALTH CARE SOLUTIONS,
INC.,

        Defendants.
_____/












                TRANSCRIPT OF MOTION HEARING
        Held before HONORABLE JUDGE MARTIN REIDINGER
                    Friday, March 1st, 2019
                    9:00 a.m. - 10:26 a.m.









    Court Reporter:  Beverly Bourlier James, RPR
    Stenograph with Computer Aided Transcription

APPEARANCES:

For the Plaintiff:
        LARRY S. MCDEVITT, ESQUIRE
        lmcdevitt@vwlawfirm.com
        DAVID M. WILKERSON, ESQUIRE
        dwilkerson@vwlawfirm.com
        The Van Winkle Law Firm
        11 North Market Street
        Asheville, North Carolina 28801
        -and-
        JASON M. KNOTT, ESQUIRE
        jknott@zuckerman.com
        Zuckerman Spaeder, LLP
        1800 M Street, NW, Suite 1000
        Washington, DC 20036-5807
        NELL Z. PEYSER, ESQUIRE
        npeyser@zuckerman
        Zuckerman Spaeder, LLP
        485 Madison Avenue, 10th Floor
        New York, New York 10022-5871

For the Defendant Aetna:
        THOMISON HOLMAN, ESQUIRE
        tom@holmanlawwnc.com
        Holman Law, PLLC
        56 College Street, Suite 302
        Asheville, NC 28801
        -and-
        GEOFFREY MANSON SIGLER, ESQUIRE
        gsigler@gibsondunn.com
        Gibson Dunn & Crutcher LLP
        1050 Connecticut Avenue, N.W.
        Washington, DC 20036-5306

For the Defendant OptumHealth
        BRIAN D. BOONE, ESQUIRE
        brian.boone@alston.com
        REBECCA L. GAUTHIER, ESQUIRE
        rebecca.gauthier@alston.com
        Alston & Bird LLP
        Bank of America Plaza
        101 South Tryon Street, Suite 4000
        Charlotte, North Carolina  28280-4000

Also present:  Shari Aberle, Optum

| | | |
|---|---|---|
| 1 | THE COURT:  Good morning, everyone. | 08:59 |
| 2 | ALL PRESENT:  Good morning, your Honor. | 08:59 |
| 3 | THE COURT:  We have one matter that is on | 09:00 |
| 4 | the calendar for today and that is Peters versus | 09:00 |
| 5 | Aetna.  We have it on for a class certification | 09:00 |
| 6 | hearing. | 09:00 |
| 7 | I see a number of lawyers, some of whom I | 09:00 |
| 8 | recognize and some of whom I do not.  So I will | 09:00 |
| 9 | allow counsel to announce their appearance for the | 09:00 |
| 10 | record. | 09:00 |
| 11 | I'll start over at the Plaintiff's table, | 09:00 |
| 12 | Mr. McDevitt. | 09:00 |
| 13 | MR. McDEVITT:  Your Honor, for the record, | 09:00 |
| 14 | my name is Larry McDevitt.  I'm with the Van | 09:00 |
| 15 | Winkle Law Firm here in Asheville and appear on | 09:00 |
| 16 | behalf of the Plaintiff Peters and putative class. | 09:00 |
| 17 | With me today are my partner David | 09:00 |
| 18 | Wilkerson, who will not be participating in oral | 09:00 |
| 19 | argument but is involved in the case.  We also | 09:00 |
| 20 | have two attorneys with the Zuckerman Spaeder | 09:00 |
| 21 | firm.  You've met Jason Knott -- | 09:00 |
| 22 | MR. KNOTT:  Good morning, your Honor. | 09:00 |
| 23 | MR. McDEVITT:  -- here on my left.  And | 09:01 |
| 24 | his partner Nell Peyser who is here with us today. | 09:01 |
| 25 | MS. PEYSER:  Good morning, your Honor. | 09:01 |

1          MR. McDEVITT:  With the Court's

2     permission, I'll be taking the lead on the motion

3     to strike our expert, if the Court hears that,

4     with Mr. Knott's assistance, and he'll be taking

5     the lead on the motion for class certification.

6          THE COURT:  Okay.  Mr. Holman.

7          MR. HOLMAN:  Your Honor, Tom Holman here

8     on behalf of the Aetna Defendants.  Geoff Sigler

9     from Gibson Dunn will be arguing on behalf of the

10    Defendants this morning.

11         MR. BOONE:  Good morning, your Honor.

12    Brian Boone from Alston & Bird for Optum.  With me

13    today is Rebecca Gauthier, my associate, and Shari

14    Aberle, Optum's head of litigation.

15         MS. ABERLE:  Good morning, your Honor.

16         THE COURT:  Good morning.

17         The first thing I want to turn to is -- I

18    guess the first question that I have is to make

19    certain that everything in terms of the evidence

20    that the parties wish to present regarding the

21    issue of the class certification is what you have

22    submitted in writing.  I don't see anybody here

23    who appears to be awaiting being sworn in to

24    testify, but I don't want to make that assumption.

25         So, Mr. Knott, let me turn to you first.

```
 1        Is there any further evidence that the Plaintiff
 2        seeks to present as part of the presentation for
 3        class certification?
 4              MR. KNOTT:  No, your Honor.
 5              THE COURT:  And then with regard to the
 6        Defendants, Mr. Sigler, Mr. Boone, will there be
 7        any evidence presented by the Defendants?
 8              MR. SIGLER:  No, your Honor.
 9              MR. BOONE:  No, your Honor.
10              THE COURT:  Mr. Knott, I think that
11        Mr. McDevitt threw you on the hot seat for this
12        one, so let me turn to you first.  One thing that
13        I really didn't see addressed in the briefs by
14        anyone that seems to me to be a threshold issue,
15        particularly with the way things are structured in
16        this case, but I want to make sure that we're all
17        on the same page, and that is in light of the
18        language of Rule 23, do you agree that a class,
19        however the class is defined, has to be a class of
20        claimants?  In other words, where it says that a
21        representative may -- one or more members of a
22        class may sue on behalf of all members, in other
23        words, all members, therefore, must have some
24        claim.  Do you agree with that?
25              MR. KNOTT:  I do, your Honor.
```

1     THE COURT:  Okay.  With that then, here's

2  what I don't understand yet with regard to the two

3  classes that you are wanting to define for

4  certification and that is what is their claim?

5  And let me refine that question so that it

6  hopefully is more understandable rather than less

7  understandable.

8     It seems to me that where you have this

9  situation where a payment by Optum exceeds the

10  contract amount, that you have potential plan

11  participants who fall into four different

12  categories.  Category 1 is that all claims involve

13  a payment greater than the contract amount.

14  Category 2 is where all contract amounts exceed

15  all payments.  Category 3 is where you have some

16  of each, but the degree of the amount by which

17  payments exceed contract amount is greater than

18  the contract amount exceeding payment.  And then

19  the fourth category is the reverse, where contract

20  amount exceeding payment is greater than payment

21  exceeding contract amount.

22     So have I at least given you the

23  foundation here in a way that's understandable?

24     MR. KNOTT:  I believe so, your Honor.

25     THE COURT:  Okay.  Of those four

categories, who are you saying is in your class?

MR. KNOTT:  Who we're saying is in the class is anyone who had a claim --

THE COURT:  No, I've given you the four categories.  What I want to hear from you is the class consists of group 1 or the class consists of groups 1 and 2 or the class consists of groups 1 and 4 or the class consists of all four groups.

MR. KNOTT:  So I believe you -- I want to make sure I've got the categories right.  Category 3 was the group where all of the Optum-contracted amounts exceeded what the plan or the member paid?

THE COURT:  That was category 2.

MR. KNOTT:  Okay, that's category 2.  So for an individual in that group where there was no member or plan responsibility that exceeded what the actual provider received, then there would be no harm or loss, and those individuals would not be in the proposed class.

THE COURT:  But the other three groups you are saying would be?

MR. KNOTT:  Where there was a mix or where there was any claim for a member in which the Optum-contracted rate was lower than the combined

1    member in plan responsibility, that's the measure

2    that we'd propose to identify the class members.

3         THE COURT:  With regard to group 4, and

4    that is where there's a mix of claims, there are

5    some where the payment exceeds the contract

6    amount, there are some where the contract amount

7    exceeds the payment, but group 4 is where the

8    contract amount exceeding the payment by more than

9    the payments exceeded the contract amount.  How

10   are those people claimants?  Because they have not

11   suffered a loss, they've actually -- it has enured

12   to their benefit, they're on the plus side of

13   ledger.  How are they a claimant?

14        MR. KNOTT:  So our position is those

15   people are still not on the plus side of the

16   ledger because they are paying, on the claims

17   where there was a difference, an administrative

18   fee that they should not have been required to pay

19   under their plan.  And, so, it's to that claim

20   there was a breach of fiduciary duty, the member's

21   responsibility was incorrectly calculated, and we

22   believe there's a remedy for that under ERISA.

23        THE COURT:  That doesn't -- at least

24   doesn't answer my question to my satisfaction.

25   How is somebody a claimant?  In other words, if I

1    owe you $10 but you owe me $20, how am I a

2    claimant against you?

3         MR. KNOTT:  Because the claim that is

4    being addressed in this litigation is the claim

5    where you improperly charged me for a claim.  So,

6    for example, if I'm an attorney and I steal from

7    your trust account but I gave you a discount over

8    here, the client would still have a claim against

9    the attorney for the breach of fiduciary duty that

10   led to the loss.  And maybe --

11        THE COURT:  Well, you said "led to the

12   loss," but if there isn't a net loss, how is there

13   a loss?

14        MR. KNOTT:  Well, there's an injury on

15   that particular claim.  Based on this Court's

16   prior ruling on the motion to dismiss, the Court

17   found that we had pleaded an injury based on the

18   fact that Ms. Peters paid more than she should

19   have on a given claim and the Defendants contend

20   that they should get an offset for claims where

21   maybe the relationship worked to the member's

22   benefit because the member would have paid more to

23   the actual provider than to the doctor, but that's

24   a damages issue, it's a relief issue, it's not one

25   that goes to whether the person has a viable ERISA

1          claim or not.

2               THE COURT:  Well, you're now hitting on

3          what I see as the crux of the matter, but how --

4          again, how is it a viable ERISA claim if the

5          claimant is on -- came out ahead?  I mean, for any

6          kind of claim.

7               MR. KNOTT:  So I point to, for example,

8          Judge Eagles' decision in the Clark v Duke

9          University case last year where the Defendants

10         made arguments that the plan had made imprudent

11         investments, but some of the proposed class

12         members had profited from those investments.  And

13         the Court found that, because of the way the

14         relief requested was structured and because all

15         class members shared the same legal theory and

16         legal claim, and in this case, all class members,

17         including the ones in your category 4, would share

18         the same theory, the same claim that they were

19         improperly charged for administrative fees --

20              THE COURT:  Okay.  I need to stop you for

21         a second because you seem to be conflating the

22         concept of the legal theory of a party, a

23         potential party, with a claim by that party.  And

24         those seem to be two very different things.  Just

25         because I can make an argument that, over here on

1    this one transaction, if you take it in a vacuum,

2    I have a loss does not mean that I have a claim if

3    I have a contractual relationship with another

4    party and I actually came out on the plus side of

5    that relationship.  So how -- you know, before you

6    get to the theories that apply, you have to define

7    the class and the class has to consist of

8    claimants and what I'm having trouble getting over

9    is how is somebody a claimant if they came out

10   ahead.

11        MR. KNOTT:  Well, your Honor, I don't

12   think anybody comes out ahead from having to pay

13   an administrative fee to a vendor that they

14   shouldn't have had to pay under their plan.

15   Whether there were other collateral benefits is

16   not an issue that deprives someone of a claim.

17        THE COURT:  Well, you say "collateral

18   benefits," but it's a benefit that arises from

19   precisely the same arrangement that you're

20   complaining about.  In other words, you have the

21   situation where, for procedure A, that Optum is

22   paid $100 but has a contract rate with the

23   provider to pay 95.  So Optum comes out ahead by

24   that $5.  For procedure B for that same patient,

25   that same plan participant, Optum is paid $100 but

1     has to pay the contract provider 105.  Therefore,

2     by exactly the same process, exactly the same

3     arrangement, exactly the same contracts, both on

4     the plan side and on the provider side, Optum

5     gains $5 on one, loses $5 on the other, there's no

6     loss to anybody.  Everybody comes out exactly

7     even.  How is anybody a claimant under those

8     circumstances?

9          In other words, you keep wanting to

10    separate those and say, well, you only count A,

11    you don't count B.  On what basis?  If the

12    claim -- you have to be a claimant, you have to be

13    able to say for whatever small piece, I, as a

14    member of this plan, have lost money to Optum to

15    be a claimant.  And that proverbial participant in

16    the plan hasn't lost anything, he or she has come

17    ahead, haven't they?

18         MR. KNOTT:  Your Honor, again, I think I

19    just have a fundamental disagreement with whether

20    ERISA would allow that person who has paid a $5

21    improper fee to have a claim based on the injury,

22    the right under ERISA to challenge any act that

23    violates the terms of their plan.

24         THE COURT:  Well, then let me stop you on

25    that because that's where I thought you were going

next.  Do you have any case law to back that up in

a situation where -- let's leave the class action

part of this aside for a moment.  Just where a

plan participant says, plan administrator, the way

you do things, sometimes you cause me to lose a

little bit of money and sometimes you cause me to

gain money.  And even though I've come out ahead,

I get to recover from you those losses by treating

those in a vacuum and because that's a violation

of ERISA.  Do you have any case law that backs up

that theory?

MR. KNOTT:  Your Honor, I would just point

to any case where a Plaintiff, for example,

challenges a benefits denial, where the Plaintiff

only has to establish that benefits were wrongly

denied on one claim and doesn't have to establish

or refute a Defendant showing, well, maybe we

would have approved this other claim over here

that you didn't have approved.  There's not -- you

don't take each claim and smash them together;

each claim is a separate transaction.

And on your example with the $105 here and

the $95 here, on the claim where there's the $105

charge, there's been an improper fee for the other

claim, ERISA hasn't been violated because the

1          member hasn't been required to pay more than they

2          were obligated to pay under the plan.  And the

3          Defendant may take the position, well, we didn't

4          charge enough for that particular claim, but we're

5          not seeking to have people pay that money back.

6          It's similar to the Clark case where no one was

7          seeking to have class members pay back profits

8          that they received from imprudent investments, but

9          were still challenging the improper fees that were

10         charged on the investment decisions.

11              THE COURT:  Well, let me hear from the

12         other side on this.  Mr. Sigler, Mr. Boone, I

13         don't know which one of you wants to go first.

14              MR. SIGLER:  I can go first, your Honor.

15              The issue, I think, your Honor is

16         identifying has a few different facets to it.

17         Certainly, it is a Rule 23 issue.  I think the

18         Supreme Court made that clear in Duke's, that

19         there needs to be a common injury, which I think

20         is getting to a similar issue to the one your

21         Honor is identifying.

22              In addition to that --

23              THE COURT:  Well, tell me if you view this

24         differently.  I see this as the threshold issue

25         because until we can identify who is and who is

1    not a claimant, we can't begin to define a class,

2    we can't begin to define what the commonality is,

3    we can't begin to determine whether there's any

4    ascertainability of the class.  Figuring out who

5    is and who is not a claimant is -- it has to be

6    step one of the process, doesn't it?

7         MR. SIGLER:  Absolutely, your Honor.  And

8    part and parcel with that, my only point is that

9    what Duke says is that the class, once you've

10   figured out who those claimants are, needs to

11   include people with a common injury, which I think

12   if you end up in a situation where you're letting

13   people into the class who aren't true claimants,

14   you'll end up with the situation identified in

15   Duke's, where there isn't a common injury binding

16   the class together.

17        I think that the hypotheticals that

18   counsel was identifying, if I understood them

19   correctly, involve situations where you've got

20   separate acts resulting in different results for a

21   particular person, and that's not, as I understand

22   it, the issue here.  The Plaintiffs are

23   challenging this relationship, the way the

24   relationship was established, the structure of the

25   relationship, and if that's the focus of their

1    claim, if that's the alleged breach, then it would

2    make no sense to look at category 4 any

3    differently than category 1, 2 or 3 in terms of

4    how to calculate their benefits.  You wouldn't

5    calculate the benefits one way on certain claims

6    and another way on other claims.  And if the focus

7    is on the but-for world where we're calculating

8    rates differently, category 4 is a category of

9    people who aren't injured by the alleged breach

10   that they are challenging.

11           And, finally, your Honor --

12           THE COURT:  Let me stop you for a second

13   because Mr. Knott argues that even outside of the

14   class action area, that, under ERISA, where you

15   have a plan participants who, because of a series

16   of claims, has been harmed by the way the claims

17   have been handled as to claims 1 and 2 but has

18   benefitted as a result of the way that same

19   process handles claims 3 and 4, Mr. Knott argues

20   that the law is that the claimant can isolate

21   claims 1 and 2 and recover for the loss on those

22   irrespective of any gain from that method being

23   used that enured to the claimant's benefit.  Is he

24   right about that?

25           MR. SIGLER:  Absolutely not, your Honor.

1          THE COURT:  Do you have any case law to

2     back up your side?

3          MR. SIGLER:  I would point to the Pender

4     decision in 2018 out of the Fourth Circuit and the

5     Plasterers decision in 2011 out of the Fourth

6     Circuit in which the Fourth Circuit made very

7     clear that you need to apply a but-for analysis in

8     determining whether someone is injured or not,

9     whether they stand to recover under a breach of

10    fiduciary duty claim.  And if the but-for analysis

11    takes you back to a decision and that decision is

12    applied to the Plaintiff's experience and the

13    Plaintiff comes out behind under the Plaintiff's

14    theory, there is no injury.

15         And, here, we've got them pointing back to

16    a decision that would have brought about category

17    4 people who had some claims in one bucket and

18    some people in another, and it doesn't make sense

19    under those authorities to treat those claims

20    differently when they are rooted in the same

21    fiduciary decision that they're challenging.

22         I heard them mention the Clark case; if I

23    could briefly respond to that case.  That's a

24    District Court decision, and as I understand the

25    analysis in that case, the judge was pointing to

1     the fact --

2           THE COURT:  To make sure I understand,

3     you're talking about -- that's the same as the

4     Duke University case?

5           MR. SIGLER:  Yes, your Honor.  Clark

6     versus Duke University.  It involved a single

7     plan, the Duke University plan, and some decisions

8     about how to allocate assets under that retirement

9     plan.  As I understand what the Court was saying

10    there is that the Defendant had identified

11    hypothetical differences in outcomes, hypothetical

12    conflicts, and she didn't think that those issues,

13    those hypothetical issues rose to the level that

14    they would require denial of class certification.

15          Here, we've got specific concrete examples

16    of people in category 4, Ms. Peters herself is in

17    that category.  And, of course, from a

18    class-certification perspective, it's also

19    important to note that figuring out who is in that

20    category versus the other categories is itself a

21    claim-by-claim person-by-person analysis.

22          THE COURT:  Okay.  Mr. Boone, do you have

23    something you want to add to that issue?

24          MR. BOONE:  Yes, your Honor.  I'll try not

25    to repeat what Mr. Sigler just said to you.

1          You're exactly right, the person who,

2     under the Aetna-Optum contract, is better off or

3     in the same position otherwise than they would

4     have been has no legal claim, they've suffered no

5     injury, and sorting that out would require

6     thousands of individual inquires.

7          And I guess the next point that I would

8     make is that we're not talking about benefits

9     claims here.  Mr. Knott, in his briefing, doesn't

10    really talk about the elements to his claims

11    because I think he knows that if you talk about

12    the elements of claims, that Rule 23 is not going

13    to favor his position.

14         The third point that I would make is that

15    Aetna members don't pay Optum, they pay Optum's

16    downstream providers.  And, so, Mr. Knott talks

17    that Aetna members are paying Optum directly.

18    That doesn't happen, they are paying Aetna's

19    downstream providers; Optum doesn't have members.

20         And the fourth thing that I would say is

21    that Mr. Knott is not seeking certification of a

22    fiduciary theory against Optum.  We're here for

23    Optum on a narrow unpleaded claim of non-fiduciary

24    liability which raises its own individual issues

25    that we can talk about later.

 1          THE COURT:  Mr. Knott, I'll turn back to

 2     you.  For instance, Mr. Sigler refers the Court

 3     back to Pender and Plasterers as refuting your

 4     view of who is and who is not a claimant under

 5     ERISA.  What do you say in response to that?

 6          MR. KNOTT:  What I say is that Plasterers

 7     and Pender recognize that there has to be some

 8     sort of loss, but, here, we can establish a loss

 9     by virtue of the practice that violated the plan,

10     which was charging members more than they were

11     required to pay the downstream providers.  As to

12     the other claims in category 4, there's not a loss

13     because members weren't required to pay more than

14     they otherwise were required to pay.

15          THE COURT:  But the loss that you're

16     claiming arises from a system of administering the

17     claims.  In category 4, the application of that

18     system for administering the claims enured to the

19     benefit of the person you're wanting to include in

20     the class.  So how -- again, how is that a

21     claimant?  I'm -- apparently, I'm being very dense

22     on this because I'm having a lot of trouble

23     grasping your argument on how somebody who

24     actually, because of the application of the

25     practice in question, has benefitted, unlike what

1    you have in the Duke University case, how is that

2    person a claimant?  Because in any other context,

3    they are not.  The person who came out ahead does

4    not have a possibility of suing.

5        If you and I have a contractual

6    relationship that involves even a series of

7    transactions and I came out ahead and I get ticked

8    off with you and I try to sue you for breach, I

9    don't have a loss.  How do I have -- you'd file a

10   Rule 11 motion against me, wouldn't you?

11       MR. KNOTT:  I think two points on this.

12   First of all, this is a common issue for a lot of

13   class members and, actually, Ms. Peters does not

14   fall in category 4.  If you add up the claims

15   where the actual provider would have collected

16   more but for Optum, the Optum rate, in other

17   words, the claims where the actual provider's

18   charge exceeded the Optum rate, I think she may

19   have one or two of those, but in the aggregate,

20   her claims, typically, the Optum rate greatly

21   exceeded what the actual provider collected.

22       THE COURT:  But with Ms. Peters, wasn't it

23   if you break it down by year, there's at least one

24   year where she does come out ahead, but if you

25   aggregate all of the years involved together, that

1    she comes out somewhat behind?

2         MR. KNOTT:  Well, so their position as to

3    the one particular year in question involves

4    deductible claims which, again, is a common issue.

5    Every member has deductibles and their position is

6    that, because of the way they treated deductibles,

7    Ms. Peters and thousands of other class members

8    wouldn't have an injury or a loss.  And, again,

9    that's a common issue that they would bring up in

10   any case where any of these absent class members

11   sued them, but their theory is that Ms. Peters

12   actually paid on deductible claims exactly what

13   she should have paid, which was the actual

14   provider's charge, but Aetna, for whatever reason

15   that was part of the cover-up, wrote off the

16   remainder which they applied to the deductible

17   because there wasn't a means for them to go out

18   and collect that money from the member without the

19   member figuring out what was going on, that they

20   were being charged for these administrative fees.

21   And, so, they take the position that that is

22   somehow a benefit that eliminates the injury from

23   actually being charged the improper fees on later

24   claims.

25         THE COURT:  I have to admit I did not

1    follow that argument.  If you want to try that

2    again, maybe I'll grasp it this time.

3         MR. KNOTT:  Sure.  So I think the claims

4    generally fall into four categories, there are

5    deductible claims, there are co-insurance claims,

6    there are copay claims where you owe a fixed copay

7    every time you go to the doctor and then there are

8    claims where the plan for the entirety of the fee.

9         And, so, in the deductible --

10        THE COURT:  What's the fourth?

11        MR. KNOTT:  So --

12        THE COURT:  The fourth category, I didn't

13   understand what you said.

14        MR. KNOTT:  So after the member has

15   exhausted whatever they are required to pay under

16   the plan, then the plan pays 100 percent of the

17   charges.  So, in that scenario to Mr. Boone's

18   point, the plan would be paying Optum's entire fee

19   in violation of the plan.

20        For the deductible claims, how to handle

21   them was the actual provider would collect what

22   they were supposed to collect from the member, so,

23   say, $40.  That was what the negotiated charge

24   was, that was what the member was supposed to pay.

25   Aetna still decided to apply the Optum rate,

which, for example, would be $70.89, to the
patient's deductible, but Optum has basically
written that off and decided not to collect it,
which is pretty unusual in the insurance context.
And now Aetna and Optum take the position that
because they wrote off the deductible and didn't
seek to collect it from the member, that that
somehow is a benefit to the member, but you have
to ask, why did they do that?  Why didn't they try
to collect the deductibles?  Because, if they did,
the member would figure out what was going on and
they wouldn't be able to dip into the member's
payment and the plan's payment on the co-insurance
claims where the member owes a percentage of the
negotiated charge.

        So, for example, the member would owe
20 percent of $70.89 and the plan would owe the
rest.  In that scenario, Optum told the doctor to
collect 20 percent of $70.89 and the plan paid the
rest of that amount.  Optum kept, for example, in
that scenario, $56.71 and then paid $26 to the
plan -- or to the provider, to the actual
provider, and kept the rest.  And, so, the
Defendants' position is that because of the way
they treated the deductibles where, again, the

1          member was required to pay what they were supposed

2          to pay.  So our position is that's not a claim

3          where there was a loss because the member didn't

4          pay any more than they were supposed to, but the

5          Defendants say, well, we gave this credit, this

6          deceptive credit because, otherwise, we couldn't

7          have carried out the scheme as to the other

8          claims, and that's somehow a benefit that

9          eliminates the fact that we charged you improperly

10         on the other claims.

11              THE COURT:  But it is a benefit.  The plan

12         participant didn't pay that -- you didn't use very

13         round numbers, so it makes it very hard, but

14         whatever that 20 percent or whatever, that plan

15         participant didn't pay it, therefore, the plan

16         participant benefitted to that amount, right?

17              MR. KNOTT:  It is an economic benefit,

18         your Honor.  That is true.  If you don't have to

19         pay your whole deductible, that's a benefit.  But

20         it is not one that eliminates the harm and the

21         unjust gain on the other claims.

22              THE COURT:  Why doesn't it offset?

23              MR. KNOTT:  They can argue for an offset,

24         but, again, that's a common issue and that's a

25         common merits issue.

                THE COURT:  But, again, if it offsets and
    that offset is greater than any loss from the
    manner in which these claims are processed, how is
    that participant a claimant?

                MR. KNOTT:  Well, I don't agree that there
    would be an offset, your Honor, because it's like
    a doctor who says I didn't collect this other
    charge and, so, maybe I overcharged you for this
    other claim, but I didn't send you a bill for this
    other charge, so you have no loss on the improper
    charge.  That's just -- that's not the way that
    ERISA works.

                And the deductible write-off is part of
    the scheme that allows them to get the unjust
    gains that are at issue here.  Again, Aetna is a
    fiduciary.  It's supposed to follow the plan, and
    when it doesn't follow the plans and members are
    forced to pay more on a benefit claim as a result,
    that is a breach and it's a breach that's
    remediable under ERISA.

                THE COURT:  You say that that's not an
    offset, in other words, that the Defendants do not
    get to offset that benefit even though you
    acknowledge the benefit to the participant.  You
    say that there can't be an offset there, but

that's an issue that's not common to all your

class members, that's an entirely separate

calculation and -- calculation that has to be done

and issue that has to be resolved only with regard

to categories 3 and 4, the way I've defined it at

the beginning, right?

MR. KNOTT:  Well, it's an issue that would

apply to thousands of class members.  It's not

unique or individualized to Ms. Peters.  And the

question can be answered with the Defendants' own

data, so there is not a complicated individualized

inquiry.

THE COURT:  Let's not make it more

complicated than we need to for each individual

question because my point is that is an issue that

is not common to all members of the class as you

intend to define it, correct?

MR. KNOTT:  I'd expect that most, if not

all, class members would have deductibles and they

have deductible claims falling within that, but I

don't have a specific answer as to whether there

might be some members in our proposed class that

would not have had a deductible claim.

THE COURT:  But then with regard to

those -- if there is a determination that an

1    offset is allowed, in other words, that the

2    Defendants can make this calculation on an offset

3    basis, then it's a matter of discerning who is in

4    the category 3 box as opposed to the category 4

5    box, correct?

6         MR. KNOTT:  Yes, and that's something that

7    can be addressed on common evidence using common

8    data.

9         THE COURT:  How can that be addressed

10   using common evidence using common data when you

11   have to take each individual plan participant and

12   determine which box they are in?  Even if I define

13   the class as you are suggesting that I should, we

14   still have group 1, group 3 and group 4.  And,

15   ultimately, because of these issues that we're

16   talking about now, first, we have to separate out

17   groups 3 and 4 from group 1, but then we have to

18   separate out group 3 from group 4.  How is that

19   not an individualized analysis to figure out who

20   is in and who is not in each of these groups?

21        MR. KNOTT:  Your Honor, I want to be

22   careful because I'm not accepting the proposition

23   that we have to conduct that sort of analysis in

24   order to certify that class because --

25        THE COURT:  How can you avoid it?

1          MR. KNOTT:  Because we have identified a

2     group of class members, each of which were

3     subjected to improper charges that violated the

4     plan, and these arguments about other benefits on

5     other claims where either --

6          THE COURT:  Well, I mean, isn't that

7     essentially saying we win on the issue that you're

8     talking about right now, dividing group 3 from

9     group 4, if we ignore that issue?  I mean, isn't

10     that essentially what you're saying?  You're

11     saying we can certify the class so long as you

12     ignore that issue.

13          MR. KNOTT:  What I'm saying is that the

14     class can be certified.  To the extent they have

15     arguments about offset for damages, those go to

16     the ultimate relief that can be recovered, not to

17     whether someone is a proper part of class.  And we

18     have cited antitrust cases, Cardizem, Laumann,

19     where there actually is this holistic economic

20     analysis required and those Courts rejected

21     arguments about other attendant economic benefits

22     depriving the class of certification.  The Courts

23     have said those are -- those offset injuries,

24     those are damages issues that go to the relief,

25     they don't go to whether the class can properly be

```
1    certified.                                         09:36

2          THE COURT:  But none of those had to do      09:36

3    with benefits that arise from the application of   09:36

4    exactly the same process that gives rise to the    09:36

5    claim, right?  Do you have any case that says that 09:36

6    by setting up a particular arrangement of how      09:36

7    claims -- or how any type of claim is being        09:36

8    handled, that in some way it benefits and in some  09:36

9    way it harms the putative class members, that you  09:36

10   can ignore the portion of that process that gives  09:36

11   rise to the gain?  Do you have any cases that say   09:36

12   that because, in reading the briefs, I never saw    09:37

13   that anywhere.                                      09:37

14         MR. KNOTT:  Again, I would point to           09:37

15   Laumann, I'd point to Cardizem, I'd point to Clark  09:37

16   where, again, the process at issue there was an     09:37

17   antitrust violation.  You violated the antitrust    09:37

18   laws, you deprived us of a competitive              09:37

19   environment.  And the Defendant said, well, that    09:37

20   actually benefitted some people in some way.  And   09:37

21   the Court said that's an injury or that's a damage  09:37

22   argument, that's not an argument that's unique to   09:37

23   any given class member that deprives the class of   09:37

24   certification.                                      09:37

25         And, your Honor, I'd like to make one more    09:37
```

1       point on the deductible claims, if I could.

2               THE COURT:  You may.

3               MR. KNOTT:  Which is that the Defendants

4       were actually inconsistent in how they handled

5       deductible claims versus how they handled

6       co-insurance claims or plans where the -- claims

7       where the plans paid the full amount because

8       members were held financially responsible for the

9       Optum rate under co-insurance claims and the plans

10      were held responsible for the Optum rate of the

11      claims where the plans paid the entire amount.

12      For deductible claims, the Defendants' position is

13      that the members weren't actually financially

14      responsible for the full Optum rate, and that's

15      inconsistent.  That, to me, it is another example

16      of how they breached by picking and choosing when

17      they want to apply their own rules.

18              THE COURT:  You're going to have to go

19      through that one again because, again, I did not

20      follow the argument that you made.

21              MR. KNOTT:  Sure.  So the Defendants'

22      position is that when a member had a deductible

23      claim, the member was only financially responsible

24      for the actual provider's charge, or for their

25      percentage, which is 100 percent in deductible

```
1        claims of the actual provider's charge.  The EOB        09:38
2        says something different, it said you owe the full      09:39
3        charge, but that wasn't true.                           09:39
4             Then we get to the co-insurance plans.             09:39
5        The Defendants' position is that the members are        09:39
6        responsible for their percentage, 20 percent of         09:39
7        the Optum charge, not the actual provider's             09:39
8        charge.  So they are actually applying a different      09:39
9        rule.                                                   09:39
10            THE COURT:  There's an inconsistency to            09:39
11       the Defendants' argument.                               09:39
12            MR. KNOTT:  There absolutely is.                   09:39
13            THE COURT:  How does -- why does that make         09:39
14       any difference with regard to the question of           09:39
15       class certification, particularly with regard to        09:39
16       this question of who is -- who is and who is not a      09:39
17       claimant?                                               09:39
18            MR. KNOTT:  Because they applied that              09:39
19       inconsistency to every member of the class who          09:39
20       owed co-insurance and to every plan that paid.          09:39
21       And, remember, that a participant or beneficiary        09:39
22       can bring a claim on behalf of the plan for the         09:39
23       Defendants' breaches of fiduciary duty, not just        09:39
24       limited to bringing a claim on their own behalf.        09:39
25            THE COURT:  But, again, as to class                09:40
```

1     certification and determining who is and who is

2     not a claimant, why does that matter?  I mean,

3     let's say I accept your argument that there is an

4     inconsistency to the Defendants' position

5     depending on what kind of claim.  As for why we're

6     here today, so what?

7          MR. KNOTT:  Well, because our position is

8     that if they followed that rule for the deductible

9     claims, that you were not supposed to pay anything

10    but what you were paying to the actual provider,

11    that they should have followed that same rule with

12    the co-insurance claims and with the claims where

13    the plan was paying.

14         THE COURT:  And assume that they did.  As

15    to why we're here today, so what?

16         MR. KNOTT:  Assume that they did take that

17    inconsistent position?

18         THE COURT:  No, assuming that you could

19    convince them to be consistent, what difference

20    would it make with regard to class certification,

21    particularly on this threshold issue of who is and

22    who is not a claimant?

23         MR. KNOTT:  So if we could establish that

24    there was a legal violation when they were

25    inconsistent as to everybody who paid under the

1    old rule, then every class member would have a

2    claim based on that.  And that's the claim we're

3    asserting, that's the common --

4         THE COURT:  How is it -- I mean, you know

5    your case a lot better than I know your case, so

6    you're going to have to teach me enough of your

7    case to where any of this makes sense.  And that's

8    probably one of the reasons why you ultimately

9    probably don't want this in front of a jury,

10    because you're never going to be able to teach a

11    jury about this case.  But the thing is you say

12    that, oh, well, if they can't be inconsistent,

13    then everybody is a claimant.  How do I tell that

14    from this record?  How do I know that everybody

15    who participates in this plan miraculously becomes

16    a claimant, that they miraculously have a loss if

17    calculated without that inconsistency?  Where do

18    you get that, how do I know that?

19         MR. KNOTT:  Because we have put in

20    evidence from our expert that is, based on the

21    Defendants' claims data that shows that, as

22    to everyone the expert identified paid subject to

23    that inconsistent rule.  They were charged subject

24    to that inconsistent rule.

25         THE COURT:  They were charged subject to

1    that inconsistent rule, but you were saying

2    yourself earlier that you count only the losses

3    and you don't count the benefits that accrue from

4    that -- applying that same process to the same

5    plan participants.  So, again, looking at this

6    issue in a vacuum, this claim of yours that the

7    Defendants are being inconsistent, as to the

8    question of who is or who is not a claimant, what

9    difference does it make?

10          MR. KNOTT:  So I think I want to tackle

11   sort of two buckets of claims.  One is the

12   deductible claim where we've talked about the

13   inconsistent practice and then the other are the

14   set where I think Optum has pointed to, in a

15   minority of claims, sometimes Optum agreed to pay

16   more to the actual doctor than it took in.  For

17   that second bucket of claims, we can identify

18   those claims, and if those claims were to outweigh

19   the claims where Optum took in more than it paid

20   out, we can identify those people.  We can

21   identify the people in category 4.

22          THE COURT:  But then that would be -- that

23   would require an individualized or particularized

24   analysis of the plan participants which, as the

25   Fourth Circuit has said, that eliminates

1    commonality, you don't have commonality then.

2         MR. KNOTT:  It's not an analysis that

3    requires individual assessment of each claimant's

4    personal circumstances, it's based on the claims

5    data that's common evidence.  I point to the Ward

6    case, for example, where the Fourth Circuit

7    approved a method of assessing damages that relied

8    on claims data.  And, yes, each data line is

9    specific to a particular participant, but you can

10   use the data to answer the question.  You don't

11   have to do -- you know, call every class member in

12   to say, well, what did you pay on this claim or

13   that claim; the answer is there and it's in the

14   data.

15        THE COURT:  But with -- here's the problem

16   I'm having in understanding the argument that

17   you're making.  In the -- it's the Fourth

18   Circuit's case, I think it's EQT, where they -- it

19   doesn't have to do with insurance claims, it has

20   to do with this several purported classes of

21   property owners, and then there was a question of

22   whether or not they had a claim to the methane

23   rights on their property.  And it sounds like

24   there, the ones who were seeking class

25   certification were making an argument that, as far

as I can tell, is identical to yours.  You look at
these as a group.  As a group, there are so many
of these that where there is -- there are methane
rights on the properties, therefore, we go forward
with the class, we define it as all these property
owners and we will separate the sheep from the
goats later.  And the Fourth Circuit says you
can't do that, you have to figure out first who
the claimants are, and if you can't do that, then
you don't have commonality.  And if you have to go
through to figure out, well, this one has methane
rights and that one does not and this one does and
this one does, but number 5 does not, then you
don't have a class action.

How is this any different?  Because, here,
it seems to me that particularly with these four
categories that I've talked about, and you've said
you're excluding group 2, but we're still talking
about groups 1, 3 and 4, but the Defendants are
saying group 4 can't be in the class and,
therefore, to separate out group 4, you have to do
exactly that same sort of particularized analysis
of each individual participant just like the Court
had in EQT.  How is your situation any different
from that?

1          MR. KNOTT:  For a couple of reasons.  In

2    EQT, identification of the class members who had a

3    claim depended on complicated deeding laws and

4    implied trusts over the methane in the ground.

5    And, here, all class members are relying on ERISA,

6    all class members are relying on plans that were

7    materially the same.  So that --

8          THE COURT:  But each of them has a

9    different group of claims that were made that

10   would either form or not form the basis for a

11   claim.  So it's that claims information regarding

12   each participant that's just like the deed in EQT,

13   isn't it?

14         MR. KNOTT:  I disagree with that, your

15   Honor, because I think you would have this

16   scenario in every single ERISA class action.  To

17   figure out whether somebody is in the class, you

18   have to look at the data and see if they have a

19   claim, a benefits claim, a claim that's been

20   adjudicated.  And, here, again, we can do it

21   looking at the data to figure out who is in, who

22   is out.  If you have an objective measure, the

23   data permits you to ascertain who is in the class

24   based on the legal parameters that define what

25   class is.

1          THE COURT:  How can you do that without

2     looking at each individual participant's claim

3     ledger?  You keep saying you can discern it from

4     the data, all you have to do is look at the data.

5     But isn't the data the claim -- my term, claim

6     ledger, the list of claims by each individual

7     participant, isn't that what you're talking about?

8          MR. KNOTT:  Yes, but, again, you'd have to

9     do that in any ERISA case involving claims for

10    thousands of class members.  And they exist, they

11    are out there.  Again, you have to look at the

12    data to figure out who is in the class, but you

13    don't have to conduct an individualized inquiry

14    where you have to collect individual evidence from

15    every person and hear their story, hear what

16    happened to them, and there's no oral

17    representations at issue, so --

18          THE COURT:  There wasn't in EQT, either.

19    You just have to look at, rather than the claims

20    ledger, you have to look at the deed, you have to

21    analyze each deed.  How is this different?

22          MR. KNOTT:  Well, actually, the difference

23    is that, in EQT, the Court actually didn't say you

24    can't possibly certify this class, it just said

25    you have to do a more rigorous analysis to figure

1    out whether these people fall into the buckets

2    you're talking about.  And what I'm saying is that

3    that sort of analysis, the complicated analysis of

4    deeds and deeding history and all that, that's not

5    an issue here.  We have a single law, ERISA.  We

6    have a common practice that we know applied to

7    every class member.  They charged --

8         THE COURT:  But each participant has a

9    different claims ledger and that's the equivalent

10   of the deeds in EQT.  Right?

11        MR. KNOTT:  I disagree with that because

12   claimants may have a certain number of claims,

13   some may have 10, some may have one, but we can

14   figure out just based on the data who had a claim

15   that was subjected to this inconsistent rule.  And

16   that is not an individualized inquiry that runs

17   afoul of Rule 23 because it's based on common

18   evidence.  Again, the data, it's their own data,

19   it's not specific to any class member.  The data

20   is there for Ms. Peters, it's there for every

21   other absent class member.

22        THE COURT:  But only if I adopt your view

23   that any loss by a plan participant gives rise to

24   inclusion within the class, in other words,

25   classes 1, 3 and 4 are really all just one class

1     because any benefit that enured to the participant

2     from the administration of the plans according to

3     this process don't matter.  I have to adopt that

4     view.  Your entire class certification theory

5     rests on that one point, doesn't it?

6          MR. KNOTT:  No.  And here's why:  You have

7     to analyze the data to figure out who is under the

8     class -- who is in the class on my theory.  You

9     can just as easily analyze the class under a

10    theory where if you had a set of claims over here

11    that exceeded -- where the Optum rate was lower

12    than the actual provider collected and that

13    outweighed the claims where Optum took in more,

14    and you said that person is not going to be in the

15    class, you can look at the data, you can crunch

16    the numbers and that person is out.  It's the same

17    analysis.  You're looking at the same data, the

18    same information, the same common information.

19          THE COURT:  Okay.  Well, let me hear from

20    either Mr. Sigler or Mr. Boone in response.

21          Mr. Sigler, I'll hear from you first.

22          MR. SIGLER:  Of course, your Honor.  So I

23    wanted to point out that Plaintiff's counsel keeps

24    saying that could figure out who is in which

25    category by looking at the data.  Their expert

1       actually hasn't done that.                          09:51

2            THE COURT:  Well, let me stop for a second     09:52

3       because this is one thing that I'm still unclear    09:52

4       about.  When we make this reference to the data,    09:52

5       Mr. Knott keeps referring to the data, if I         09:52

6       understand correctly, ultimately, he's saying the   09:52

7       data is the particular claims that pertain to each  09:52

8       individual participant.  It's not like there is     09:52

9       some mass data out there that some expert or some   09:52

10      lawyer could look at and say here's the universe    09:52

11      of those who fall in categories 1 and 3 but not in  09:52

12      categories 2 and 4.  That doesn't exist.  The data  09:52

13      is each individual participant's claim ledger, my   09:52

14      term.  Am I understanding at least that correctly?  09:52

15           MR. SIGLER:  I think that's correct, your      09:53

16      Honor, but let me just make sure and clarify.       09:53

17           Aetna produced data that it uses subject       09:53

18      to this relationship in the case, data across a     09:53

19      number of participants, a number of plans,          09:53

20      whatever data Aetna could identify that was         09:53

21      subject to this relationship which, of course,      09:53

22      reflected Aetna's transactions which would only     09:53

23      include the rate that Aetna paid, would not         09:53

24      include the Optum downstream rate because Aetna     09:53

25      doesn't get those, those are Optum's transactions.  09:53

Optum produced a set of data reflecting its
transactions.  What the Plaintiff's expert tried
to do and what our expert did was, on particular
transactions for particular people, tried to fit
those two data sets together.

And, so, when we talk about how to
identify whether, for a particular person, a
person is in a particular category, at least the
starting point for that is being able to match
transactions from the different data sets, isolate
them out on a person-by-person basis and determine
how the downstream rates relate to the rates that
Aetna used to calculate benefits for that person.

Now very important point, your Honor, is
that that is just the starting point in
determining the impact of the Plaintiff's theory.
What our expert did to demonstrate that, if, for a
particular person, he did this for Ms. Peters, you
apply the Plaintiff's theory, you do what they
just said they want to do, which is apply
consistently throughout all of the person's claims
history their approach, what you see is that,
first of all, their expert excluded certain claims
that were subject to the relationship for his
analysis and it's, of course, an impact on those

1    excluded claims, and what you also see is that,

2    even on the claims that their expert analyzed and

3    our expert also analyzed, when you look at the

4    entire claims population for a person and you

5    carry their approach through that person's claims

6    history, the results change from claim to claim

7    because there is a knock-on effect from applying

8    their approach throughout a person's --

9         THE COURT:  I don't understand what you

10   mean by "a knock-on effect."

11        MR. SIGLER:  Sorry, your Honor, apologies

12   the jargon.  What I mean by that is that changing

13   the rate on one claim may impact subsequent claims

14   for that person and, in fact, did for Ms. Peters.

15   If you carry their approach through her claims

16   history, there are changes throughout her claims

17   history, Optum transactions, and her results, when

18   you did that, when you engaged in that kind of

19   manual claim-by-claim analysis, her results

20   flipped from someone who is claiming an injury

21   under her theory to being someone who actually

22   comes out worse off under her own theory.

23        Now that is an analysis that their expert

24   has not done at all even though he agreed that

25   that's the analysis he would need to do to figure

1  out the impact of this relationship.

2  THE COURT:  Well, before we get lost in

3  the minutiae of what the experts looked at and how

4  they analyzed the data, isn't the crux of what

5  you're talking about an illustration of how each

6  individual participant's claim ledger needs to be

7  analyzed to make a determination of whether or not

8  they are, in fact, a claimant?

9  MR. SIGLER:  Yes, your Honor.

10  THE COURT:  Isn't that the bottom line?

11  MR. SIGLER:  It requires an individualized

12  inquiry, it hasn't been done, they don't know how

13  to do it, and depending on the results of that

14  inquiry, they know that lots of people would be

15  impacted by an analysis like that, they just don't

16  know who or how many.  And the implications of

17  this are very important because what this means is

18  that there are many people in their putative class

19  who would not benefit from -- their legal theory

20  of the case would not benefit from the claims in

21  this case whose interests are not aligned with the

22  theory the Plaintiffs would like to pursue on

23  their behalf.

24  THE COURT:  Mr. Boone.

25  MR. BOONE:  Yes, your Honor, just a few

additional points.  I think it's important to

focus on Ms. Peters' liability theory from the

beginning.  From the beginning, she has said that,

across the board, Aetna should have calculated its

members' co-insurance based on the Optum

downstream rates, not on the Aetna-Optum contract

rates, but if you do that -- or if Aetna did that,

if Aetna calculated its members' co-insurance

based only on the Optum downstream contract rates

without adding this credit, this benefit and

within deductible claims, a lot of people would be

worse off.  And sorting that out would require

thousands upon thousands of individual inquiries.

  And I guess the other point that I would

make is that just because some of this is shown in

data in digital form doesn't make it any less

individualized.

  THE COURT:  Mr. Knott.

  MR. KNOTT:  Yes, two points.  On the data,

as Mr. Sigler explained, the Defendants produced

comprehensive data sets, including all the

Aetna-Optum claims whether there were overcharges

on the claims or not.  So that data is there.

And, again, you can look at the data to identify

who is a class member under our theory.  If you

were to determine that there were some
modifications required, you could again apply the
claims data to find the people.  It doesn't
require you digging into each individual person's
file to figure that out.

            THE COURT:  Well, and that's what I don't
understand.  How can you avoid digging into each
individual person's file to determine whether or
not they are a member of the class?  Because, just
as Mr. Sigler, I believe, was just arguing, the
process of using that data would involve looking
at John Smith's claims.  Did he make a claim for
procedure A?  What was the quantity or the amount
that Aetna paid Optum?  What was the amount that
Optum paid provider?  Is there an administrative
delta for Optum?  If the answer is yes, then you
put that over here on the side.  Then you look for
the same participant, did he also have procedure
B?  Go through that same analysis.  Then you total
that up for the year from this data and figure
out, did Mr. Jones come out on the plus side or
the minus side?  If he came out on the plus side,
then he's not in the class.  If he came out on the
minus side, then he is in the class.  Isn't that
the process that you're talking about for

1    discerning who would be defined as being within

2    the class and not?

3    MR. KNOTT:  You would apply whatever rule

4    was necessary to ascertain who is --

5    THE COURT:  Wait a minute.  Wait a minute.

6    If you're saying whatever rule is necessary

7    implies it's different rules for different people

8    and then --

9    MR. KNOTT:  Not at all.

10    THE COURT:  -- that completely shoots

11    commonality.  So I'll let you start over again.

12    MR. KNOTT:  Not at all.  I'm saying you

13    would determine a rule that applies to everybody,

14    a common rule, and then apply it to the data to

15    identify who is in the class.

16    THE COURT:  But in order to do that, don't

17    you have to do exactly what I was just talking

18    about, looking at the proverbial participant John

19    Jones.  Procedure A, is there a delta?  Yes.  Then

20    go to the next one.  Procedure B, is there a

21    delta?  Accumulate those.  If there's something --

22    if he comes out on the minus for the period of

23    time we're looking for, then he's in the class.

24    If he comes out on the plus, he's not in the

25    class.  Isn't that what we're talking about?

1          MR. KNOTT:  You could do that based on the
2     data and it is not an individualized inquiry
3     prohibited by Rule 23.
4          THE COURT:  Well, let's break that down
5     because you said it's not an individualized
6     inquiry prohibited by Rule 23.  It is an
7     individualized inquiry, isn't it?
8          MR. KNOTT:  I would disagree that it's an
9     individualized --
10          THE COURT:  How can it not --
11          MR. KNOTT:  -- under Rule 23.
12          THE COURT:  How -- two different
13     questions.  Two different questions.  Whether it's
14     an individualized inquiry and then we analyze how
15     does it fit into Rule 23.  As to the first
16     question, it certainly is an individualized
17     inquiry, isn't it, because you have to go through
18     each one?  You have to separate John Jones from
19     Jane Smith, each one is individualized as to the
20     plan participant, right?  Do you agree with that?
21          MR. KNOTT:  What I'm struggling with is
22     the word "individualized" because, in every class
23     action, you have to figure out for each individual
24     class member whether they are in the class or not.
25          THE COURT:  Well, I'm not talking about

1        how this applies in other cases, I'm talking about   10:01

2        how it applies in this case.  There is -- you have   10:01

3        to go into that data and make an individual   10:01

4        assessment of whether or not the claimant has come   10:02

5        out on the plus side or the minus side to   10:02

6        separate, as I say, separate the sheep from the   10:02

7        goats.  You have to do that, right?  Then it's   10:02

8        just a question of whether or not that prohibits   10:02

9        you from coming through the front door of Rule 23.   10:02

10        MR. KNOTT:  Under the theory we are   10:02

11        proffering and our theories of relief -- again,   10:02

12        the Defendants don't get to define what our theory   10:02

13        is, we do.  Our theory is that there was a breach   10:02

14        of fiduciary duty every time that a plan or a   10:02

15        member had to pay Optum's administrative fee.  And   10:02

16        you have to -- if you take that theory, you can   10:02

17        then go to the data and answer the question of who   10:02

18        was charged those fees.  If you take the approach   10:02

19        that if the member had some claims where the   10:02

20        actual provider would have gotten more but for the   10:02

21        way they administered the claim, and you have to   10:03

22        remove those or offset them and calculate whether   10:03

23        the member came out ahead or behind taking into   10:03

24        account those claims, you can do that based on the   10:03

25        data, too.   10:03

          THE COURT:  But you can't do that after
the fact, you have to do that at the front end in
order to define the class, correct?

          MR. KNOTT:  I think you can do it at the
stage where you're identifying who the class
members are and who has to get notice and all
that.

          THE COURT:  Okay.  Anything else on that
point?

          MR. KNOTT:  No, your Honor.

          MR. BOONE:  May I add one thing, your
Honor?

          THE COURT:  You may.

          MR. BOONE:  A couple of times now,
Mr. Knott has suggested that we can sort these
individual issues out later at some unspecified
time.  Well, the time is now.  We're here on class
certification now and it was Ms. Peters' burden
now to prove that the requirements of Rule 23 were
satisfied and she hasn't done that.

          THE COURT:  The next thing that I want to
turn attention to, at least for a few minutes, and
I realize that the proposed class definitions are
not something that the Court is bound by, but I at
least want to talk about those for a few minutes

1          because I'm --  the proposed class definitions are          10:04

2          at least the Court's starting point.                       10:04

3               And I note that there is an interesting               10:04

4          linguistic difference between the definition of            10:04

5          the two classes that the Plaintiff proposes, and I         10:04

6          want to make sure that I understand the difference         10:04

7          and the purpose behind the difference because             10:04

8          there are two, one called plan claim class and the         10:05

9          other one called the member claim class.  Whereas,         10:05

10         the first one, the plan claim class is where Aetna         10:05

11         is the administrator for self-insured plans and            10:05

12         then the second one is where Aetna is, in fact,            10:05

13         the insurer.                                                10:05

14              And am I understanding that correctly, at             10:05

15         least so far?                                               10:05

16              MR. KNOTT:  Yes, your Honor.                           10:05

17              THE COURT:  Okay.  Turning first to the               10:05

18         plan claim class and dissecting this sentence --           10:05

19         it's not a sentence, it's a definition.  All plan          10:05

20         participants and beneficiaries, so, in other               10:05

21         words, the people who are enrolled in the plan,            10:05

22         people, of self-insured ERISA health insurance             10:05

23         plans administered by Aetna, so people in                  10:06

24         Aetna-administered plans, and here's where I run           10:06

25         aground, for which, "which" is a non-personal --           10:06

1    it's not a personal pronoun, therefore, it doesn't    10:06
2    refer back to people, it refers back to the plan,    10:06
3    so all people in self-insured plans which plans --    10:06
4    or for which plans the plan responsibility for a    10:06
5    claimant -- excuse me, for a claim was assessed    10:06
6    using method in question.  So it's all people in    10:06
7    self-insured plans which plans use this method.    10:06
8    That defines every participant in the plan,    10:07
9    doesn't it?  Whether they made a claim or not,    10:07
10   they are members of the class, right?  Are we    10:07
11   really defining the class that broadly that it's    10:07
12   every person whose health insurance is in one of    10:07
13   these self-insured plans for which Aetna is the    10:07
14   plan administrator regardless of whether or not    10:07
15   their name even shows up on the data?  Am I    10:07
16   reading that right?    10:07
17        MR. KNOTT:  I think that is a correct    10:07
18   reading of the definition, your Honor.  In that    10:07
19   ERISA Section 502(a)(2) gives participants and    10:07
20   beneficiaries the ability to challenge breaches of    10:07
21   fiduciary duty on behalf of their plans and bring    10:07
22   claims on behalf of their plans.    10:07
23        THE COURT:  But a claim on behalf of the    10:08
24   plan would be in the nature of a derivative claim    10:08
25   as opposed to a class action claim, wouldn't it?    10:08

1        MR. KNOTT:  You can -- you can bring a

2    502(a)(2) claim as a class action claim.  So, for

3    example, Ms. Peters clearly has a 502(a)(2) claim

4    on behalf of the Mars plan and she has standing to

5    bring that claim and she has standing to bring a

6    claim on behalf of the other members of the other

7    plans who were similarly affected under Rule 23.

8    She has the ability to do that.

9        THE COURT:  How can a -- because the

10   self-insured plans administered by Aetna, there

11   are hundreds of them across the country, correct?

12       MR. KNOTT:  Correct, thousands.

13       THE COURT:  So, if I am a participant in

14   one of those self-insured plans, I can bring a

15   derivative claim claiming a breach of fiduciary

16   duty on behalf of some other participant in some

17   other plan or thousands of other plans regardless

18   of the fact that I don't have anything to do with

19   those plans?  You're saying that I can do that as

20   a participant in my one Aetna plan.

21       MR. KNOTT:  As a participant in one Aetna

22   plan, you can represent on a class basis other

23   members of other plans that were similarly

24   affected.

25       THE COURT:  Do you have any case law that

1       allows for that broad an application, in other          10:09

2       words, a stacking of this class action                  10:09

3       representative ability on top of the derivative         10:09

4       representative ability of a particular plan -- a        10:09

5       plan participant in a particular plan?                  10:10

6               MR. KNOTT:  Your Honor, I don't have a          10:10

7       specific case that certifies an (a)(2) class            10:10

8       related to other plans, but I do have -- there are      10:10

9       numerous cases that approve of a participant like       10:10

10      Ms. Peters representing participants and                10:10

11      beneficiaries of other plans on their claims and        10:10

12      there's nothing about (a)(2) that suggests that         10:10

13      that should be -- that remedy should be excluded        10:10

14      from the class action proposed.                         10:10

15              THE COURT:  Let me hear from Mr. Sigler         10:10

16      and Mr. Boone on this.  Is Mr. Knott correct that,      10:10

17      particularly with these self-insured plans, that       10:10

18      even though Ms. Peters can bring this sort of           10:10

19      breach of fiduciary duty derivative claim on           10:10

20      behalf of all of her plan participants, she can        10:10

21      bring it on behalf of all plan participants in all     10:10

22      such self-insured plans?                                10:11

23              MR. SIGLER:  She cannot, your Honor,            10:11

24      and --                                                  10:11

25              THE COURT:  Do you have any case law that       10:11

1    backs that up?                                          10:11

2         MR. SIGLER:  We do have a case, the Berry          10:11

3    case out of the District of South Carolina holds        10:11

4    that there is an Article III problem with that          10:11

5    type of a claim because the Plaintiff does not          10:11

6    have any concrete injury related to those other         10:11

7    plans that she's seeking to sue on behalf of.  So       10:11

8    we rely on the Berry case.                              10:11

9         In addition to that, this case and the            10:11

10   evidentiary record here makes it particularly           10:11

11   problematic for a claimant to assert a claim like       10:11

12   that because, of course, there are significant          10:11

13   differences between the Plaintiff's plan and these      10:11

14   other plans, both in terms of the contracts             10:11

15   governing those relationships and the economic          10:11

16   interests of those other plans, many of whom            10:11

17   benefit from this relationship significantly, may       10:12

18   want to continue those benefits of having this          10:12

19   relationship and, of course, we've addressed            10:12

20   extensively in our papers the plan-specific             10:12

21   contracts or communications with those other            10:12

22   plans.  And those plans, those other plans also         10:12

23   are subject to arbitration provisions in their          10:12

24   contracts with Aetna to the extent she is               10:12

25   purporting to sue derivatively on behalf of those       10:12

1    plans.  So you really get into a whole host of          10:12

2    individualized plan-specific issues once you get        10:12

3    outside of Ms. Peters' specific plan and, again,        10:12

4    that's assuming you can get past that initial           10:12

5    Article III threshold, which she cannot.                10:12

6            THE COURT:  Mr. Boone.                           10:12

7            MR. BOONE:  Yes, your Honor.  Just one           10:12

8    Optum-specific twist on that.  There can be no          10:12

9    derivative claim at all under 502(a)(2) against         10:12

10   Optum because 502(a)(2) is about fiduciary              10:12

11   breaches, and as this Court has already held,           10:12

12   Optum has served no fiduciary function at all           10:12

13   under these relationships.                              10:12

14           MR. KNOTT:  It sounds like a common issue,       10:12

15   your Honor.                                             10:12

16           THE COURT:  Mr. Knott, I didn't follow how       10:13

17   what you said related to what Mr. Boone said.           10:13

18   Maybe I'm --                                            10:13

19           MR. KNOTT:  His argument is that Optum           10:13

20   can't be sued under the 502(a)(2).  They've             10:13

21   adopted other arguments in their recently filed         10:13

22   summary judgment motion that are clearly common         10:13

23   arguments that are not specific to Ms. Peters.          10:13

24           On Mr. Sigler's point about the Berry            10:13

25   case, I would just point to the Fallick case from       10:13

1       the Sixth Circuit, I believe it's the NECW case      10:13

2       from the Second Circuit cited in our brief, the      10:13

3       Forbush case that allowed a class member like        10:13

4       Ms. Peters to represent members of other plans       10:13

5       with regard to their claims.  Under ERISA, I think   10:13

6       those cases are better and more persuasive than      10:13

7       the Berry case.                                      10:13

8               THE COURT:  You said Forbush from the        10:13

9       Second Circuit?                                      10:13

10              MR. KNOTT:  Fifth Circuit.                   10:13

11              THE COURT:  Fifth Circuit.                   10:13

12              MR. KNOTT:  There's the Fallick,             10:13

13      F-A-L-L-I-C-K, decision from the Sixth Circuit.      10:13

14      There's a Second Circuit case, I believe it's the    10:14

15      NECW case; I'll check that.  And the Forbush case    10:14

16      from the Fifth Circuit.                              10:14

17              MR. BOONE:  Your Honor, may I?               10:14

18              THE COURT:  You may.                         10:14

19              MR. BOONE:  Your Honor discussed the EQT     10:14

20      case earlier; it's one of my favorite cases as it    10:14

21      turns out.  Mr. Knott is making precisely the        10:14

22      argument that the Fourth Circuit rejected in EQT.    10:14

23      Rule 23 does not tie this Court's hand from          10:14

24      deciding antecedent legal questions in going         10:14

25      through the Rule 23 analysis.  In fact, for          10:14

1    Duke's, Rule 23 demands it in many cases and
2    that's what we're arguing here.
3         THE COURT:  Yes, Mr. Knott.
4         MR. KNOTT:  I actually really like
5    Mr. Boone's reference to Duke's because I embrace
6    Duke's.  Duke's shows why we have common questions
7    where the Plaintiffs in Duke's did not.  What the
8    Plaintiffs in Duke's were challenging was
9    Walmart's assignment of discretion to individual
10   managers to make employment decisions.  And, so,
11   there was no glue, there was no common
12   discriminatory policy binding the class together.
13   Here, we have a common policy, the policy to
14   charge plans and members for Optum's
15   administrative fees in violation of the terms of
16   the plan.  We have common plan language.
17   Mr. Sigler said that the plans vary, but if you
18   look at the evidence we submitted, they really
19   don't vary in any material sense.
20        Aetna's position is it was entitled to
21   treat Optum as a health care provider and the
22   Optum rate is a negotiated charge under the plans
23   and require plans and members to pay it.  Our
24   position is that that was not proper.  And that is
25   a common question that is fundamental to the

1    claims of every class member.  And that's -- those    10:15
2    are just two reasons why our case is so different    10:15
3    from Duke's.  We presented common issues, common    10:16
4    legal claims that rely on evidence of the common    10:16
5    policy practice.    10:16
6         THE COURT:  Okay.  With regard to the    10:16
7    issue of class certification, is there anything    10:16
8    that any of you on either side are dying to say    10:16
9    that you haven't been given an opportunity to say?    10:16
10   Okay.    10:16
11        I really want to move to the expert issue    10:16
12   only briefly.  And, Mr. McDevitt, you said that    10:16
13   you were going to take the lead on that.  I assume    10:16
14   that means that you probably have something that    10:16
15   you want to say, but I felt that I understood that    10:16
16   issue pretty well.  It's a much simpler issue than    10:16
17   what we've been talking about for the last hour    10:16
18   and a half, but, Mr. McDevitt, I'll hear from you    10:17
19   if you have something that you want to say in    10:17
20   supplement to what you have submitted in writing.    10:17
21        MR. McDEVITT:  No, your Honor, we will    10:17
22   rest on what we've filed.  Happy to address any    10:17
23   questions that the Court might have, but,    10:17
24   otherwise, no, I was just sort of identifying who    10:17
25   was going to be speaking as necessary.    10:17

```
 1                    THE COURT:  Okay.                    10:17

 2             MR. KNOTT:  Your Honor, with the Court's    10:17

 3       indulgence, I would like to say just one more     10:17

 4       thing about the conflicting theories about how    10:17

 5       relief should be addressed in this case and what  10:17

 6       the claims are.                                   10:17

 7                    THE COURT:  Okay.                     10:17

 8             MR. KNOTT:  The Defendants' position is     10:17

 9       that this is a challenge to the Aetna-Optum       10:17

10       relationship and that the relief we're seeking is 10:17

11       going to wipe out their relationship, wipe out    10:17

12       their contracts and that, therefore, to look at   10:17

13       the harm in the case, you have to look            10:17

14       holistically at the entire Aetna-Optum            10:17

15       relationship.  That's not where our case is.  Our 10:17

16       case is a challenge to their common practice of   10:17

17       requiring members in plans to pay Optum's         10:17

18       administrative fees.  That's --                   10:18

19                    THE COURT:  How are those two things any 10:18

20       different?                                        10:18

21             MR. KNOTT:  Because if you look at the      10:18

22       briefs, there's a lot of argument from the        10:18

23       Defendants about how they were motivated to save  10:18

24       money, although the documents show they had a     10:18

25       motive to bury the fees in the claims, that they  10:18
```

1    cut costs through this relationship, they cut          10:18

2    care, they -- Optum negotiated lower prices than       10:18

3    Aetna could have negotiated, and those are             10:18

4    attendant benefits of the contracts between these      10:18

5    two parties that we're trying to get rid of.           10:18

6    That's not what this case is about.  And that's        10:18

7    why this analysis that their expert has conducted,     10:18

8    which is really something imported from the            10:18

9    antitrust world, is so far afield from what's          10:18

10   required to show harm, unjust gain to a fiduciary      10:18

11   under ERISA.                                           10:18

12        THE COURT:  Okay.  On the Defendants'             10:18

13   side, anything you want to say with regard to          10:19

14   either what Mr. Knott just addressed or with           10:19

15   regard to the expert issue?                            10:19

16        MR. SIGLER:  Well, your Honor, I know             10:19

17   we're not here today to argue the merits, so I         10:19

18   won't respond to his characterizations of the          10:19

19   relationship or the reasons for it, although you       10:19

20   understand from the briefs we disagree with much       10:19

21   of what he just said.                                  10:19

22        I just wanted to make the point, and this         10:19

23   was in our briefs at least briefly, but it's           10:19

24   highlighted by something Mr. Knott just said.  If      10:19

25   their case is about decisions made when this           10:19

1    relationship was set up, established, entered into    10:19
2    in 2011 and 2012, and of course it is, it's about    10:19
3    the structure of this relationship, this Court has    10:19
4    already recognized and we think the law is very    10:19
5    clear that that is not a fiduciary act when Aetna    10:19
6    was entering into these relationships in 2011 and    10:19
7    2012.  So I just wanted to make sure that that was    10:19
8    highlighted.    10:19
9         When Mr. Knott says our case is about a    10:19
10   common policy, it satisfies Duke's, the "policy"    10:19
11   he's relying on, the evidence he uses to say there    10:20
12   is a common policy consists of contracts and    10:20
13   communications around the contracts that really    10:20
14   don't even implicate a fiduciary function of    10:20
15   Aetna.  That is a threshold failing of their    10:20
16   theory that, under the EQT case that's been talked    10:20
17   about a lot today, is an additional reason to deny    10:20
18   class certification.    10:20
19        I certainly don't want to get us    10:20
20   sidetracked, your Honor, but I think that's a very    10:20
21   important point and an additional reason to deny    10:20
22   their motion.    10:20
23        THE COURT:  Okay.  I don't want to open a    10:20
24   new Pandora's box here, but how does that relate    10:20
25   to the class certification issue?  That seems to    10:20

1      be something downstream from class certification.      10:20

2          MR. SIGLER:  Only, your Honor, that, under      10:20

3      the EQT case, what the Fourth Circuit said is that      10:20

4      if there is a threshold legal failing in the      10:20

5      Plaintiff's class certification theory, the Court      10:20

6      should address that and deny the motion, not take      10:20

7      it down the road.  And we think that issue      10:20

8      qualifies.  I understand your Honor's question,      10:20

9      but that would be the point I'd make on that.      10:21

10          THE COURT:  Yes, Mr. Knott.      10:21

11          MR. KNOTT:  Two points.  First of all,      10:21

12      what Mr. Sigler just said is an obvious common      10:21

13      issue that would pertain to every class members'      10:21

14      claim, whether Aetna was acting as a fiduciary or      10:21

15      not.      10:21

16          The second point is that this case is a      10:21

17      challenge to the benefits determinations that      10:21

18      Aetna made and the policy that it carried out in      10:21

19      each and every benefit determination for the      10:21

20      proposed class members of requiring plans and      10:21

21      members to bear Optum's administrative fees.  That      10:21

22      is a decision that Aetna made as a fiduciary      10:21

23      applying the plans.  It said it was allowed to do      10:21

24      it under the plans; we disagree.      10:21

25          THE COURT:  You started out by saying that      10:21

        the issue that Mr. Sigler just addressed is an          10:21
        issue that is common to all of the claims that any       10:21
        participant would have, but under -- just like           10:21
        Mr. Sigler said, under EQT, EQT talked about how         10:22
        if that one particular Virginia case, I can't            10:22
        remember the name of the case, disposed of the           10:22
        question of whether or not there were retained           10:22
        methane rights, that that was a threshold question       10:22
        that should be addressed and disposed of before          10:22
        determining the class certification and class            10:22
        membership.  So if I determine that Mr. Sigler is        10:22
        correct on that issue, isn't that a threshold            10:22
        determination that I need to address before we           10:22
        even get to class certification and class                10:22
        membership because it determines who is a claimant       10:22
        and who is not a claimant?  Do I understand that?        10:22
                MR. KNOTT:  I actually disagree with that        10:22
        because --                                               10:22
                THE COURT:  That doesn't surprise me.            10:22
                MR. KNOTT:  -- I think the issue in EQT          10:23
        was if the Virginia case had held a certain way,         10:23
        then you would have to conduct an individualized         10:23
        inquiry into each class member's history of              10:23
        acquiring the land and what they had as far as           10:23
        their implied deed and all of that in order to           10:23

 1    figure out whether they had a claim or not.  Here,    10:23

 2    the question of whether Aetna acted as a fiduciary    10:23

 3    or not is a predicate to fiduciary duty breach    10:23

 4    liability.  And there's not a -- it's a factual    10:23

 5    question that can be answered with common    10:23

 6    evidence, specifically, Aetna's admission that it    10:23

 7    decided, for all of its plans, that it was going    10:23

 8    to treat Optum's fee this way, the common evidence    10:23

 9    about what Aetna did, it administered every single    10:23

10    one of these plans.  And if Aetna is going to    10:23

11    argue that it didn't act as a fiduciary when it    10:23

12    decided, in its benefits determinations, to charge    10:23

13    everybody for that, that's an issue that's going    10:23

14    to be common to the class.    10:24

15         And, again, Amgen, the Supreme Court has    10:24

16    cautioned you do not get into the merits, you    10:24

17    don't make merits decisions except to the extent    10:24

18    necessary to certify the class and it's not    10:24

19    necessary to certify the class to figure out    10:24

20    whether Aetna's right when it says we weren't a    10:24

21    fiduciary, we are entitled to act in our own    10:24

22    self-interest and require everybody to pay these    10:24

23    fees or whether it was, indeed, acting as a    10:24

24    fiduciary when it made the benefits determinations    10:24

25    at issue.    10:24

THE COURT: Okay. Mr. Boone, I didn't
mean to ignore you, Mr. Knott was very anxious
there to make his point, so I went out of turn,
but I'll turn to you now.

MR. BOONE: That's fine, your Honor.

The last thing that I would say is that
we're not trying to transform this into an
antitrust case, we're just taking Ms. Peters'
liability theory at face value. From the very
beginning, she has said that Aetna, in every
instance, should have applied the Optum downstream
rate. If Aetna did that, lots of people would be
worse off. Figuring that out would require lots
of individual inquiries. You can't do it through
common evidence. So we are taking her theory at
face value, we're not trying to reshape it for our
own purposes.

THE COURT: Okay. Does anybody else have
anything that they want to address, any other
point you want to make that you haven't had an
opportunity to make today?

MR. BOONE: Not from us, your Honor.

THE COURT: We will try to get an order
out on this as quickly as possible. To state the
obvious, this is a rather complex matter. I'm not

1       going to be able to get it out by next Friday.      10:25

2       It's going to take us a little while to get this     10:26

3       done just because of the nature of the complexity,   10:26

4       but we will try to do it as expeditiously as we      10:26

5       can.                                                 10:26

6               MR. SIGLER:  Thank you, your Honor.          10:26

7               MR. BOONE:  Thank you, your Honor.           10:26

8               THE COURT:  When we adjourn, Mr. McDevitt    10:26

9       and Mr. Holman, if I could talk to the two of you    10:26

10      for a moment in chambers about something that has    10:26

11      absolutely nothing to do with this case.             10:26

12              (The proceedings were concluded at

13      approximately 10:26 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTER'S CERTIFICATE

2

3    STATE OF NORTH CAROLINA

4    COUNTY OF BUNCOMBE

5

6              I, BEVERLY BOURLIER JAMES, certify that

7    I was authorized to and did stenographically report

8    the foregoing proceedings and that the transcript is

9    a true and complete record of my stenographic notes.

10

11             Dated this 4th day of March, 2019.

12

13

14             BEVERLY BOURLIER JAMES
               Registered Professional Reporter
15             Certified Realtime Reporter
               Certified LiveNote Reporter
16             Florida Professional Reporter
               Georgia Certified Reporter
17             NCRA Realtime Systems Administrator

18

19

20

21

22

23

24

25
```

**$10** [1] - 9:1
**$100** [2] - 11:22, 25
**$105** [2] - 13:22
**$20** [1] - 9:1
**$26** [1] - 24:21
**$40** [1] - 23:23
**$5** [1] - 11:24
**$56.71** [1] - 24:21
**$70.89** [3] - 24:1, 17, 19
**$95** [1] - 13:23
**1** [12] - 6:12; 7:6; 16:3, 17, 21; 28:14, 17; 37:19; 40:25; 42:11
**10** [1] - 40:13
**100** [2] - 23:16; 31:25
**105** [1] - 12:1
**11** [1] - 21:10
**2** [9] - 6:14; 7:7, 14-15; 16:3, 17, 21; 37:18; 42:12
**20** [4] - 24:17, 19; 25:14; 32:6
**2011** [3] - 17:5; 63:2, 6
**2012** [2] - 63:2, 7
**2018** [1] - 17:4
**23** [14] - 5:18; 14:17; 19:12; 40:17; 49:3, 6, 11, 15; 50:9; 51:19; 54:7; 58:23, 25; 59:1
**3** [13] - 6:15; 7:11; 16:3, 19; 27:5; 28:4, 14, 17-18; 29:8; 37:19; 40:25; 42:11
**4** [24] - 7:8; 8:3, 7; 10:17; 16:2, 8, 19; 17:17; 18:16; 20:12, 17; 21:14; 27:5; 28:4, 14, 17-18; 29:9; 35:21; 37:19-21; 40:25; 42:12
**5** [4] - 12:5, 20; 37:13
**502(a)(2** [5] - 53:19; 54:2; 57:9
**502(a)(2)** [1] - 57:20
**95** [1] - 11:23
**a)(2** [2] - 55:7, 12
**Aberle** [1] - 4:14
**ABERLE** [1] - 4:15
**ability** [4] - 53:20; 54:8; 55:3
**able** [4] - 12:13; 24:12; 34:10; 43:9
**absent** [2] - 22:10; 40:21
**absolutely** [3] - 15:7; 16:25; 32:12
**accept** [1] - 33:3
**accepting** [1] - 28:22
**according** [1] - 41:2
**account** [2] - 9:7; 50:24
**accrue** [1] - 35:3
**accumulate** [1] - 48:21
**acknowledge** [1] - 26:24
**acquiring** [1] - 65:24
**act** [4] - 12:22; 63:5; 66:11, 21
**acted** [1] - 66:2
**acting** [2] - 64:14; 66:23

**action** [9] - 13:2; 16:14; 37:14; 38:16; 49:23; 53:25; 54:2; 55:2, 14
**acts** [1] - 15:20
**actual** [15] - 7:18; 9:23; 21:15, 17, 21; 22:13; 23:21; 24:22; 31:24; 32:1, 7; 33:10; 35:16; 41:12; 50:20
**add** [3] - 18:23; 21:14; 51:11
**adding** [1] - 46:10
**addition** [1] - 14:22; 56:9
**additional** [3] - 46:1; 63:17, 21
**address** [4] - 60:22; 64:6; 65:13; 67:19
**addressed** [9] - 5:13; 9:4; 28:7, 9; 56:19; 61:5; 62:14; 65:1, 9
**adjudicated** [1] - 38:20
**administered** [5] - 50:21; 52:23; 54:10; 66:9
**administering** [2] - 20:16, 18
**administration** [1] - 41:2
**administrative** [9] - 8:17; 10:19; 11:13; 22:20; 47:15; 50:15; 59:15; 61:18; 64:21
**administrator** [3] - 13:4; 52:11; 53:14
**admission** [1] - 66:6
**admit** [1] - 22:25
**adopt** [2] - 40:22; 41:3
**adopted** [1] - 57:21
**Aetna** [42] - 3:5; 4:8; 19:2, 15, 17; 22:14; 23:25; 24:5; 26:15; 42:17, 20, 23-24; 43:13; 46:4, 6-8, 22; 47:14; 52:10, 12, 23-24; 53:13; 54:10, 20-21; 56:24; 61:9, 14; 62:3; 63:5, 15; 64:14, 18, 22; 66:2, 9-10; 67:10, 12
**Aetna's** [5] - 19:18; 42:22; 59:20; 66:6, 20
**Aetna-administered** [1] - 52:24
**Aetna-Optum** [5] - 19:2; 46:6, 22; 61:9, 14
**affected** [2] - 54:7, 24
**afield** [1] - 62:9
**afoul** [1] - 40:17
**aggregate** [2] - 21:19, 25
**agree** [4] - 5:18, 24; 26:5; 49:20
**agreed** [2] - 35:15; 44:24
**aground** [1] - 52:25
**ahead** [10] - 10:5; 11:10, 12, 23; 12:17; 13:7; 21:3, 7, 24; 50:23
**aligned** [1] - 45:21
**ALL** [1] - 3:2
**alleged** [2] - 16:1, 9

**allocate** [1] - 18:8
**allow** [2] - 3:9; 12:20
**allowed** [3] - 28:1; 58:3; 64:23
**allows** [2] - 26:14; 55:1
**Alston** [1] - 4:12
**Amgen** [1] - 66:15
**amount** [17] - 6:10, 13, 16-18, 20-21; 8:6, 8-9; 24:20; 25:16; 31:7, 11; 47:13
**amounts** [2] - 6:14; 7:12
**analysis** [22] - 17:7, 10, 25; 18:21; 28:19, 23; 29:20; 35:24; 36:2; 37:22; 39:25; 40:3; 41:17; 43:25; 44:19, 23, 25; 45:15; 47:19; 58:25; 62:7
**analyze** [4] - 39:21; 41:7, 9; 49:14
**analyzed** [4] - 44:2; 45:4, 7
**announce** [1] - 3:9
**answer** [6] - 8:24; 27:21; 36:10, 13; 47:16; 50:17
**answered** [2] - 27:10; 66:5
**antecedent** [1] - 58:24
**antitrust** [5] - 29:18; 30:17; 62:9; 67:8
**anxious** [1] - 67:2
**apologies** [1] - 44:11
**appear** [1] - 3:15
**appearance** [1] - 3:15
**application** [4] - 20:17, 24; 30:3; 55:1
**applied** [5] - 17:12; 22:16; 32:18; 40:6; 67:11
**applies** [3] - 48:13; 50:1
**apply** [10] - 11:6; 17:7; 23:25; 27:8; 31:17; 43:19; 47:2; 48:3, 14
**applying** [4] - 32:8; 35:4; 44:7; 64:23
**approach** [5] - 43:22; 44:5, 8, 15; 50:18
**approve** [1] - 55:9
**approved** [3] - 13:18; 36:7
**arbitration** [1] - 56:23
**area** [1] - 16:14
**argue** [3] - 25:23; 62:17; 66:11
**argues** [2] - 16:13, 19
**arguing** [3] - 4:9; 47:10; 59:2
**argument** [14] - 3:19; 10:25; 20:23; 23:1; 30:22; 31:20; 32:11; 33:3; 36:16, 25; 57:19; 58:22; 61:22
**arguments** [6] - 10:10; 29:4, 15, 21; 57:21, 23
**arise** [1] - 30:3
**arises** [2] - 11:18; 20:16
**arrangement** [3] - 11:19; 12:3; 30:6

**Article** [2] - 56:4; 57:5
**ascertain** [2] - 38:23; 48:4
**ascertainability** [1] - 15:4
**Asheville** [1] - 3:15
**aside** [1] - 13:3
**assert** [1] - 56:11
**asserting** [1] - 34:3
**assessed** [1] - 53:5
**assessing** [1] - 36:7
**assessment** [2] - 36:3; 50:4
**assets** [1] - 18:8
**assignment** [1] - 59:9
**assistance** [1] - 4:4
**associate** [1] - 4:13
**assume** [3] - 33:14, 16; 60:13
**assuming** [2] - 33:18; 57:4
**assumption** [1] - 4:24
**attendant** [2] - 29:21; 62:4
**attention** [1] - 51:22
**attorney** [2] - 9:6, 9
**attorneys** [1] - 3:20
**authorities** [1] - 17:19
**avoid** [2] - 28:25; 47:7
**awaiting** [1] - 4:23
**backs** [2] - 13:10; 56:1
**based** [13] - 9:15, 17; 12:21; 34:2, 20; 36:4; 38:24; 40:14, 17; 46:5, 9; 49:1; 50:24
**basis** [5] - 12:11; 28:3; 38:10; 43:11; 54:22
**bear** [1] - 64:21
**becomes** [1] - 34:15
**begin** [3] - 15:1
**beginning** [4] - 27:6; 46:3; 67:10
**behalf** [17] - 3:16; 4:8; 5:22; 32:22, 24; 45:23; 53:21-23; 54:4, 6, 16; 55:20; 56:7, 25
**behind** [4] - 17:13; 22:1; 50:23; 52:7
**beneficiaries** [3] - 52:20; 53:20; 55:11
**beneficiary** [1] - 32:21
**benefit** [20] - 8:12; 9:22; 11:18; 16:23; 20:19; 22:22; 24:8; 25:8, 11, 17, 19; 26:18, 23-24; 41:1; 45:19; 46:10; 56:17; 64:19
**benefits** [19] - 11:15, 18; 13:14; 16:4; 19:8; 29:4, 21; 30:3, 8; 35:3; 38:19; 43:13; 56:18; 62:4; 64:17; 66:12, 24
**benefitted** [6] - 16:18; 20:25; 25:16; 30:20
**Berry** [4] - 56:2, 8; 57:24; 58:7
**better** [3] - 19:2; 34:5; 58:6
**between** [3] - 52:4; 56:13; 62:4
**bill** [1] - 26:9

**binding** [2] - 15:15; 59:12
**Bird** [1] - 4:12
**bit** [1] - 13:6
**board** [1] - 46:4
**BOONE** [11] - 4:11; 5:9; 18:24; 45:25; 51:11, 14; 57:7; 58:17, 19; 67:5, 22
**Boone** [10] - 4:12; 5:6; 14:12; 18:22; 41:20; 45:24; 55:16; 57:6, 17; 67:1
**Boone's** [2] - 23:17; 59:5
**bottom** [1] - 45:10
**bound** [1] - 51:24
**box** [4] - 28:4, 12; 63:24
**breach** [12] - 8:20; 9:9; 16:1, 9; 17:9; 21:8; 26:19; 50:13; 54:15; 55:19; 66:3
**breached** [1] - 31:16
**breaches** [3] - 32:23; 53:20; 57:11
**break** [2] - 21:23; 49:4
**Brian** [1] - 4:12
**brief** [1] - 58:2
**briefing** [1] - 19:9
**briefly** [3] - 17:23; 60:12; 62:23
**briefs** [5] - 5:13; 30:12; 61:22; 62:20, 23
**bring** [9] - 22:9; 32:22; 53:21; 54:1, 5, 14; 55:18, 21
**bringing** [1] - 32:24
**broad** [1] - 55:1
**broadly** [1] - 53:11
**brought** [1] - 17:16
**bucket** [2] - 17:17; 35:17
**buckets** [2] - 35:11; 40:1
**burden** [1] - 51:18
**bury** [1] - 61:25
**but-for** [3] - 16:7; 17:7, 10
**calculate** [4] - 16:4; 43:13; 50:22
**calculated** [4] - 8:21; 34:17; 46:4, 8
**calculating** [1] - 16:7
**calculation** [3] - 27:3; 28:2
**calendar** [1] - 3:4
**cannot** [2] - 55:23; 57:5
**Cardizem** [1] - 29:18; 30:15
**care** [2] - 59:21; 62:2
**careful** [1] - 28:22
**Carolina** [1] - 56:3
**carried** [2] - 25:7; 64:18
**carry** [2] - 44:5, 15
**case** [58] - 3:19; 5:16; 10:9, 16; 13:1, 10, 13; 14:6; 17:1, 22-23, 25; 18:4; 21:1; 22:10; 30:5; 34:5, 7, 11; 36:6, 18; 39:9; 42:18; 45:20; 50:2; 54:25; 55:7, 25; 56:2, 8-9; 57:25; 58:1, 3, 7, 14-15, 20; 60:2; 61:5, 13, 15-16; 62:6, 25; 63:9, 16; 64:3, 16; 65:5,

21; 67:8
**cases** [7] - 29:18; 30:11; 50:1; 55:9; 58:6, 20; 59:1
**categories** [10] - 6:12; 7:1, 5, 10; 18:20; 23:4; 27:5; 37:17; 42:11
**category** [25] - 6:12, 14-15, 19; 7:11, 14-15; 10:17; 16:2, 8; 17:16; 18:16, 20; 20:12, 17; 21:14; 23:12; 28:4; 35:21; 41:25; 43:8
**cautioned** [1] - 66:16
**certain** [5] - 4:19; 16:5; 40:12; 43:23; 65:21
**certainly** [3] - 14:17; 49:16; 63:19
**certification** [23] - 3:5; 4:5, 21; 5:3; 6:4; 18:14, 18; 19:21; 29:22; 30:24; 32:15; 33:1, 20; 36:25; 41:4; 51:18; 60:7; 63:18, 25; 64:1, 5; 65:10, 14
**certified** [2] - 29:14; 30:1
**certifies** [1] - 55:7
**certify** [5] - 28:24; 29:11; 39:24; 66:18
**challenge** [5] - 12:22; 53:20; 61:9, 16; 64:17
**challenges** [1] - 13:14
**challenging** [5] - 14:9; 15:23; 16:10; 17:21; 59:8
**change** [1] - 44:6
**changes** [1] - 44:16
**changing** [1] - 44:12
**characterizations** [1] - 62:18
**charge** [17] - 13:24; 14:4; 21:18; 22:14; 23:23; 24:15; 26:8, 10-11; 31:24; 32:1, 3, 7-8; 59:14, 22; 66:12
**charged** [10] - 9:5; 10:19; 14:10; 22:20, 23; 25:9; 34:23, 25; 40:7; 50:18
**charges** [2] - 23:17; 29:3
**charging** [1] - 20:10
**check** [1] - 58:15
**choosing** [1] - 31:16
**Circuit** [16] - 17:4, 6; 35:25; 36:6; 37:7; 58:1, 9-11, 13-14, 16, 22; 64:3
**Circuit's** [1] - 36:18
**circumstances** [2] - 12:8; 36:4
**cited** [2] - 29:18; 58:2
**claim** [90] - 5:24; 6:4; 7:3, 24; 8:19; 9:3-5, 8, 15, 19; 10:1, 4, 6, 16, 18, 23; 11:2, 16; 12:12, 21; 13:16, 18, 20-21, 23, 25; 14:4; 16:1; 17:10; 18:21; 19:4, 23; 25:2; 26:9, 18; 27:23; 30:5, 7; 31:23; 32:22, 24; 33:5; 34:2; 35:6, 12; 36:12, 22; 38:3, 11,

19; 39:2, 5; 40:14; 42:13; 44:6, 13, 19; 45:6; 47:12; 50:21; 52:8-10, 18; 53:5, 9, 23-25; 54:2, 5-6, 15; 55:19; 56:5, 11; 57:9; 64:14; 66:1
**claim-by-claim** [2] - 18:21; 44:19
**claimant** [27] - 8:13, 25; 9:2; 10:5; 11:9; 12:7, 12, 15; 15:1, 5; 16:20; 20:4, 21; 21:2; 26:4; 32:17; 33:2, 22; 34:13, 16; 35:8; 45:8; 50:4; 53:5; 56:11; 65:15
**claimant's** [2] - 16:23; 36:3
**claimants** [7] - 5:20; 8:10; 11:8; 15:10, 13; 37:9; 40:12
**claiming** [3] - 20:16; 44:20; 54:15
**claims** [95] - 6:12; 8:4, 16; 9:20; 16:5, 16-17, 19, 21; 17:17, 19; 19:9, 12; 20:12, 17-18; 21:14, 17, 20; 22:4, 12, 24; 23:3, 5-6, 8, 20; 24:14; 25:8, 10, 21; 26:3; 27:20; 29:5; 30:7; 31:1, 5-6, 9, 11-12; 32:1; 33:9, 12; 34:21; 35:11, 15, 17-19; 36:4, 8, 19; 38:9, 11; 39:6, 9, 19; 40:9, 12; 41:10, 13; 42:7; 43:21, 23; 44:1, 4-5, 13, 15-16; 45:20; 46:11, 22-23; 47:3, 12; 50:19, 24; 53:22; 55:11; 58:5; 60:1, 4; 61:6, 25; 65:2
**clarify** [1] - 42:16
**Clark** [5] - 10:8; 14:6; 17:22; 18:5; 30:15
**class** [129] - 3:5, 16; 4:5, 21; 5:3, 18-19, 22; 7:1, 3, 6-8, 20; 8:2; 10:11, 15-16; 11:7; 13:2, 14:7; 15:1, 4, 9, 13, 16; 16:14; 18:14, 18; 20:20; 21:13; 22:7, 10; 27:2, 8, 16, 19, 22; 28:13, 24; 29:2, 11, 14, 17, 22, 25; 30:9, 23; 32:15, 19, 25; 33:20; 34:1; 36:11, 24; 37:5, 14, 20; 38:2, 5-6, 16-17, 23, 25; 39:10, 12, 24; 40:7, 19, 21, 24-25; 41:4, 8-9, 15; 45:18; 46:25; 47:9, 23-24; 48:2, 15, 23, 25; 49:22, 24; 51:3, 5, 17, 23; 52:1, 8-10, 18; 53:10, 25; 54:2, 22; 55:2, 7, 14; 58:3; 59:12; 60:1, 7; 63:18, 25; 64:1, 5, 13, 20; 65:10, 14, 23; 66:14, 18
**class-certification** [1] - 18:18
**classes** [4] - 6:3; 36:20; 40:25; 52:5
**clear** [3] - 14:18; 17:7; 63:5
**clearly** [2] - 54:3; 57:22

**client** [1] - 9:8
**co** [9] - 23:5; 24:13; 31:6, 9; 32:4, 20; 33:12; 46:5, 8
**co-insurance** [9] - 23:5; 24:13; 31:6, 9; 32:4, 20; 33:12; 46:5, 8
**collateral** [2] - 11:15, 17
**collect** [9] - 22:18; 23:21; 24:3, 7, 10, 19; 26:7; 39:14
**collected** [3] - 21:15, 21; 41:12
**combined** [1] - 7:25
**coming** [1] - 50:9
**common** [39] - 14:19; 15:11, 15; 21:12; 22:4, 9; 25:24; 27:1, 16; 28:7, 10; 34:3; 36:5; 40:6, 17; 41:18; 48:14; 57:14, 22; 59:6, 11, 13, 16, 25; 60:3; 61:16; 63:10, 12; 64:12; 65:2; 66:5, 8, 14; 67:15
**commonality** [5] - 15:2; 36:1; 37:10; 48:11
**communications** [2] - 56:21; 63:13
**competitive** [1] - 30:18
**complaining** [1] - 11:20
**completely** [1] - 48:10
**complex** [1] - 67:25
**complicated** [4] - 27:11, 14; 38:3; 40:3
**comprehensive** [1] - 46:21
**concept** [1] - 10:22
**concrete** [2] - 18:15; 56:6
**conduct** [3] - 28:23; 39:13; 65:22
**conducted** [1] - 62:7
**conflating** [1] - 10:21
**conflicting** [1] - 61:4
**conflicts** [1] - 18:12
**consist** [1] - 11:7
**consistent** [1] - 33:19
**consistently** [1] - 43:21
**consists** [5] - 7:6-8; 63:12
**contend** [1] - 9:19
**context** [2] - 21:2; 24:4
**continue** [1] - 56:18
**contract** [16] - 6:10, 13-14, 17-19, 21; 8:5, 8-9; 11:22; 12:1; 19:2; 46:6, 9
**contracted** [2] - 7:12, 25
**contracts** [8] - 12:3; 56:14, 21, 24; 61:12; 62:4; 63:12
**contractual** [2] - 11:3; 21:5
**convince** [1] - 33:19
**copay** [2] - 23:6
**correct** [9] - 27:17; 28:5; 42:15; 51:3; 53:17; 54:11; 55:16; 65:12
**correctly** [4] - 15:19; 42:6, 14; 52:14
**costs** [1] - 62:1

**counsel** [3] - 3:9; 15:18; 41:23
**count** [4] - 12:10; 35:2
**country** [1] - 54:11
**couple** [2] - 38:1; 51:14
**course** [7] - 18:17; 41:22; 42:21; 43:25; 56:12, 19; 63:2
**Court** [16] - 4:3; 9:16; 10:13; 14:18; 17:24; 18:9; 20:2; 30:21; 37:23; 39:23; 51:24; 57:11; 60:23; 63:3; 64:5; 66:15
**COURT** [100] - 3:1, 3; 4:6, 16; 5:5, 10; 6:1, 25; 7:4, 14, 21; 8:3, 23; 9:11; 10:2, 20; 11:17; 12:24; 14:11, 23; 16:12; 17:1; 18:2, 22; 20:1, 15; 21:22; 22:25; 23:10, 12; 25:11, 22; 26:1, 21; 27:13, 24; 28:9, 25; 29:6; 30:2; 31:2, 18; 32:10, 13, 25; 33:14, 18; 34:4, 25; 35:22; 36:15; 38:8; 39:1, 18; 40:8, 22; 41:19; 42:2; 44:9; 45:2, 10, 24; 46:18; 47:6; 48:5, 10, 16; 49:4, 10, 12, 25; 51:1, 8, 13, 21; 52:17; 53:23; 54:9, 13, 25; 55:15, 25; 57:6, 16; 58:8, 11, 18; 59:3; 60:6; 61:1, 7, 19; 62:12; 63:23; 64:10, 25; 65:19; 67:1, 18, 23
**Court's** [5] - 4:1; 9:15; 52:2; 58:23; 61:2
**Courts** [2] - 29:20, 22
**cover** [1] - 22:15
**cover-up** [1] - 22:15
**credit** [3] - 25:5; 46:10
**crunch** [1] - 41:15
**crux** [2] - 10:3; 45:4
**cut** [2] - 62:1
**damage** [1] - 30:21
**damages** [4] - 9:24; 29:15, 24; 36:7
**data** [50] - 27:11; 28:8, 10; 34:21; 36:5, 8, 10, 14; 38:18, 21, 23; 39:4, 12; 40:14, 18-19; 41:7, 15, 17, 25; 42:4, 7, 9, 12, 17-18, 20; 43:1, 5, 10; 45:4; 46:16, 19, 21, 23-24; 47:3, 11, 20; 48:14; 49:2; 50:3, 17, 25; 53:15
**David** [1] - 3:17
**deceptive** [1] - 25:6
**decided** [4] - 23:25; 24:3; 66:7, 12
**deciding** [1] - 58:24
**decision** [10] - 10:8; 17:4, 11, 16, 21, 24; 58:13; 64:22
**decisions** [5] - 14:10; 18:7; 59:10; 62:25; 66:17
**deductible** [20] - 22:4, 12,

16; 23:5, 9, 20; 24:2, 6; 25:19; 26:13; 27:20, 23; 31:1, 5, 12, 22, 25; 33:8; 35:12; 46:11
**deductibles** [5] - 22:5; 24:10, 25; 27:19
**deed** [4] - 38:12; 39:20; 65:25
**deeding** [2] - 38:3; 40:4
**deeds** [2] - 40:4, 10
**Defendant** [4] - 13:17; 14:3; 18:10; 30:19
**Defendants** [15] - 4:8, 10; 5:6; 9:19; 10:9; 25:5; 26:22; 28:2; 31:3; 35:7; 37:19; 46:20; 50:12; 61:23
**Defendants'** [11] - 24:24; 27:10; 31:12, 21; 32:5, 11, 23; 33:4; 34:21; 61:8; 62:12
**define** [10] - 6:3; 11:6; 15:1; 27:17; 28:12; 37:5; 38:24; 50:12; 51:3
**defined** [3] - 5:19; 27:5; 48:1
**defines** [1] - 53:8
**defining** [1] - 53:11
**definition** [3] - 52:4, 19; 53:18
**definitions** [2] - 51:23; 52:1
**degree** [1] - 6:16
**delta** [3] - 47:16; 48:19, 21
**demands** [1] - 59:1
**demonstrate** [1] - 43:17
**denial** [2] - 13:14; 18:14
**denied** [1] - 13:16
**dense** [1] - 20:21
**deny** [2] - 63:17, 21; 64:6
**depended** [1] - 38:3
**deprived** [1] - 30:18
**deprives** [2] - 11:16; 30:23
**depriving** [1] - 29:22
**derivative** [5] - 53:24; 54:15; 55:3, 19; 57:9
**derivatively** [1] - 56:25
**determination** [4] - 27:25; 45:7; 64:19; 65:13
**determinations** [3] - 64:17; 66:12, 24
**determine** [7] - 15:3; 28:12; 43:11; 47:1, 8; 48:13; 65:11
**determines** [1] - 65:15
**determining** [4] - 17:8; 33:1; 43:16; 65:10
**difference** [8] - 8:17; 32:14; 33:19; 35:9; 39:22; 52:4, 6
**differences** [2] - 18:11; 56:13
**different** [18] - 6:11; 10:24; 14:16; 15:20; 32:2, 8; 37:15, 24; 38:9; 39:21; 40:9; 43:10; 48:7; 49:12; 60:2; 61:20
**differently** [4] - 14:24; 16:3,

8; 17:20
**digging** [2] - 47:4, 7
**digital** [1] - 46:16
**dip** [1] - 24:12
**directly** [1] - 19:17
**disagree** [6] - 38:14; 40:11; 49:8; 62:20; 64:24; 65:17
**disagreement** [1] - 12:19
**discern** [1] - 39:3
**discerning** [2] - 28:3; 48:1
**discount** [1] - 9:7
**discretion** [1] - 59:9
**discriminatory** [1] - 59:12
**discussed** [1] - 58:19
**dismiss** [1] - 9:16
**disposed** [2] - 65:6, 9
**dissecting** [1] - 52:18
**District** [2] - 17:24; 56:3
**dividing** [1] - 29:8
**doctor** [5] - 9:23; 23:7; 24:18; 26:7; 35:16
**documents** [1] - 61:24
**done** [5] - 27:3; 42:1; 44:24; 45:12; 51:20
**door** [1] - 50:9
**down** [3] - 21:23; 49:4; 64:7
**downstream** [9] - 19:16, 19; 20:11; 42:24; 43:12; 46:6, 9; 64:1; 67:11
**Duke** [6] - 10:8; 15:9; 18:4, 6-7; 21:1
**Duke's** [10] - 14:18; 15:15; 59:1, 5-6; 60:3; 63:10
**Dunn** [1] - 41:3
**duty** [9] - 8:20; 9:9; 17:10; 32:23; 50:14; 53:21; 54:16; 55:19; 66:3
**dying** [1] - 60:8
**Eagles'** [1] - 10:8
**easily** [1] - 41:9
**economic** [4] - 25:17; 29:19, 21; 56:15
**effect** [2] - 44:7, 10
**either** [6] - 29:5; 38:10; 39:18; 41:20; 60:8; 62:14
**elements** [2] - 19:10, 12
**eliminates** [4] - 22:22; 25:9, 20; 35:25
**embrace** [1] - 59:5
**employment** [1] - 59:10
**end** [3] - 15:12, 14; 51:2
**engaged** [1] - 44:18
**enrolled** [1] - 52:21
**entered** [1] - 63:1
**entering** [1] - 63:6
**entire** [5] - 23:18; 31:11; 41:4; 44:4; 61:14
**entirely** [1] - 27:2
**entirety** [1] - 23:8
**entitled** [2] - 59:20; 66:21
**enured** [4] - 8:11; 16:23; 20:18; 41:1

**environment** [1] - 30:19
**EOB** [1] - 32:1
**EQT** [14] - 36:18; 37:24; 38:2, 12; 39:18, 23; 40:10; 58:19, 22; 63:16; 64:3; 65:4, 20
**equivalent** [1] - 40:9
**ERISA** [19] - 8:22; 9:25; 10:4; 12:20, 22; 13:10, 25; 16:14; 20:5; 26:12, 20; 38:5, 16; 39:9; 40:5; 52:22; 53:19; 58:5; 62:11
**essentially** [2] - 29:7, 10
**establish** [4] - 13:15; 20:8; 33:23
**established** [2] - 15:24; 63:1
**evidence** [15] - 4:19; 5:1, 7; 28:7, 10; 34:20; 36:5; 39:14; 40:18; 59:18; 60:4; 63:11; 66:6, 8; 67:15
**evidentiary** [1] - 56:10
**exactly** [9] - 12:2, 6; 19:1; 22:12; 30:4; 37:22; 48:17
**example** [10] - 9:6; 10:7; 13:13, 22; 24:1, 16, 20; 31:15; 36:6; 54:3
**examples** [1] - 18:15
**exceed** [2] - 6:14, 17
**exceeded** [6] - 7:12, 17; 8:9; 21:18, 21; 41:11
**exceeding** [4] - 6:18, 20-21; 8:8
**exceeds** [3] - 6:9; 8:5, 7
**except** [1] - 66:17
**excluded** [3] - 43:23; 44:1; 55:13
**excluding** [1] - 37:18
**excuse** [1] - 53:5
**exhausted** [1] - 23:15
**exist** [2] - 39:10; 42:12
**expect** [1] - 27:18
**experience** [1] - 17:12
**expert** [15] - 4:3; 34:20, 22; 41:25; 42:9; 43:2, 17, 23; 44:2, 23; 60:11; 62:7, 15
**experts** [1] - 45:3
**explained** [1] - 46:20
**extensively** [1] - 56:20
**extent** [3] - 29:14; 56:24; 66:17
**face** [2] - 67:9, 16
**facets** [1] - 14:16
**fact** [9] - 9:18; 18:1; 25:9; 44:14; 45:8; 51:2; 52:12; 54:18; 58:25
**factual** [1] - 66:4
**failing** [2] - 63:15; 64:4
**fall** [5] - 6:11; 21:14; 23:4; 40:1; 42:11
**Fallick** [1] - 57:25; 58:12
**FALLICK** [1] - 58:13

**falling** [1] - 27:20
**far** [4] - 36:25; 52:15; 62:9; 65:24
**favor** [1] - 19:13
**favorite** [1] - 58:20
**fee** [8] - 8:18; 11:13; 12:21; 13:24; 23:8, 18; 50:15; 66:8
**fees** [10] - 10:19; 14:9; 22:20, 23; 50:18; 59:15; 61:18, 25; 64:21; 66:23
**felt** [1] - 60:15
**few** [4] - 14:16; 45:25; 51:22, 25
**fiduciary** [24] - 8:20; 9:9; 17:10, 21; 19:22; 26:16; 32:23; 50:14; 53:21; 54:15; 55:19; 57:10, 12; 62:10; 63:5, 14; 64:14, 22; 66:2, 11, 21, 24
**Fifth** [3] - 58:10, 16
**figure** [17] - 24:11; 28:19; 37:8, 11; 38:17, 21; 39:12, 25; 40:14; 41:7, 24; 44:25; 47:5, 20; 49:23; 66:1, 19
**figured** [1] - 15:10
**figuring** [4] - 15:4; 18:19; 22:19; 67:13
**file** [3] - 21:9; 47:5, 8
**filed** [2] - 57:21; 60:22
**finally** [1] - 16:11
**financially** [3] - 31:8, 13, 23
**fine** [1] - 67:5
**Firm** [1] - 3:15
**firm** [1] - 3:21
**first** [15] - 4:17, 25; 5:12; 14:13; 21:12; 28:16; 37:8; 41:21; 43:23; 49:15; 52:10, 17; 64:11
**fit** [2] - 43:4; 49:15
**fixed** [1] - 23:6
**flipped** [1] - 44:20
**focus** [3] - 15:25; 16:6; 46:2
**follow** [5] - 23:1; 26:16; 31:20; 57:16
**followed** [2] - 33:8, 11
**Forbush** [3] - 58:3, 8, 15
**forced** [1] - 26:18
**form** [3] - 38:10; 46:16
**forward** [1] - 37:4
**foundation** [1] - 6:23
**four** [6] - 6:11, 25; 7:4, 8; 23:4; 37:16
**Fourth** [9] - 17:4-6; 35:25; 36:6, 17; 37:7; 58:22; 64:3
**fourth** [4] - 6:19; 19:20; 23:10, 12
**front** [3] - 34:9; 50:9; 51:2
**full** [3] - 31:7, 14; 32:2
**function** [2] - 57:12; 63:14
**fundamental** [2] - 12:19; 59:25
**gain** [5] - 13:7; 16:22;

25:21; 30:11; 62:10
**gains** [2] - 12:5; 26:15
**Gauthier** [1] - 4:13
**generally** [1] - 23:4
**Geoff** [1] - 4:8
**Gibson** [1] - 4:9
**given** [5] - 6:22; 7:4; 9:19; 30:23; 60:9
**glue** [1] - 59:11
**goats** [2] - 37:7; 50:7
**governing** [1] - 56:15
**grasp** [1] - 23:2
**grasping** [1] - 20:23
**greater** [4] - 6:13, 17, 20; 26:2
**greatly** [1] - 21:20
**ground** [1] - 38:4
**group** [20] - 7:6, 11, 16; 8:3, 7; 28:14, 17-18; 29:2, 8-9; 37:2, 18, 20-21; 38:9
**groups** [7] - 7:7, 21; 28:17, 20; 37:19
**guess** [3] - 4:18; 19:7; 46:14
**half** [1] - 60:18
**hand** [1] - 58:23
**handle** [1] - 23:20
**handled** [4] - 16:17; 30:8; 31:4
**handles** [1] - 16:19
**happy** [1] - 60:22
**hard** [1] - 25:13
**harm** [4] - 7:19; 25:20; 61:13; 62:10
**harmed** [1] - 16:16
**harms** [1] - 30:9
**head** [1] - 4:14
**health** [3] - 52:22; 53:12; 59:21
**hear** [8] - 7:5; 14:11; 39:15; 41:19, 21; 55:15; 60:18
**heard** [1] - 17:22
**hearing** [1] - 3:6
**hears** [1] - 4:3
**held** [4] - 31:8, 10; 57:11; 65:21
**herself** [1] - 18:16
**highlighted** [2] - 62:24; 63:8
**history** [6] - 40:4; 43:22; 44:6, 16-17; 65:23
**hitting** [1] - 10:2
**holds** [1] - 56:3
**holistic** [1] - 29:19
**holistically** [1] - 61:14
**Holman** [2] - 4:6
**HOLMAN** [1] - 4:7
**Honor** [51] - 3:2, 13, 22, 25; 4:7, 11, 15; 5:4, 8-9, 25; 6:24; 11:11; 12:18; 13:12; 14:14, 21; 15:7; 16:11, 25; 18:5, 24; 25:18; 26:6; 28:21;

30:25; 38:15; 41:22; 42:16; 43:14; 44:11; 45:9, 25; 51:10, 12; 52:16; 53:18; 55:6, 23; 57:7, 15; 58:17, 19; 60:21; 61:2; 62:16; 63:20; 64:2; 67:5, 22
**Honor's** [1] - 64:8
**hopefully** [1] - 6:6
**host** [1] - 57:1
**hot** [1] - 5:11
**hour** [1] - 60:17
**hundreds** [1] - 54:11
**hypothetical** [3] - 18:11, 13
**hypotheticals** [1] - 15:17
**identical** [1] - 37:1
**identification** [1] - 38:2
**identified** [4] - 15:14; 18:10; 29:1; 34:22
**identify** [9] - 8:2; 14:25; 35:17, 20-21; 42:20; 43:7; 46:24; 48:15
**identifying** [5] - 14:16, 21; 15:18; 51:5; 60:24
**ignore** [4] - 29:9, 12; 30:10; 67:2
**Ill** [2] - 56:4; 57:5
**illustration** [1] - 45:5
**impact** [4] - 43:16, 25; 44:13; 45:1
**impacted** [1] - 45:15
**implicate** [1] - 63:14
**implications** [1] - 45:16
**implied** [2] - 38:4; 65:25
**implies** [1] - 48:7
**important** [5] - 18:19; 43:14; 45:17; 46:1; 63:21
**imported** [1] - 62:8
**improper** [6] - 12:21; 13:24; 14:9; 22:23; 26:10; 29:3
**improperly** [3] - 9:5; 10:19; 25:9
**imprudent** [2] - 10:10; 14:8
**include** [4] - 15:11; 20:19; 42:23
**including** [2] - 10:17; 46:21
**inclusion** [1] - 40:24
**inconsistency** [4] - 32:10, 19; 33:4; 34:17
**inconsistent** [11] - 31:4, 15; 33:17, 25; 34:12, 23-24; 35:1, 7, 13; 40:15
**incorrectly** [1] - 8:21
**indeed** [1] - 66:23
**individual** [21] - 7:16; 19:6, 24; 27:14; 28:11; 36:3; 37:23; 39:2, 6, 14; 42:8, 13; 45:6; 46:13; 47:4, 8; 49:23; 50:3; 51:16; 59:9; 67:14
**individualized** [12] - 27:9, 11; 28:19; 35:23; 39:13; 40:16; 45:11; 46:17; 49:2, 5, 7, 9, 14, 16, 19, 22; 57:2;

65:22
**individuals** [1] - 7:19
**indulgence** [1] - 61:3
**information** [3] - 38:11; 41:18
**initial** [1] - 57:4
**injured** [2] - 16:9; 17:8
**injuries** [1] - 29:23
**injury** [13] - 9:14, 17; 12:21; 14:19; 15:11, 15; 17:14; 19:5; 22:8, 22; 30:21; 44:20; 56:6
**inquires** [1] - 19:6
**inquiries** [2] - 46:13; 67:14
**inquiry** [11] - 27:12; 39:13; 40:16; 45:12, 14; 49:2, 6-7, 14, 17; 65:23
**instance** [2] - 20:2; 67:11
**insurance** [13] - 23:5; 24:4, 13; 31:6, 9; 32:4, 20; 33:12; 36:19; 46:5, 8; 52:22; 53:12
**insured** [9] - 52:11, 22; 53:3, 7, 13; 54:10, 14; 55:17, 22
**insurer** [1] - 52:13
**intend** [1] - 27:17
**interest** [1] - 66:22
**interesting** [1] - 52:3
**interests** [2] - 45:21; 56:16
**investment** [1] - 14:10
**investments** [3] - 10:11; 14:8
**involve** [3] - 6:12; 15:19; 47:11
**involved** [3] - 3:19; 18:6; 21:25
**involves** [2] - 21:6; 22:3
**involving** [1] - 39:9
**irrespective** [1] - 16:22
**isolate** [2] - 16:20; 43:10
**issue** [44] - 4:21; 5:14; 9:24; 11:16; 14:15, 17, 20, 24; 15:22; 18:23; 21:12; 22:4, 9; 25:24; 26:15; 27:1, 4, 7, 15; 29:7, 9, 12; 30:16; 33:21; 35:6; 39:17; 40:5; 57:14; 60:7, 11, 16; 62:15; 63:25; 64:7, 13; 65:1, 12, 20; 66:13, 25
**issues** [8] - 18:12; 19:24; 28:15; 29:24; 51:16; 57:2; 60:3
**itself** [1] - 18:20
**Jane** [1] - 49:19
**jargon** [1] - 44:12
**Jason** [1] - 3:21
**John** [3] - 47:12; 48:18; 49:18
**Jones** [3] - 47:21; 48:19; 49:18
**Judge** [1] - 10:8
**judge** [1] - 17:25

**judgment** [1] - 57:22
**jury** [2] - 34:9, 11
**keep** [2] - 12:9; 39:3
**keeps** [2] - 41:23; 42:5
**kept** [2] - 24:20, 23
**kind** [3] - 10:6; 33:5; 44:18
**knock** [2] - 44:7, 10
**knock-on** [2] - 44:7, 10
**Knott** [21] - 3:21; 4:25;
5:10; 16:13, 19; 19:9, 16, 21;
20:1; 42:5; 46:18; 51:15;
55:16; 57:16; 58:21; 59:3;
62:14, 24; 63:9; 64:10; 67:2
**KNOTT** [75] - 3:22; 5:4, 25;
6:24; 7:2, 9, 15, 23; 8:14;
9:3, 14; 10:7; 11:11; 12:18;
13:12; 20:6; 21:11; 22:2;
23:3, 11, 14; 25:17, 23; 26:5;
27:7, 18; 28:6, 21; 29:1, 13;
30:14; 31:3, 21; 32:12, 18;
33:7, 16, 23; 34:19; 35:10;
36:2; 38:1, 14; 39:8, 22;
40:11; 41:6; 46:19; 48:3, 9,
12; 49:1, 8, 11, 21; 50:10;
51:4, 10; 52:16; 53:17; 54:1,
12, 21; 55:6; 57:14, 19;
58:10, 12; 59:4; 61:2, 8, 21;
64:11; 65:17, 20
**Knott's** [1] - 4:4
**knows** [1] - 19:11
**land** [1] - 65:24
**language** [2] - 5:18; 59:16
**Larry** [1] - 3:14
**last** [3] - 10:9; 60:17; 67:6
**Laumann** [1] - 29:18; 30:15
**Law** [1] - 3:15
**law** [8] - 13:1, 10; 16:20;
17:1; 40:5; 54:25; 55:25;
63:4
**laws** [2] - 30:18; 38:3
**lawyer** [1] - 42:10
**lawyers** [1] - 3:7
**lead** [3] - 4:2, 5; 60:13
**least** [10] - 6:22; 8:23;
21:23; 42:14; 43:8; 51:22,
25; 52:2, 15; 62:23
**leave** [1] - 13:2
**led** [2] - 9:10
**ledger** [8] - 8:13, 16; 39:3,
6, 20; 40:9; 42:13; 45:6
**left** [1] - 3:23
**legal** [10] - 10:15, 22; 19:4;
33:24; 38:24; 45:19; 58:24;
60:4; 64:4
**less** [2] - 6:6; 46:16
**letting** [1] - 15:12
**level** [1] - 18:13
**liability** [4] - 19:24; 46:2;
66:4; 67:9
**light** [1] - 5:17
**limited** [1] - 32:24
**line** [2] - 36:8; 45:10

**linguistic** [1] - 52:4
**list** [1] - 39:6
**litigation** [2] - 4:14; 9:4
**look** [16] - 16:2; 37:1;
38:18; 39:4, 11, 19-20;
41:15; 42:10; 44:3; 46:24;
47:17; 59:18; 61:12, 21
**looked** [1] - 45:3
**looking** [8] - 35:5; 38:21;
39:2; 41:17, 25; 47:11;
48:18, 23
**lose** [1] - 13:5
**loses** [1] - 12:5
**loss** [20] - 7:19; 8:11; 9:10,
12-13; 11:2; 12:6; 16:21;
20:8, 12, 15; 21:9; 22:8;
25:3; 26:2, 10; 34:16; 40:23
**losses** [2] - 13:8; 35:2
**lost** [3] - 12:14, 16; 45:2
**lower** [3] - 7:25; 41:11; 62:2
**managers** [1] - 59:10
**manner** [1] - 26:3
**manual** [1] - 44:19
**Mars** [1] - 54:4
**mass** [1] - 42:9
**match** [1] - 43:9
**material** [1] - 59:19
**materially** [1] - 38:7
**matter** [6] - 3:3; 10:3; 28:3;
33:2; 41:3; 67:25
**McDevitt** [9] - 3:12-14, 23;
4:1; 5:11; 60:12, 18, 21
**mean** [9] - 10:5; 11:2; 29:6,
9; 33:2; 34:4; 44:10, 12; 67:2
**means** [3] - 22:17; 45:17;
60:14
**measure** [2] - 8:1; 38:22
**member** [38] - 7:13, 17, 24;
8:1; 9:22; 12:14; 14:1; 22:5,
18-19; 23:14, 22, 24; 24:7,
11, 14, 16; 25:1, 3; 30:23;
31:22; 32:19; 34:1; 36:11;
40:7, 19, 21; 46:25; 47:9;
49:24; 50:15, 19, 23; 52:9;
58:3; 60:1
**member's** [4] - 8:20; 9:21;
24:12; 65:23
**members** [41] - 5:21-23;
8:2; 10:12, 15-16; 14:7;
19:15, 17, 19; 20:10, 13;
21:13; 22:7, 10; 26:17; 27:2,
8, 16, 19, 22; 29:2; 30:9;
31:8, 13; 32:5; 38:2, 5-6;
39:10; 51:6; 53:10; 54:6, 23;
58:4; 59:14, 23; 61:17; 64:20
**members'** [3] - 46:5, 8;
64:13
**membership** [2] - 65:11, 15
**mention** [1] - 17:22
**merits** [4] - 25:25; 62:17;
66:16
**met** [1] - 3:21
**methane** [5] - 36:22; 37:3,

11; 38:4; 65:8
**method** [4] - 16:22; 36:7;
53:6
**might** [2] - 27:22; 60:23
**minority** [1] - 35:15
**minus** [4] - 47:22, 24;
48:22; 50:5
**minute** [2] - 48:5
**minutes** [2] - 51:22, 25
**minutiae** [1] - 45:3
**miraculously** [2] - 34:15
**mix** [2] - 7:23; 8:4
**modifications** [1] - 47:2
**moment** [1] - 13:3
**money** [6] - 12:14; 13:6;
14:5; 22:18; 61:24
**morning** [8] - 3:1, 22, 25;
4:10, 15
**most** [1] - 27:18
**motion** [7] - 4:2, 5; 9:16;
21:10; 57:22; 63:22; 64:6
**motivated** [1] - 61:23
**motive** [1] - 61:25
**move** [1] - 60:11
**MR** [106] - 3:13, 22-23; 4:1,
7, 11; 5:4, 8-9, 25; 6:24; 7:2,
9, 15, 23; 8:14; 9:3, 14;
10:7; 11:11; 12:18; 13:12;
14:14; 15:7; 16:25; 17:3;
18:5, 24; 20:6; 21:11; 22:2;
23:3, 11, 14; 25:17, 23; 26:5;
27:7, 18; 28:6, 21; 29:1, 13;
30:14; 31:3, 21; 32:12, 18;
33:7, 16, 23; 34:19; 35:10;
36:2; 38:1, 14; 39:8, 22;
40:11; 41:6, 22; 42:5;
44:11; 45:9, 11, 25; 46:19;
48:3, 9, 12; 49:1, 8, 11, 21;
50:10; 51:4, 10-11, 14;
52:16; 53:17; 54:1, 12, 21;
55:6, 23; 56:2; 57:7, 14, 19;
58:10, 12, 17, 19; 59:4;
60:21; 61:2, 8, 21; 62:16;
64:2, 11; 65:17, 20; 67:5, 22
**MS** [2] - 3:25; 4:15
**must** [1] - 5:23
**name** [3] - 3:14; 53:15; 65:6
**narrow** [1] - 19:23
**nature** [1] - 53:24
**necessary** [5] - 48:4, 6;
60:25; 66:18
**NECW** [2] - 58:1, 15
**need** [5] - 10:20; 17:7;
27:14; 44:25; 65:13
**needs** [3] - 14:19; 15:10;
45:6
**negotiated** [5] - 23:23;
24:15; 59:22; 62:2
**Nell** [1] - 3:24
**net** [1] - 9:12
**never** [2] - 30:12; 34:10
**new** [1] - 63:24
**next** [4] - 13:1; 19:7; 48:20;

51:21
**non** [2] - 19:23; 52:25
**non-fiduciary** [1] - 19:23
**non-personal** [1] - 52:25
**none** [1] - 30:2
**note** [2] - 18:19; 52:3
**nothing** [1] - 55:12
**notice** [1] - 51:6
**number** [5] - 3:7; 37:13;
40:12; 42:19
**numbers** [2] - 25:13; 41:16
**numerous** [1] - 55:9
**objective** [1] - 38:22
**obligated** [1] - 14:2
**obvious** [2] - 64:12; 67:25
**offset** [13] - 9:20; 25:22;
26:2, 6, 22-23, 25; 28:1;
29:15, 23; 50:22
**offsets** [1] - 26:1
**old** [1] - 34:1
**once** [2] - 15:9; 57:2
**one** [48] - 3:3; 5:12, 21;
9:24; 11:1; 12:5; 13:16; 14:6,
13, 20; 15:6; 16:5; 17:17;
21:19, 23; 22:3; 25:20;
30:25; 31:19; 34:8; 35:11;
37:11-13; 40:13, 25; 41:5;
42:3; 44:13; 48:20; 49:18;
51:11; 52:8-10, 12; 53:12;
54:14, 20-21; 57:7; 58:20;
61:3; 65:5; 66:10
**ones** [2] - 10:17; 36:24
**open** [1] - 63:23
**opportunity** [2] - 60:9;
67:21
**opposed** [2] - 28:4; 53:25
**Optum** [53] - 4:12; 6:9;
7:12, 25; 11:21, 23, 25; 12:4,
14; 19:2, 15, 17, 19, 22-23;
21:16, 18, 20; 23:25; 24:2, 5,
18, 20; 31:9, 14; 32:7; 35:14,
19; 41:11, 13; 42:24; 43:1;
44:17; 46:5, 9, 22; 47:14-16;
57:8, 10, 12, 19; 59:21; 61:9,
14; 62:2; 67:11
**Optum's** [9] - 4:14; 19:15;
23:18; 42:25; 50:15; 59:14;
61:17; 64:21; 66:8
**Optum-contracted** [2] -
7:12, 25
**Optum-specific** [1] - 57:8
**oral** [2] - 3:18; 39:16
**order** [5] - 28:24; 48:16;
51:3; 65:25; 67:23
**otherwise** [4] - 19:3; 20:14;
25:6; 60:24
**outcomes** [1] - 18:11
**outside** [2] - 16:13; 57:3
**outweigh** [1] - 35:18
**outweighed** [1] - 41:13
**overcharged** [1] - 26:8
**overcharges** [1] - 46:22

**owe** [6] - 9:1; 23:6; 24:16; 32:2
**owed** [1] - 32:20
**owes** [1] - 24:14
**own** [8] - 19:24; 27:10; 31:17; 32:24; 40:18; 44:22; 66:21; 67:17
**owners** [2] - 36:21; 37:6
**page** [1] - 5:17
**paid** [19] - 7:13; 9:18, 22; 11:22, 25; 12:20; 22:12; 24:19, 21; 31:7, 11; 32:20; 33:25; 34:22; 35:19; 42:23; 47:14
**Pandora's** [1] - 63:24
**papers** [1] - 56:20
**parameters** [1] - 38:24
**parcel** [1] - 15:8
**part** [6] - 5:2; 13:3; 15:8; 22:15; 26:13; 29:17
**participant** [29] - 11:25; 12:15; 13:4; 25:12, 15-16; 26:4, 24; 28:11; 32:21; 36:9; 37:23; 38:12; 39:7; 40:8, 23; 41:1; 42:8; 47:18; 48:18; 49:20; 53:8; 54:13, 16, 20-21; 55:5, 9; 65:3
**participant's** [3] - 39:2; 42:13; 45:6
**participants** [10] - 6:11; 16:15; 35:5, 24; 42:19; 52:20; 53:19; 55:10, 20
**participates** [1] - 34:15
**participating** [1] - 3:18
**particular** [15] - 9:15; 14:4; 15:21; 22:3; 30:6; 36:9; 42:7; 43:3, 7-8, 18; 55:4; 65:5
**particularized** [2] - 35:23; 37:22
**particularly** [6] - 5:15; 32:15; 33:21; 37:16; 55:17; 56:10
**parties** [2] - 4:20; 62:5
**partner** [2] - 3:17, 24
**party** [4] - 10:22; 11:4
**past** [1] - 57:4
**patient** [1] - 11:24
**patient's** [1] - 24:2
**pay** [30] - 8:18; 11:12, 14, 23; 12:1; 14:1, 5, 7; 19:15; 20:11, 13-14; 23:15, 24; 25:1, 4, 12, 15, 19; 26:18; 33:9; 35:15; 36:12; 50:15; 59:23; 61:17; 66:22
**paying** [6] - 8:16; 19:17; 23:18; 33:10, 13
**payment** [10] - 6:9, 13, 18, 20; 8:5, 7-8; 24:13
**payments** [3] - 6:15, 17; 8:9
**pays** [1] - 23:16
**Pender** [3] - 17:3; 20:3, 7
**people** [26] - 8:10, 15; 14:5; 15:11, 13; 16:9; 17:17;

18:16; 30:20; 35:20; 40:1; 43:4; 45:14, 18; 46:11; 47:3; 48:7; 52:21-23; 53:2, 6; 67:12
**percent** [6] - 23:16; 24:17, 19; 25:14; 31:25; 32:6
**percentage** [3] - 24:14; 31:25; 32:6
**period** [1] - 48:22
**permission** [1] - 4:2
**permits** [1] - 38:23
**person** [21] - 9:25; 12:20; 15:21; 18:21; 19:1; 20:19; 21:2; 39:15; 41:14, 16; 43:7, 11, 13, 18; 44:4, 14; 53:12
**person's** [5] - 43:21; 44:5, 8; 47:4, 8
**person-by-person** [2] - 18:21; 43:11
**personal** [3] - 36:4; 52:25; 53:1
**perspective** [1] - 18:18
**persuasive** [1] - 58:6
**pertain** [2] - 42:7; 64:13
**Peters** [17] - 3:4, 16; 9:18; 18:16; 21:13, 22; 22:7, 11; 27:9; 40:20; 43:18; 44:14; 54:3; 55:10, 18; 57:23; 58:4
**Peters'** [4] - 46:2; 51:18; 57:3; 67:8
**Peyser** [1] - 3:24
**PEYSER** [1] - 3:25
**picking** [1] - 31:16
**piece** [1] - 12:13
**Plaintiff** [3] - 3:16; 5:1; 13:13; 17:13; 52:5; 56:5
**Plaintiff's** [9] - 3:11; 17:12; 41:23; 43:2, 16, 19; 56:13; 64:5
**Plaintiffs** [4] - 15:22; 45:22; 59:7
**plan** [68] - 6:10; 7:12, 17; 8:1, 19; 10:10; 11:14, 25; 12:4, 14, 16, 23; 13:4; 14:2; 16:15; 18:7, 9; 20:9; 23:8, 16, 18-19; 24:17, 19, 22; 25:11, 14-15; 26:16; 28:11; 29:4; 32:20, 22; 33:13; 34:15; 35:5, 24; 40:23; 49:20; 50:14; 52:8, 10, 18-19, 21; 53:2, 4, 8, 14, 24; 54:4, 17, 20, 22; 55:4, 20-21; 56:13, 20; 57:2; 59:16
**plan's** [1] - 24:13
**plan-specific** [2] - 56:20; 57:2
**plans** [48] - 26:17; 31:6, 9, 11; 32:4; 38:6; 41:2; 42:19; 52:11, 23-24; 53:3, 7, 13, 21-22; 54:7, 10, 14, 17, 19, 23; 55:8, 11, 17, 22; 56:7, 14, 16, 22; 57:1; 58:4; 59:14,

17, 22-23; 61:17; 64:20, 23-24; 66:7, 10
**Plasterers** [3] - 17:5; 20:3, 6
**pleaded** [1] - 9:17
**plus** [7] - 8:12, 15; 11:4; 47:21; 48:24; 50:5
**point** [29] - 10:7; 13:12; 15:8; 17:3; 19:7, 14; 23:18; 27:15; 30:14; 31:1; 36:5; 41:5, 23; 43:9, 14-15; 46:14; 51:9; 52:2; 57:24; 62:22; 63:21; 64:9, 16; 67:3, 20
**pointed** [1] - 35:14
**pointing** [2] - 17:15, 25
**points** [4] - 21:11; 46:1, 19; 64:11
**policy** [8] - 59:12; 60:5; 63:10, 12; 64:18
**population** [1] - 44:4
**portion** [1] - 30:10
**position** [19] - 8:14; 14:3; 19:3, 13; 22:2, 5, 21; 24:5, 24; 25:2; 31:12, 22; 32:5; 33:4, 7, 17; 59:20, 24; 61:8
**possibility** [1] - 21:4
**possible** [1] - 67:24
**possibly** [1] - 39:24
**potential** [2] - 6:10; 10:23
**practice** [6] - 20:9, 25; 35:13; 40:6; 60:5; 61:16
**precisely** [2] - 11:19; 58:21
**predicate** [1] - 66:3
**PRESENT** [1] - 3:2
**present** [2] - 4:20; 5:2
**presentation** [1] - 5:2
**presented** [2] - 5:7; 60:3
**pretty** [2] - 24:4; 60:16
**prices** [1] - 62:2
**problem** [2] - 36:15; 56:4
**problematic** [1] - 56:11
**procedure** [6] - 11:21, 24; 47:13, 18; 48:19
**process** [10] - 12:2; 15:6; 16:19; 30:4, 10, 16; 35:4; 41:3; 47:11, 25
**processed** [1] - 26:3
**produced** [3] - 42:17; 43:1; 46:20
**proffering** [1] - 50:11
**profited** [1] - 10:12
**profits** [1] - 14:7
**prohibited** [2] - 49:3, 6
**prohibits** [1] - 50:8
**pronoun** [1] - 53:1
**proper** [2] - 29:17; 59:24
**properly** [1] - 29:25
**properties** [1] - 37:4
**property** [3] - 36:21, 23; 37:5
**propose** [1] - 8:2
**proposed** [7] - 7:20; 10:11;

27:22; 51:23; 52:1; 55:14; 64:20
**proposes** [1] - 52:5
**proposition** [1] - 28:22
**prove** [1] - 51:19
**proverbial** [2] - 12:15; 48:18
**provider** [15] - 7:18; 9:23; 11:23; 12:1, 4; 21:15, 21; 23:21; 24:22; 33:10; 41:12; 47:15; 50:20; 59:21
**provider's** [5] - 21:17; 22:14; 31:24; 32:1, 7
**providers** [3] - 19:16, 19; 20:11
**provisions** [1] - 56:23
**purported** [1] - 36:20
**purporting** [1] - 56:25
**purpose** [1] - 52:7
**purposes** [1] - 67:17
**pursue** [1] - 45:22
**put** [2] - 34:19; 47:17
**putative** [3] - 3:16; 30:9; 45:18
**qualifies** [1] - 64:8
**quantity** [1] - 47:13
**questions** [5] - 49:13; 58:24; 59:6; 60:23
**quickly** [1] - 67:24
**raises** [1] - 19:24
**rate** [15] - 7:25; 11:22; 21:16, 18, 20; 23:25; 31:9, 14; 41:11; 42:23; 44:13; 59:22; 67:12
**rates** [6] - 16:8; 43:12; 46:6, 9
**rather** [3] - 6:6; 39:19; 67:25
**reading** [3] - 30:12; 53:16, 18
**realize** [1] - 51:23
**really** [10] - 5:13; 19:10; 40:25; 53:11; 57:1; 59:4, 18; 60:11; 62:8; 63:13
**reason** [3] - 22:14; 63:17, 21
**reasons** [4] - 34:8; 38:1; 60:2; 62:19
**Rebecca** [1] - 4:13
**received** [2] - 7:18; 14:8
**recently** [1] - 57:21
**recognize** [2] - 3:8; 20:7
**recognized** [1] - 63:4
**record** [4] - 3:10, 13; 34:14; 56:10
**recover** [2] - 13:8; 16:21; 17:9
**recovered** [1] - 29:16
**refer** [1] - 53:2
**reference** [2] - 42:4; 59:5
**referring** [1] - 42:5
**refers** [2] - 20:2; 53:2

**refine** [1] - 6:5
**reflected** [1] - 42:22
**reflecting** [1] - 43:1
**refute** [1] - 13:17
**refuting** [1] - 20:3
**regard** [12] - 5:5; 6:2; 8:3; 27:4, 24; 32:14; 33:20; 58:5; 60:6; 62:13, 15
**regarding** [2] - 4:20; 38:11
**regardless** [2] - 53:14; 54:17
**rejected** [2] - 29:20; 58:22
**relate** [2] - 43:12; 63:24
**related** [3] - 55:8; 56:6; 57:17
**relationship** [20] - 9:21; 11:3, 5; 15:23-25; 21:6; 42:18, 21; 43:24; 45:1; 56:17, 19; 61:10, 15; 62:1, 19; 63:1, 3
**relationships** [3] - 56:15; 57:13; 63:6
**relied** [1] - 36:7
**relief** [7] - 9:24; 10:14; 29:16, 24; 50:11; 61:5, 10
**rely** [2] - 56:8; 60:4
**relying** [3] - 38:5; 63:11
**remainder** [1] - 22:16
**remediable** [1] - 26:20
**remedy** [2] - 8:22; 55:13
**remember** [2] - 32:21; 65:6
**remove** [1] - 50:22
**repeat** [1] - 18:25
**represent** [2] - 54:22; 58:4
**representations** [1] - 39:17
**representative** [3] - 5:21; 55:3
**representing** [1] - 55:10
**requested** [1] - 10:14
**require** [8] - 18:14; 19:5; 35:23; 46:12; 47:4; 59:23; 66:22; 67:13
**required** [10] - 8:18; 14:1; 20:11, 13-14; 23:15; 25:1; 29:20; 47:2; 62:10
**requirements** [1] - 51:19
**requires** [2] - 36:3; 45:11
**requiring** [2] - 61:17; 64:20
**reshape** [1] - 67:16
**resolved** [1] - 27:4
**respond** [2] - 17:23; 62:18
**response** [2] - 20:5; 41:20
**responsibility** [4] - 7:17; 8:1, 21; 53:4
**responsible** [5] - 31:8, 10, 14, 23; 32:6
**rest** [4] - 24:18, 20, 23; 60:22
**rests** [1] - 41:5
**result** [2] - 16:18; 26:18
**resulting** [1] - 15:20
**results** [5] - 15:20; 44:6, 17,

19; 45:13
**retained** [1] - 65:7
**retirement** [1] - 18:8
**reverse** [1] - 6:19
**rid** [1] - 62:5
**rights** [4] - 36:23; 37:4, 12; 65:8
**rigorous** [1] - 39:25
**rise** [3] - 30:4, 11; 40:23
**road** [1] - 64:7
**rooted** [1] - 17:20
**rose** [1] - 18:13
**round** [1] - 25:13
**Rule** [15] - 5:18; 14:17; 19:12; 21:10; 40:17; 49:3, 6, 11, 15; 50:9; 51:19; 54:7; 58:23, 25; 59:1
**rule** [12] - 32:9; 33:8, 11; 34:1, 23-24; 35:1; 40:15; 48:3, 6, 13
**rules** [2] - 31:17; 48:7
**ruling** [1] - 9:16
**run** [1] - 52:24
**runs** [1] - 40:16
**satisfaction** [1] - 8:24
**satisfied** [1] - 51:20
**satisfies** [1] - 63:10
**save** [1] - 61:23
**saw** [1] - 30:12
**scenario** [4] - 23:17; 24:18, 21; 38:16
**scheme** [2] - 25:7; 26:14
**seat** [1] - 5:11
**second** [6] - 10:21; 16:12; 35:17; 42:2; 52:12; 64:16
**Second** [3] - 58:2, 9, 14
**Section** [1] - 53:19
**see** [8] - 3:7; 4:22; 5:13; 10:3; 14:24; 38:18; 43:22; 44:1
**seek** [1] - 24:7
**seeking** [6] - 14:5, 7; 19:21; 36:24; 56:7; 61:10
**seeks** [1] - 5:2
**seem** [1] - 10:21, 24
**self** [10] - 52:11, 22; 53:3, 7, 13; 54:10, 14; 55:17, 22; 66:22
**self-insured** [9] - 52:11, 22; 53:3, 7, 13; 54:10, 14; 55:17, 22
**self-interest** [1] - 66:22
**send** [1] - 26:9
**sense** [4] - 16:2; 17:18; 34:7; 59:19
**sentence** [2] - 52:18
**separate** [11] - 12:10; 13:21; 15:20; 27:2; 28:16, 18; 37:6, 21; 49:18; 50:6
**series** [2] - 16:15; 21:6
**served** [1] - 57:12
**set** [4] - 35:14; 41:10; 43:1;

63:1
**sets** [3] - 43:5, 10; 46:21
**setting** [1] - 30:6
**several** [1] - 36:20
**share** [1] - 10:17
**shared** [1] - 10:15
**Shari** [1] - 4:13
**sheep** [2] - 37:6; 50:6
**shoots** [1] - 48:10
**show** [2] - 61:24; 62:10
**showing** [1] - 13:17
**shown** [1] - 46:15
**shows** [3] - 34:21; 53:15; 59:6
**side** [16] - 8:12, 15; 11:4; 12:4; 14:12; 17:2; 47:17, 21-22, 24; 50:5; 60:8; 62:13
**sidetracked** [1] - 63:20
**Sigler** [15] - 4:8; 5:6; 14:12; 18:25; 20:2; 41:20; 46:20; 47:10; 55:15; 59:17; 64:12; 65:1, 4, 11
**SIGLER** [15] - 5:8; 14:14; 15:7; 16:25; 17:3; 18:5; 41:22; 42:15; 44:11; 45:9, 11; 55:23; 56:2; 62:16; 64:2
**Sigler's** [1] - 57:24
**significant** [1] - 56:12
**significantly** [1] - 56:17
**similar** [1] - 14:6, 20
**similarly** [2] - 54:7, 23
**simpler** [1] - 60:16
**single** [4] - 18:6; 38:16; 40:5; 66:9
**situation** [6] - 6:9; 11:21; 13:2; 15:12, 14; 37:24
**situations** [1] - 15:19
**Sixth** [2] - 58:1, 13
**small** [1] - 12:13
**smash** [1] - 13:20
**Smith** [1] - 49:19
**Smith's** [1] - 47:12
**someone** [5] - 11:16; 17:8; 29:17; 44:20
**sometimes** [3] - 13:5; 35:15
**somewhat** [1] - 22:1
**sorry** [1] - 44:11
**sort** [8] - 20:8; 28:23; 35:11; 37:22; 40:3; 51:15; 55:18; 60:24
**sorting** [2] - 19:5; 46:12
**sounds** [2] - 36:23; 57:14
**South** [1] - 56:3
**Spaeder** [1] - 3:20
**speaking** [1] - 60:25
**specific** [10] - 18:15; 27:21; 36:9; 40:19; 55:7; 56:20; 57:2, 8, 23
**specifically** [1] - 66:6
**stacking** [1] - 55:2
**stage** [1] - 51:5
**stand** [1] - 17:9

**standing** [2] - 54:4
**start** [2] - 3:11; 48:11
**started** [1] - 64:25
**starting** [3] - 43:9, 15; 52:2
**state** [1] - 67:24
**steal** [1] - 9:6
**step** [1] - 15:6
**still** [7] - 8:15; 9:8; 14:9; 23:25; 28:14; 37:18; 42:3
**stop** [4] - 10:20; 12:24; 16:12; 42:2
**story** [1] - 39:15
**strike** [1] - 4:3
**structure** [2] - 15:24; 63:3
**structured** [2] - 5:15; 10:14
**struggling** [1] - 49:21
**subject** [7] - 34:22, 25; 42:17, 21; 43:24; 56:23
**subjected** [2] - 29:3; 40:15
**submitted** [3] - 4:22; 59:18; 60:20
**subsequent** [1] - 44:13
**sue** [4] - 5:22; 21:8; 56:7, 25
**sued** [2] - 22:11; 57:20
**suffered** [2] - 8:11; 19:4
**suggested** [1] - 51:15
**suggesting** [1] - 28:13
**suggests** [1] - 55:12
**suing** [1] - 21:4
**summary** [1] - 57:22
**supplement** [1] - 60:20
**supposed** [6] - 23:22, 24; 25:1, 4; 26:16; 33:9
**Supreme** [2] - 14:18; 66:15
**surprise** [1] - 65:19
**sworn** [1] - 4:23
**system** [2] - 20:16, 18
**table** [1] - 3:11
**tackle** [1] - 35:10
**talks** [1] - 19:16
**teach** [2] - 34:6, 10
**term** [2] - 39:5; 42:14
**terms** [5] - 4:19; 12:23; 16:3; 56:14; 59:15
**testify** [1] - 4:24
**THE** [100] - 3:1, 3; 4:6, 16; 5:5, 10; 6:1, 25; 7:4, 14, 21; 8:3, 23; 9:11; 10:2, 20; 11:17; 12:24; 14:11, 23; 16:12; 17:1; 18:2, 22; 20:1, 15; 21:22; 22:25; 23:10, 12; 25:11, 22; 26:1, 21; 27:13, 24; 28:9, 25; 29:6; 30:2; 31:2, 18; 32:10, 13, 25; 33:14, 18; 34:4, 25; 35:22; 36:15; 38:8; 39:1, 18; 40:8, 22; 41:19; 42:2; 44:9; 45:2, 10, 24; 46:18; 47:6; 48:5, 10, 16; 49:4, 10, 12, 25; 51:1, 8, 13, 21; 52:17; 53:23; 54:9, 13, 25; 55:15, 25; 57:6, 16;

58:8, 11, 18; 59:3; 60:6; 61:1, 7, 19; 62:12; 63:23; 64:10, 25; 65:19; 67:1, 18, 23

**theories** [3] - 11:6; 50:11; 61:4

**theory** [26] - 10:15, 18, 22; 13:11; 17:14; 19:22; 22:11; 41:4, 8, 10; 43:16, 19; 44:21; 45:19, 22; 46:2, 25; 50:10, 12-13, 16; 63:16; 64:5; 67:9, 15

**therefore** [7] - 5:23; 12:1; 25:15; 37:4, 21; 53:1; 61:12

**they've** [3] - 8:11; 19:4; 57:20

**third** [1] - 19:14

**thousands** [8] - 19:6; 22:7; 27:8; 39:10; 46:13; 54:12, 17

**three** [1] - 7:21

**threshold** [8] - 5:14; 14:24; 33:21; 57:5; 63:15; 64:4; 65:8, 12

**threw** [1] - 5:11

**throughout** [3] - 43:21; 44:8, 16

**ticked** [1] - 21:7

**tie** [1] - 58:23

**today** [9] - 3:4, 17, 24; 4:13; 33:6, 15; 62:17; 63:17; 67:21

**together** [5] - 13:20; 15:16; 21:25; 43:5; 59:12

**Tom** [1] - 4:7

**took** [3] - 35:16, 19; 41:13

**top** [1] - 55:3

**total** [1] - 47:19

**transaction** [2] - 11:1; 13:21

**transactions** [7] - 21:7; 42:22, 25; 43:2, 4, 10; 44:17

**transform** [1] - 67:7

**treat** [3] - 17:19; 59:21; 66:8

**treated** [2] - 22:6; 24:25

**treating** [1] - 13:8

**tried** [2] - 43:2, 4

**trouble** [2] - 11:8; 20:22

**true** [3] - 15:13; 25:18; 32:3

**trust** [1] - 9:7

**trusts** [1] - 38:4

**try** [5] - 18:24; 21:8; 23:1; 24:9; 67:23

**trying** [3] - 62:5; 67:7, 16

**turn** [7] - 4:17, 25; 5:12; 20:1; 51:22; 67:3

**turning** [1] - 52:17

**turns** [1] - 58:21

**twist** [1] - 57:8

**two** [16] - 3:20; 6:2; 10:24; 21:11, 19; 35:11; 43:5; 46:19; 49:12; 52:5, 8; 60:2; 61:19; 62:5; 64:11

**type** [2] - 30:7; 56:5

**typically** [1] - 21:20

**ultimate** [1] - 29:16

**ultimately** [3] - 28:15; 34:8; 42:6

**unclear** [1] - 42:3

**under** [36] - 8:19, 22; 11:14; 12:7, 22; 14:2; 16:14; 17:9, 13, 19; 18:8; 19:2; 20:4; 23:15; 26:20; 31:9; 33:25; 41:7, 9; 44:21; 46:25; 49:11; 50:10; 54:7; 57:9, 13, 20; 58:5; 59:22; 62:11; 63:16; 64:2, 24; 65:3

**understandable** [3] - 6:6, 23

**understood** [2] - 15:18; 60:15

**unique** [2] - 27:9; 30:22

**universe** [1] - 42:10

**University** [5] - 10:9; 18:4, 6-7; 21:1

**unjust** [3] - 25:21; 26:14; 62:10

**unlike** [1] - 20:25

**unpleaded** [1] - 19:23

**unspecified** [1] - 51:16

**unusual** [1] - 24:4

**up** [13] - 13:1, 10; 15:12, 14; 17:2; 21:14; 22:9, 15; 30:6; 47:20; 53:15; 56:1; 63:1

**uses** [2] - 42:17; 63:11

**vacuum** [3] - 11:1; 13:9; 35:6

**value** [2] - 67:9, 16

**Van** [1] - 3:14

**vary** [2] - 59:17, 19

**vendor** [1] - 11:13

**versus** [4] - 3:4; 18:6, 20; 31:5

**viable** [2] - 9:25; 10:4

**view** [4] - 14:23; 20:4; 40:22; 41:4

**violated** [4] - 13:25; 20:9; 29:3; 30:17

**violates** [1] - 12:23

**violation** [5] - 13:9; 23:19; 30:17; 33:24; 59:15

**Virginia** [2] - 65:5, 21

**virtue** [1] - 20:9

**wait** [2] - 48:5

**Walmart's** [1] - 59:9

**wants** [1] - 14:13

**Ward** [1] - 36:5

**whereas** [1] - 52:9

**whole** [2] - 25:19; 57:1

**Wilkerson** [1] - 3:18

**win** [1] - 29:7

**Winkle** [1] - 3:15

**wipe** [2] - 61:11

**wish** [1] - 4:20

**word** [1] - 49:22

**words** [11] - 5:20, 23; 8:25; 11:20; 12:9; 21:17; 26:22; 28:1; 40:24; 52:21; 55:2

**works** [1] - 26:12

**world** [2] - 16:7; 62:9

**worse** [3] - 44:22; 46:12; 67:13

**write** [1] - 26:13

**write-off** [1] - 26:13

**writing** [2] - 4:22; 60:20

**written** [1] - 24:3

**wrongly** [1] - 13:15

**wrote** [2] - 22:15; 24:6

**year** [5] - 10:9; 21:23; 22:3; 47:20

**years** [1] - 21:25

**yourself** [1] - 35:2

**Zuckerman** [1] - 3:20