# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
Case No. 1:15-cv-00109-MR

| | | |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **PLAINTIFF'S BRIEF IN RESPONSE TO OPTUM'S MOTION FOR SUMMARY JUDGMENT** |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

TABLE OF EXHIBITS .................................................................... vi

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS ................................................................... 3

    A.    Aetna served as a fiduciary and claims administrator for the Mars Plan ........................................................................ 3

    B.    Aetna hired Optum to do its work .......................................... 4

    C.    Defendants sought to "bury" Optum's administrative fee in benefits claims .............................................................. 5

    D.    Optum recognized that the fees and dummy codes were improper but accepted them to avoid losing Aetna's business ...................... 6

    E.    Defendants concealed the truth about the charges .......................... 7

    F.    The written terms of the Mars Plan did not permit Defendants' charges for Optum's administrative fees .................................. 8

    G.    Defendants charged Ms. Peters and the Mars Plan for Optum's fees ...................................................................... 9

LEGAL STANDARD ..................................................................... 10

ARGUMENT ........................................................................... 11

    I.    MS. PETERS AND THE MARS PLAN WERE INJURED .............. 11

    II.    AETNA BREACHED FIDUCIARY DUTIES AND CAUSED THE MARS PLAN TO ENGAGE IN PROHIBITED TRANSACTIONS ............................................................. 16

        A.    Aetna Violated ERISA § 406(a)(1)(D) and (b)(1) .................. 17

            1.    Optum Was a "Party in Interest" Under ERISA and Would Be Liable Even if It Were Not ............................ 17

Case 1:15-cv-00109-MR   Document 200   Filed 03/15/19   Page 2 of 35

2.      Optum Waived A Defense of "Reasonable Compensation" Under ERISA § 408(b)(2), Which Is Disputed in Any Event ...................................18

B.      Aetna Deceptively Violated the Written Terms of the Mars Plan to Serve Its Own Interests.......................................19

III.    OPTUM KNOWINGLY PARTICIPATED IN THE PROHIBITED TRANSACTIONS AND BREACHES .....................23

IV.    MS. PETERS CAN OBTAIN RELIEF AGAINST OPTUM UNDER ERISA § 502(a)(3) .............................................................23

CONCLUSION ..........................................................................................25

Case 1:15-cv-00109-MR   Document 200   Filed 03/15/19   Page 3 of 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*,
 703 F. App'x 126 (3d Cir. 2017) .........................................................................20

*Allen v. GreatBanc Tr. Co.*,
 835 F.3d 670 (7th Cir. 2016) ...............................................................................18

*Amara v. Cigna Corp.*,
 775 F.3d 510 (2d Cir. 2014) ................................................................................12

*Banyai v. Mazur*,
 No. 00 CIV. 9806 (SHS), 2007 WL 959066 (S.D.N.Y. Mar. 29, 2007) .............24

*Brundle v. Wilmington Tr., N.A.*,
 1:15-cv-1494 (LMB/IDD), 2016 WL 6542718 (E.D. Va. Nov. 3, 2016)............19

*Carter v. Fleming*,
 879 F.3d 132 (4th Cir. 2018) ...............................................................................11

*Dreher v. Experian Info. Sols., Inc.*,
 856 F.3d 337 (4th Cir. 2017) ...............................................................................16

*EEOC v. McLeod Health, Inc.*,
 914 F.3d 876 (4th Cir. 2019) ...............................................................................10

*Fritcher v. Health Care Serv. Corp.*,
 301 F.3d 811 (7th Cir. 2002) ...............................................................................21

*FTC v. Bronson Partners, LLC*,
 654 F.3d 359 (2d Cir. 2011) ......................................................................... 24, 25

*Great-West Life & Annuity Ins. Co. v. Knudson*,
 534 U.S. 204 (2002) .............................................................................................25

*Griggs v. E.I. DuPont de Nemours & Co.*,
 237 F.3d 371 (4th Cir. 2001) ...............................................................................16

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
 530 U.S. 238 (2000) ..................................................................... 3, 13, 23, 24

Case 1:15-cv-00109-MR   Document 200   Filed 03/15/19   Page 4 of 35

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
   555 U.S. 285 (2009) ........................................................................21

*LeBlanc v. Cahill*,
   153 F.3d 134 (4th Cir. 1998) .................................................. 18, 24

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ....................................................................3, 24

*Metro. Life Ins. Co. v. Glenn*,
   554 U.S. 105 (2008) ........................................................................14

*Pender v. Bank of Am. Corp.*,
   736 F. App'x 359 (4th Cir. 2018) ..................................................12

*Pender v. Bank of Am. Corp.*,
   788 F.3d 354 (4th Cir. 2015) ...................................... 2, 11, 16, 24

*Plasterers' Local Union No. 96 Pension Plan v. Pepper*,
   663 F.3d 210 (4th Cir. 2011) .........................................................12

*Rudolph v. Buncombe Cty. Gov't*,
   846 F. Supp. 2d 461 (W.D.N.C. 2012), *aff'd*, 474 F. App'x 931 (4th Cir.
   2012) ..............................................................................................10

*S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*,
   353 F.3d 367 (4th Cir. 2003) .........................................................18

*Smith v. Sydnor*,
   84 F.3d 356 (4th Cir. 1999) ...........................................................21

*Spear v. Fenkell*,
   Civil Action No. 13-2391, 2016 WL 5661720 (E.D. Pa. Sept. 30, 2016),
   *clarified on denial of reconsideration*, 2016 WL 7475814 (E.D. Pa. Dec. 29,
   2016) ..............................................................................................11

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ...................................................................16

*Staudner v. Robinson Aviation, Inc.*,
   910 F.3d 141 (4th Cir. 2018) .........................................................18

*Taylor v. KeyCorp*,
    680 F.3d 609 (6th Cir. 2012) ...............................................................................14

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ...............................................................................25

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ...............................................................................24

*White v. Bank of Am., N.A.*,
    Civil No. CCB-10-1183, 2012 WL 1067657 (D. Md. Mar. 27, 2012) ...............11

**STATUTES**

29 U.S.C. § 1001 ...............................................................................16

29 U.S.C. § 1002(14)(B) ...............................................................................17

29 U.S.C. § 1002(21)(A) ...............................................................................4

29 U.S.C. § 1022 ...............................................................................21

29 U.S.C. § 1106(a)(1)(D) ............................................................................... 17, 18

29 U.S.C. § 1106(b)(1) ...............................................................................17

29 U.S.C. § 1108(b)(2) ............................................................................... 18, 19

29 U.S.C. § 1132(a)(3) ............................................................................... *passim*

**OTHER AUTHORITIES**

Bogert, The Law of Trusts and Trustees § 708 ...............................................14

Restatement (Third) of Trusts § 101 (2012) ...............................................2, 14

**RULES**

Fed. R. Civ. P. 56(a) ...............................................................................10

# TABLE OF EXHIBITS

**Exhibit**   **Description**

1   List of approved health benefit claims for Sandra Peters that were processed through OptumHealth Care Solutions ("Optum")

2   Transcript excerpts from the deposition of Theresa Eichten

3   Transcript excerpts from the deposition of Ellen Gallagher

4   Transcript excerpts from the deposition of Cyndy Kilpinen

5   Transcript excerpts from the deposition of David Elton

6   Transcript excerpts from the Aetna 30(b)(6) deposition

7   Transcript excerpts from the deposition of Sandra Peters

8   Transcript excerpts from the Optum 30(b)(6) deposition

9   February 28, 2011 email chain

10   April 29, 2011 email chain

11   September 14, 2011 email chain and attachment

12   February 16, 2012 email chain and attachments

13   March 8, 2012 email chain and attachments

14   April 15, 2012 Contract Oversight Claims Management Agreement

15   April 15, 2012 Delegated Credentialing Agreement

16   April 15, 2012 Delegated Patient Management Agreement

17   November 27, 2012 email chain

18   December 21, 2012 AetNet Network Reference Tool

| | |
|---|---|
| 19 | June 1, 2013 Contract Oversight Claims Management Agreement |
| 20 | June 1, 2013 Delegated Credentialing Agreement |
| 21 | June 1, 2013 Delegated Patient Management Agreement |
| 22 | September 19, 2013 email chain |
| 23 | October 18, 2013 email chain |
| 24 | November 12, 2013 email chain |
| 25 | November 15, 2013 email chain |
| 26 | December 5, 2013 email chain |
| 27 | December 28, 2013 email chain |
| 28 | March 20, 2014 Explanation of Benefits for a February 19, 2014 service received by Sandra Peters |
| 29 | Health Insurance Claim Form, Optum data sheet, and Optum remittance advice for a July 16, 2014 service received by Sandra Peters |
| 30 | September 4, 2014 Explanation of Benefits for a July 16, 2014 service received by Sandra Peters |
| 31 | December 23, 2014 email chain |
| 32 | April 14, 2015 email and attachment |
| 33 | April 22, 2015 email chain |
| 34 | November 18, 2015 email chain |
| 35 | January 28, 2016 email and attachment |
| 36 | March 30, 2016 email chain |
| 37 | PowerPoint titled "Aetna SE Business Model" |

38       Document titled "OPTUM/DOL"

39       Document titled "Aetna SE Chiro Q&A"

40       Document titled "Aetna SE Q&A"

## PRELIMINARY STATEMENT

Aetna, a claims administrator and fiduciary, agreed with Optum, its hired vendor, to "bury"[1] Optum's administrative fees in benefits claims. Ex. 35. The evidence shows that Aetna did so to avoid paying those fees itself. *Id.* Aetna's Rule 30(b)(6) witness admitted that Aetna carried out this scheme in its benefits determinations by treating Optum's fees as covered expenses. Ex. 6, Aetna 30(b)(6) Tr. 39:1-4. Because of Aetna's benefits determinations, Ms. Peters and her plan, the Mars, Inc. Health Care Plan (the "Mars Plan"), made payments that were not required by the terms of the Mars Plan, directly benefiting Aetna and Optum.

Optum knew that Aetna's benefits administration was dishonest and inconsistent with Aetna's plans. One of Optum's Chief Clinical Officers wrote that it would be "virtually impossible" for members "to make the math work on the co-insurance" that Aetna was requiring. Ex. 23. That same employee also wrote:

> Our thinking so far feels a bit like *circling the wagons and drinking our own Koolaid to support a position we have a hard time explaining and understanding.*

Ex. 22 (emphasis added).

Now, Optum asks to receive a pass for its role in Aetna's deceitful and self-

---

[1] "Bury" is not a word that Plaintiff invented. It is how Defendants described their scheme.

interested conduct. But Optum is not entitled to summary judgment on any of the issues it raises.

*First*, Optum's argument that Ms. Peters cannot show "injury" is legally and factually wrong. Under controlling Fourth Circuit law, Ms. Peters can pursue her ERISA claims even without showing that she personally suffered a "financial loss." *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 366 (4th Cir. 2015). Regardless, both Ms. Peters and the Mars Plan indisputably suffered losses on those claims where they paid Optum's improper charges.

Optum contends that these injuries are somehow "offset" by its treatment of deductible claims. Specifically, even though Aetna sent EOBs to Ms. Peters saying that she owed Optum's charges on those claims and no one ever told her to the contrary, Optum has announced for the first time in this litigation that it has no intention of collecting those charges, such that Ms. Peters has received the "benefit" of "deductible credits" on those claims. But Optum's separate decision not to collect on those claims does not eliminate her injury from Aetna's other benefit determinations. Defendants have never cited a single ERISA case holding that a loss resulting from one benefits determination can be "offset" by an alleged economic benefit related to a separate determination. Trust law, in which ERISA is grounded, is to the contrary. *See* Restatement (Third) of Trusts § 101 (profits to a beneficiary from one breach cannot be used to reduce a fiduciary's liability for

another breach).

*Second*, a genuine dispute exists as to whether Aetna caused the Mars Plan to engage in prohibited transactions and breached fiduciary duties. *Third*, a genuine dispute exists as to whether Optum had actual or constructive knowledge of Aetna's violations.

*Fourth*, Optum mischaracterizes the relief available against it. ERISA § 502(a)(3) allows Ms. Peters to pursue "appropriate equitable relief" against Optum on her own behalf and on behalf of her plan, even if Optum were a "nonfiduciary." *See* 8/13/2016 Order (ECF No. 54) at 29 n.7 (citing *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc*., 530 U.S. 238, 245 (2000)).[2] This relief can take the form of disgorgement of "assets and profits" obtained in prohibited transactions, "restitution, and … other equitable decrees." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

## STATEMENT OF FACTS

### A. Aetna served as a fiduciary and claims administrator for the Mars Plan.

Ms. Peters was a member of the Mars Plan during the relevant time period.

_____

[2] Optum does not attempt to show the lack of a genuine fact dispute as to its own fiduciary status. Rather, it relies on this Court's prior discovery ruling that it was not "functioning as a fiduciary." ECF No. 141 at 21. Ms. Peters preserves her objections to this ruling and to any dispositive ruling incorporating it, especially in light of Optum's failure to even attempt to meet its summary judgment burden.

3

Aetna was the "Claim Administrator" that Mars, Inc. hired to "evaluate, process and pay claims under the Plan." Optum Ex. 19 at -00003010; Ex. 6, Aetna 30(b)(6) Tr. 59:24–60:15; 116:17–118:3.[3] Aetna had "the discretionary authority to determine whether services and supplies are Medically Necessary and appropriately provided." Optum Ex. 19 at -00002972; Ex. 6, Aetna 30(b)(6) Tr. 122:7–123:20. ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ *See* Optum Ex. 17 at -00002793, 2809.

### B. Aetna hired Optum to do its work.

In 2012, Aetna and Optum entered into a set of four agreements relating to physical therapy services received by patients insured by Aetna-administered plans, including Ms. Peters and the Mars Plan. Under these agreements, Optum agreed to perform services that Aetna would otherwise have provided. In a so-called "Provider Agreement," Optum agreed to make available its network of contracted physical therapy/occupational therapy providers to Aetna, such that those providers would then be "in-network" under Aetna's plans. Optum Ex. 21. In

---

[3] Thus, there is no dispute that Aetna was a fiduciary for the Mars Plan and its members. *See* 29 U.S.C. § 1002(21)(A) (definition of fiduciary); *see also* ECF No. 141 at 22 ("Aetna does not dispute that it served in a limited fiduciary role in the administration of the Plaintiff's Plan").

the other three related agreements, Optum agreed to provide other services including "claims management" (i.e., utilization review), "credentialing," and "patient management." Exs. 14, 15, 16. Optum's only compensation was the ███████████████████████████████████████████ *See, e.g.*, Ex. 14, § 6.1. Aetna and Optum later entered into similar agreements as to chiropractic services. Optum Mem. Ex. 22; Exs. 19, 20, 21.

### C. Defendants sought to "bury" Optum's administrative fee in benefits claims.

Aetna asked Optum to make "a claims-based reimbursement proposal" for its services. Ex. 9. Optum responded with a "proposal that builds the ASO [administrative services only] pricing into the provider fee schedule/claims process." Ex. 10 at -00057620; *see also* Ex. 2, Eichten Tr. 34–36. Optum suggested that it could "append[]" an administrative fee to claims. Ex. 10 at -00057622. Aetna could then "appl[y] benefits" to the total claim and Optum would "keep[]" a per visit fee. *Id.*

Aetna and Optum adopted this process. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ It also included an additional "upside" for Optum. Ex. 27 at -000022969.

As Optum described it, Aetna's goal of this "service model design" was "to

'bury' the admin fee within the claims process (to ensure Aetna didn't have to pay a PMPM [per-member per-month fee] out of [its] own bank account)." Ex. 35. If this goal had not been "critical," Optum could have "lower[ed] the cost of the program." *Id.* Defendants' references to "burying" the fee were not "offhanded" as Optum now contends. Rather, they were part of key discussions about Optum's compensation. *See id.*; *see also* Ex. 32 at -000040747.

Optum also agreed to add "dummy codes" to the benefits claims it processed, which were then included in communications sent to Ms. Peters and the Mars Plan. *See* Ex. 17 at -000002887; Ex. 28 (Explanation of Benefits ("EOB") including dummy code). These "dummy codes" did not represent actual medical services. Ex. 5, Elton Tr. 34:9–41:22. Rather, Optum added them to capture its own fees. *See* Ex. 26 at -000046141 ("a 97xxx 'dummy' code is included in the claims stream to bill Aetna for our admin fee. Just didn't seem like something clinicians would sign off on."); Ex. 18 at -00003057; Exs. 40, 39 at -000031284, -000007727.[4]

### D. Optum recognized that the fees and dummy codes were improper but accepted them to avoid losing Aetna's business.

Optum tried to shield itself from ERISA liability for these improper

---

[4] Aetna has asserted that a different payment method was not feasible due to "system limitations." But Aetna also hired Optum in other geographic areas and paid it by a different method. Ex. 3, Gallagher Tr. 15:3–16:8.

practices. ████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████ Ex. 4, Kilpinen Tr. 149:7–150:2; Optum Ex. 21, § 7.1.

Internally, Optum's Chief Clinical Officer and others expressed concern about Aetna's "very problematic" approach to member and plan responsibility. Ex. 22; *see also* Ex. 23; Ex. 24 at -000046033 ("Aetna claims processing … won't take much longer to bubble up to be a substantial issue"). Optum was also concerned because it recognized that the dummy codes were being used as a "payment trigger," not for their "industry intended use" of describing actual medical services. Ex. 25; *see also* Ex. 26. Yet it still added the dummy codes to claims knowing that Aetna would present them as medical services in its EOBs. *See id.* Optum viewed both the dummy codes and the administrative fees as "High Risk Issues." Ex. 37 at 4.

In short, one key Optum employee wrote, "we don't like the admin fee." Ex. 33 at -000022687. But Optum agreed to the fee because otherwise it would "lose the business." *Id.*

### E.    Defendants concealed the truth about the charges.

Defendants sought to conceal how Optum was compensated from plans like

7

the Mars Plan, members like Ms. Peters, and the actual providers. The form letter that Aetna sent to employers in 2012 stated that self-funded plans would "not be charged any fees" for Optum's work (Ex. 13 at -000006734), even though an Aetna employee commented that this was not "completely true as fee is included in the rate" (Ex. 12 at -00006900). Aetna also warned Optum: "We need to ensure that members are not being relayed this information about wrap or administration fees as they are feeling they are absorbing costs, which in turn makes most of them unhappy." Ex. 36 at -000014642; *see also* Ex. 34 at -00064960 (stating that it would be a "breach of the contract" to discuss the administrative fee with members or providers); Ex. 3, Gallagher Tr. 44:2–68:18 (Aetna told Optum not to discuss administrative fee or dummy code with providers or members).

### F. The written terms of the Mars Plan did not permit Defendants' charges for Optum's administrative fees.

There is no evidence that Aetna reviewed the terms of the Mars Plan, or any other plan, before it decided to include Optum's fees and dummy codes in its benefits determinations and charge members and plans for them. Aetna also never sought legal advice as to whether any plan allowed these charges. *See* ECF No. 101 at 1-2. In fact, the charges were inconsistent with the Mars Plan. *See infra* 19-23.

### G. Defendants charged Ms. Peters and the Mars Plan for Optum's fees.

For Ms. Peters and the Mars Plan, Defendants made a number of benefits determinations that required Ms. Peters and her plan to pay increased amounts based on Optum's fees. *See* Ex. 1. By way of example, Ms. Peters received a service on July 16, 2014, for which her provider billed $40 and agreed to collect $34 (the "Negotiated Charge"). Ex. 29 at -000001749. Optum added a dummy code and its contracted charge with Aetna, increasing the amount billed to $110.89. *Id.* at -000001750. Aetna then approved the claim for $70.89. Ex. 30 at -00000256. It paid 80% of that amount ($56.71) to Optum from the Mars Plan, and required Ms. Peters to pay co-insurance of 20% ($14.18) to the provider. *Id.* Aetna has admitted that this was "more than 20 percent of the actual charge for the services." Ex. 31 at -00044606. Optum kept $36.89 and paid $19.82 to the provider, such that the provider received $34 for the service in total. Ex. 29 at -000001751. Aetna and Optum applied this practice to Ms. Peters's other coinsurance claims as well. Ex. 1 at 2-3. After Ms. Peters met her out-of-pocket maximum, Aetna charged the Mars Plan 100% of Optum's rate and paid that amount to Optum. *See* Ex. 1 at 4-6.

For two categories of claims, Ms. Peters or her plan were not charged for Optum's fees. *First*, on two of the 65 benefits claims for services received by Ms. Peters, the actual provider's agreed rate actually exceeded the Optum rate. Thus, the Mars Plan paid less than the actual provider's charge. *See* Ex. 1 at 6.

9

*Second*, for the five claims subject to Ms. Peters's deductible,[5] Aetna determined her responsibility based on Optum's rate, but her provider only billed her for its actual charge. *See* Ex. 7, Peters Dep. 69:20–72:25; Ex. 1 at 1. Aetna still applied the higher Optum rate to Ms. Peters's deductible, and its EOBs told her that she "owe[d]" the charges. *See* Ex. 28, 3/20/2014 EOB at -00000203. Nevertheless, during this litigation, Optum has taken the position that it will not collect those charges from Ms. Peters, even though no one has ever communicated that to her. Optum Mem. 8; Ex. 7, Peters Dep. 69:20-72:25.

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] Thus, "if the evidence would permit a … find[ing] in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate." *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019). The Court must "view[] all facts and reasonable inferences

---

[5] Under the Mars Plan, a deductible is the amount a member "must satisfy … before the Plan begins to pay benefits." Optum Ex. 19 at -00002958.

[6] Hearsay evidence is properly excluded at summary judgment. *See Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 466 (W.D.N.C. 2012), *aff'd*, 474 F. App'x 931 (4th Cir. 2012). Thus, Optum cannot rely on Dr. Joe Siragusa's out-of-court statement that the N.C. Department of Insurance (which does not enforce ERISA) supposedly deemed these practices "legal." Optum Mem. 7.

therefrom in the light most favorable to the nonmoving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018).[7]

**ARGUMENT**

## I. MS. PETERS AND THE MARS PLAN WERE INJURED.

"An injury refers to the invasion of some 'legally protected interest' arising from constitutional, statutory, or common law." *Pender*, 788 F.3d at 366. Neither Article III nor ERISA defines an "injury" as a "financial loss." *Id.* Indeed, a plan or its beneficiaries can pursue an action for breach of fiduciary duty under ERISA, and a disgorgement remedy, even "in cases where the fiduciary profits from the breach but the plan or plan beneficiaries incur *no* financial loss." *Id.* at 366 & n.9 (emphasis added); *see also Spear v. Fenkell*, Civil Action No. 13-2391, 2016 WL 5661720, at *33 (E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, 2016 WL 7475814 (E.D. Pa. Dec. 29, 2016) (an accounting and disgorgement is "available against non-fiduciaries who knowingly participate in a fiduciary breach" even if the plan or member did not lose money from the breach).

In any event, Ms. Peters and the Mars Plan *did* suffer an identifiable financial loss. On *all* of her 32 coinsurance claims, Ms. Peters was charged 20%

---

[7] By filing a dispositive motion prior to class certification, Optum has waived procedural safeguards against interventions by class members after a favorable ruling on the merits. Aetna has similarly waived those safeguards by failing to object to consideration of this motion. *See White v. Bank of Am., N.A.*, Civil No. CCB-10-1183, 2012 WL 1067657, at *4 (D. Md. Mar. 27, 2012).

11

coinsurance based on Optum's fees, not the "Negotiated Charge." Ex. 1 at 2-3. Likewise, the Mars Plan paid more than its percentage of the "Negotiated Charge" on 56 of the 58 claims for which it bore responsibility. Ex. 1 at 2-6.

Ms. Peters seeks relief for these improper charges. She is not asking the Court or Aetna to reverse every benefit decision Defendants ever made or to reprocess all of her Optum and non-Optum claims from scratch. Nothing in ERISA requires her to do so, especially if it could harm her. *See Amara v. Cigna Corp.*, 775 F.3d 510, 521, 532 (2d Cir. 2014) (approving "structure of … remedy" that "prevent[ed] any class member … from being worse off"). Nonetheless, Optum argues that the Court must imagine a "but-for world" in which there was no "Aetna-Optum relationship" and adopt a theory of "injury" that is inconsistent with ERISA and Article III. Optum Mem. 2. Optum contends that Ms. Peters would have been "worse off" in this hypothetical world—which does not actually fit her claims for relief, *see* Ex. 1—and thus, has "no injury."[8]

Optum's "no injury" argument hinges on the fact that when Aetna calculated

_____

[8] Optum does not cite *any* case to support its theory that only this hypothetical world can establish "injury." It just relies on its expert's say-so. *See* Optum Mem. 12-13. Previously, Defendants have relied on *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210 (4th Cir. 2011), which involved the damages associated with an investment strategy, and *Pender v. Bank of Am. Corp.*, 736 F. App'x 359 (4th Cir. 2018), which involved the equitable relief available for a transfer of invested assets. Neither case supports Optum's theory that Ms. Peters cannot show an Article III or ERISA injury even though she and her plan were improperly charged for its fees and received false EOBs.

Ms. Peters's deductible, it applied the Optum rate, but Ms. Peters's provider only billed her for its actual charge and Optum has not sent a separate bill for its charges. Optum Mem. 10. According to Optum, because it has not billed for its charges on deductible claims, Ms. Peters has received so-called "deductible credits" that eliminate her injury from paying Optum's charges. *Id.* at 12.

Optum's argument should not be accepted as a matter of law or fact. *First*, as to the law, Optum's theory conflicts with this Court's prior ruling that Ms. Peters suffered an "injury in fact" when she "paid at least one coinsurance requirement that included Optum's administrative fee charges," and was "financially responsible for other inflated co-insurance amounts." ECF No. 54 at 17. As the Court recognized, Ms. Peters is not required to plead or prove an aggregate economic gain or loss from the "Aetna-Optum relationship" to obtain relief under ERISA. Indeed, the Court rejected Defendants' argument that Ms. Peters "was not injured" because "if she had received out-of-network services, she could have paid more," finding that it lacked any "legal support." *Id.* at 17 n.5.

The Court's prior resolution of these injury-related questions finds extensive support in the law. Optum's theory does not. ERISA is grounded in the law of trusts. *See Harris Trust*, 530 U.S. at 250 (analyzing the "common law of trusts" to determine whether relief was available under ERISA § 502(a)(3)). Under trust law, "[t]he amount of a [fiduciary]'s liability for breach of trust *may not be reduced* by

a profit resulting from other misconduct unless the acts of misconduct causing the loss and the profit constitute a single breach." *See* Restatement (Third) of Trusts § 101 (2012) (emphasis added); *see also* Bogert, The Law of Trusts and Trustees § 708 ("Under traditional analysis, a trustee who incurred liability by reason of a breach of a duty regarding investments could not reduce that liability by proving that he made a profit for the trust by other legal or illegal conduct in the trust administration.").

Under these well-established principles, Optum may not offset Ms. Peters's injury through any "gains" to her from Defendants' handling of other claims. Each of Aetna's discrete benefits determinations was a separate act and a separate breach. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) ("a benefit determination" is "a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries"). No ERISA case has ever held that injuries flowing from one benefit decision can be "offset" by alleged economic gains flowing from another benefit decision.[9] Such a holding would turn ERISA, and the trust law upon which it is based, on its head.

*Second*, as to the facts, the purported "gain" from the so-called "deductible

---

[9] In *Taylor v. KeyCorp*, 680 F.3d 609 (6th Cir. 2012), an investment case, the court "netted" gains and losses from a failure to disclose facts bearing on the value of the company's stock. But *Taylor*, unlike this case, did not involve separate benefits decisions, or "separate breaches causing separate damages." *Id.* at 615.

credits" did not result from Aetna's benefits determinations. Rather, the "credits" are the consequence of Optum's decision, in this litigation, to state that Ms. Peters does not owe what Aetna said she owed on the deductible claims.[10] Optum's argument boils down to the following: a fiduciary can impose improper charges on members for the benefit of itself and its vendor, so long as the vendor fails to collect some of the charges and then announces that it has thus "benefited" the member.[11] No case supports this proposition.

Likewise unavailing is Optum's argument that Ms. Peters had no injury in 2013 because she would have "reached her out-of-pocket maximum in any event." Optum Mem. 12. In other words, a member who is subjected to an improper charge is not injured if the defendant can show that for all claims in that year, she would have paid the same total amount. ERISA says otherwise. *See* 29 U.S.C. § 1132(a)(3) (a plaintiff may obtain relief for "any act or practice which violates any provision of [ERISA] or the terms of the plan").

Optum also ignores Ms. Peters's allegations that Defendants violated her

---

[10] The Aetna-Optum agreements authorized Optum to bill its fees to members on deductible claims (*see* Optum Ex. 21, § 4.3.1), but it did not bill Ms. Peters, apparently because it knew that doing so would disclose the amount of its fee.

[11] This is but one of the many common arguments asserted in Optum's motion, accentuating that common issues predominate and that class certification is appropriate.

statutory rights to prudent management of the Mars Plan and accurate disclosures. Violations of these rights are sufficient to satisfy Article III's requirement of "injury" even without a pecuniary loss. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016); *see also Pender*, 788 F.3d at 366.[12]

Finally, Ms. Peters has standing to bring ERISA § 502(a)(3) claims for "appropriate equitable relief" on the Mars Plan's behalf *regardless* of whether she personally suffered a "financial loss." *See Pender*, 788 F.3d at 366–67. Optum does not even *attempt* to demonstrate that the Mars Plan was not injured.

## II. AETNA BREACHED FIDUCIARY DUTIES AND CAUSED THE MARS PLAN TO ENGAGE IN PROHIBITED TRANSACTIONS.

Despite generically asserting that Aetna did not breach any duties, Optum fails to address Ms. Peters's claim that Aetna violated its "fiduciary obligation not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *See* 8/31/2016 Order (ECF No. 54) at 30 (quoting *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)). It cannot do so on reply. Optum does argue that Aetna did not engage in prohibited transactions and that Aetna "complied with the Mars plan." Optum

---

[12] Unlike the purely "technical violation[s]" of the FCRA in *Dreher v. Experian Information Solutions, Inc.*, 856 F.3d 337, 344 (4th Cir. 2017), Aetna's violations deprived Ms. Peters and the Mars Plan of information and adversely affected their awareness of Aetna's benefits practices, a harm that Congress specifically sought to prohibit when it passed ERISA. *See* 29 U.S.C. §§ 1001(a), (b); *see also Griggs*, 237 F.3d at 380.

Mem. 13, 18. It is wrong on both points.

### A. Aetna Violated ERISA § 406(a)(1)(D) and (b)(1).

Section 406 of ERISA prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D), and from "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1). Aetna—undisputedly a "party in interest" as to the Mars Plan—violated these provisions when it caused the Mars Plan to pay assets to Optum so that it could avoid paying Optum "out of [its] own bank account." Ex. 35; *see also* 8/31/2016 Order, ECF No. 54 at 31 (ruling that Ms. Peters had "clearly allege[d] prohibited transactions by the Defendants").

### 1. Optum Was a "Party in Interest" Under ERISA and Would Be Liable Even if It Were Not.

Under ERISA, a "party in interest" is "a person providing services to [an employee benefits] plan." 29 U. S. C. § 1002(14)(B). ███████████████

████████████████████████████████████████████████

Because Optum— ████████████████████████████████████ it is undisputedly a party in interest. In any event, Ms. Peters is not required to prove Optum's "party in interest" status to hold it liable for the

prohibited transactions. *See LeBlanc v. Cahill*, 153 F.3d 134, 153 (4th Cir. 1998) (agreeing with a Third Circuit decision allowing a claim for violation of § 406(a)(1)(D) against "one who is not a party in interest").

### 2. Optum Waived A Defense of "Reasonable Compensation" Under ERISA § 408(b)(2), Which Is Disputed in Any Event.

For the first time, Optum raises a defense to Ms. Peters's ERISA § 406 claim that its compensation was "reasonable" under § 408(b)(2). *See* Optum Mem. 16-17 (citing 29 U.S.C. § 1108(b)(2)). This is an affirmative defense that Optum was required to plead and prove. *Allen v. GreatBanc Tr. Co*., 835 F.3d 670, 676 (7th Cir. 2016) ("We now hold squarely that the section 408 exemptions are affirmative defenses for pleading purposes, and so the plaintiff has no duty to negate any or all of them."). By failing to plead a defense of reasonable compensation (*see* Optum Answer, ECF No. 57), Optum has waived it. *See Staudner v. Robinson Aviation, Inc.*, 910 F.3d 141, 148 (4th Cir. 2018) ("[A] defendant's failure to plead an affirmative defense waives that issue for the remainder of the litigation."). Allowing Optum to raise the defense now would severely prejudice Ms. Peters, as she has had no opportunity to take discovery on the defense and to proffer expert testimony concerning it. *See S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367, 371 (4th Cir. 2003) (barring as prejudicial a statute of limitations defense raised for the first time in a summary judgment motion).

Moreover, Optum has not established a lack of a genuine dispute as to whether its compensation was reasonable. Here, that issue requires not only a comparison of what Optum was paid and what it did in exchange, but who paid it and under what circumstances. As shown above, the evidence establishes that the Mars Plan and Ms. Peters were required to pay Optum's fees even though Mars, Inc. had already hired Aetna to provide these services, and the plan's written terms prohibited Optum's fees from being treated as "covered expenses." These considerations make it especially improper for the Court to grant Optum's motion on a waived § 408(b)(2) defense. *See Brundle v. Wilmington Tr., N.A.*, 1:15-cv-1494 (LMB/IDD), 2016 WL 6542718, at *15 (E.D. Va. Nov. 3, 2016) (denying Defendants' motion for summary judgment on § 408 affirmative defense because of factual questions about negotiations and motives).

### B. Aetna Deceptively Violated the Written Terms of the Mars Plan to Serve Its Own Interests.

Optum is also wrong when it contends that Aetna's "calculations of Peters's financial responsibility complied with the Mars Plan." Optum Mem. 18. Under the written terms of the Mars Plan, for in-network services received from a "Network Provider," members and the plan were only required to pay the "Negotiated Charge." Optum Mem. Ex. 19 at -0003013. The plan defined the "Negotiated Charge" as "the maximum charge a Network Provider has agreed to make as to any service or supply for the purpose of the benefits under this Plan." *Id.* "Network

Provider," meanwhile, meant "[a] *health care provider* or pharmacy that has contracted to furnish services or supplies for this Plan, but only if the provider is … included in the directory as a Network Provider." *Id.* (emphasis added). By contrast, an "Out-of-Network Provider" was "[a] health care provider or pharmacy that has not contracted, with Aetna, an affiliate, *or a third-party vendor* to furnish services or supplies for this Plan." *Id.* (emphasis added).

Thus, the Network Providers were the health care providers who actually treated members, and the Negotiated Charge was the "maximum charge" those providers had agreed to collect. The Negotiated Charge was *not* defined in reference to the rate that *Optum* agreed to receive as payment for its administrative services. Optum was a "third-party vendor" that contracted with providers, not a "health care provider." *See* 7/27/2018 Order (ECF No. 141) at 21; *see also* Ex. 18, (describing Optum as a "contracted vendor" and the doctors as the "actual Provider of Service"); Ex. 11 at -00011136 (describing Optum as the "vendor" and the "servicing providers" as "contracted with Optum"); Ex. 27 at -000022969 ("our Network Development team negotiates with the actual service providers on their actual payment").[13] Moreover, the Mars Plan only covered "Medically Necessary" charges, not fake charges. *See* Optum Ex. 19 at -00002972, -00003012.

---

[13] *See also Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, 703 F. App'x 126, 131 (3d Cir. 2017) ("Because an administrator or manager does not render medical care, she is not, by plain definition, a provider.").

After this case was filed, Aetna told the Department of Labor that it was revising the definition of "Negotiated Charge" in its plans to mean "[t]he amount Aetna has agreed to pay directly to the [select care and] [network] provider *or to a third party vendor (including any administrative fee that may be included in the amount paid)* for the services, provision of prescription drugs or supplies." Ex. 38 (emphasis added). By proposing this change, Aetna effectively admitted that Optum was a "third party vendor," not a "network provider," and that the Mars Plan as written did not permit charges for Optum's administrative fees. Moreover, because Aetna furthered its own "financial interests" through its determinations that Optum's charges were covered expenses, the Court should not "act as deferentially" to those determinations as "would otherwise be appropriate." *Smith v. Sydnor*, 184 F.3d 356, 365 n.9 (4th Cir. 1999).

In arguing that Aetna construed the Mars Plan correctly, Optum principally relies on the secret administrative services agreement, or ASA, between Aetna and the employer, Mars, Inc. Optum Mem. 19 (citing Optum Ex. 17). But the terms of the ASA are not the written terms of the Mars Plan; if they were, they would have had to be included in the Summary Plan Description. *See* 29 U.S.C. § 1022 (describing requirements of summary plan description); *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (holding that the documents and instruments governing the plan are controlling); *Fritcher v. Health Care Serv.*

*Corp.*, 301 F.3d 811, 817 (7th Cir. 2002) (stating that an ASA is "not a 'plan document' for purposes of holding its terms against a plan participant or beneficiary"). Regardless, Optum was not a "Network Provider" under the ASA either. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

Optum also argues that Ms. Peters's treating providers were *not* Network Providers because "Aetna has no contract" with them. Optum Mem. 19. This argument is baseless for two reasons. First, it is contrary to Optum's "Provider Agreement" with Aetna. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Second, Optum's reading of the term "Network Providers" as *excluding* Ms. Peters's providers is inconsistent with the Mars Plan, which defined "Out-of-Network Providers" as those providers who had *not* contracted with Aetna *or* a "*third-party vendor*" to provide covered services. Optum Mem. Ex. 19 at -0003013 (emphasis added).

Optum also repeats its standard refrain that "Aetna contracted with Optum" to "lower … costs for Aetna plan sponsors and members." Optum Mem. 18. But this lawsuit is not about Aetna's decision to hire Optum. Rather, Ms. Peters is challenging Defendants' handling of particular benefits claims and their decision to

require her and the Mars Plan to bear Optum's charges on those claims. The evidence shows that Defendants administered these claims to require payment of the charges so that Aetna could avoid paying Optum itself. Ex. 35. Whether Aetna hired Optum to save money, mostly by reducing "utilization" (Optum Mem. 5)—a euphemism for cutting care—is immaterial.

## III. OPTUM KNOWINGLY PARTICIPATED IN THE PROHIBITED TRANSACTIONS AND BREACHES.

At minimum, a genuine factual dispute exists as to whether Optum had "actual or constructive knowledge of the circumstances that rendered" Aetna's conduct unlawful. *Harris Trust*, 530 U.S. at 251. As set forth above (supra 3-10), the evidence shows that Optum knew or should have known that Aetna was violating its duties to Ms. Peters, the Mars Plan, and others, but cooperated with Aetna to avoid losing the business. Optum saw the fees as a "high risk" and complained internally that it could not support Aetna's reasoning. Optum also colluded with Aetna to keep its fees secret from members and providers. At minimum, this shows constructive knowledge.[14]

## IV. MS. PETERS CAN OBTAIN RELIEF AGAINST OPTUM UNDER ERISA § 502(a)(3).

ERISA § 502(a)(3) permits an ERISA plan member to seek "appropriate

---

[14] Optum argues that it never saw the plans. Optum Mem. 3. But it asked for them, and Aetna refused to provide them. Ex. 8, Optum 30(b)(6) Tr. 98:10–99:23. This alone was a red flag.

equitable relief" against a nonfiduciary. *See Harris Trust*, 530 U.S. at 251. This includes relief on behalf of the plan, not just on behalf of the member. *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (§ 502(a)(3) acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"); *Banyai v. Mazur*, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) (ruling that § 502(a)(3) authorizes representative suits on behalf of a plan against nonfiduciaries). Equitable relief under § 502(a)(3) can take different forms, including disgorgement or a constructive trust or equitable lien. *Harris Trust*, 530 U.S. at 250; *Pender*, 788 F.3d at 364-65.[15]

*Disgorgement*. Optum ignores this remedy, which is designed to avoid "unjust enrichment." *Pender*, 788 F.3d at 364. Disgorgement "does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011). Thus, Optum's discussion about requiring tracing (Mem. 23–25) is irrelevant to disgorgement. Moreover, a service provider must "disgorge assets *and* profits," not just *net* profit. *See Mertens*, 508 U.S. at 262 (emphasis added); *see also LeBlanc*, 153 F.3d at 153 (same).

---

[15] As Optum notes, a surcharge remedy is only available against a fiduciary. Were the Court to conclude that Optum was a fiduciary, that remedy would also be available.

*Constructive Trust or Equitable Lien*. Another form of restitution available against Optum is a constructive trust or equitable lien, "where money or property identified as belonging in good conscience to the plaintiff c[an] clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). Optum's ill-gotten gains are traceable to Optum's "cash account." Ex. 2, Eichten Tr. 210:3–211:25. Undisputedly, Aetna paid money into this account on behalf of the Mars Plan— payments that Optum called the "slush" or the "upside." *Id.* Even if Optum commingled this money, "as long as the amount in the account exceeds the amount of misappropriated funds that were deposited there, all the plaintiffs' money is still in the account." *See Bronson Partners*, 654 F.3d at 373 n.8. It is also irrelevant that the payments to Optum came from Aetna, rather than directly from the plans. When Aetna made the payments, it was acting with authority to issue checks to pay plan benefits. *See* Ex. 6, Aetna 30(b)(6) Tr. 117:7–23. Finally, Optum does not dispute that the funds are in its bank account, which is all that is required to trace them. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 332 (4th Cir. 2006).

## CONCLUSION

Optum's Motion for Summary Judgment should be denied.

Dated: March 15, 2019

Jason M. Knott*
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(202) 778-1800
(202) 822-8106 (fax)
jknott@zuckerman.com


* *pro hac vice*

/s/ Larry McDevitt
Larry McDevitt
David M. Wilkerson
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
lmcdevitt@vwlawfirm.com

D. Brian Hufford*
Jason S. Cowart*
Nell Z. Peyser*
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
(212) 704-9600
(212) 704-4256 (fax)
dbhufford@zuckerman.com

*Attorneys for Plaintiff Sandra M. Peters,
on behalf of herself and all others
similarly situated*

26