## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:15-cv-00109-MR

| | | |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | MEMORANDUM OF |
| vs. | ) ) | DECISION AND ORDER |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Class

Certification [Doc. 144].

## I.    PROCEDURAL BACKGROUND

On June 12, 2015, the Plaintiff Sandra M. Peters filed this putative

class action against the Defendants Aetna, Inc., Aetna Life Insurance

Company (collectively, "Aetna"), and OptumHealth Care Solutions, Inc.

("Optum"), asserting claims pursuant to the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO") and the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.

§ 1001, et seq. ("ERISA"). [Doc. 1]. In her Complaint, the Plaintiff alleged that Aetna engaged in a fraudulent scheme with Optum and other subcontractors, whereby insureds were caused to pay the subcontractors' administrative fees because the Defendants misrepresented such fees as medical expenses. The Plaintiff alleged that these misrepresentations allowed Aetna to illegally (i) obtain payment of the subcontractors' administrative fees directly from insureds when the insureds' deductibles have not been reached; (ii) use insureds' health spending accounts to pay for these fees; (iii) inflate insureds' co-insurance obligations using administrative fees; (iv) artificially reduce the amount of available coverage for medical services when such coverage is subject to an annual cap; and (v) obtain payment of the administrative fees directly from employers when an insured's deductible has been exhausted or is inapplicable. [Id.].

The Plaintiff asserted two claims based on RICO violations. In Count I of the Complaint, the Plaintiff alleged that Aetna and its subcontractors, including Optum, violated 18 U.S.C. § 1962(c) by engaging in acts of mail and wire fraud in furtherance of a common purpose to collect administrative fees from Aetna insureds and plans by improperly characterizing them as payment for covered medical expenses, and as such, constitute an associated-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4).

Alternatively, the Plaintiff alleged that Aetna has conducted multiple bilateral association-in-fact RICO enterprises with each of its subcontractors. In Count II of the Complaint, the Plaintiff alleged that the Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). The Plaintiff also asserted two claims under ERISA, alleging that the Defendants breached their fiduciary duties as plan administrators, in violation of 29 U.S.C. § 1132(a)(2) (Count III) and 29 U.S.C. § 1132(a)(1), (a)(3), and/or 29 U.S.C. § 1104 (Count IV).

Aetna and Optum moved to dismiss the action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Plaintiff lacked standing to assert her claims and that her Complaint otherwise failed to state claims upon which relief can be granted. [Docs. 37, 39]. On August 31, 2016, the Court entered an Order granting in part and denying in part the Defendants' motions. [Doc. 54]. Specifically, the Court concluded that the Plaintiff had standing to assert claims regarding Aetna's actions with respect to Optum but that the Plaintiff lacked standing to assert any claims with respect to Aetna's interactions with other subcontractors. [Id. at 18-20]. Further, the Court granted the Defendants' motions with respect to the Plaintiff's RICO claims and dismissed those claims with prejudice. The

Court denied the Defendants' motions with respect to the Plaintiff's ERISA claims.  [Id. at 34].

The Plaintiff now moves this Court to grant class certification pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(3), or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(4).

The Defendants oppose the Plaintiff's motion for class certification, arguing that: (1) the proposed classes do not satisfy Rule 23(a)'s commonality requirement; (2) the Plaintiff cannot demonstrate through classwide evidence that all proposed class members suffered injury; (3) the proposed classes do not satisfy Rule 23(a)'s typicality and adequacy requirements; (4) the Plaintiff does not specify what "equitable" relief the proposed members seek or how they would prove their entitlement to it; (5) the proposed classes do not satisfy Rule 23(b)(1); (6) the proposed classes fail Rule 23(b)(3)'s predominance and superiority requirements because individualized inquiries would overwhelm any "class" proceeding; and (7) because the proposed classes are overrun with individualized issues of liability, causation, and injury, there is no basis for issue certification under Rule 23(c)(4).  [Doc. 162].

The Court held a hearing on the motion for class certification on March 1, 2019. Having been fully briefed and argued, this matter is ripe for disposition.

## II. STANDARD OF REVIEW

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (citation and internal quotation marks omitted). To justify a departure from that usual rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. at 348-49 (quoting East Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)). Thus, in seeking the certification of a class action, a putative class representative must demonstrate as a threshold matter that she is a member of the proposed class and that the other class members are "readily identifiable" or "ascertainable." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria.").

Once this threshold determination has been made, the Court must then determine whether the readily identifiable class should be certified. Rule 23(a) of the Federal Rules of Civil Procedure sets forth the four prerequisites

that an action must satisfy in order to be certified as a class action: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims and defenses of the class as a whole ("typicality"); and (4) the representative party must fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Dukes, 564 U.S. at 349 (citations and internal quotation marks omitted).

In addition to satisfying the requirements of Rule 23(a), "the class action must fall within one of the three categories enumerated in Rule 23(b)." Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 423 (4th Cir. 2003). Here, the Plaintiff seeks certification under Rule 23(b)(1) and (3), which provide, respectively, as follows:

> (1) prosecuting separate actions by or against
> individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

\*        \*        \*

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1), (3).

The party seeking class certification bears the burden of demonstrating compliance with Rule 23. "A party seeking class certification must do more

than plead compliance with the aforementioned Rule 23 requirements. Rather, the party must present evidence that the putative class complies with Rule 23." EQT Prod. Co, 764 F.3d at 357 (internal citations omitted). While the plaintiff bears the burden of demonstrating compliance with Rule 23, the Court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." Id. at 358 (quoting in part Dukes, 564 U.S. at 350-51). To satisfy this obligation, the Court may "probe behind the pleadings before coming to rest on the certification question." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (citation and internal quotation marks omitted). Ultimately, the decision to certify a class action is within the discretion of the Court. Gunnells, 348 F.3d at 424.

## III.  FACTUAL BACKGROUND

Aetna insures, underwrites, and administers health benefits plans. [Doc. 56 at ¶ 5]. Aetna's responsibilities under its plans including processing and administering claims, as well as entering into network participation agreements with providers. [Id. at ¶ 21]. Aetna receives compensation from plan sponsors of self-funded[1] plans in exchange for providing these

---

[1] "Self-funded" or "self-insured" plans are ones in which employers are "financially responsible for payment of benefits owed under the terms of the plan." [Id. at ¶ 4].

administrative services.  Those fees are set forth in "administrative services agreements."  [Id. at ¶ 14].

In 2011, Aetna issued a "request for proposal" to several companies (including Optum) with networks of physical therapists seeking to lower costs for employers and members.  [Doc. 163-1: Aetna 30(b)(6) Dep. at 22; see also Doc. 163-4: Kilpinen Dep. at 30]. After "carefully evaluat[ing]" the "pros and cons" of the various responses, Aetna concluded that "Optum had a very solid network" and could generate millions of dollars in "medical cost savings for [Aetna's] members and plan sponsors."  [Doc. 163-1: Aetna 30(b)(6) Dep. at 44; see also Doc. 163-8: Kessler Report at ¶¶ 59-64 (discussing Aetna's contemporaneous savings analyses)].

That analysis showed two types of savings. First, the program would generate "unit cost savings" -- essentially lower rates -- because the Aetna-Optum contract rate was on average lower than the pre-Optum rates that Aetna's plans and members were paying. Second, the program would generate "treatment cost savings due to control of unnecessary visits/utilization."  [Doc. 163-13: HOPP Intake at 4; Doc. 163-1: Aetna 30(b)(6) Dep. at 45].  The lion's share of those savings flowed to self-insured plans and their members because comparatively few members are enrolled in Aetna-insured plans.  [Doc. 163-8: Kessler Report at ¶¶ 64-66].

In 2012, Aetna and Optum entered into a series of agreements relating to Optum's physical-therapy network, including a Provider Agreement [Doc. 146-3]; a Contract Oversight Claims Management Agreement [Doc. 146-4]; a Delegated Patient Management Agreement [Doc. 146-5]; and a Delegated Credentialing Agreement [Doc. 146-6]. Just over a year later, they entered into a similar series of contracts with respect to Optum's chiropractor network. [Docs. 146-7, 146-8, 146-9]. Under these agreements, Optum became responsible for credentialing, utilization management, and payment of the physical therapy and chiropractic providers who provide services to Aetna plan participants.

Under these agreements, the claims process works as follows: An Aetna plan participant visits an Optum-contracted chiropractor or physical therapist. That downstream provider performs a service for the Aetna plan participant and submits a claim to Optum. If the claim is timely and includes the required information, then Optum forwards the claim to Aetna, adding a Current Procedural Terminology ("CPT") medical billing code to the claim in order to insert the rate contracted by Aetna and Optum for that service. Aetna determines whether to cover the claim and (if covered) calculates the amount due as well as the participant's responsibility based on the Aetna-Optum contract rate ("Aetna Bundled Payment rate") rather than the contracted rate

between Optum and that provider ("Optum Downstream rate"). Aetna then sends its determination back to Optum. Optum then pays the treating provider the Optum downstream rate (minus the amount that Aetna calculated as the participant's financial responsibility). [Doc. 163-14: Eichten Dep. at 111, 124; Doc. 162-18: Optum 30(b)(6) Dep. at 62, 117]. Aetna then sends an Explanation of Benefits (an "EOB") to the member identifying Optum as the "provider" for the service. The EOB reports a total "Amount Billed" that includes Optum's charge and its CPT code. The EOB also states the plan's and the participant's responsibility to pay, which Aetna bases on the Aetna-Optum contract rate, not the amount the downstream provider agreed to receive from Optum.

On the whole, the Aetna-Optum relationship has yielded millions of dollars in savings for Aetna plans and participants. [Doc. 163-1: Aetna 30(b)(6) Dep. at 48; Doc. 163-7: Aetna SE – Physical Health Value Review; Doc. 163-8: Kessler Report at ¶¶ 59–64]. As with many flat-rate arrangements, however, results vary across the range of benefits claims, in light of different plan language, benefit design, participant obligations (co-insurance, co-pay, or deductible), downstream providers, and the like. [Doc. 163-1: Aetna 30(b)(6) Dep. at 135]. Depending on the benefits claim, Aetna may pay Optum an amount that is greater than or less than the amount

Optum pays the downstream provider. [Doc. 163-14: Eichten Dep. at 124-25]. Further, if the claim is within the participant's deductible, Optum receives nothing and the Aetna plan participant pays only the contracted rate between Optum and the downstream provider. [Doc. 162-18: Optum 30(b)(6) Dep. at 126-28].

The Plaintiff is a member of a self-insured health insurance plan offered through her husband's former employer, Mars, Inc. ("the Mars Health Care Plan"). The Mars Health Care Plan is one of approximately 1,600 self-insured plans that Aetna administers. The Plaintiff received chiropractic care and physical therapy services from Optum providers from 2013 through 2015. [Doc. 1 at ¶¶ 40-56]. She contends that the Aetna-Optum arrangement wrongfully allowed Optum to "bury" its administrative fees in claims, and that Aetna misled her by representing these administrative fees as medical expenses. [Id.].

The Plaintiff seeks the following relief under ERISA: (1) a declaration that Aetna breached its fiduciary duties of care and loyalty when it caused members and plans to bear responsibility for Optum's administrative fees and misrepresented Optum's fees in EOBs; and that Aetna engaged in prohibited transactions by using plan assets to pay Optum's administrative fees; (2) a declaration that Optum is liable for its role in aiding Aetna's

fiduciary violations; and (3) equitable and injunctive relief for the Defendants'
misconduct, including but not limited to enjoining further misconduct,
requiring the Defendants to issue accurate EOBs, restoring of monetary
losses to self-insured plans and insureds, including interest, imposing a
surcharge for the improper gains obtained in breach of the Defendants'
duties, and removal of the Defendants as administrators of the plans.[2]  [See
Doc. 1 at 26].   The Plaintiff seeks to represent the following class for
purposes of her claims under 29 U.S.C. §1132(a)(2) and (a)(3):

- Plan Claim Class:  All participants or beneficiaries of
  self-insured ERISA health insurance plans
  administered by Aetna for which plan responsibility
  for a claim was assessed using an agreed rate
  between Optum and Aetna that exceeded the
  provider's contracted rate with Optum for the
  treatment provided.

The Plaintiff also seeks to represent the following class for purposes of
her claims under 29 U.S.C. § 1132(a)(1)(B) and (a)(3):

---

[2] The Plaintiff seeks class-wide relief under 29 U.S.C. § 1132(a)(1)(B), (a)(2), and (a)(3).
Section 1132(a)(1)(B) provides that a plan participant or beneficiary may bring a civil
action under ERISA in order "to recover benefits due to him under the terms of his plan,
to enforce his rights under the terms of the plan, or to clarify his rights to future benefits
under the terms of the plan…."  29 U.S.C. § 1132(a)(1)(B).  Section 1132(a)(2) provides
that a plan participant, beneficiary or fiduciary may also seek "appropriate relief" under 29
U.S.C. § 1109.  29 U.S.C. § 1132(a)(2).  Finally, section 1132(a)(3) provides that a plan
participant, beneficiary or fiduciary may bring a civil action "(A) to enjoin any act or practice
which violates any provision of this subchapter or the terms of the plan, or (B) to obtain
other appropriate equitable relief (i) to redress such violations or (ii) to enforce any
provisions of this subchapter or the terms of the plan…."  29 U.S.C. § 1132(a)(3).

- <u>Member Claim Class</u>: All participants or beneficiaries of ERISA health insurance plans insured or administered by Aetna for whom coinsurance responsibility for a claim was assessed using an agreed rate between Optum and Aetna that exceeded the provider's contracted rate with Optum for the treatment provided.

[Doc. 144].

## IV. DISCUSSION

As noted above, the Plaintiff must, as a threshold matter, demonstrate that she is a member of the proposed classes and that the other members of the proposed classes are "readily identifiable" or "ascertainable." <u>EQT Prod. Co.</u>, 764 F.3d at 358. "The plaintiff bears the burden of offering a reliable and administratively feasible mechanism for determining whether putative class members fall within the proposed class definition." <u>Krakauer v. Dish Network L.L.C.</u>, 311 F.R.D. 384, 390 (M.D.N.C. 2015) (quoting in part <u>Hayes v. Wal-Mart Stores, Inc.</u>, 725 F.3d 349, 355 (3d Cir. 2013). A class action is inappropriate where identifying the class members would require "extensive and individualized fact-finding or 'mini-trials.'" <u>EQT Prod. Co.</u>, 764 F.2d at 358 (citation and internal quotation marks omitted).

To identify the members of the potential classes, the Plaintiff relies on the report of Dr. Constantijn Panis, an economist who, at the instruction of Plaintiff's counsel, reviewed and identified the claims for which self-insured

plans and self-insured plan participants were "overcharged," that is, where the assessed Aetna Bundled Payment Rate exceeded the Optum Downstream Rate. Plaintiff's counsel instructed Dr. Panis to identify claims where "the combined responsibility of the plan and the member was equal to the Aetna-allowed amount and exceed the provider-allowed amount." [Doc. 146-22: Panis Report at ¶ 39]. Dr. Panis calculated that this occurred in 70.6% of the claims at issue in this matter, and thus excluded the remaining 29.4% of claims (approximately 300,000 claims) from his analysis. [See id.; see also Doc. 163-23: Panis Dep. at 130-32]. Restricting his analysis to only the portion of the claims identified by counsel's rule as stated above, Dr. Panis calculated what he called an "overcharge" for each claim equal to the difference between the Aetna Bundled Payment Rate (what Aetna paid) and the Optum Downstream Rate (what Optum paid). [Doc. 146-22: Panis Report at ¶ 41]. Dr. Panis then allocated each claim's "overcharge" as follows: "(1) If the member was responsible for a copayment and the plan for the remainder, the entire overcharge was borne by the plan. (2) Otherwise, I assume that the plan and the members were overcharged in proportion to their responsibility of the Aetna-allowed amount." [Id. at ¶ 42]. Dr. Panis then calculated that the plans were "overcharged" a total of $13.7 million and as a result the participants were "overcharged" a total of $1 million. [Id. at

¶¶ 43-44]. He further concluded that Optum's "gain" on claims for which it was paid more than it paid the downstream providers was $15 million.[3] [Id. at ¶ 37]. Dr. Panis, however, did not calculate any set off against these "overcharges" based upon the remaining 29.4% of the claims in which the Aetna payment to Optum was less than Optum's payment to the downstream provider. Thus, the amount of any net loss to the plans and participants (if there was such loss) is not before the Court.

The initial step in a proper economic analysis of injury and damages is to define the "but-for world", i.e. the arrangement as it would exist without the allegedly improper elements. This "but-for world" is then compared to the economic conditions in the actual world, with its allegedly offending elements. As Dr. Daniel P. Kessler, the Defendants' economic expert, explained: "Such a comparison is necessary to determine whether the challenged conduct caused injury and, if so, the extent of that injury." [Doc. 163-8: Kessler Report at ¶ 10]. If the economic conditions in the actual world are equal to or better for the Plaintiff than those in the "but-for world," then no injury occurred as a result of the Defendants' arrangement.

---

[33] Dr. Panis explained that the difference between the $14.7 million in "overcharges" ($13.7 million + $1 million) and Optum's "gain" of $15 million is due to "rounding." [Id. at ¶ 37 n.4].

Consequently, determining the existence of an economic harm and the magnitude of such harm depends on properly defining the "but-for world."

Dr. Panis testified that the appropriate "but-for world" for determining whether plans and participants were harmed by the Defendants' conduct would be an alternative world in which there were no agreements between Optum and Aetna at all, but rather that plan participants were charged the rates negotiated between Optum and its downstream providers, i.e., the Optum Downstream Rate. [Doc. 163-23: Panis Dep. at 218]. In other words, the Plaintiff seeks to compare the alleged improper arrangement with a hypothetical one in which Aetna was able to contract with the downstream providers at the same rate as what Optum was able to arrange with its own Network members.

This "but-for world," however, is not based on recognized economic principles. Dr. Panis was instructed by Plaintiff's counsel to assume an impossible scenario. It is undisputed that Optum's role was crucial in lowering the amounts charged by the downstream providers. [Doc. 146-22: Panis Report at ¶ 39]. Without Optum arranging the streamlining and bundling of services, Aetna would have been charged more than the rate Dr. Panis *assumes* it would have in his "but-for world." Thus, the hypothetical savings Dr. Panis posits are illusory. Either the services provided by Optum

would have to have been provided (by someone) for no charge[4] or the downstream providers would have continued to charge Aetna the higher rates. Theoretically, Aetna could have done for itself what Optum did, but it is contrary to all economic logic that it could have done so at no cost to itself. Thus, in such a scenario the participants would have paid the price in the form of higher premiums. [See Doc. 163-8: Kessler Report at ¶ 50]. For all these reasons, the Court is compelled to disregard entirely Dr. Panis's "but-for world."

The more appropriate "but-for world" for determining whether the Aetna-Optum contractual arrangements caused injury to any plans or participants would be to assume a world where the challenged agreements were not entered into in the first place. In such a situation, Aetna plans and participants would be subject to the rates that Aetna charged prior to its contractual arrangement with Optum ("pre-agreement rates"). Dr. Kessler demonstrates in his report, however, that these pre-agreement rates were on the whole higher than the Aetna Bundled Payment Rates negotiated by Optum and thus would not have resulted in any substantial savings for any Aetna plans or their participants. [See Doc. 163-8: Kessler Report at ¶¶ 56-

---

[4] It is undisputed that Optum invested significant resources in developing and maintaining its Network and providing services. [See Doc. 163-8: Kessler Report at ¶ 49]. It therefore would make no economic sense for Optum to offer such services to Aetna free of charge.

66]. For these reasons, the Court concludes that the Plaintiff has failed to demonstrate that there exists a class of participants who have actually been harmed by the Aetna-Optum arrangement.

The absence of proof of injury is not the only shortcoming in the Plaintiff's evidence. Even if the Court were to accept Dr. Panis's "but-for world," the Plaintiff has not presented any methodology by which the Court could identify who the members of the proposed classes are. In order to certify the proposed classes, the Court must be able to identify, on a class-wide basis, those plans and participants who were actually injured by the Defendants' conduct and the materiality of any such injury. See Hayes, 725 F.3d at 355. In his analysis, Dr. Panis ignored those claims where plans and participants actually benefited from the Agreements, even though he found these instances comprised nearly a third of all claims. As such, he failed to offset any alleged "overcharges" with instances in which the same plan or participant was "undercharged" (i.e., benefited financially) as a result of the Aetna-Optum arrangement. Dr. Panis agreed in his deposition that a class member who was charged less on a particular claim was "undercharged" under his theory, and that "[a]s an economist," he believes that in order to "look at the impact of the Aetna-Optum relationship on a member, you would have to look at that member's complete claims experience and the evolution

of claims over the course of the year." [Doc. 163-23: Panis Dep. at 174-75]. Dr. Panis, however, did not conduct such an analysis, and therefore he has not offered a methodology by which the Court can assess the impact of the Defendants' arrangement on any plan or participant, much less *all* plans and participants in the purported classes.

Dr. Panis's "overcharge" calculation not only fails to quantify any purported loss, it also fails to identify who should be included in the class. It does not distinguish those plans or participants suffering a purported injury from those actually benefiting from the challenged conduct. Many plans and participants actually received "undercharges" and therefore benefited from the Agreements but are nevertheless classified by Dr. Panis as having suffered injury. For example, a participant who had one claim where the Bundled Payment Rate was greater than the Optum Downstream Rate (and therefore was "overcharged"), but also had a claim where the Bundled Payment Rate was less than the Optum Downstream Rate (and therefore had a financial benefit) would be classified by the Plaintiff as having suffered an injury regardless of whether the "undercharge" exceeded the "overcharge." In doing so, however, the Plaintiff simply ignores the claims for which the participant benefited. To determine the actual impact of the Defendants' challenged conduct on a participant, the Court must consider

both claims where the participant's responsibility was based on lower rates and claims where the participant's responsibility was based on higher rates. In other words, the Court must consider *all the claims* incurred by the participant in any given plan year, including those for which the participant benefited as well as those for which the participant was allegedly harmed. Without considering the entirety of a participant's claim history for the entire year, a participant who, over the history of his or her claim history benefited from the Agreements, would be incorrectly classified as having been harmed.

In other words, even employing Dr. Panis's simplistic and unrealistic definition of the "injury" as the difference between what Aetna paid Optum and what Optum paid the providers, Dr. Panis compounds this error by excluding from his analysis all the situations where the payment by Optum to the provider exceeds the payment by Aetna to Optum. As a result, he counts a participant who had a small loss that is more than offset by a larger gain as one who was nonetheless "injured" – notwithstanding such participant's net *gain*. Thus, Dr. Panis's method is of no use in identifying members of a class of participants who were *actually injured*.

The inconsistency between Dr. Panis's "overcharge" calculation and economic reality is clearly illustrated in the case of the named Plaintiff. Dr.

Panis calculates that the Plaintiff was "overcharged" by $151.42 in 2013 and 2014. This calculation, however, is not a measure of any actual economic injury because it ignores the offsetting benefits the Plaintiff received from the alleged improper arrangement. When considering the entirety of the Plaintiff's claims history for these years, Dr. Kessler calculates that the Plaintiff's participant responsibility for those years was actually a net *gain* of $114.71. [Doc. 163-8: Kessler Report at ¶ 105]. As a result, the Plaintiff benefited from the Agreements, even using Dr. Panis's flawed definition of injury based on his economically unrealistic "but-for world."

As illustrated by the case study of the Plaintiff, a detailed individualized inquiry is needed to assess the impact of the challenged conduct on each individual participant in each of the 1,600+ different plans in order to determine whether they come within the bounds of the proposed class. Dr. Panis, however, has not conducted such an inquiry. Instead, he has offered a faulty methodology that improperly ignores a substantial portion of claims and their impact on the participants' claims history, thereby classifying some putative class members as "overcharged" when they actually benefited — including the named Plaintiff herself. As a result, Dr. Panis's methodology does not reliably identify a common injury or damage among putative class members such that they could be readily identifiable or ascertainable.

The complexity of determining a participant's injury, or even whether a participant has been injured, goes beyond correcting for the Plaintiff's simplistic failure to count participants' gain arising from the Aetna-Optum arrangement. For example, whether a participant actually suffered injury will also depend on the amount of coinsurance responsibility that the participant's particular downstream provider actually collected from the participants, a factor that varies among both providers and participants. Additionally, in those cases where the downstream provider did not in fact collect or pursue payment from the participant, the participant suffered no injury and thus could not be included in the class. An individual inquiry on a claim-by-claim basis would be necessary to determine whether this occurred for any particular claim.

Further, a participant's responsibility on one claim may depend on the participant's and the plan's responsibility on the participant's previous claims. Because of the impact of plan terms such as the deductible and out-of-pocket maximum, the impact of the Defendants' challenged conduct on any particular participant or claim can only be assessed through a detailed analysis of an individual participant's claims history considered in the context of that participant's particular plan. Thus, it is not possible to calculate what a participant's (or plan's) responsibility for a claim would have been in any

"but-for world" without considering all of a participant's previous claims incurred in that same plan year. Dr. Panis, however, fails to conduct the individualized inquiry that is necessary to determine how a participant's earlier claims history would have been different in his "but-for world" compared to the actual world, and how that would have affected the participant's responsibility on later claims.[5]

For all these reasons, the Court concludes that the Plaintiff has not offered the Court a "reliable and administratively feasible mechanism for determining" which plans and participants fall within the proposed class definitions. Krakauer, 311 F.R.D. at 390. To ascertain the members of the proposed classes, the Court would be forced to engage in a highly individualized inquiry of *every* plan, *every* participant and *every* claim in those participants' claim histories, taking into account the impact of each participant's deductible, copayments, coinsurance, and out-of-pocket

---

[5] While the Plaintiff is proposing to serve as a class representative for both plans and participants affected by the Defendants' arrangement, the interests of those plans and participants can easily conflict economically under the Plaintiff's theory. For example, a participant could exhaust her deductible more quickly in the actual world than she would have in Dr. Panis's "but-for world," thereby saving her money. That participant's plan would begin bearing responsibility for her claims more quickly in the actual world than it would have in Dr. Panis's "but-for world." In this scenario, the benefit to the participant comes at the expense of the plan, meaning that under the Plaintiff's theory, plans and participants have conflicting interests that can only be reconciled with individualized inquiry. This, of course, begs the question of how the Plaintiff can serve as class representative of a class of plans of which Plaintiff is not a member. The Court, however, need not reach these issues.

maximum. As the Fourth Circuit has noted, certification of a class action is inappropriate where identifying the class members would require "extensive and individualized fact-finding or 'mini-trials.'" EQT Prod. Co., 764 F.2d at 358 (citation and internal quotation marks omitted).

Moreover, the Plaintiff's flawed methodology for determining class membership also reflects a lack of commonality among the putative class members. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Dukes, 564 U.S. at 349-50 (citation and internal quotation marks omitted). Here, the evidence indicates that, in the aggregate, the Aetna-Optum contracts *saved* plans and their participants millions of dollars. Indeed, many proposed class members would be worse off if their claims were reassessed using the Plaintiff's methodology of using only the Optum Downstream Rates. A proposed class challenging conduct that did not harm -- and in fact benefitted -- some proposed class members fails to establish the commonality required for certification.

For all these reasons, the Court in the exercise of its discretion denies the Plaintiff's motion for class certification.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Class

Certification [Doc. 144] is **DENIED**.

**IT IS SO ORDERED.**

Signed: March 29, 2019

Martin Reidinger
United States District Judge