# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

|  |  |  |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:15-cv-00109-MR |
| v. | ) ) | |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## AETNA'S MEMORANDUM IN SUPPORT OF ITS
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

TABLE OF EXHIBITS ...................................................................... iv

I. INTRODUCTION ........................................................................1

II. STATEMENT OF UNDISPUTED FACTS ........................................3

    A.   Aetna Enters into Agreements with Optum to Provide Its Members with a Network of Physical Therapists and Chiropractors.........................3

    B.   Aetna Pays Optum for Access to Its Network and Optum, In Turn, Pays Its Providers. ..............................................................4

    C.   The Aetna-Optum Agreements Have Resulted in Savings to Plans and Members, Including Plaintiff...................................................7

    D.   Aetna Acted in Accordance with the Mars Plan. ....................................11

III. STANDARD OF REVIEW ...........................................................12

IV. ARGUMENT AND AUTHORITIES ...............................................13

    A.   Aetna Is Entitled to Summary Judgment on Plaintiff's Derivate Claim Under ERISA (Count III). .............................................13

        1.   The Aetna-Optum Relationship Resulted in Savings, Not Losses, for the Mars Plan. ......................................................14

        2.   Aetna Did Not Breach Any Fiduciary Duty.......................................16

        3.   Even If the Court Were to Conclude That Aetna Was Operating as a Fiduciary, Its Administration of Plaintiff's Benefits Was Not Arbitrary and Capricious. ...................................................20

        4.   Aetna Did Not Engage in a Prohibited Transaction Under ERISA § 406. ..........................................................................20

    B.   Aetna Is Entitled to Summary Judgment on Plaintiff's Individual Claim Under ERISA (Count IV).............................................22

    C.   Plaintiff Is Not Entitled to Injunctive Relief (Counts III, IV).................23

V. CONCLUSION ...........................................................................23

Case 1:15-cv-00109-MR   Document 228   Filed 05/23/19   Page 2 of 32

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................12

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003) ................................................................12, 13

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................................................................................23

*DiFelice v. Fiduciary Counselors, Inc.*,
398 F. Supp. 2d 453 (E.D. Va. 2005) ..........................................................19

*Estate of Spinner v. Anthem Health Plans of Virginia, Inc.*,
388 F. App'x 275 (4th Cir. 2010)................................................................16

*Faulman v. Sec. Mut. Fin. Life Ins. Co.*,
Civil No. 04-0583, 2007 WL 3025700 (D.N.J. Oct. 15, 2007).........................20

*Firestone Tire & Rubber Co. v. Bruch*,
89 U.S. 101 (1989)....................................................................................20

*Griggs v. E.I. DuPont de Nemours & Co.*,
237 F.3d 371 (4th Cir. 2001) .......................................................................19

*Harley v. Minnesota Mining & Mfg. Co.*,
284 F.3d 901 (8th Cir. 2002) ......................................................................16

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)...................................................................................21

*Massachusetts Mutual Life Ins. Co. v. Russell*,
473 U.S. 134 (1985)...................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 57 (1986)....................................................................................12

*Payne v. Chapel Hill N. Props.*,
   LLC, 947 F. Supp. 2d 567 (M.D.N.C. 2013)......................................................23

*Phelps v. CT Enters.*,
   194 F. App'x 120 (4th Cir. 2006) .......................................................19

*Wiseman v. First Citizens Bank & Trust Co.*,
   215 F.R.D. 507 (W.D.N.C. 2003)........................................................18

STATUTES

29 U.S.C. § 1106 (ERISA § 406)........................................................20, 21

29 U.S.C. § 1108 (ERISA § 408).........................................................21, 22

29 U.S.C. § 1109 (ERISA § 409)...........................................................13

29 U.S.C. § 1132(a)(1) (ERISA § 502(a)(1)) ...........................................22

29 U.S.C. § 1132(a)(2) (ERISA § 502(a)(2)) ...................... 2, 13, 14, 16, 20, 22, 23

29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) ...........................................2

OTHER AUTHORITIES

Fed. R. Civ. P. 56(a)................................................................12

# TABLE OF EXHIBITS

| | |
|---|---|
| 1 | Transcript excerpts from Aetna 30(b)(6) deposition |
| 2 | Transcript excerpts from deposition of Cyndy Kilpinen |
| 3 | Exhibit 213 to deposition of Dr. Daniel Kessler |
| 4 | Exhibit 1 to deposition of Dawn Waggoner |
| 5 | Transcript excerpts from deposition of Shiron Hagens |
| 6 | Transcript excerpts from deposition of Dawn Waggoner |
| 7 | Document AETNA-PETERS-00015341-43 |
| 8 | April 15, 2012 Provider Agreement (Exhibit 4 to D. Waggoner Deposition) |
| 9 | June 1, 2013 Provider Agreement (Exhibit 6 to D. Waggoner Deposition) |
| 10 | July 1, 2016 Amendment No. 4 (Exhibit 63 to E. Gallagher Deposition) |
| 11 | Transcript excerpts from deposition of Theresa Eichten |
| 12 | Transcript excerpts from Optum 30(b)(6) deposition |
| 13 | Exhibit 9 to deposition of D. Waggoner (also Exhibit 126 to Aetna 30(b)(6) deposition) |
| 14 | Exhibit 45 to deposition of T. Eichten |
| 15 | Document AETNA-PETERS-00000203-04 |
| 16 | Declaration of Theresa Eichten (Sept. 7, 2018) |
| 17 | Transcript excerpts from the deposition of Dr. Constantijn Panis |
| 18 | Exhibit 58 to deposition of S. Hagens |
| 19 | Exhibit 127 to Aetna 30(b)(6) deposition |
| 20 | Transcript excerpts from deposition of Sandra Peters |

21          Plaintiff's Second Supplemental & Amended Responses to
            Aetna's First Set of Interrogatories and Exhibit A thereto

22          Exhibit 133 to Aetna 30(b)(6) deposition

Case 1:15-cv-00109-MR   Document 228   Filed 05/23/19   Page 6 of 32

# I.
## <u>INTRODUCTION</u>

Plaintiff's Complaint is rooted in her contention that the relationship between Aetna Life Insurance Company ("Aetna") and OptumHealthCare Solutions, Inc. ("Optum")—a relationship entered into with the goal of providing Aetna members with access to a network of chiropractors and physical therapists and designed to result in savings for members and health benefits plans—caused her injury. But as this Court has now ruled, there is no evidence to support Plaintiff's claim that she, or any of the members of the class she seeks to represent, was injured; in fact, the Court found that the evidence shows that "Plaintiff benefited from the [Aetna-Optum] Agreements" and that, "in the aggregate, the Aetna-Optum contracts *saved* plans and their participants millions of dollars." Dkt. 203 at 19, 22, 25.

Plaintiff's liability theory is premised on the assertion that she would have paid less for her physical therapy and chiropractic benefits without the Aetna-Optum relationship in place—that Aetna somehow should have provided her access to the Optum network of providers directly, without Optum's participation. But Plaintiff's theory ignores both economic reality and the undisputed facts of her own claims history. First, but for the Aetna-Optum agreement, Plaintiff never would have had access to Optum's downstream providers and Optum's favorable rates with those providers. Second, as this Court correctly recognized in its order denying Plaintiff's motion to certify a class: "[T]he Aetna-Optum relationship has yielded millions of

dollars in savings for Aetna plans and participants." Dkt. 203 at 11. Indeed, the record is clear that Plaintiff herself actually benefited from the Aetna-Optum relationship.

Also fatal to Plaintiff's ERISA claims is the fact that she cannot show that Aetna breached any fiduciary duty or acted arbitrarily and capriciously in the administration of her benefits. As this Court has held, in "negotiat[ing] with Optum to establish and maintain a provider network that benefited a broad range of health-care consumers . . . and implementing th[e] system-wide contractual relationship" with Optum, Aetna was not acting as a fiduciary vis-à-vis Plaintiff or her health benefits plan. Dkt 141 at 23-24. And, to the extent Plaintiff is asserting a claim that Aetna breached a fiduciary duty in administering her plan, she would need to prove that Aetna acted arbitrarily and capriciously—a showing that finds no support in the evidence. Aetna's agreement with Optum reaped savings both for Aetna members and for the plans Aetna administered, and was entirely consistent with the terms of Plaintiff's benefits plan. Aetna reasonably and correctly calculated Plaintiff's financial responsibility under her policy, and a benefits determination that correctly construes a health benefits policy cannot, by definition, be arbitrary and capricious.

Further, insofar as Plaintiff seeks injunctive relief pursuant to 29 U.S.C. § 1132(a)(2) and/or 29 U.S.C. § 1132(a)(3), there are no facts to support that Plaintiff suffered any harm in the past, much less any immediate threat of future harm.

2

Aetna is therefore entitled to summary judgment.[1]

## II.
## STATEMENT OF UNDISPUTED FACTS

**A.     Aetna Enters into Agreements with Optum to Provide Its Members with a Network of Physical Therapists and Chiropractors.**

In 2011, in an effort to lower costs for employer-sponsored plans and members, Aetna issued a "request for proposal" to several companies with networks of physical therapists.  Ex. 1 at 22:2-5; *see also* Ex. 2 at 30:17-18 ("Aetna was seeking proposals to lower medical costs for employers and members").  After "carefully evaluat[ing]" the "pros and cons" of the responses to its request for proposal, Aetna concluded that "Optum had a very solid network" that could generate significant "medical cost savings for [Aetna's] members and plan sponsors."  Ex. 1 at 44:4-22.  *See also* Ex. 3 at ¶¶ 59-64 (discussing Aetna's contemporaneous savings analyses).  The goal was to generate two types of savings: (1) "unit cost reduction," Ex. 1 at 45:4—lower rates—because the Aetna-Optum contract rate was on average lower than the pre-Optum rates that Aetna's plans and members were paying; and (2) █████████████████████████████████ ███████████████████████████ *See also* Ex. 1 at 208:1-5 ("Aetna entered into a relationship with Optum . . . to achieve medical cost savings for our members

---

[1] Optum has filed its own motion for summary judgment.  Dkt. 190; Dkt. 207.  In the interest of efficiency, Aetna will not repeat all of Optum's arguments here and instead incorporates them by reference.

3

and plan sponsors."); Ex. 5 at 31:1-4 ("[W]e hired Optum to help us manage PT/OT and Chiro, so that we can save money for our employers and . . . Aetna members."); Ex. 2 at 102:3-4 ("We wanted to help realize savings for the plan sponsors and for the members . . . ."); Ex. 6 at 54:19-25 ("Optum's case rate . . . g[ave] us the opportunity to have increased savings for our members and plan sponsors for rates."); ████████████████████████████████████████████████

████████████████████.

Beginning in 2012, Aetna entered into a series of provider contracts with Optum, whereby Aetna agreed to pay Optum flat, per-visit rates for physical therapy and chiropractic services in particular markets. *See* Ex. 8 (covering physical therapy services); Ex. 9 (covering chiropractic services); Ex. 10 (renegotiating chiropractic agreement to lower rates); *see also* Dkt. 141 at 3 (summarizing agreements).

**B.** **Aetna Pays Optum for Access to Its Network and Optum, In Turn, Pays Its Providers.**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *See also* Ex. 1 at 71:24-72:11 (explaining payment structure under the Aetna-Optum arrangement). Optum, in turn, pays the downstream providers for the services they perform, according to the rates that Optum has negotiated through its separate agreements with those providers. *See* Ex. 11 at 124:25-125:2 ████████████████████████████

██████████████████████. Regardless of the rate paid by Optum to its downstream treating provider, Optum receives the same flat, per-visit payment from Aetna. *Id.* at 124:7-125:24. In some instances, the flat rate Aetna pays to Optum is greater than the payment Optum receives from its downstream provider; in other instances, it is less. *See* Dkt. 141 at 3 n.3 (explaining that where "the amount paid by Optum to its downstream provider exceeded the amount Aetna paid to Optum[,] . . . Optum absorbed that loss as a part of its overall operating arrangement with Aetna"). And if the claim is within the member's deductible, Optum receives nothing and the Aetna member pays only the contracted rate between Optum and the downstream provider. Ex. 12 at 126:19-128:2; Dkt. 203 at 12.

The claims process "is a mechanical process governed by Aetna's claims-submission rules." Dkt. 141 at 16. An Aetna plan member visits an Optum-contracted chiropractor or physical therapist, and the downstream provider then submits a claim to Optum for the service performed. Ex. 12 at 117:8-13. If the claim is timely and includes the required information, *id.* at 73:24-74:5, Optum forwards the claim to Aetna, *id.* at 117:14-16, using a Current Procedural Terminology ("CPT") medical billing code specified in the Aetna-Optum contracts. *Id.* at 75:9-12. *See also* Ex. 13 at 00003057 (explaining that the code is "just a code we use in regards to contracting"). Those codes facilitate the efficient processing and payment of claims. *See, e.g.*, Ex. 5 at 146:5-10 ("That's the code that we have assigned to the

contract to cover the per visit rate."); Ex. 12 at 65:2-12 ("CPT codes . . . are service codes that are used to facilitate the process of getting payment.").[2]

Upon receiving the information from Optum, Aetna determines whether to cover the claim. If the claim is covered, Aetna calculates the payment and the member's responsibility based on the Aetna-Optum flat, contract rate (not the Optum downstream provider rate, which Aetna does not know), and sends its determination back to Optum. Ex. 11 at 111:5-17; Ex. 12 at 62:10-15, 117:8-19. Optum then pays the downstream provider the contracted rate between Optum and that provider, less the amount that Aetna calculated as the member's financial responsibility under the member's individual plan terms. Ex. 11 at 124:13-125:2. Separately, Aetna sends an Explanation of Benefits ("EOB") to the member setting forth the plan's and participant's payment responsibilities. Dkt. 203 at 11; *see also* Ex. 2 at 219:8-221:6. The EOB identifies Optum as the "provider" for the service and reports a total "amount billed," which includes the flat-rate contractual fee to Optum and the CPT code. Dkt. 203 at 11; *see also* Ex. 15.

---

[2] Although some e-mails and notes offhandedly referred to the Aetna-Optum fee structure as "burying" Optum's administrative fee in the claims process, *see, e.g.*, Ex. 14 at 000040747, witnesses explained that "bury" meant only "[t]hat Aetna requested [Optum] build [its] administrative fee into the claims process." Ex. 12 at 195:19-196:3. *See also* Ex. 2 at 57:1-7 ("There was no burying of anything. It [Optum's rate] was inclusive [of the administrative fee]."); Ex. 11 at 205:5-11 ("Q. Did Aetna—did anyone at Aetna communicate to you that in order for the deal to continue, Optum would need to continue to bury the admin fee in the claims process? . . . A. I don't remember ever having it stated like that, no.").

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

## C. The Aetna-Optum Agreements Have Resulted in Savings to Plans and Members, Including Plaintiff.

Plaintiff's liability theory is premised on the assertion that she paid more for her physical therapy and chiropractic benefits under the Aetna-Optum arrangement than she otherwise would have had the Aetna-Optum contracts not existed.[3] But Plaintiff's theory is based on an economic impossibility—i.e., that as a member of an Aetna health benefits plan, she would have been able to avail herself of the rates negotiated between Optum and its downstream providers even if Aetna had not entered into the contested agreements with Optum. *See* Ex. 17 at 218:13-22. As the

---

[3] Plaintiff relies on the report of Dr. Constantijn Panis, an economist who her counsel tasked with reviewing and identifying claims where the Aetna-Optum contract rate exceeded the downstream Optum-provider rate. Ex. 17 130:6-132:14. Dr. Panis did not offset these claims (and the calculations based on them) against the claims in which the Aetna-Optum rate was less than Optum's downstream rate to the provider—i.e., claims where the Aetna-Optum arrangement saved Plaintiff money. Aetna responded with a report from Dr. Daniel Kessler that appropriately looked at the whole picture and demonstrated that the Aetna-Optum relationship bore substantial savings for Aetna plans and their participants, including Plaintiff herself. Ex. 3 at ¶¶ 59-64. The Court rejected Dr. Panis's report for a multitude of reasons, Dkt. 203 at 14-22, which Aetna will not rehash here.

Court has held, Plaintiff's assumption of a hypothetical world in which "Aetna was able to contract with the downstream providers at the same rate as what Optum was able to arrange with its own Network members . . . is not based on recognized economic principles." Dkt. 203 at 17 (explaining that "[w]ithout Optum arranging the streamlining and bundling of services, Aetna would have been charged more than the rate Dr. Panis *assumes* it would have in his 'but-for world'"). Moreover— and even assuming Plaintiff's economic impossibility—the evidence shows that the Aetna-Optum relationship has resulted in millions of dollars in savings for Aetna plans and members. Ex. 3 at ¶¶ 59-64; Ex. 1 at 48:13-20; Ex. 18; *see also* Dkt. 203 at 11.

The beneficiaries of the Aetna-Optum arrangement include Plaintiff herself. Until February 2015, Plaintiff was a member of an ERISA plan (the "Mars Plan") self-funded by her husband's employer, Mars, Inc. ("Mars"). Complaint ("Compl."), Dkt. 1, at ¶ 4. For over two decades, Aetna has served as the Mars Plan's claims administrator. Ex. 1 at 113:10-19; ███████████████████ ███████████████████████████████.

Between 2013 and 2015, Plaintiff visited chiropractors and physical therapists in Optum's network. Compl. ¶¶ 40-56; Ex. 20 at 74:24-75:1, 77:21-78:7. Under the Mars Plan, Plaintiff bore full financial responsibility for her claims until she met her $250 annual deductible, during which time she paid only the rate between Optum

and its downstream provider—though Aetna credited her as if she had paid the Aetna-Optum contract rate (which is typically higher). Ex. 20 at 56:15-57:24, 68:13-71:19. After meeting her deductible, Plaintiff was responsible for 20 percent coinsurance payments on each claim until she met her $1,650 out-of-pocket maximum, after which she had no financial responsibility for her benefits claims. *Id.* at 56:15-57:24. Plaintiff paid her chiropractors and physical therapists directly; she made no payments to Optum for these services. *Id.* at 142:8-150:24 (discussing payments made to provider); Ex. 12 at 127:8-128:2 (explaining that treating provider always collects payment from member directly).

In 2014, Plaintiff fared better under the Aetna-Optum arrangement than she would have under her liability theory. That year, she was responsible for ███████ of her chiropractic and physical therapy claims. Ex. 3 at ¶ 123. If Aetna had calculated Plaintiff's financial responsibility and deductible credits based on the downstream provider rates instead of the Aetna-Optum contract rates, as Plaintiff's theory envisions, she would have paid ████████—$114.71 *more* than she actually paid. *Id.* at ¶¶ 113-25.

In 2013 and 2015, Plaintiff would have fared the same under her liability theory as she did in reality. In 2013, Plaintiff was responsible for ██████ of her chiropractic and physical therapy claims. Ex. 3 at ¶ 108. If Aetna had applied the downstream provider rates to *all* of Plaintiff's chiropractic and physical therapy

9

claims to calculate her patient responsibility and credited toward her deductible and out-of-pocket maximum only the downstream rates, she still would have been responsible for ▇▇▇▇ because she would have reached her out-of-pocket maximum in any event. *Id.* at ¶¶ 108-12. In 2015, Plaintiff had only one benefits claim involving an Optum downstream provider, and she was responsible for the entire downstream rate because she had not met her deductible for that year. *Id.* at ¶ 127.

Looking only at the claims where she paid more than the Optum downstream provider rate, Plaintiff alleges that she paid $151.42 more than she should have. *See* Ex. 21, Ex. A. But applying the Optum downstream rates consistently to all claims—not just to the claims that Plaintiff cherry picks—would result in Plaintiff paying $114.71 *more* than she did in reality. Ex. 3 at ¶¶ 105, 113-25; *see also* Dkt. 203 at 22.

In its order denying class certification, the Court recognized that Plaintiff was self-selecting a skewed sample of claims to try to concoct a damage theory. *See* Dkt. 203 at 20 ("Many plans and participants actually received 'undercharges' and therefore benefited from the Agreements but are nevertheless classified by Dr. Panis as having suffered injury."); *id.* ("[T]he Plaintiff simply ignores the claims for which the participant benefited."). The Court further recognized that Plaintiff—and many of the class members she sought to represent—suffered no harm (and in fact benefited) from the Aetna-Optum relationship:

It is undisputed that Optum's role was crucial in lowering the amounts charged to downstream providers. Without Optum arranging the streamlining and bundling of services, Aetna would have been charged more than the rate Dr. Panis [Plaintiff's expert] *assumes* it would have in his 'but-for-world.' Thus, the hypothetical savings Dr. Panis posits are illusory. . . .

The more appropriate 'but-for-world' for determining whether the Aetna-Optum contractual arrangements caused injury to any plans or participants would be to assume a world where the challenged agreements were not entered into in the first place. In such a situation, Aetna plans and participants would be subject to the rates that Aetna charged prior to its contractual arrangement with Optum. Dr. Kessler demonstrates in his report, however, that these pre-arrangement rates were on the whole higher than the [rates] negotiated by Optum . . . . [T]he Court concludes that the Plaintiff has failed to demonstrate that there exists a class of participants who have actually been harmed by the Aetna-Optum arrangement.

Dkt. 203 at 17-19. The Court continued:

When considering the entirety of the Plaintiff's claims history for these years, Dr. Kessler calculates that Plaintiff's participant responsibility for those years was actually a net *gain* of $114.71. As a result, the Plaintiff benefited from the Agreements, even using Dr. Panis's flawed definition of injury based on his economically unrealistic 'but-for-world.'

*Id.* at 22.

### D.    Aetna Acted in Accordance with the Mars Plan.

The evidence shows that Aetna administered Plaintiff's benefits in a manner consistent with the Mars Plan. Under that plan, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

11

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████ As discussed in

Section II.C, *supra*, the Aetna-Optum relationship also resulted in significant

savings for Aetna plans and members, including Plaintiff.

## III.
## <u>STANDARD OF REVIEW</u>

Summary judgment is warranted if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "[T]he mere existence of *some* alleged dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of material fact." *Bouchat v. Baltimore

Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (citing *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).[4]  In considering a motion for

summary judgment, the court is to view the pleadings in the light most favorable to

the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

57, 587 (1986).  However, "neither unsupported speculation nor evidence that is

---

[4] Unless otherwise noted, internal citations, quotation marks, and alterations are omitted.

merely colorable or not significantly probative will suffice to defeat a motion for summary judgment." *Bouchat*, 346 F.3d at 522.

## IV.
## ARGUMENT AND AUTHORITIES

**A.    Aetna Is Entitled to Summary Judgment on Plaintiff's Derivate Claim Under ERISA (Count III).**

ERISA § 502(a)(2) provides that a plan participant, beneficiary, or fiduciary may bring a civil action for "appropriate relief under section 1109 of this title," which in turn covers "losses to the plan resulting from each such breach [of fiduciary duty] . . . ."  29 U.S.C. § 1109(a); 29 U.S.C. § 1132(a)(2)).  Collectively, these provisions authorize a derivative suit for a fiduciary breach that results in losses to the plan.  *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985) (holding that § 502(a)(2) addresses "the possible misuse of plan assets" and provides remedies to "protect the entire plan, rather than . . . the rights of an individual beneficiary").

Plaintiff claims that she is seeking relief under ERISA § 502(a)(2) "to make good any losses to the self-funded plans" caused by Defendants "issuing EOBs that improperly characterize administrative fees as expenses for medical services, failing to disclose to insureds and plans the charges for administrative fees, and knowingly participating in, enabling, and failing to correct fiduciary breaches by their fellow Defendants."  Compl. ¶¶ 95, 98.  But Plaintiff has not demonstrated that the Mars

Plan (or any other plan) suffered any losses from the Aetna-Optum relationship—indeed, the evidence shows that the Mars Plan, like Plaintiff herself, benefited from the low healthcare costs generated by the Aetna-Optum arrangement. Further, there is no support for Plaintiff's allegation that Aetna breached any fiduciary duty with respect to Plaintiff or her plan. Accordingly, her claims under ERISA § 502(a)(2) should be dismissed.

### 1. The Aetna-Optum Relationship Resulted in Savings, Not Losses, for the Mars Plan.

Plaintiff cannot show that the Mars Plan suffered any loss. Indeed, with respect to her own benefits claims, Plaintiff has conceded that, of the 58[5] claims she contends are at issue, she suffered no financial loss on 26 of those claims. Dkt. 199 at 11-12; Ex. 21, Ex. A. Applying the downstream provider rates to the 32 remaining claims, Plaintiff alleges that she paid $151.42 more than she should have. Ex. 21, Ex. A. But applying the downstream rates to *all* 58 claims—not just a self-selected sample—shows that Plaintiff would have in fact fared worse under her proposed methodology.

In 2013, Plaintiff was responsible for ▮▮▮▮ of her chiropractic and physical therapy claims—the same amount she would have owed under her theory given that she would have reached her out-of-pocket maximum in any event. Ex. 3 at ¶¶ 108-

---

[5] In her interrogatory responses, Plaintiff contended that 57 benefits claims are in question. Ex. 21, Ex. A. She recently revised that number to 58. Dkt. 199 at 12.

12.  In 2014, Plaintiff fared $114.71 better with the Aetna-Optum relationship in place; she paid ███████ for her chiropractic and physical therapy claims and would have paid ███████ under her own theory.  *Id.* at ¶¶ 113-25.  And in 2015, Plaintiff had only one benefits claim involving an Optum downstream provider, and she was responsible for the entire rate because she had not met her deductible for that year.  *Id.* at ¶ 127.  Thus, had Aetna calculated Plaintiff's financial responsibility and deductible credits based on the downstream provider rates and not the Aetna-Optum contracted rates—as Plaintiff argues Aetna should have done—Plaintiff would be $114.71 *worse off*.

In its order denying class certification, the Court noted that "Plaintiff benefited from the [Aetna-Optum] Agreements, even using [Plaintiff's expert] Dr. Panis's flawed definition of injury based on his economically unrealistic 'but-for-world.'"  Dkt. 203 at 22.  The Court also recognized that the benefits from the Aetna-Optum relationship were widespread, benefiting not just Plaintiff, but also other Aetna members and plans.  *Id.* at 11 ("On the whole, the Aetna-Optum relationship has yielded millions of dollars in savings for Aetna plans and participants."); *id.* at 19 ("[T]he Court concludes that the Plaintiff has failed to demonstrate that there exists a class of participants who have actually been harmed by the Aetna-Optum arrangement.").  The Court noted: "It is undisputed that Optum's role was crucial in lowering the amounts charged by the downstream providers," *id.* at 17, and criticized

Plaintiff's expert for "[i]gnoring those claims where plans and participants actually benefited from the [Aetna-Optum] Agreements." *Id*. at 19; *see also id.* at 20 ("Many plans and participants actually received 'undercharges' and therefore benefited from the Agreements . . . .").

Because she cannot show any injury to the Mars Plan, Plaintiff does not have standing to assert an ERISA § 502(a)(2) claim on its behalf. *See, e.g.*, *Estate of Spinner v. Anthem Health Plans of Virginia, Inc.*, 388 F. App'x 275, 281 (4th Cir. 2010) ("Section 1132(a)(2) enables plan participants and beneficiaries to bring actions on behalf of the plan to recover for breaches of fiduciary duties *which harm the plan*.") (emphasis added). *Cf. Harley v. Minnesota Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002) (upholding dismissal of claims under 29 U.S.C. § 1132(a)(2) where plan had suffered no cognizable harm and reasoning that "the limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan").

### 2. Aetna Did Not Breach Any Fiduciary Duty.

Even if Plaintiff could somehow show that the Mars Plan suffered injury (she cannot), her ERISA § 502(a)(2) claim still would fail since the evidence shows that Aetna breached no fiduciary duty vis-à-vis Plaintiff or her plan.

First, the Court has recognized that Aetna served only as a limited fiduciary with respect to Plaintiff and the Mars Plan—and, importantly, did *not* serve a fiduciary function in negotiating "with Optum to establish and maintain a provider network that benefited a broad range of health-care consumers . . . ." Dkt. 141 at 23. Aetna contracted with Optum to lower physical therapy and chiropractic costs for Aetna plan sponsors and members generally, and the relationship has done just that. Ex. 1 at 48:13-20; Ex. 6 at 54:17-25; Ex. 3 at ¶¶ 59-64. Further, even had Aetna been operating as a fiduciary when it negotiated the Optum arrangement, it is axiomatic that Aetna could not have breached a fiduciary duty by entering into an agreement that ultimately saved both Plaintiff and the Mars Plan money.

Aetna acted entirely consistent with the Mars Plan. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ And Aetna calculated Plaintiff's financial responsibility in accordance with the Mars Plan. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ Recognizing Optum as the "Network Provider" for purposes of calculating the "Negotiated Charge" is not only consistent with the Mars Plan's definitions of those terms, *see* Ex. 22 at 00003013—████████████████

[REDACTED]

Moreover, to the extent Plaintiff alleges that Aetna breached its fiduciary duties by "issuing EOBs that improperly characterize administrative fees as expenses for medical services," Compl. ¶ 95, there is no evidence to support any specific misrepresentations by Aetna in its EOBs, let alone any that Plaintiff relied upon to her detriment. *See, e.g.*, *Wiseman v. First Citizens Bank & Trust Co.*, 215 F.R.D. 507, 510 (W.D.N.C. 2003) (explaining that to prove an ERISA breach of fiduciary duty based on a misrepresentation, a plaintiff must establish that the defendant was an ERISA fiduciary acting as such, that the defendant made a material misrepresentation, and that the plaintiff relied on that misrepresentation to her detriment).

Finally, Plaintiff's allegation that Aetna failed to disclose "charges for administrative fees," Compl. ¶ 95, similarly fails to support any breach of fiduciary duty. Plaintiff has not identified a single regulatory or statutory requirement for Aetna to disclose the information concerning "charges for administrative fees" in the absence of any request for such information. Nor can Plaintiff point to any facts

18

to support that either of the two scenarios that the Fourth Circuit has recognized as imposing affirmative disclosure duties on ERISA administrators—i.e., (1) where the beneficiary requests information from the administrator or (2) where an administrator that has fostered a misunderstanding of facts possesses information that the beneficiary needs for her protection—are applicable here. *See Phelps v. CT Enters.*, 194 F. App'x 120, 126 (4th Cir. 2006) ("[A] fiduciary must give complete and accurate information to a beneficiary if the beneficiary requests information."); *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380-81 (4th Cir. 2001) (describing "limited fiduciary duty" to "communicate to the beneficiary material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection"); *see also DiFelice v. Fiduciary Counselors, Inc.*, 398 F. Supp. 2d 453, 465 (E.D. Va. 2005) (explaining that the affirmative duty to provide information discussed in *Griggs* "arises only when the fiduciary has fostered the misunderstanding of facts material to participants' . . . decisions").

Plaintiff cannot establish that Aetna breached any fiduciary duty owed to the Mars Plan, and Aetna is entitled to summary judgment on Plaintiff's Count III on this basis.

3. **Even If the Court Were to Conclude That Aetna Was Operating as a Fiduciary, Its Administration of Plaintiff's Benefits Was Not Arbitrary and Capricious.**

███████████████████████████████████████████████████████

████████████████████████ Aetna's interpretation of those terms is reviewed under the "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch*, 89 U.S. 101, 111 (1989) (counseling courts to apply deferential standard of review where administrator is given discretion). And, even if there was some ambiguity in the contractual language (i.e., that Plaintiff's argument that her plan required Aetna to interpret "Negotiated Charge" to mean Optum's downstream rate with her treating providers carried any weight), Aetna's interpretation was not arbitrary and capricious for the reasons set forth in Section IV.A.2, *supra*. Because "[a] fiduciary who complies with the written terms of an ERISA plan cannot be said to have breached its fiduciary duties," *Faulman v. Sec. Mut. Fin. Life Ins. Co.*, Civil No. 04-0583, 2007 WL 3025700, at *3 (D.N.J. Oct. 15, 2007), let alone acted arbitrarily and capriciously, Aetna is entitled to summary judgment on Plaintiff's ERISA § 502(a)(2) claim.

4. **Aetna Did Not Engage in a Prohibited Transaction Under ERISA § 406.**

Plaintiff's final, tacked-on claim that Aetna violated ERISA § 406(a)(1)(D) and (b)(1) by using plan assets to pay Optum's administrative fees, Compl. ¶ 97, also fails.

ERISA § 406(a)(1)(D) prohibits a plan fiduciary from causing the plan to engage in a transaction constituting a transfer of "assets of the plan" to a "party in interest." 29 U.S.C. § 1106(a)(1)(D). But Plaintiff's out-of-pocket payments to downstream providers, which Plaintiff alleges (incorrectly) were inflated, were not assets of the Mars Plan. Moreover, § 406(a)(1)(D) targets transfers to a "party in interest"—i.e., deals "struck with plan insiders, presumably not at arm's length," *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996)—not contracts with outsiders like Optum to provide services. *See* Dkt. 141 at 15 ("Optum has no contractual relationship with the Mars Plan. Rather, Optum contracts directly with Aetna to create and maintain provider networks for chiropractic and physical-therapy services.").

For these same reasons, Plaintiff's claim under ERISA § 406(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the plan in [its] own interest or for [its] own account," also fails. 29 U.S.C. § 1106(b)(1). Additionally, even if Aetna's conduct in entering into and maintaining a relationship with Optum for the purpose of giving its members access to Optum's physical therapy and chiropractic networks was somehow covered by § 406, that conduct would fall within § 408(b)(2)'s exemption. *See* 29 U.S.C. § 1108(b)(2) (exempting from the scope of § 406 "reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of a plan, if no more than reasonable compensation

is paid therefor").  As this Court has already concluded and the evidence plainly shows, Aetna paid Optum reasonable compensation for its provider network.  *See* Dkt. 141 at 20 ("Optum's compensation was a product of arm's length negotiations."); Dkt. 203 at 18 n.4 ("It is undisputed that Optum invested significant resources in developing and maintaining its Network and providing services.  It therefore would make no economic sense for Optum to offer such services to Aetna free of charge."); Ex. 3 at ¶¶ 38, 48-50, 57.  Accordingly, even under the unrealistic assumption that Aetna engaged in a "prohibited transaction" by entering into an agreement with Optum that gave Plaintiff and other Aetna members access to a network of providers and saved them money, such conduct would be exempted from liability under § 408.

As the evidence fails to support a finding that Aetna breached any fiduciary obligation owed to the Mars Plan, Aetna is entitled to summary judgment on Plaintiff's ERISA § 502(a)(2) claim, along with the rest of her claims in Count III.

## B. Aetna Is Entitled to Summary Judgment on Plaintiff's Individual Claim Under ERISA (Count IV).

ERISA § 502(a)(1) permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  To the extent that Plaintiff is bringing a direct claim under this provision for damages that she allegedly suffered as a result

of the Aetna-Optum relationship, that claim fails since the evidence shows that Plaintiff suffered no losses (and in fact benefited) from that relationship. Moreover, Plaintiff cannot show that Aetna's disposition of any of her claims was erroneous, much less arbitrary and capricious. For the reasons set forth in detail above, *see* Section II.C, *supra*, Plaintiff cannot show that she suffered any individual injury— indeed, the undisputed evidence shows that she did not.

## C.    Plaintiff Is Not Entitled to Injunctive Relief (Counts III, IV).

Plaintiff has no claim for injunctive relief under ERISA § 502(a)(2) and/or (a)(3) because she cannot show an immediate threat of future harm. Plaintiff challenges "inflated" coinsurance amounts for services that she received from Optum-contract providers in 2013 and 2014. Compl. ¶¶ 40-54. She does not allege any problematic payments in or after 2015, let alone any that would support an imminent threat of *future* harm. And, under well-established authorities, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy. *Payne v. Chapel Hill N. Props.*, LLC, 947 F. Supp. 2d 567, 571-72 (M.D.N.C. 2013) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Indeed, Plaintiff has shown no harm, past or future.

## V.
## CONCLUSION

Through the Aetna-Optum relationship, Aetna offered its members access to a quality network of Optum providers at a reduced cost. The record demonstrates

that neither Plaintiff nor the Mars Plan suffered any injury as a result of the relationship. To the contrary, the evidence shows that both actually benefited from the arrangement. Aetna breached no fiduciary duty owed to the Mars Plan, and violated no rights of Plaintiff herself, by entering into a relationship that ultimately saved them both money. Aetna is entitled to summary judgment on all of Plaintiff's claims asserted herein.

Dated: May 23, 2019

Respectfully submitted,

*/s/ E. Thomison Holman*
E. Thomison Holman
  NC Bar No. 19380
HOLMAN LAW, PLLC
56 College Street, Suite 302
Asheville, NC 28801
tom@holmanlawwnc.com
(828) 252-7381
(828) 252-5018 (fax)

Earl B. Austin (*pro hac vice*)
Jessica F. Rosenbaum (*pro hac vice*)
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
earl.austin@bakerbotts.com
jessica.rosenbaum@bakerbotts.com
(212) 408-2500
(212) 408-2501 (fax)

*Counsel for Defendants Aetna Inc.*
*and Aetna Life Insurance Company*

## <u>CERTIFICATE OF COMPLIANCE WITH THE COURT'S RULES</u>

I certify that this brief complies with Local Rule 7.1 and this Court's Pretrial Order and Case Management Plan. It uses Microsoft Word double-spacing and one-inch margins, is in Times New Roman 14-point font (including footnotes), and does not exceed 25 pages.

Dated: May 23, 2019

*/s/ E. Thomison Holman*
E. Thomison Holman
  NC Bar No. 19380
HOLMAN LAW, PLLC
56 College Street, Suite 302
Asheville, NC 28801
tom@holmanlawwnc.com
(828) 252-7381
(828) 252-5018 (fax)

*Attorneys for Defendants Aetna Inc.*
*and Aetna Life Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of May 2019, a copy of the foregoing was electronically filed with the clerk of the court of the United States District Court, Western District of North Carolina, Asheville Division, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ E. Thomison Holman
E. Thomison Holman
   NC Bar No. 19380
HOLMAN LAW, PLLC
56 College Street, Suite 302
Asheville, NC 28801
tom@holmanlawwnc.com
(828) 252-7381
(828) 252-5018 (fax)

*Attorneys for Defendants Aetna Inc. and Aetna Life Insurance Company*