# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
Case No. 1:15-cv-00109-MR

|  |  |  |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **PLAINTIFF'S BRIEF IN RESPONSE TO AETNA'S MOTION FOR SUMMARY JUDGMENT** |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF EXHIBITS ....................................................................................... vii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ....................................................................................2

    A.    Mars, Inc. Hired Aetna to Administer Claims and Supply a Network of Providers to Members ..........................................2

    B.    Aetna Outsourced Its Work to Optum ..................................................2

    C.    To Avoid Paying Optum, Aetna Came Up With A Scheme to Bury Optum's Charges in Medical Claims ...........................................3

    D.    Ms. Peters and the Mars Plan Were Forced to Bear Optum's Charges in Violation of the Plan Terms .................................................5

LEGAL STANDARD ............................................................................................7

ARGUMENT .........................................................................................................8

    I.    MS. PETERS AND HER PLAN WERE INJURED ...........................8

        A.    Ms. Peters and the Mars Plan were injured by Aetna's breaches, including when they were improperly required to pay Optum's fees ............................................8

        B.    The opinion of Aetna's paid expert that Ms. Peters suffered no injury is inconsistent with ERISA .......................................10

    II.    A GENUINE DISPUTE EXISTS AS TO MS. PETERS' SECTION 502(a)(2) CLAIM ON BEHALF OF THE MARS PLAN .................................................................................................14

        A.    There is a genuine dispute as to whether Aetna breached fiduciary duties by charging the Mars Plan for Optum's fees ...............................................15

Case 1:15-cv-00109-MR    Document 233    Filed 06/13/19    Page 2 of 36

1.  Aetna was acting as a fiduciary when it administered the Mars Plan and adjudicated Ms. Peters' benefit claims ...............................................................15

2.  Aetna breached its fiduciary duty by adjudicating Ms. Peters' claims in a manner that violated the Mars Plan ........................................................................16

3.  Aetna also breached its fiduciary duty by sending misleading EOBs that failed to disclose charges for administrative fees ..........................................................19

4.  Aetna's new plan interpretation is not entitled to deference ........................................................................20

B.  There is a genuine dispute as to whether Aetna engaged in a prohibited transaction under § 406 ....................................21

III.  A GENUINE DISPUTE EXISTS AS TO MS. PETERS' § 502(a)(1)(B) CLAIM...........................................................23

IV.  A GENUINE DISPUTE EXISTS AS TO MS. PETERS' § 502(a)(3) CLAIM ...............................................................24

CONCLUSION ..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Bayona*,
223 F.3d 1030 (9th Cir. 2000), *as amended on denial of reh'g and
suggestion for reh'g en banc* (Nov. 3, 2000) ......................................................15

*Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*,
703 F. App'x 126 (3d Cir. 2017)...........................................................................17

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670 (7th Cir. 2016)................................................................................22

*Amara v. Cigna Corp.*,
775 F.3d 510 (2d Cir. 2014) ................................................................................13

*Barboza v. California Ass'n of Prof'l Firefighters*,
799 F.3d 1257 (9th Cir. 2015)..............................................................................22

*Carter v. Fleming*,
879 F.3d 132 (4th Cir. 2018) ..................................................................................8

*CIGNA Corp. v. Amara*,
563 U.S. 421 (2011) .............................................................................................25

*DiFelice v. Fiduciary Counselors, Inc.*,
398 F. Supp. 2d 453 (E.D. Va. 2005)...................................................................20

*EEOC v. McLeod Health, Inc.*,
914 F.3d 876 (4th Cir. 2019) ..................................................................................8

*Fritcher v. Health Care Serv. Corp.*,
301 F.3d 811 (7th Cir. 2002)................................................................................18

*FTC v. Bronson Partners, LLC*,
654 F.3d 359 (2d Cir. 2011) ................................................................................25

*Griggs v. E.I. DuPont de Nemours & Co.*,
237 F.3d 371 (4th Cir. 2001)................................................................................19

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000) ............................................................................................12

*Helton v. AT&T Inc.*,
    709 F.3d 343 (4th Cir. 2013)..............................................................................20

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
    555 U.S. 285 (2009) ............................................................................................18

*Kenseth v. Dean Health Plan, Inc.*,
    722 F.3d 869 (7th Cir. 2013)..............................................................................19

*McConocha v. Blue Cross & Blue Shield of Ohio*,
    898 F. Supp. 545 (N.D. Ohio 1995)....................................................................19

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008) ............................................................................................12

*Nat'l Sec. Sys., Inc. v. Iola*,
    700 F.3d 65 (3d Cir. 2012) .................................................................................23

*Patelco Credit Union v. Sahni*,
    262 F.3d 897 (9th Cir. 2001)..............................................................................23

*Pender v. Bank of Am. Corp.*,
    788 F.3d 354 (4th Cir. 2015)..........................................................................8, 25

*Ret. Comm. of DAK Americas LLC v. Brewer*,
    867 F.3d 471 (4th Cir. 2017)..............................................................................20

*Smith v. Sydnor*,
    184 F.3d 356 (4th Cir. 1999)..............................................................................21

*Smith v. United HealthCare Servs., Inc.*,
    No. Civ. 00-1163 ADM AJB, 2003 WL 22047861 (D. Minn. Aug. 28, 2003)...23

*Spear v. Fenkell*,
    Civil Action No. 13-2391, 2016 WL 5661720 (E.D. Pa. Sept. 30, 2016),
    *clarified on denial of reconsideration*, 2016 WL 7475814 (E.D. Pa. Dec. 29,
    2016)......................................................................................................................8

*Staudner v. Robinson Aviation, Inc.*,
    910 F.3d 141 (4th Cir. 2018)..............................................................................22

Case 1:15-cv-00109-MR   Document 233   Filed 06/13/19   Page 5 of 36

*Taylor v. KeyCorp*,
  680 F.3d 609 (6th Cir. 2012) ...................................................................................13

*Whitfield v. Tomasso*,
  682 F. Supp. 1287 (E.D.N.Y. 1988) .......................................................................23

**Statutes**

29 U.S.C. § 1001, ERISA § 2 ....................................................................................20

29 U.S.C. § 1002(14)(B), ERISA § 3(14)(B) ..........................................................21

29 U.S.C. § 1002(21)(A)(iii), ERISA § 3(21)(A)(iii) ..............................................15

29 U.S.C. § 1002(21)(A), ERISA § 3(21)(A) .............................................................2

29 U.S.C. § 1022, ERISA § 102 ...............................................................................18

29 U.S.C. § 1106(a)(1)(D), ERISA § 406(a)(1)(D) ..................................................21

29 U.S.C. § 1106(b)(1), ERISA § 406(b)(1) ..................................................... 21, 22

29 U.S.C. § 1106(b), ERISA § 406(b) ......................................................................23

29 U.S.C. § 1106, ERISA § 406 ................................................................................22

29 U.S.C. § 1108(b)(2), ERISA § 408(b)(2) ..................................................... 22, 23

29 U.S.C. § 1109, ERISA § 409 ................................................................................15

29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B) ......................................... 23, 24

29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2) ............................................... 14, 15, 22

29 U.S.C. § 1132(a)(3), ERISA § 502(a)(3) ............................................... 12, 24, 25

**Other Authorities**

BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 708 ................................................12

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51(4) ..........25

RESTATEMENT (THIRD) OF TRUSTS § 101 ...............................................................12

Case 1:15-cv-00109-MR   Document 233   Filed 06/13/19   Page 6 of 36

**Rules**

Fed. R. Civ. P. 56(a).................................................................................................8

Case 1:15-cv-00109-MR   Document 233   Filed 06/13/19   Page 7 of 36

# TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | List of approved health benefit claims for Sandra Peters that were processed through Optum |
| 2 | Excerpts from the March 1, 2018 Rule 30(b)(6) deposition of Aetna |
| 3 | April 15, 2012 Contract Oversight Claims Management Agreement (AETNA-PETERS-00000451) |
| 4 | April 15, 2012 Delegated Credentialing Agreement (AETNA-PETERS-00000521) |
| 5 | April 15, 2012 Delegated Patient Management Agreement (AETNA-PETERS-00000565) |
| 6 | June 1, 2013 Contract Oversight Claims Management Agreement (AETNA-PETERS-00001541) |
| 7 | June 1, 2013 Delegated Credentialing Agreement (AETNA-PETERS-00034417) |
| 8 | June 1, 2013 Delegated Patient Management Agreement (AETNA-PETERS-00001583) |
| 9 | February 28, 2011 email chain (AETNA-PETERS-00010642) |
| 10 | April 29, 2011 email chain (AETNA-PETERS-00057620) |
| 11 | Excerpts from the November 2, 2017 deposition of Theresa Eichten |
| 12 | December 28, 2013 email chain (OPTUM-PETERS-000022968) |
| 13 | January 28, 2016 email and attachment (OPTUM-PETERS-000014072) |

Case 1:15-cv-00109-MR   Document 233   Filed 06/13/19   Page 8 of 36

| 14 | April 14, 2015 email and attachment (OPTUM-PETERS-000040745) |
|---|---|
| 15 | November 27, 2012 email chain (OPTUM-PETERS-000002883) |
| 16 | March 20, 2014 Explanation of Benefits for a February 19, 2014 service received by Sandra Peters (AETNA-PETERS-00000203) |
| 17 | Excerpts from the December 15, 2017 deposition of David Elton |
| 18 | December 5, 2013 email chain (OPTUM-PETERS-000046141) |
| 19 | December 21, 2012 AetNet Network Reference Tool (AETNA-PETERS-00003056) |
| 20 | Document titled "Aetna SE Q&A" (OPTUM-PETERS-000031280) |
| 21 | Document titled "Aetna SE Chiro Q&A" (OPTUM-PETERS-000007722) |
| 22 | Excerpts from the December 7, 2017 deposition of Ellen Gallagher |
| 23 | Health Insurance Claim Form, Optum data sheet, and Optum remittance advice for a July 16, 2014 service received by Sandra Peters (OPTUM-PETERS-000001749) |
| 24 | September 4, 2014 Explanation of Benefits for a July 16, 2014 service received by Sandra Peters (AETNA-PETERS-00000255) |
| 25 | December 23, 2014 email chain (AETNA-PETERS-00044590) |
| 26 | Excerpts from the March 5, 2018 deposition of Sandra Peters |
| 27 | November 18, 2014 email chain (AETNA-PETERS-00008530) |

28    Excerpts from the March 8, 2018 Rule 30(b)(6) deposition of Optum

29    Excerpts from the December 13, 2017 deposition of Cyndy Kilpinen

30    Excerpts from the June 25, 2018 deposition of Dr. Daniel Kessler

31    Excerpts from the March 2, 2018 deposition of Jennifer Cross Hennigan

32    September 14, 2011 email chain and attachment
      (AETNA-PETERS-00011136)

33    Document titled "OPTUM/DOL"
      (AETNA-PETERS-00065833)

# PRELIMINARY STATEMENT

Ms. Peters' employer, Mars, hired Aetna to administer claims for medical benefits and contract with providers for in-network services. Mars agreed to pay Aetna for that work. Aetna then outsourced those jobs to Optum, but it did not want to pay Optum out of its own pocket. Instead, it agreed to bury Optum's fees in benefits claims so that the Mars Plan and its members would have to pay them, in addition to the compensation Aetna had already received. The terms of the Mars Plan did not permit Aetna to charge Ms. Peters or the plan for the fees. Nonetheless, through Aetna's benefits determinations, members and the Mars Plan were charged for Optum's fees, and Aetna sent Explanation of Benefit forms ("EOBs") misrepresenting the fees as medical expenses.

Ms. Peters claims that these actions violated ERISA. *See* Compl. ¶¶ 1-2. Her claims are not a challenge to the "Aetna-Optum relationship" writ large. And nothing in ERISA requires Ms. Peters to engage in a holistic economic analysis of the entire "relationship" to show that she was injured. If ERISA did include such a requirement, there would be at least one case saying so, and none exists.

Ms. Peters and her plan were charged for Optum's fees, and Aetna's EOBs were false and misleading. These injuries are sufficient to satisfy ERISA. The evidence also shows that Aetna buried Optum's fees in its benefits determinations to avoid paying Optum for the same services for which it had already been

compensated. As further detailed below, Aetna's theories lack legal support, it cannot show the absence of a genuine fact dispute, and it is not entitled to summary judgment on any of Ms. Peters' claims.

## STATEMENT OF FACTS

### A. Mars, Inc. Hired Aetna to Administer Claims and Supply a Network of Providers to Members.

Ms. Peters was a member of the Mars Plan during the relevant time period. Aetna was the "Claim Administrator" that Mars, Inc. hired to "evaluate, process and pay claims under the Plan." Aetna Ex. 22 at -3010; Ex. 2, Aetna 30(b)(6) Dep. 59:24–60:15; 116:17–118:3.[1] Aetna had "the discretionary authority to determine whether services and supplies are Medically Necessary and appropriately provided." Aetna Ex. 22 at -2972; Ex. 2, Aetna 30(b)(6) Dep. 122:7–123:20. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *See* Aetna Ex. 19 at -2793, 2809.

### B. Aetna Outsourced Its Work to Optum.

In 2012, Aetna and Optum entered into a set of four agreements relating to

---

[1] Thus, there is no dispute that Aetna was a fiduciary for the Mars Plan and its members. *See* 29 U.S.C. § 1002(21)(A) (definition of fiduciary); *see also* ECF No. 141 at 22 ("Aetna does not dispute that it served in a limited fiduciary role in the administration of the Plaintiff's Plan").

physical therapy services received by patients insured by Aetna-administered plans. Under these agreements, Optum agreed to perform services that Aetna would otherwise have provided, and that Mars was already paying for.

In a so-called "Provider Agreement," Optum agreed to make available its network of contracted physical therapy/occupational therapy providers to Aetna. Aetna Ex. 8. Under the contract, Optum's contracted providers were deemed to be "in-network" with Aetna for the purposes of its plans. *Id.* at §§ 1.14, 1.15.

In the other three related agreements, Optum agreed to provide other services including "claims management" (i.e., utilization review), "credentialing," and "patient management." Exs. 3, 4, 5. Optum's only compensation for this administrative work was to be the ███████████████████████████ ███████████ *See, e.g.*, Ex. 3, § 6.1. Aetna and Optum later entered into similar agreements as to chiropractic services. Aetna Ex. 9; Exs. 6, 7, 8.

### C. To Avoid Paying Optum, Aetna Came Up With A Scheme to Bury Optum's Charges in Medical Claims.

Aetna asked Optum to make "a claims-based reimbursement proposal" for its services. Ex. 9 at -10642. Optum responded with a "proposal that builds the ASO [administrative services only] pricing into the provider fee schedule/claims process." Ex. 10 at -57620; *see also* Ex. 11, Eichten Dep. 34–36. Optum suggested that it could "append[]" an administrative fee to claims. Ex. 10 at -57622. Aetna could then "appl[y] benefits" to the total claim and Optum would "keep[]" a per

3

visit fee. *Id.*

Aetna and Optum adopted this process. ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ It also included an additional "upside"
for Optum. Ex. 12 at -22969.

Aetna's goal of this "service model design" was "to 'bury' the admin fee
within the claims process (to ensure Aetna didn't have to pay a PMPM [per-
member per-month fee] out of [its] own bank account)." Ex. 13. If this goal had
not been "critical," Optum could have "lower[ed] the cost of the program." *Id.*
Although Aetna relegates this evidence to a footnote and attempts to treat it as
"offhanded[]," Aetna Mem. 6 n.2, it actually reflects the key discussions about
Optum's compensation. *See id.*; *see also* Ex. 14 at -40747.

Optum also agreed to add "dummy codes" to the benefits claims it
processed, which were then included in communications sent to Ms. Peters and the
Mars Plan. *See* Ex. 15 at -2887; Ex. 16 (Explanation of Benefits ("EOB")
including dummy code). These "dummy codes" did not represent actual medical
services. Ex. 17, Elton Dep. 34:9–41:22. Rather, at Aetna's direction, Optum
added them to capture its own fees. *See* Ex. 18 at -46141 ("a 97xxx 'dummy' code
is included in the claims stream to bill Aetna for our admin fee. Just didn't seem

like something clinicians would sign off on."); Ex. 19 at -3057; Exs. 20, 21 at -31284, -7727. Aetna asserted that a different payment method was not feasible due to "system limitations." But Aetna also hired Optum in other areas and paid it by a different method. Ex. 22, Gallagher Dep. 15:3–16:8.

### D. Ms. Peters and the Mars Plan Were Forced to Bear Optum's Charges in Violation of the Plan Terms.

There is no evidence that Aetna reviewed the terms of the Mars Plan, or any other plan, before it decided to charge members and plans for Optum's fees and dummy codes. Aetna also never sought legal advice as to whether these charges were allowed. *See* ECF No. 101 at 1-2. In fact, the charges were inconsistent with the Mars Plan. *See infra* Section II.A.2.

Undisputedly, Aetna's benefits determinations required Ms. Peters and her plan to pay for Optum's buried fees on a number of benefits claims. *See* Ex. 1. For example, Ms. Peters received a service on July 16, 2014, for which her provider billed $40 and agreed to collect $34 (the "Negotiated Charge"). Ex. 23 at -1749. Optum added a "dummy" CPT code and its agreed rate with Aetna, increasing the amount billed to $110.89. *Id.* at -1750.[2]

Aetna then approved the Optum-altered claim for $70.89—*$30.89* more than

---

[2] A CPT code is supposed to be used to represent medical services performed, not a vendor's administrative work on behalf of an insurer. *See* https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval (CPT codes are a "uniform language for coding medical services and procedures").

the provider billed, and *$36.89* more than the Negotiated Charge of $34. Ex. 24 at -256. It paid 80% of $70.89 ($56.71) to Optum from the Mars Plan (even though 80% of the Negotiated Charge was $27.20), and required Ms. Peters to pay co-insurance of 20% ($14.18) to the provider (even though 80% of the Negotiated Charge was $6.80). *Id.* Aetna has admitted that the charge to Ms. Peters was "more than 20 percent of the actual charge for the services." Ex. 25 at -44606. Optum kept $36.89 for itself and paid $19.82 to the provider, such that the provider received $34 for the service in total. Ex. 23 at -1751. Aetna and Optum applied this practice to Ms. Peters' other coinsurance claims as well. Ex. 1 at 2-3. After Ms. Peters met her out-of-pocket maximum, Aetna charged the Mars Plan 100% of Optum's rate and paid that amount to Optum. *See* Ex. 1 at 4-6.

For two categories of claims, Ms. Peters or her plan were not charged for Optum's fees. *First*, on two of the 65 benefits claims for services received by Ms. Peters, the Negotiated Charge slightly exceeded the Optum rate. For those claims, the Mars Plan paid a small amount less than the Negotiated Charge. *See* Ex. 1 at 6. Aetna concedes that this scenario was atypical, and that Optum's rate was "typically higher" than the Negotiated Charge. Aetna Mem. 9.

*Second*, for the five claims subject to Ms. Peters' deductible,[3] Aetna

---

[3] Under the Mars Plan, a deductible is the amount a member "must satisfy … before the Plan begins to pay benefits." Aetna Ex. 22 at -2958.

determined her responsibility based on Optum's rate, but her provider only billed her for the Negotiated Charge. *See* Ex. 26, Peters Dep. 69:20–72:25; Ex. 1 at 1. Aetna still applied the higher Optum rate to Ms. Peters' deductible, and its EOBs told her that she "owe[d]" Optum's fees. *See* Ex. 16 at -203. Optum was allowed to collect the fees under its "provider agreement" with Aetna. Aetna Ex. 8, § 4.3.1. And it collected them on deductible claims when Aetna paid claims from members' health savings accounts ("HSAs"). *See* Ex. 27 at -8533 ("the member KNOWS that … Optum is allowing 36.00, and … instead we are paying out 70.58"); Ex. 28, Optum 30(b)(6) Dep. 128:10-130:20. Neither Aetna nor Optum ever communicated to Ms. Peters or her plan that Optum was waiving its fees. Ex. 26, Peters Dep. 69:20-72:25. And an Aetna director testified that members should have been charged Optum's fees on within-deductible claims. Ex. 29, Kilpinen Dep. 234:11-14. Nevertheless, during this litigation, Defendants have taken the position that Optum will not collect the fees, and that these waivers constitute "deductible credits" to Ms. Peters. Optum Mem. in Supp. of Mot. for Summ. J. (ECF No. 190), at 8; Aetna Mem. 5.[4]

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no

---

[4] Aetna's own expert has opined that routine waivers of patient charges like these "lead ultimately to higher utilization and higher cost," harming members and their plans. Ex. 30, Kessler Dep. 227:6-10.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, "if the evidence would permit a … find[ing] in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate." *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019). The Court must "view[] all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018).

## ARGUMENT

## I.    MS. PETERS AND HER PLAN WERE INJURED.

### A.    Ms. Peters and the Mars Plan were injured by Aetna's breaches, including when they were improperly required to pay Optum's fees.

As a threshold matter, "an injury refers to the invasion of some 'legally protected interest' arising from constitutional, statutory, or common law." *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 366 (4th Cir. 2015). Neither Article III nor ERISA defines an "injury" as a "financial loss." *Id.* A plan or its beneficiaries can pursue an action for breach of fiduciary duty under ERISA, and a disgorgement remedy, even "in cases where the fiduciary profits from the breach but the plan or plan beneficiaries incur *no* financial loss." *Id.* at 366 & n.9 (emphasis added); *see also Spear v. Fenkell*, Civil Action No. 13-2391, 2016 WL 5661720, at *33 (E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, 2016 WL 7475814

8

(E.D. Pa. Dec. 29, 2016) (an accounting and disgorgement is "available against non-fiduciaries who knowingly participate in a fiduciary breach" even if the plan or member did not lose money from the breach). Aetna profited by requiring members and plans to pay Optum's charges even though Aetna had already been paid by the plan for the same services.

Moreover, the Mars Plan did suffer a loss from Aetna's wrongful benefits determinations. Aetna's motion does not address this loss; instead, it attempts to hand-wave it away by discussing only Ms. Peters' loss. *See* Aetna Mem. 14-16 (discussing alleged losses to *Ms. Peters*, but not her plan).

Defendants' data shows that the Mars Plan was financially responsible for 58 of Ms. Peters' benefits claims processed through Optum. On 56 of those claims, the Mars Plan paid a total of $1,020.96 *more* than its required percentage of the Negotiated Charge. Ex. 1 at 2-6 (subtracting "Amount Properly Charged to Mars Plan" from "Amount Mars Plan Was Charged"). This is the amount the Mars Plan paid for Optum's fees on Ms. Peters' claims *alone*—an obvious and indisputable injury. Even if the Court were to net out the two benefits claims for which the Optum rate was actually below the provider's agreed charge—a netting that is not required under ERISA—those "undercharges" only amount to $6.22. *See id.* Further, the Mars Plan did not receive any "gains" from Optum's "deductible credits," because Optum never waived *any* of its fees for the plan.

Likewise, Ms. Peters suffered an identifiable loss on *each* of her 32 coinsurance claims because she was charged 20% coinsurance based on Optum's fees, not the Negotiated Charge. Ex. 1 at 2-3.[5] She did not have *any* claims for which she bore responsibility where the Optum rate was below the actual provider charge. Ms. Peters was also injured because she received misleading EOBs.

**B.    The opinion of Aetna's paid expert that Ms. Peters suffered no injury is inconsistent with ERISA.**

This case is *not* about whether the "Aetna-Optum relationship" is good or bad, or whether that "relationship" saved members and plans money and why. It is therefore irrelevant whether or not the entire "relationship" was economically beneficial, as Aetna argues.[6] Aetna does not cite *any* case to support its theory that Ms. Peters must evaluate a hypothetical world without the "relationship" to show

---

[5] Ms. Peters is not claiming an out-of-pocket loss on her five deductible claims because, to date, she has only paid what she was supposed to for those claims: the actual provider's agreed charge. But that does not invalidate the overcharges she paid on other claims, or the fact that her EOBs misrepresented her financial responsibility for those claims.

[6] The principal way that the "Aetna-Optum relationship" allegedly saved money was through "utilization" management—a euphemism for cutting care to patients by denying claims and imposing additional burdens on providers. Ex. 31, Hennigan Dep. 45:23-46:2. Dr. Kessler did not consider the economic impact on patients of these actions.

Defendants have also alleged that Optum saved money by contracting with providers at lower rates (*see* Aetna Mem. 8), but they have never proffered any evidence that those same providers would have refused to contract with Aetna directly at the same rates. Ex. 30, Kessler Dep. 182:2-4 ("I can't say for—for sure that it would have been impossible for Aetna to have obtained rates comparable to the Optum downstream rates ….").

injury. It just relies on its expert Dr. Kessler's say-so.

Proving this point, Dr. Kessler did not even analyze the full economic effects of the "Aetna-Optum relationship" on Ms. Peters. For example, he ignored the benefits claims that Optum denied, for which she paid more out of pocket. Aetna Ex. 3 at 38-47. A holistic analysis of the entire "relationship" would have taken these claims into account. Aetna's argument that Ms. Peters "fared better under the Aetna-Optum arrangement" (Aetna Mem. 9) thus rings hollow.

Aetna's hypothetical world without the "Aetna-Optum relationship" also has no grounding in the law of ERISA.[7] Defendants have never cited a single ERISA case for the proposition that proof of injury in a health benefits case requires a "but-for world" without the "relationship," instead of a showing of the *actual* harm from an improper benefit determination. Were there such a requirement, this Court would not have ruled on Defendants' motion to dismiss that Ms. Peters pleaded injury simply by alleging that she "has paid at least one coinsurance requirement that included Optum's administrative fee charges." ECF No. 54 at 17. Nor would the Court have rejected Defendants' argument that she was "not injured" because she "could have paid more" without Optum, finding "no legal support for this speculative proposition." *Id.* at 17 n.5.

---

[7] Dr. Kessler admitted he was not conducting an ERISA-based analysis. Ex. 30, Kessler Dep. 34:8-35:20.

Aetna's proposed analysis is also contrary to the trust law in which ERISA is grounded. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000) (analyzing the "common law of trusts" to determine whether relief was available under ERISA § 502(a)(3)). Under trust law, "[t]he amount of a [fiduciary]'s liability for breach of trust *may not be reduced* by a profit resulting from other misconduct unless the acts of misconduct causing the loss and the profit constitute a *single* breach." *See* RESTATEMENT (THIRD) OF TRUSTS § 101 (emphasis added); *see also* BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 708 ("Under traditional analysis, a trustee who incurred liability by reason of a breach of a duty regarding investments could not reduce that liability by proving that he made a profit for the trust by other legal or illegal conduct in the trust administration.").

Under these well-established principles, Aetna may not offset Ms. Peters' injury using purported "gains" from the "relationship" writ large, or from how it handled other claims (specifically, her five deductible claims, which are the only Optum-processed claims on which she did not pay an improper fee). Each of Aetna's discrete benefits determinations was a separate act and a separate breach. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) ("a benefit determination" is "a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)"). No ERISA case has ever required a plaintiff to prove not only that she was harmed by a medical benefits

determination, but also offset purported economic gains from other decisions, or to show that the "relationship" as a whole was not economically beneficial.[8] Such a holding would turn ERISA, and the trust law upon which it is based, on its head. If applied in other cases, this concept would make ERISA litigation impracticable: each time that a member alleged that her fiduciary made an improper benefit decision, she would have to refute a paid expert opining that she was not injured because she benefited economically from the entire "relationship."

Aetna's "but-for world" is not just inconsistent with ERISA—it is inconsistent with Ms. Peters' claims. Ms. Peters is not seeking reprocessing of all of her Optum and non-Optum claims from scratch. Nothing in ERISA requires this, especially if it could harm her. *See Amara v. Cigna Corp.*, 775 F.3d 510, 521, 532 (2d Cir. 2014) (approving "structure of … remedy" that "prevent[ed] any class member … from being worse off"). Rather, the proper "but-for world" is one in which Ms. Peters and the Mars Plan did not actually pay Optum's administrative fees, buried in medical claims, for the same services that Aetna was already paid to perform. Under ERISA, Ms. Peters and her plan can get relief for these charges without redoing her entire claims history.

---

[8] In *Taylor v. KeyCorp*, 680 F.3d 609 (6th Cir. 2012), an investment case, the court "netted" gains and losses from a failure to disclose facts bearing on the value of the company's stock. But *Taylor*, unlike this case, did not involve separate benefits decisions, or "separate breaches causing separate damages." *Id.* at 615.

Thus, it is legally irrelevant whether Ms. Peters would have met her out-of-pocket maximum in certain years even without the improper fees. Likewise, it is also irrelevant that Optum has chosen to waive its fees on claims that were subject to Ms. Peters' deductible,[9] an action that Aetna characterizes as "deductible credits." Aetna Mem. 9. This concept of "deductible credits" is found nowhere in the Mars Plan or ERISA law. And Aetna did not decide to give Ms. Peters the "deductible credits." Rather, the so-called "deductible credits" arise from Optum's position, in this litigation, that it will not collect those particular fees from Ms. Peters. These waivers do not eliminate Ms. Peters' injury on other claims where she did pay the fees. Allowing this outcome would mean that a fiduciary can impose improper charges for its own and its vendor's benefit, and then escape liability so long as the vendor announces that it is waiving some (but not all) of the charges. No case supports this proposition.

## II. A GENUINE DISPUTE EXISTS AS TO MS. PETERS' SECTION 502(a)(2) CLAIM ON BEHALF OF THE MARS PLAN.

Under ERISA § 502(a)(2), a plan participant can seek relief on behalf of a plan for appropriate relief under § 409, which makes a fiduciary liable to "make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through

---

[9] Optum announced this for the first time, four years into this litigation, in its Motion for Summary Judgment, ECF No. 190, at 8.

use of assets of the plan by the fiduciary, and [for] such other equitable or remedial relief as the court may deem appropriate …." 29 U.S.C. § 1109. Ms. Peters' § 502(a)(2) claim on behalf of the Mars Plan presents genuine factual disputes.

### A. There is a genuine dispute as to whether Aetna breached fiduciary duties by charging the Mars Plan for Optum's fees.

#### 1. Aetna was acting as a fiduciary when it administered the Mars Plan and adjudicated Ms. Peters' benefit claims.

Aetna tries to confuse the issues when it states it was not acting as a fiduciary when it negotiated the Optum contracts. Aetna Mem. 17. This lawsuit is not about Aetna's decision to outsource its work to Optum. Rather, Ms. Peters is challenging Aetna's benefits determinations that Optum's fees were covered expenses under the Mars Plan. These actions were at the core of Aetna's fiduciary responsibility. *See, e.g.*, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000), *as amended on denial of reh'g and suggestion for reh'g en banc* (Nov. 3, 2000) ("When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii).") (citations omitted). Aetna cannot and does not dispute that it was a fiduciary in this capacity. *See* Aetna Mem. 20 (citing ███████████████████████████████ ███████████████████████████████). Its fiduciary status in any other capacity is irrelevant.

### 2. Aetna breached its fiduciary duty by adjudicating Ms. Peters' claims in a manner that violated the Mars Plan.

As set forth above, the Mars Plan was injured when Aetna determined that it was required to pay Optum's fees. Those charges violated the Mars Plan. Under the plan, for in-network services received from a "Network Provider," members and the plan were supposed to pay the Negotiated Charge. Aetna Ex. 22 at -3013. The plan defined the Negotiated Charge as "the maximum charge a Network Provider has agreed to make as to any service or supply for the purpose of the benefits under this Plan." *Id.* "Network Provider," meanwhile, meant "[a] *health care provider* or pharmacy that has contracted to furnish services or supplies for this Plan, but only if the provider is … included in the directory as a Network Provider." *Id.* (emphasis added).

Thus, the Network Providers were the health care providers who actually treated members, and the Negotiated Charge was the "maximum charge" those providers had agreed to collect. The Negotiated Charge was *not* defined in reference to the rate that *Optum* agreed to receive as payment for its administrative services. Optum was a "third-party vendor" that contracted with providers, not a "health care provider." *See* July 27, 2018 Order (ECF No. 141) at 21; *see also* Ex. 19 at -3056, -3057 (describing Optum as a "contracted vendor" and the doctors as the "actual Provider of Service"); Ex. 32 at -11136 (describing Optum as the "vendor" and the "servicing provider[s]" as "contracted with Optum"); Ex. 12 at -

22969 ("our Network Development team negotiates with the actual service providers on their actual payment").[10] Also, the Mars Plan only covered "Medically Necessary" charges, not "dummy" codes imposed for a vendor's administrative fees. *See* Aetna Ex. 22 at -2972, -3012.

Aetna argues that  and Aetna's argument to the contrary is false. The argument also makes no sense in the context of the definition of "Out-of-Network Provider" in the Mars Plan. That definition confirms that an "Out-of-Network Provider" is one that "has not contracted, with Aetna, an affiliate, *or a third-party vendor* to furnish services or supplies for this Plan." *See* Aetna Ex. 22 at -3013 (emphasis added). The only logical inference is that a provider who *has* contracted with a "third-party vendor"—i.e., Optum—*is* a Network Provider.

---

[10] *See also Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, 703 F. App'x 126, 131 (3d Cir. 2017) ("Because an administrator or manager does not render medical care, she is not, by plain definition, a provider.").

17

Aetna's own admissions are consistent with Ms. Peters' reading of the plan. Specifically, after this case was filed, Aetna told the Department of Labor that it was revising the definition of Negotiated Charge in its plans to mean "[t]he amount Aetna has agreed to pay directly to the [select care and] [network] provider *or to a third party vendor (including any administrative fee that may be included in the amount paid)* for the services, provision of prescription drugs or supplies." Ex. 33 at -65834 (emphasis added). By proposing this change, Aetna effectively admitted that Optum was a "third party vendor," not a "network provider," and that the Mars Plan as written did not permit it to bury Optum's fees in claims for medical benefits.

In arguing for a different interpretation, Aetna primarily relies on the secret administrative services agreement, or ASA, between Aetna and Mars, Inc. Aetna Mem. 17 (citing Aetna Ex. 19). But the terms of the ASA are not the written terms of the Mars Plan; if they were, they should have been included in the Summary Plan Description. *See* 29 U.S.C. § 1022 (describing requirements of summary plan description); *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (holding that the documents and instruments governing the plan are controlling); *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002) (stating that an ASA is "not a 'plan document' for purposes of holding its terms against a plan participant or beneficiary"). Regardless, Aetna is wrong that

Optum was a "Network Provider," even under the ASA, because Optum is not a

provider. ████████████████████████████████████████████████

████████████████████████████████

> ### 3. Aetna also breached its fiduciary duty by sending misleading EOBs that failed to disclose charges for administrative fees.

Aetna also contends that it did not violate any duties when it sent EOBs

concealing the fees (Aetna Mem. 18), but it is wrong. ERISA administrators have a

duty not to make "material misrepresentations to the beneficiary" or "misinform

employees through material misrepresentations and incomplete, inconsistent or

contradictory disclosures." Aug. 31, 2016 Order (ECF No. 54) at 29-30 (citing

*Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)); *see

also McConocha v. Blue Cross & Blue Shield of Ohio*, 898 F. Supp. 545, 551

(N.D. Ohio 1995) ("The presence of a discounting scheme which increases the

copay percentage is a material fact about which plaintiffs should have been told.").

Indeed, the duty to disclose such material information is the "core of a fiduciary's

responsibility." *Griggs*, 237 F.3d at 380; *see also Kenseth v. Dean Health Plan,

Inc.*, 722 F.3d 869, 872 (7th Cir. 2013).

Here, the evidence shows that Aetna sent Ms. Peters misleading EOBs that

used "dummy" CPT codes, falsely claimed that Optum was the "provider" of

medical services, and falsely reported the amounts billed by the actual provider.

*See, e.g.*, Ex. 16, Mar. 20, 2014 EOB; Ex. 24, Sept. 4, 2014 EOB. These false EOBs deprived Ms. Peters and the Mars Plan of information that adversely affected their ability to contest the improper charges. This is a harm Congress specifically sought to prohibit when it passed ERISA. *See* 29 U.S.C. §§ 1001 (a), (b). Aetna itself admits that it had a duty to provide accurate information to protect Ms. Peters and her plan from being overcharged unknowingly. *See* Aetna Mem. 19 (citing *DiFelice v. Fiduciary Counselors, Inc*., 398 F. Supp. 2d 453, 465 (E.D. Va. 2005)).

### 4.     Aetna's new plan interpretation is not entitled to deference.

Aetna asserts—without evidence—that the Court should apply a deferential "arbitrary and capricious" standard to its proffered reading of the Mars Plan. Aetna Mem. 20. Not so. First, a fiduciary is entitled to no deference when the plan is unambiguous. *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 480 (4th Cir. 2017). Here, the Mars Plan admits to only one reading: that the Negotiated Charge is the amount the provider agreed to receive, not Optum's fee.

And even when a plan is ambiguous, the deference due the fiduciary is a fact-specific inquiry, depending on factors including "the adequacy of the materials considered to make the decision and the degree to which they support it," "whether the decision-making process was reasoned and principled," and "the fiduciary's motives and any conflict of interest it may have." *Helton v. AT&T Inc.*, 709 F.3d

343, 353 (4th Cir. 2013). Here, Aetna has offered no evidence that it even *looked* at the Mars Plan before it decided to treat Optum's buried fees and dummy codes as covered expenses. Further, because Aetna furthered its own "financial interests" by determining that Optum's fees were covered expenses, deference would be inappropriate regardless of whether Aetna reviewed and interpreted the plan. *See Smith v. Sydnor*, 184 F.3d 356, 365 n.9 (4th Cir. 1999). The evidence shows that Aetna treated Optum's fees as covered expenses to avoid paying Optum itself. Therefore, Aetna's newfound reading is not entitled to any deference.

### B. There is a genuine dispute as to whether Aetna engaged in a prohibited transaction under § 406.

Aetna—undisputedly a fiduciary and "party in interest" as to the Mars Plan—violated ERISA § 406(a)(1)(D) and (b)(1) when it caused the Mars Plan to pay assets to Optum so that it could avoid paying Optum "out of [its] own bank account." Ex. 13 at -14072; *see also* Aug. 31, 2016 Order, ECF No. 54 at 31 (ruling that Ms. Peters had "clearly allege[d] prohibited transactions by the Defendants"). Optum is a "party in interest" because it is "a person providing services to [an employee benefits] plan." 29 U.S.C. § 1002(14)(B). ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ Because Aetna ████████████████████████████

███████████████████████████████████████████, Aetna cannot dispute Optum's status as a party in interest.

Aetna further claims that Ms. Peters' out-of-pocket payments were not assets of the Mars Plan. Aetna Mem. 21. This is a non sequitur. What matters for Ms. Peters' § 502(a)(2) claim is that Aetna caused the Mars Plan to make improper payments to Optum from plan assets. *See* Ex. 1 at 2-5 (listing 56 claims where the Mars Plan was overcharged); Ex. 2, Aetna 30(b)(6) Dep. 117:7-23 (█████████████ ████████████████████████████████████).

Finally, Aetna invokes for the first time in this litigation the affirmative defense to Ms. Peters' ERISA § 406 claim that Optum's compensation was "reasonable" under § 408(b)(2). *See* Aetna Mem. 21-22 (citing 29 U.S.C. § 1108(b)(2)). Aetna was required to plead and prove this affirmative defense, *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016), and waived it by failing to do so (*see* Aetna Answer, ECF No. 56). *See Staudner v. Robinson Aviation, Inc.*, 910 F.3d 141, 148 (4th Cir. 2018) ("[A] defendant's failure to plead an affirmative defense waives that issue for the remainder of the litigation.").

In addition, § 408(b)(2)'s "safe harbor for fiduciary compensation is not applicable" when a fiduciary violates § 406(b)(1) by dealing with assets of the plan in his own interest or for his own account. *Barboza v. California Ass'n of Prof'l*

*Firefighters*, 799 F.3d 1257, 1270 (9th Cir. 2015).[11] That is what Aetna did when it decided to use plan and member money to compensate Optum so that it did not have to pay "out of [its] own bank account." Ex. 13. In addition, the Mars Plan did *not* hire Optum and had *no* oversight into how much Optum received. *See Whitfield v. Tomasso*, 682 F. Supp. 1287, 1303 (E.D.N.Y. 1988) (no reasonable compensation defense where trustees were "not even aware of the amounts" paid). Instead, Aetna decided to use the plan's funds to pay Optum for the same services Aetna was already paid to provide. There is also no evidence that Optum's fees comported with industry standards. Even if Aetna were permitted to raise a "reasonable compensation" defense at this late stage, summary judgment would be inappropriate in light of these facts.

## III. A GENUINE DISPUTE EXISTS AS TO MS. PETERS' § 502(a)(1)(B) CLAIM.

ERISA § 502(a)(1)(B) permits a plan participant "to enforce [their] rights under the terms of" their plan. *See* 29 U.S.C. § 1132(a)(1)(B). Under this provision, Ms. Peters is entitled to enforce her rights under the plan by requiring Aetna to send corrected EOBs that comply with its obligations. She is also entitled to "legal restitution" for the amounts she paid for Optum's fees. *See Smith v.*

---

[11] Every court to consider the applicability of § 408(b)(2) to § 406(b) has held that the "reasonable compensation" defense does not apply to § 406(b) claims. *See Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) (collecting cases); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 94-95 (3d Cir. 2012).

*United HealthCare Servs., Inc.*, No. Civ. 00-1163 ADM AJB, 2003 WL 22047861, at \*5 and n.9 (D. Minn. Aug. 28, 2003) (holding that plaintiffs were entitled to recover restitution of inflated co-payments through a § 502(a)(1)(B) claim to "enforce … rights"). Aetna argues that Ms. Peters suffered no loss. Aetna Mem. 22-23. But Ms. Peters did suffer an injury when she paid inflated coinsurance amounts that were not required by her plan. *See supra* Section I; *see also* ECF No. 54 at 17. Under § 502(a)(1)(B), Ms. Peters can obtain relief for that injury.

## IV.     A GENUINE DISPUTE EXISTS AS TO MS. PETERS' § 502(a)(3) CLAIM.

Ms. Peters seeks relief under § 502(a)(3), which authorizes her to sue "to enjoin any act or practice which violates [ERISA] or the terms of the plan" or for "other appropriate equitable relief" to redress violations of ERISA or the plan terms. Aetna contends that Ms. Peters is not entitled to injunctive relief because she cannot show a threat of future harm. Aetna Mem. 23. Aetna is wrong. *First*, Aetna again ignores injury to the Mars Plan, which is still being harmed by the challenged practices. *Second*, there is a threat of future harm to Ms. Peters if Optum attempts to collect its deductible charges from her, or if Aetna attempts to reprocess her claims to charge her more because Optum waived some charges. As such, Ms. Peters is entitled to an injunction to prevent these actions. In a recent $8.25 million settlement of similar claims against Cigna and its vendor, ASH, that relief was part of the settlement. *See In re Cigna-ASH Administrative Fee*

*Litigation*, Case 2:16-cv-03967-NIQA, ECF No. 87-1, § 2.2(d). *Third*, Ms. Peters is entitled to an injunction requiring corrective disclosures. *See supra* Sections II.A.3, III.

Aetna also ignores all of the other types of equitable relief available to Ms. Peters under § 502(a)(3). For example, ERISA allows courts to impose a "surcharge," i.e., "relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011). The surcharge remedy is designed "to eliminate profit from wrongdoing." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51(4). Under ERISA, courts also have the power to order disgorgement of profits to avoid a wrongdoer's "unjust enrichment." *Pender*, 788 F.3d at 364. Disgorgement "does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011). Either of these types of equitable relief should be available to Ms. Peters.

## CONCLUSION

Aetna's Motion for Summary Judgment should be denied.

Dated: June 13, 2019

Jason M. Knott*
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(202) 778-1800
(202) 822-8106 (fax)
jknott@zuckerman.com


*/s/ Larry McDevitt*

Larry McDevitt
David M. Wilkerson
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
lmcdevitt@vwlawfirm.com

* *pro hac vice*

D. Brian Hufford*
Jason S. Cowart*
Nell Z. Peyser*
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
(212) 704-9600
(212) 704-4256 (fax)
dbhufford@zuckerman.com

*Attorneys for Plaintiff Sandra M. Peters*

26