## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:15-cv-00109-MR

| | | |
|---|---|---|
| SANDRA M. PETERS, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | <u>MEMORANDUM OF</u> |
| vs. | ) ) | <u>DECISION AND ORDER</u> |
| AETNA INC., AETNA LIFE INSURANCE COMPANY, and OPTUMHEALTH CARE SOLUTIONS, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**THIS MATTER** is before the Court on OptumHealth Care Solutions, Inc.'s Motion for Summary Judgment [Doc. 188] and Aetna's Motion for Summary Judgment [Doc. 225].

## I.    PROCEDURAL BACKGROUND

On June 12, 2015, the Plaintiff Sandra M. Peters filed this putative class action against the Defendants Aetna, Inc., Aetna Life Insurance Company (collectively, "Aetna"), and OptumHealth Care Solutions, Inc. ("Optum"), asserting claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO") and the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA"). [Doc. 1]. In her Complaint, the Plaintiff alleged that Aetna engaged in a fraudulent scheme with Optum and other subcontractors, whereby insureds were caused to pay the subcontractors' administrative fees because the Defendants misrepresented such fees as medical expenses. The Plaintiff alleged that these misrepresentations allowed Aetna to illegally (i) obtain payment of the subcontractors' administrative fees directly from insureds when the insureds' deductibles have not been reached; (ii) use insureds' health spending accounts to pay for these fees; (iii) inflate insureds' co-insurance obligations using administrative fees; (iv) artificially reduce the amount of available coverage for medical services when such coverage is subject to an annual cap; and (v) obtain payment of the administrative fees directly from employers when an insured's deductible has been exhausted or is inapplicable. [Id.].

The Plaintiff sought to bring two separate putative class actions. The first was on behalf of her Plan ("the Mars Plan") seeking redress for all similarly situated plans, alleging violations of ERISA, 29 § 1132(a)(2) (Count III). The second claim was brought by the Plaintiff individually and on behalf of all other similarly situated plan participants in any such plan where Aetna and Optum have the accused arrangement, alleging violations of 29 U.S.C.

§ 1132(a)(1) and (a)(3) and 29 U.S.C. § 1104 (Count IV). The Plaintiff also asserted two claims pursuant to RICO, alleging violations of 18 U.S.C. § 1962(c) and (d) (Counts I and II), which claims were previously dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 54].

The Plaintiff moved for class certification with respect to both ERISA class claims, which the Court denied in March 2019. [Doc. 203]. Remaining are the Plaintiff's individual claim in Count IV, and the claim she brings on behalf of the Mars Plan in Count III. The Defendants now move for summary judgment with respect to both of these claims. [Docs. 188, 225].

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record or by showing that the adverse party

cannot produce admissible evidence to support that fact.  Fed. R. Civ. P. 56(c)(1).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists.  Id.  Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the non-movant as well.  Adams v. Trustees of Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

### A.  The Mars Plan

The following facts are not in dispute.  The Plaintiff is a former[1] member of an ERISA plan ("the Mars Plan" or "the Plan") self-funded by her husband's former employer, Mars, Inc. ("Mars"), for its employees and

---

[1] The Plaintiff had primary medical coverage under the Mars Plan from 2013 to February 1, 2015.  Since February 2015, the Plaintiff's primary medical coverage has been through Medicare.  [Doc. 189: Optum Ex. 1 at 37-38].  The Plaintiff also had supplemental Medicare coverage through Aetna (until December 2015), through Blue Cross and Blue Shield of North Carolina (2016), and through Cigna (2017 and 2018).  [Id. at 37-39].

retirees. Mars, through its benefits committee, is the Plan Administrator for the Plan. Mars hired Aetna to serve as the Claims Administrator for the Plan and to evaluate, process, and pay claims under the Plan. As part of its services to the Plan, Aetna agreed to "provide Plan Participants access to Aetna's network hospitals, and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and who are participating in the Network covering the Plan Participants…." [Doc. 229-14: Aetna Ex. 19 at 00002809]. It also agreed to provide case management and utilization management services. [Id.].

Under the Mars Plan, Mars and Aetna agreed that "Aetna will issue a payment on behalf of Customer for [in-network] services in an amount determined in accordance with the Aetna contract with the Network Provider and the Plan benefits." [Id.]. The same provision explains that those payments might be based on a range of reimbursement methodologies (including "per diem" rates) through Aetna's contracts with different "Network Providers." [Id.].

### B. Aetna Enters into Agreements with Optum

In 2011, in an effort to lower costs for employer-sponsored plans and members, Aetna issued a "request for proposal" to several companies with networks of physical therapists. [Doc. 229-1: Aetna Ex. 1 at 22; see also

Doc. 228-3: Aetna Ex. 2 at 30 ("Aetna was seeking proposals to lower medical costs for employers and members")]. After "carefully evaluat[ing]" the "pros and cons" of the responses to its request for proposal, Aetna concluded that "Optum had a very solid network" that could generate significant "medical cost savings for [Aetna's] members and plan sponsors." [Doc. 228-2: Aetna Ex. 1 at 44; <u>see also</u> Doc. 229-2: Aetna Ex. 3 at ¶¶ 59-64 (discussing Aetna's contemporaneous savings analyses). The goal was to generate two types of savings: (1) lower rates or "unit cost reduction" [Doc. 228-2: Aetna Ex. 1 at 45] and (2) "treatment cost savings due to control of unnecessary visits/utilization" [Doc. 229-3: Aetna Ex. 4 at 00015291; <u>see also</u> Doc. 228-2: Ex. 1 at 208 ("Aetna entered into a relationship with Optum . . . to achieve medical cost savings for our members and plan sponsors."); Doc. 228-6: Aetna Ex. 5 at 31 ("[W]e hired Optum to help us manage PT/OT and Chiro, so that we can save money for our employers and . . . Aetna members."); Doc. 228-3: Aetna Ex. 2 at 102 ("We wanted to help realize savings for the plan sponsors and for the members . . . ."); Doc. 229-4: Aetna Ex. 6 at 54 ("Optum's case rate . . . g[ave] us the opportunity to have increased savings for our members and plan sponsors for rates."); Doc. 229-5: Aetna Ex. 7 at 00015341 ("[T]he savings projection . . . increase[s] . . . the savings for the entire region.")].

Beginning in 2012, after a series of arm's-length negotiations, Aetna entered into a series of Provider Agreements with Optum as the provider of the networks. In these Provider Agreements, Optum agreed to make available its network of contracted physical therapists, occupational therapists, and chiropractors (hereinafter "downstream treating providers" or "DTPs") to Aetna. In return, Aetna agreed to pay Optum flat, per-visit rates for these services. [See Doc. 229-6: Aetna Ex. 8 (covering physical therapy services); Doc. 229-7: Aetna Ex. 9 (covering chiropractic services); Doc. 229-8: Aetna Ex. 10 (renegotiating chiropractic agreement to lower rates)]. Under the contracts, Optum's DTPs were deemed to be "in-network" with Aetna for purposes of its plans. [Id. at ¶¶ 1.14, 1.15]. As part of providing these networks, Optum also agreed to provide "claims management" (i.e., utilization review), "credentialing," and "patient management." [Docs. 232-2, 232-3, 232-4: Aetna Exs. 3, 4, 5]. Optum's only compensation for such management of its networks was to be the "compensation set forth in the Provider Agreement." [See, e.g., Doc. 232-2: Aetna Ex. 3 at § 6.1].

## C.    The Aetna-Optum Arrangement

Under the Aetna-Optum contracts, Aetna typically pays Optum a flat-rate payment when an Aetna member receives a covered service by a DTP. [See Doc. 229-1: Aetna Ex. 1 at 71-72 (explaining payment structure under

the Aetna-Optum arrangement)]. Optum, in turn, pays the DTP a specified amount for the services performed, according to the rates that Optum has negotiated through its separate agreement with that provider. [See Doc. 229-9: Aetna Ex. 11 at 124-125 ("Each contract between Optum and the providers are negotiated . . . .")]. Regardless of the rate paid by Optum to the DTP, Optum receives the same flat, per-visit payment from Aetna. [Id.].

Depending on the benefits claim, Aetna may pay Optum an amount that is greater than or less than the amount Optum pays the DTP. [Id.]. If the claim is within the member's deductible, Optum receives nothing and the Aetna member pays only the contracted rate between Optum and the DTP. [Doc. 229-10: Aetna Ex. 12 at 126-128].

The claims process works as follows. An Aetna plan member visits an Optum-contracted DTP, and the DTP then submits a claim for the service performed to Optum for processing. [Doc. 229-10: Aetna Ex. 12 at 117]. If the claim is timely and includes the required information, [id. at 73-74], Optum forwards the claim to Aetna [id. at 117], using a Current Procedural Terminology ("CPT") medical billing code specified in the Aetna-Optum contracts.[2] [Id. at 75; see also Doc. 228-14: Aetna Ex. 13 at 00003057

_____

[2] As the Court previously explained, Current Procedural Terminology, or "CPT Codes" are standardized codes used to bill for specific medical outpatient and office procedures. [Doc. 141 at 5 n.4]. The Aetna-Optum contracts called for the use of non-specific CPT

(explaining that the code is "just a code we use in regards to contracting")]. Although some emails and notes offhandedly referred to the Aetna-Optum fee structure as "burying" Optum's administrative fee in the claims process [see, e.g., Doc. 190-15: Optum Ex. 14 at 000040747], Optum's corporate designee, Theresa Eichten, explained that "burying" meant only "[t]hat Aetna requested [Optum] build [its] administrative fee into the claims process." [Doc. 190-12: Optum Ex. 11 at 195-96].

Upon receiving the information from Optum, Aetna determines whether to cover the claim. If the claim is covered, Aetna calculates the payment and the member's responsibility based on the Aetna-Optum flat contract rate (not the Optum DTP rate, which is not provided to Aetna), and sends its determination back to Optum. [Doc. 229-9: Aetna Ex. 11 at 111; Doc. 229-10: Aetna Ex. 12 at 62, 117; Doc. 189-9: Optum Ex. 8 at 111, 117]. Optum then pays the DTP the contracted rate negotiated between Optum and that DTP, less the amount that Aetna calculated as the member's financial responsibility under the member's individual plan terms. [Doc. 229-9: Aetna Ex. 11 at 124-25; Doc. 229-10: Aetna Ex. 12 at 62, 117].

---

Codes, such as CPT Code 97039 (the billing code for an "unlisted modality"), in order to bill the flat-rate fee negotiated by Optum and Aetna.

Separately, Aetna sends an Explanation of Benefits ("EOB") to the member setting forth the plan's and participant's payment responsibilities. [Doc. 228-3: Aetna Ex. 2 at 219-21]. Since Optum is the provider of the network, the EOB identifies Optum as the "provider" for the service and reports a total "amount billed," which includes the flat-rate contractual fee to Optum and the CPT code required by the Aetna-Optum contracts. [Doc. 228-16: Aetna Ex. 15]. Under the Aetna-Optum relationship, Optum receives payments only from Aetna itself, never from an Aetna member or plan sponsor. [Doc. 229-12: Aetna Ex. 16 at ¶ 9].

The Aetna-Optum relationship has resulted in millions of dollars in savings for Aetna plans and members. [Doc. 229-2: Aetna Ex. 3 at ¶¶ 59-64; Doc. 229-1: Aetna Ex. 1 at 48; Doc. 229-13: Aetna Ex. 18]. The beneficiaries of the Aetna-Optum arrangement include the Plaintiff herself. Until February 2015, the Plaintiff was a member of an ERISA plan (the "Mars Plan") self-funded by her husband's employer, Mars, Inc. ("Mars"). [Doc. 1 at ¶ 4]. Between 2013 and 2015, the Plaintiff visited chiropractors and physical therapists in Optum's network. [Doc. 1 at ¶¶ 40-56; Doc. 228-21: Aetna Ex. 20 at 74-75, 77-78]. Under the Mars Plan, the Plaintiff bore full financial responsibility for her claims until she met her $250 annual deductible, during which time she paid only the rate between Optum and its

DTP — though Aetna credited her as if she had paid the Aetna-Optum contract rate (which is often higher).  [Doc. 228-21: Aetna Ex. 20 at 56-57, 68-71].  After meeting her deductible, the Plaintiff was responsible for 20 percent coinsurance payments on each claim until she met her $1,650 out-of-pocket maximum, after which she had no financial responsibility for her benefits claims. [Id. at 56-57].  The Plaintiff paid her chiropractors and physical therapists directly; she made no payments to Optum for these services.  [Id. at 142-150 (discussing payments made to provider); Doc. 228-13: Aetna Ex. 12 at 127-28 (explaining that treating provider always collects payment from member directly)].

The Plaintiff's personal claims experience illustrates how this arrangement can benefit plan participants.  In 2013, the Plaintiff was responsible for $70.84 of her chiropractic and physical therapy claims.  [Doc. 229-2: Aetna Ex. 3 at ¶ 108].  If Aetna had applied the DTP rates to all of Plaintiff's chiropractic and physical therapy claims to calculate her patient responsibility and credited toward her deductible and out-of-pocket maximum only the downstream rates, she still would have been responsible for exactly the same amount, $70.84, because she would have reached her out-of-pocket maximum in any event.  [Id. at ¶¶ 108-12].

In 2014, the Plaintiff was responsible for a total of $1,785.29 for her chiropractic and physical therapy claims. [Doc. 229-2: Ex. 3 at ¶ 123]. If Aetna had calculated the Plaintiff's financial responsibility and deductible credits based on the DTP rates instead of the Aetna-Optum contract rates, she would have paid $1,900.00 -- $114.71 *more* than she actually paid. [Id. at ¶¶ 113-25]. In other words, the Aetna-Optum arrangement *saved* the Plaintiff money.

In 2015, Plaintiff had only one benefits claim involving an Optum DTP, and she was responsible for the entire downstream rate because she had not met her deductible for that year. [Id. at ¶ 127]. Just like in 2013, the Aetna-Optum arrangement had no adverse effect on the Plaintiff.

## IV. DISCUSSION

In Count III of the Complaint, the Plaintiff brings a derivative claim on behalf of the Mars Plan[3] under § 502(a)(2) of ERISA, alleging that Aetna breached its fiduciary obligations by (1) issuing EOBs that fail to disclose Optum's administrative fees and instead improperly characterize such fees as expenses for medical services and by (2) using plan assets to pay such

---

[3] In the Complaint, the Plaintiff asserts Count III on behalf of the Mars Plan and all the plans identified in the "ERISA Plan Class." [See Doc. 1 at ¶ 95]. The Plaintiff's motion for class certification, however, was denied. [Doc. 203]. Therefore, the Court will limit its analysis to whether the Defendants breached any fiduciary duty owed to the Mars Plan only.

administrative fees.[4]  [Doc. 1 at ¶¶ 95, 97].  The Court will refer to this claim as the "Plan Claim."  In Count IV of the Complaint, the Plaintiff seeks relief on her own behalf for the Defendants' alleged violations of their fiduciary duties to the Plaintiff individually under ERISA § 404, 29 U.S.C. § 1104, "by issuing false EOBs and using plan assets to pay administrative fees owed by Aetna to [Optum]."  [Doc. 1 at ¶ 101].  The Court will refer to this claim as the Plaintiff's "Individual Claim."  The Court will address each of these claims in turn.

## A.    The Plan Claim

ERISA imposes certain duties upon any person named as a fiduciary by a benefit plan, see 29 U.S.C. § 1102(a), as well as anyone else who exercises discretionary control or authority over the management, administration or assets of the plan, see 29 U.S.C. § 1002(21)(A). "Fiduciaries are assigned a number of detailed duties and responsibilities, which include the proper management, administration, and investment of plan assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest."  Mertens v. Hewitt

---

[4] The Plaintiff also couches this breach of fiduciary claim as one under Section 406 of ERISA, which prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D), and from "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1).

Assocs., 508 U.S. 248, 251-52 (1993) (citation and internal quotation marks omitted).  For example, ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  The duty of loyalty imposed by ERISA prohibits fiduciaries from engaging in "self-dealing and sales or exchanges between the plan, on the one hand, and 'parties in interest' and 'disqualified persons,' on the other."  Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 143 n.10 (1985).  With respect to investment decisions and disposition of assets, ERISA obligates fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  Further, a fiduciary must also act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1)(D).

Under § 502(a)(2) of ERISA, a plan participant or beneficiary may bring a derivative action on behalf of the plan against a fiduciary for a breach of any of the fiduciary duties imposed by the statute.  See 29 U.S.C. § 1109(a); 29 U.S.C. § 1132(a)(2).  A fiduciary who commits such a breach "shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and [shall be required] to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

At the outset, the Court notes that it has already recognized that Aetna served only as a limited fiduciary with respect to the Plaintiff and the Mars Plan. As the Court previously concluded, Aetna was not serving in a fiduciary capacity when it negotiated "with Optum to establish and maintain a provider network that benefited a broad range of health-care consumers . . . ." [Doc. 141 at 23]. Aetna contracted with Optum in order to lower physical therapy and chiropractic costs for Aetna plan sponsors and members generally, and this contractual relationship has proven to be successful, saving millions of dollars for both plan sponsors and members. Even if had Aetna been operating as a fiduciary when it negotiated the Optum arrangement, it is axiomatic that Aetna could not have breached the duty of loyalty by entering into an agreement that ultimately saved money for both the Plaintiff and the Mars Plan. See Varity Corp v. Howe, 516 U.S. 489, 506 (1996) (noting that duty of loyalty is breached where fiduciary "participate[s] knowingly and

significantly in deceiving a plan's beneficiaries in order to save the employer money *at the beneficiaries' expense*") (emphasis added).

With respect to the actions complained of in the Plaintiff's Complaint, Aetna acted in a manner that was entirely consistent with the Mars Plan. The administrative services contract between Aetna and Mars promised members access to Aetna's network providers, which is precisely what Aetna did by providing Aetna members access to Optum's networks. Further, Aetna properly calculated the Plaintiff's financial responsibility in accordance with the Mars Plan. Mars and Aetna had agreed in their Master Services Agreement that Aetna would "issue a payment on behalf of Customer for [in-network] services in an amount determined *in accordance with the Aetna contract with the Network Provider* and the Plan benefits." [Doc. 229-14: Aetna Ex. 19 at 000028059 (emphasis added)]. The Plaintiff argues that this payment should have been calculated using only the Optum DTP rates. But Optum's DTPs are not the "Network Provider" in this context; Optum is. Optum provided the network of therapists to Aetna members. This interpretation is not only consistent with the Mars Plan's definitions of those terms, [see Doc. 162-23: Aetna Ex. 22 at 00003013], it is the only reasonable interpretation of the relevant contracts. Aetna had no contracts with Optum's DTPs; thus, including the individual physical therapists, chiropractors, and

other treatment providers in the Master Services Agreement's definition of "Network Provider" would render that agreement's provision requiring Aetna to issue payment in accordance with its "contract with the Network Provider" meaningless.

The Plaintiff also alleges that Aetna breached its fiduciary duties by "issuing EOBs that improperly characterize administrative fees as expenses for medical services." [Doc. 1 at ¶ 95]. In order to prove an ERISA breach of fiduciary claim, a plaintiff must establish that the defendant was an ERISA fiduciary acting as such, that the defendant made a material misrepresentation, and that the plaintiff relied on that misrepresentation to her detriment. See Wiseman v. First Citizens Bank & Trust Co., 215 F.R.D. 507, 510 (W.D.N.C. 2003). Here, the Plaintiff's forecast of evidence fails to show any specific misrepresentations by Aetna in its EOBs regarding the Negotiated Charge. The EOBs relied upon by the Plaintiff accurately disclose the rates that were negotiated pursuant to the Aetna-Optum contractual arrangement and the amounts actually paid, and Aetna accurately calculated the Plaintiff's responsibility for each of these charges in accordance with the Mars Plan. Further, the Plaintiff has not demonstrated how she could have possibly suffered any injury from EOB statements documenting health care transactions that, on balance, saved her money.

Without a showing that the EOBs contained any material misrepresentations, or that the Plaintiff relied upon such misrepresentations to her detriment, the Plaintiff's claim based on a breach of fiduciary duty in the issuance of the EOBs must fail.

Moreover, the alleged failure by Aetna to disclose that administrative costs were included in the medical charges similarly fails to support any claim for breach of fiduciary duty.  First, Aetna had no "administrative costs" to report.  The "administrative costs" to which the Plaintiffs refers are the amounts retained by Optum for those services where the rate negotiated with Aetna exceeded the rate Optum paid to the DTPs.  Every provider within our healthcare system has internal processing costs, and these are paid as part of the costs of the medical service provided.  Optum, as the Network Provider, is no different.  Such administrative costs are internal to Optum, just like the processing costs are for *any* healthcare provider or network provider.  These were not Aetna's administrative costs. Thus, there were no such "administrative costs" paid by Aetna.

Even if there were administrative costs paid by Aetna, however, there is no legal requirement to disclose them.  The Plaintiff has not identified any regulation or statute that would require Aetna to disclose any information concerning "charges for administrative fees" in the absence of any request

for such information.  The Fourth Circuit has recognized only two situations in which there is an affirmative disclosure duty on ERISA administrators – namely, (1) where the beneficiary requests information from the administrator or (2) where an administrator that has fostered a misunderstanding of facts possesses information that the beneficiary needs for her protection -- are applicable here.  See Phelps v. CT Enters., 194 F. App'x 120, 126 (4th Cir. 2006) ("[A] fiduciary must give complete and accurate information to a beneficiary if the beneficiary requests information."); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380-81 (4th Cir. 2001) (describing "limited fiduciary duty" to "communicate to the beneficiary material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection"); see also DiFelice v. Fiduciary Counselors, Inc., 398 F. Supp. 2d 453, 465 (E.D. Va. 2005) (explaining that the affirmative duty to provide information discussed in Griggs "arises only when the fiduciary has fostered the misunderstanding of facts material to participants' . . . decisions").  The Plaintiff has presented no forecast of evidence that tends to show that either of these situations is present here.

The Plaintiff's Plan Claim is also fatally deficient because the Plaintiff's forecast of evidence is insufficient to raise an issue of fact as to whether the

Mars Plan suffered any loss as a result of Aetna's actions. The Plaintiff's liability theory is premised on the assertion that she would have paid less for her physical therapy and chiropractic benefits without the Aetna-Optum relationship in place, i.e., that Aetna somehow should have provided her access to the Optum network of providers directly, without Optum's participation. But the Plaintiff's theory ignores both economic reality and her own claims history. First, but for the Aetna-Optum agreement, the Plaintiff never would have had access to Optum's DTPs and Optum's favorable rates with those providers. Further, the undisputed forecast of evidence presented to the Court shows that the Aetna-Optum contractual arrangement saved both Aetna plan sponsors and members millions of dollars. Indeed, with respect to her own benefits claims, the Plaintiff has conceded that, of the 58 claims she contends are at issue, she suffered no financial loss (and in fact realized a gain) on 26 of those claims. Applying the DTP rates to the 32 remaining claims, the Plaintiff alleges that she paid $151.42 more than she should have on those claims. Applying the downstream rates to *all 58* claims, however, shows that the Plaintiff came out ahead, having paid *less* than she would have under her proposed methodology.

In sum, the Plaintiff has failed to present a forecast of evidence from which a reasonable factfinder could find a breach of fiduciary duty by Aetna

or any injury to the Mars Plan arising from the Aetna-Optum contractual arrangement. Accordingly, the Plaintiff's claim against Aetna on behalf of the Mars Plan must be dismissed.

As for the Plaintiff's Plan Claim against Optum, the Court has already exhaustively analyzed the nature of Optum's role as a non-fiduciary in the context of denying the Plaintiff's Motion to Compel, in which the Plaintiff asserted the fiduciary exception to Optum's assertion of the attorney-client privilege. [Doc. 141 at 13-21]. The Court will not repeat all that analysis here, but for the same reasons stated therein, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a jury could reasonably conclude that Optum was acting as a fiduciary with respect to the actions complained of in the Plaintiff's Complaint.

Despite Optum's non-fiduciary status, the Plaintiff nevertheless argues that Optum can be held liable as a non-fiduciary "party in interest" who participated in prohibited transactions along with Aetna. [Doc. 199 at 26]. This argument fails for a number of reasons. First, for the reasons stated above, the Court concludes that Aetna did not breach any fiduciary duties or engage in any prohibited transactions with respect to the Aetna-Optum contractual relationship. Further, even if such a breach could be found, the Court concludes that Optum is not a "party in interest" under § 406(a).

ERISA defines "party in interest" in pertinent part as "a person providing services to [an employee benefits] plan." 29 U.S.C. § 1002(14)(B). To qualify as a "person providing services" to a plan, a party must "have a relationship with the pension plan that preexists, or is independent of, the relationship created by the allegedly prohibited transaction." UFCW Local 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P., No. 05-2435 (JEI), 2005 WL 3555390, at *3 (D.N.J. Oct. 28, 2005); see also Sellers v. Anthem Life Ins. Co., 316 F. Supp. 3d 25, 34 (D.D.C. 2018) ("the statute only prohibits such service relationships with persons who are 'parties in interest' by virtue of *some other relationship*") (emphasis added). Here, it is undisputed that Optum had no pre-existing relationship with the Mars Plan, contractual or otherwise, and did not render services to the Plan itself other than providing its networks to the Plan.[5] Further, Optum had no relationship with Aetna that pre-existed the parties' network provider contracts, and the fees that Optum received from that contractual relationship were a product of arm's-length negotiations. See Danza v. Fidelity Mgmt. Trust Co., 533 F. App'x 120, 126

_____

[5] In arguing that Optum is a "party in interest," the Plaintiff cites a contract provision that she contends reflects that Optum agreed to provide administrative services to Aetna for Aetna's "Plans" (plural). [See Docs. 199-4, 199-7: Pl. Exs. 14 and 19 at § 2.1]. The fact that Optum performs credentialing and utilization services with respect to the providers in the Optum network, however, did not create a relationship between Optum and the Mars Plan or turn Optum into a party in interest. It is undisputed that Optum has no contractual relationship with the Mars Plan.

(3d Cir. 2013) (holding that transaction did "not fall into the category of transactions that Section 406(a) was meant to prevent" because there was no allegation that service provider had prior relationship with plan fiduciary and no evidence that the transaction was other than at arm's length); Waller v. Blue Cross, 32 F.3d 1337, 1346 (9th Cir. 1994) (noting that § 406(a) "insure[s] arm's-length transactions by fiduciaries of funds subject to ERISA").

Moreover, the contractual arrangement upon which the Plaintiff's claim is based did not involve a transfer or use of any "assets of the plan" within the meaning of § 1106(a)(1)(D) or (b)(1). The Plaintiff claims that, even if the arrangement saved the Plan money, she nonetheless paid inflated co-insurance amounts to downstream providers as a result of the Defendants' arrangement. Such co-insurance payments, however, were not *plan assets*. See In re UnitedHealth Group PBM Litig., No. 16-cv-3352 (JNE/BRT), 2017 WL 6512222, at *10 (D. Minn. Dec. 19, 2017) ("[B]ecause plans generally have no right to the recoupment of copayments and coinsurance paid to providers, such payments do not, absent an arrangement to the contrary, constitute *plan* assets . . . ."); see also Deluca v. Blue Cross Blue Shield of Mich., No. 06-12552, 2007 WL 1500331, at *3 (E.D. Mich. May 23, 2007) ("Increased contributions, co-payments, and deductibles paid by participants

and beneficiaries are not 'losses to the plan' . . . . [And they] also are not profits 'of [the plan] fiduciary' or profits 'made through use of assets of the plan.'") (citations omitted). As noted earlier, this argument by the Plaintiff also fails because her forecast of evidence shows that she did *not* actually pay such inflated co-insurance amounts.

Because the Aetna-Optum arrangement did not involve the use or transfer of "plan assets" to a "party in interest," the Plaintiff's claim under § 406(a)(1)(D) fails.

For all these reasons, the Court concludes that the Plaintiff's claim against Optum under ERISA § 502(a)(2) as stated in Count III must also be dismissed.

### B. Individual Claim

Section 502(a)(1) of ERISA permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The plan participant or beneficiary also may seek an injunction or "other appropriate equitable relief" to redress violations of ERISA or to enforce the terms of the plan. 29 U.S.C. § 1132(a)(3).

To the extent that the Plaintiff is bringing a direct claim for damages that she allegedly suffered as a result of the Aetna-Optum relationship, that claim fails for the reasons stated above. The undisputed forecast of evidence before the Court shows that the Plaintiff suffered no losses, and in fact benefited, from the Aetna-Optum relationship. Further, the Plaintiff cannot show that Aetna's administration or disposition of any of her claims was erroneous or that she suffered any individual injury as a result of the administration or disposition of her claims. Accordingly, the Court concludes that the Defendants are entitled to summary judgment with respect to the individual claim asserted by the Plaintiff in Count IV.

## IV. CONCLUSION

In summary, the Plaintiff has failed to present a forecast of evidence that either the Mars Plan generally or she individually suffered any injury as a result of the Aetna-Optum contractual arrangement. Further, the Plaintiff has failed to establish that the Defendants violated any obligation, fiduciary or otherwise, to the Mars Plan or her. To the contrary, the undisputed forecast of evidence before the Court demonstrates that Aetna and Optum, through their contractual arrangement, expanded the health care services available to the Mars Plan participants, including the Plaintiff, in a manner that saved both the Plan and the Plaintiff money. Accordingly, the

Defendants' motions for summary judgment are granted, and this case is hereby dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that OptumHealth Care Solutions, Inc.'s Motion for Summary Judgment [Doc. 188] and Aetna's Motion for Summary Judgment [Doc. 225] are **GRANTED**, and Counts III and IV of the Plaintiff's Complaint are hereby **DISMISSED WITH PREJUDICE**.

A Judgment shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: September 16, 2019

Martin Reidinger
United States District Judge